**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DIGITAL MEDIA SOLUTIONS, INC., *et al.*,[1] | ) | Case No. 24-90468 (ARP) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

**DECLARATION OF JOE MARINUCCI, CO-FOUNDER AND CHIEF EXECUTIVE OFFICER OF DIGITAL MEDIA SOLUTIONS, INC. AND CERTAIN OF ITS AFFILIATES, IN SUPPORT OF CHAPTER 11 FILING AND FIRST DAY MOTIONS**

I, Joe Marinucci, Co-Founder and Chief Executive Officer of Digital Media Solutions, Inc. ("DMS Inc.," and together with the above-captioned debtors and debtors in possession, the "Debtors" and with their non-debtor subsidiaries, "DMS" or the "Company"), hereby declare under penalty of perjury:

## Preliminary Statement[2]

1. The Debtors commence these cases with the support of their Prepetition Lenders following an almost five-month marketing and sale process. The Company's sale process included outreach to approximately 118 potentially interested parties, resulting in 38 executed nondisclosure agreements, eight indications of interest ("IOIs"), and four binding letters of intent ("LOIs"). The Company, with the assistance of its advisors, undertook a comprehensive review of each letter of intent and engaged in additional discussions and diligence with each interested

[1] A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/DMS. The location of Debtor Digital Media Solutions, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 4800 140th Avenue North, Suite 101, Clearwater, Florida 33762.

[2] Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed to them in this Declaration.

party. Ultimately, the Company, in consultation with its advisors, selected a third-party strategic buyer as the highest or otherwise best bidder and engaged in weeks of negotiations therewith regarding a stalking horse purchase agreement. Unfortunately, the buyer informed the Company on the eve of bankruptcy that it was no longer willing to serve as the stalking horse bidder. As a result, the Company quickly pivoted and negotiated a $95 million stalking horse credit bid with an acquisition entity formed by the DIP Lenders (as defined in the DIP Credit Agreement) (the "Stalking Horse Bidder"). Simultaneously, the Company negotiated a $122 million DIP Facility, consisting of $30 million in new money, to provide the Company with sufficient liquidity to commence these cases and consummate the stalking horse bid, subject to higher or otherwise better bids at an auction.

2. Founded in 2012, DMS is a leading technology-enabled digital advertising company that leverages its advanced technology and proprietary customer data to efficiently and effectively connect its customers ("Customers") with their target consumers ("Consumers").[3] DMS's first-party data asset, proprietary technology and products, expansive digital media reach, and data-driven processes help digital advertising clients within the insurance, education, and consumer sectors, among others, de-risk their advertising spend while scaling their customer bases. From its inception, DMS has grown rapidly by investing in organic growth and acquiring complimentary businesses and their intellectual property. As of the Petition Date, the Debtors operate in at least 15 countries and territories around the world and employ approximately 247 individuals in the United States and Canada.[4]

3 "Customers," as it is used herein, shall refer to DMS's clients. "Consumers," as it is used herein, shall refer to the third-party individuals or businesses that DMS targets and attracts on behalf of its Customers.

4 Non-Debtor operations extend to over 60 countries and territories and employ eight individuals, in addition to hundreds of contract employees, abroad.

3. From its inception, the Company's investment in organic growth, coupled with its successful acquisition strategy, resulted in a stable, diversified business. From 2022 onward, however, the Company was challenged by an unanticipated macroeconomic headwinds and an associated significant reduction in Customer advertising spend—the lifeblood of the Company's business—stemming from rising inflation and post-pandemic changes in Consumer behavior. As discussed in further detail in Part I.B., a significant portion of the Company's revenue is drawn from its Customers in the P&C Insurance sector. Auto insurance carriers experienced record years during the COVID-19 pandemic because of lower loss ratios due to Consumers driving less and getting into fewer accidents. As a result, these insurers had significant resources to dedicate to additional advertising spend. When Consumers resumed pre-pandemic behavior, however, the increased incidence of auto accidents, coupled with extraordinary inflation, caused the insurance carriers' loss ratios to significantly increase as well. As a result, auto insurance carriers incurred substantial losses, prompting them to significantly reduce their advertising spend. This trend contributed to a 15.3% decrease in the Company's net revenue for the fourth quarter of 2022, as compared to the fourth quarter of 2021; a 17.2% decrease in the Company's net revenue for the first quarter of 2023, as compared to the first quarter of 2022; and a 9.5% decrease in the Company's net revenue for the second quarter of 2023, as compared to the second quarter of 2022. This significant decrease in net revenue resulted in the Company defaulting on the net leverage ratio under the Company's Credit Agreement as of December 31, 2022.

4. In early 2023, the Company explored alternatives to raise incremental capital to cure the covenant default and ultimately engaged in discussions with certain existing stockholders, as well as third-parties, regarding a potential preferred equity issuance. On March 29, 2023, the Company entered into the Securities Purchase Agreement, pursuant to which it issued (a) 80,000

shares of Series A Preferred Stock, par value $0.0001 per share, and (b) 60,000 shares of Series B Preferred Stock, par value $0.0001 per share, for an aggregate purchase price of $14 million, an amount sufficient to cure the net leverage covenant default. The Securities Purchase Agreement contains two key provisions: (a) a put right that the respective holders could exercise to obligate the Company to redeem all of such holders' shares of Preferred Stock for cash, shares of Class A Common Stock, or a combination of both cash and shares of Class A Common Stock, on or after June 15, 2023 (the "Immediate Redemption Right"); and (b) a monthly redemption right for 1/10 (one-tenth) of the outstanding preferred stock to be paid in cash, unless certain conditions were met, on June 30, 2023 and each month thereafter (the "Monthly Redemption Right").

5. Contemporaneously, the Company continued to execute on its acquisition strategy to diversify its business, expand its footprint, and monetize non-core assets. For example, the Company purchased HomeQuote.io, a home services marketplace website that allows Consumers to compare competitive price quotes on various home services products, and the media and technology assets of ClickDealer, an Amsterdam-based international ad network, in March 2023, for approximately $35.3 million.[5] While the acquisition of HomeQuote.io and the ClickDealer assets expanded the Company's operations into the home services industry and the European market, the acquisition ultimately underperformed expectations due to operational integration challenges.

6. Also, in early 2023, the Company was engaged in a marketing process for its Education Software Business and was in advanced discussions with one potential buyer. The Company anticipated using the proceeds of such sale transaction to, among other things, fund the

[5] The approximately $35.3 million purchase price for HomeQuote.io and the ClickDealer assets included $31.8 million in cash consideration, with an additional $3.5 million in holdbacks, subject to certain criteria. To date, $1.5 million in holdbacks has been released, while $2.0 remains outstanding.

Immediate Redemption Right. In May 2023, however, the potential buyer of the Company's Education Software Business informed the Company that it was no longer interested in pursuing an acquisition. On June 15, 2023, the Company received a notice from the holders of all the Company's outstanding Series A Preferred Stock that each holder had elected to have the Company redeem such stock for cash in connection with the Immediate Redemption Right. Absent the anticipated proceeds from the education transaction, the Company lacked the liquidity to fund the Immediate Redemption Right and notified the holders of the Series A Preferred Stock of the same.

7. As the second quarter of 2023 progressed, the Company also recognized it would be unable to satisfy the total net leverage ratio covenant under the Credit Agreement by June 30, 2023, absent relief. As a result, the Company engaged with its Prepetition Lenders regarding a potential amendment to the Credit Agreement, which was ultimately executed on August 16, 2023 (the "2023 Amendment"). The 2023 Amendment, discussed in more detail in Parts II.C.2. and IV.B-C., provided for, among other things, the election to make the quarterly interest payments due and payable on September 30, 2023, and each of the following three quarters (*i.e.*, through the second quarter of 2024) (the "PIK Election Period") via payment-in-kind ("PIK"), with all interest required to be repaid no later than December 31, 2025, and eliminated the total net leverage ratio covenant for the remainder of 2023. In consideration for this relief, the Company was required to, among other things: (a) implement a cost-savings plan and satisfy certain cost-savings milestones, including an aggregate minimum of $22.1 million of cost savings, by year-end 2023 (the "Cost-Savings Program"); (b) appoint two disinterested directors to the boards of DMS LLC and DMSH LLC; and (c) comply with certain additional covenants, including a minimum liquidity covenant.

8. In compliance with the 2023 Amendment, the Company appointed Neil Nguyen and Elizabeth LaPuma to the boards of DMS Inc.,[6] DMS LLC, and DMSH LLC (together, the "Boards") as disinterested directors on September 1 and September 18, 2023, respectively. Ms. LaPuma was also appointed to the boards of DMS UE Acquisition Holdings Inc., CEP V DMS US Blocker Company, and Traverse Data Inc. on November 7, 2023. Subsequently, on November 7, 2023, the Boards, as well as the boards of DMS UE Acquisition Holdings Inc., CEP V DMS US Blocker Company, and Traverse Data Inc., each formed a strategic committee (together the "Strategy Committee") comprised of Ms. LaPuma and Scott Flanders, another disinterested director, the purpose of which was to assist each of these boards in their oversight of the Cost-Savings Program, liquidity matters, potential strategic transactions, and any potential conflicts of interest.[7]

9. While the Company exceeded the requirements of the Cost-Savings Program—saving approximately $23 million in 2023—the Company's efforts were ultimately insufficient to overcome its liquidity challenges. Accordingly, in early 2024, the Company again engaged with its Prepetition Lenders to address its liquidity needs and discuss additional covenant relief. These discussions culminated with the Company's entry into another amendment of the Credit Agreement on April 17, 2024 (the "2024 Amendment"). The 2024 Amendment, discussed in more detail in Parts II.C.1. and IV.E., provided for, among other things, $22 million of incremental liquidity, extension of the PIK Election Period from March 31, 2024, up to and including the

[6] The 2023 Amendment did not require disinterested directors to be appointed at DMS Inc., but, simultaneously with the appointment of the directors to the Boards of DMS LLC and DMSH LLC, the two disinterested directors were also appointed to the board of DMS Inc., consistent with the terms of the DMSH LLC limited liability company agreement.

[7] Mr. Flanders was appointed to the boards of DMS Inc. and DMSH LLC on June 22, 2023. On November 7, 2023, Mr. Flanders was also appointed to the boards of DMS LLC, DMS UE Acquisition Holdings Inc., CEP V DMS US Blocker Company, and Traverse Data Inc.

quarter ending on March 31, 2025, and a waiver of the net leverage coverage ratio through June 30, 2025. In consideration for these modifications, the Company was required to, among other things, commence a strategic review and marketing process for a sale of all or substantially all of its assets.

10. On April 23, 2024, the Company and its proposed investment banker, Houlihan Lokey Capital, Inc. ("Houlihan"), commenced a marketing process with the distribution of a teaser and other promotional materials to potentially interested parties. The marketing process included outreach to 118 parties and spanned almost five months. During this process, the Company received significant interest for its assets and engaged in significant diligence with interested parties. Most notably, the Company and its advisors were engaged in extensive negotiations with a third-party strategic buyer in the weeks leading up to the Petition Date regarding the terms of a stalking horse agreement. Unfortunately, the potential buyer withdrew its offer shortly before the Petition Date, resulting in the Debtors pivoting to negotiating a credit bid with its DIP Lenders. The Stalking Horse Agreement contemplates a sale of substantially all of the Debtors' assets for aggregate consideration of: (i) a credit bid of $95 million; (ii) the assumption of Assumed Liabilities; (iii) the payment of Cure Costs; and (iv) an amount in cash equal to the amount set forth in the Wind Down Budget (each as defined in the Stalking Horse Agreement), subject to higher or otherwise better bids.

11. Additionally, the Debtors and the DIP Lenders executed that certain Senior Secured Superpriority Priming Debtor-In-Possession Credit Agreement (the "DIP Credit Agreement") on September 11, 2024 to secure incremental liquidity to fund these chapter 11 cases, subject to Court approval. The DIP Credit Agreement contemplates a $30 million new money commitment and a

roll-up of certain Prepetition Obligations,[8] the proceeds of which will provide the Debtors sufficient liquidity to stabilize their operations and fund the administration of these chapter 11 cases, and the consensual use of cash collateral.

12. The DIP Credit Agreement and the Bidding Procedures filed on the Petition Date include milestones for an approximately 50-day sale process that will provide the Debtors sufficient time to leverage the interest garnered during the prepetition sale process to maximize value while allowing the Debtors to move efficiently through these chapter 11 cases. Key sale process milestones include:

- this Court entering (i) the Final DIP Order and (ii) an order to approve the Bidding Procedures, no later than 30 calendar days after the Petition Date;
- commencing an Auction, if any, pursuant to the Bidding Procedures no later than 45 calendar days after the Petition Date; and
- this Court, subject to availability, holding a hearing to approve the Sale Transaction(s) no later than 50 calendar days after the Petition Date.

13. The Company anticipates using proceeds from the DIP Facility and cash on hand to operate in the ordinary course of business during these chapter 11 cases, which will assist the Debtors in maximizing value through the sale process.

## Background and Qualifications

14. I am the Co-Founder and Chief Executive Officer ("CEO") of DMS Inc. and certain of its Debtor affiliates and have served in this role since the Company's founding in 2012. Prior to co-founding DMS Inc., I served as the President and Co-Founder of Interactive Marketing

[8] The DIP Credit Agreement contemplates, subject to Court approval, up to $21.7 million in Tranche A Roll-Up Loans and up to $70.2 million in Tranche B Roll-Up Loans.

Solutions, a direct response marketing firm that offered a broad array of marketing solutions. I also previously served as a board member of LeadsCouncil where I advised member companies in the digital advertising space to promote best practices across all industries. I hold a Bachelor of Science in accounting from Binghamton University.

15. As CEO, I am responsible for the overall vision and strategy of DMS. I am also responsible for long range planning and execution, including budgeting and forecasting, as well as day-to-day operations of the Company as they pertain to strategy and execution. Therefore, I am generally familiar with the day-to-day operations, business and financial affairs, and books and records of DMS Inc. and its direct and indirect Debtor subsidiaries. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team and advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, and/or my opinions based upon my experience and knowledge.

16. On September 11, 2024 (the "Petition Date"), the Debtors commenced filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Southern District of Texas (the "Court"). To minimize the adverse effects on their business, the Debtors have filed motions and pleadings seeking various types of "first day" relief (collectively, the "First Day Motions"). I submit this Declaration to assist the Court and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and First Day Motions filed contemporaneously herewith.

17. To familiarize the Court with the Company, its business, the circumstances leading up to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this Declaration in five sections:

- **Part I** provides background information on the Company's business operations;
- **Part II** offers an overview of the Company's prepetition corporate and capital structure;
- **Part III** describes the circumstances leading to the filing of these chapter 11 cases;
- **Part IV** provides an overview of the Company's prepetition initiatives to address its mounting liquidity constraints, including an extensive marketing and sale process and proposed DIP Facility; and
- **Part V** summarizes the relief requested in the First Day Motions.

## I. DMS's History and Operations.

### A. Business Overview.

18. Founded in 2012 by Fernando Borghese, Matthew Goodman, Luis Ruelas, and myself, DMS is a leading provider of tailored, technology-enabled digital advertising solutions designed to help its Customers attract meaningful interactions from their target Consumers. DMS uses a combination of proprietary consumer behavior data, advanced technology and software tools, and an expansive digital media reach to successfully create attractive and highly targeted advertising solutions that reach millions of Consumers each month. Through this wide-reaching advertising platform, DMS is able to deliver the right message to the right person at the right time, attracting hundreds of thousands of consumer interactions each month, and ultimately driving Consumers to a Customer offering the goods and services that they seek.

19. In 2023, DMS provided services to approximately 1,800 Customers across a variety of industries, including several of the largest insurance firms in the United States, as well as other blue-chip companies, universities, and non-profit organizations.




### B. Advertising Solutions.

20. DMS offers a wide range of digital advertising solutions and products to its Customers that are designed to (a) assist its Customers in acquiring new Consumers and (b) track and monitor the success of Customers' advertising campaigns. These products fall into one of three categories, as more fully described below.

#### 1. Brand Direct Solutions.

21. Brand direct solutions involve placing Customer-branded content on third-party platforms and generating Consumer inquiries through ad-clicks or direct messaging, including email, and push and text notifications. DMS utilizes its data and proprietary technology to determine on which third-party websites and media channels—such as search engines, email, and social media—to place Consumer-branded content, based on connections between the Consumers visiting those platforms and the goods and services offered by those Customers. As this third-party advertising space is limited, and DMS vies with its competitors to strategically place its Customers' advertising content, the success of DMS's brand direct solutions rely on DMS's relationships with the third-party publishers. DMS's success in brand direct advertising allows the Company to reach up to approximately 70% of the adult population of the United States. The Company earns revenue for each Consumer inquiry generated by its brand direct solutions.

**2. Marketplace Solutions.**

22. In contrast to brand direct solutions, marketplace solutions place Customer advertisements on a Company owned-and-operated ("O&Os") industry-specific marketplace platform that Consumers use to price shop products and services, such as auto-insurance. Through an O&O, like those pictured below, DMS can connect a Consumer who has already searched for a particular product or service online to a specific Customer that can meet such Consumer's needs.



Protect.com



Health Market Advisor



Course Advisor



Classes and Careers

23. For example, Protect.com is an O&O that uses information gathered from Consumers to generate quotes from auto insurer-Customers that have contracted with DMS to have their brand and website linked on DMS's insurance O&O. Protect.com may pop up as a search result for a Consumer searching for auto insurance quotes online. Once a Consumer enters Protect.com, she is prompted to respond to requests for information such as zip code, whether she is currently insured, vehicle details, and policy and driver details. DMS's technology then uses the information provided by the Consumer to generate a series of insurance quotes from the Company's insurer-Customers. The Consumer can then click on the quote that interests her the most and be directed to the insurance carriers' website, where she can purchase the desired product,

often at competitive, discounted price. Through Protect.com and other similar websites, DMS is able to improve marketing outcomes by using industry specific platforms to connect Customers with high-intent Consumers.

24. Similar to brand direct solutions, DMS earns a fee for each Consumer inquiry it generates for its Customers.

**3. Technology Solutions.**

25. The Company also provides technology solutions to Customers by entering into software services ("SaaS") contracts. Under the SaaS contracts, a Customer is granted access to DMS's proprietary software that tracks certain indicators of advertising performance, including Consumer interaction with the Customer's advertisements and the Customer's overall advertising spend. This allows Customers to, among other things, manage their digital advertising campaigns based on real time key performance indicators and other advertising data. DMS earns a licensing fee from entering into SaaS contracts with its Customers.

26. Finally, DMS offers managed services, through which it uses proprietary software to manage Customers' advertising spend and performance on their behalf, in exchange for a fee equal to a percentage of the Customer's total media spend.

**C. Core Industries.**

27. The Company's business is primarily comprised of three business lines, or "verticals," based on the industries in which its Customers operate: (a) insurance; (b) education; and (c) consumer. DMS offers its Customers within each vertical one or more of the above-described advertising solutions to provide Customers with access to tailored services, technologies, and relationships.

28. Additionally, certain of the Company's products and services, while primarily dedicated to providing services to Customers in a certain industry or vertical, offer solutions to

Customers across multiple industries. For example, Performance Ad Network ("PAN"), described below, is organized under the consumer vertical, but is used by a variety of Customers, including those in the insurance and education industry.

29. **Insurance** – The insurance vertical is comprised of businesses designed to connect insurance Customers in the health, home, or auto insurance industries with Consumers wanting to price-shop and purchase those types of insurance policies.[9] This vertical offers several insurance-tailored O&Os, including Protect.com and Quotza.net for auto-insurance and Medicare Deluxe and Health Market Advisor for health insurance. The Company also offers platforms such as ZipQuote, which allow insurance Customers' agents to, among other things, define their target Consumer audience and measure ad performance in real time, so that they can connect directly with Consumers in their local markets. The Company also maintains Protect Health Insurance Agency an approved agency to sell health insurance policies, described in further detail in Part III.B.ii.b.

30. In 2023, approximately 29% of the Company's revenue was generated from the insurance vertical.

31. **Education** – Businesses in the education vertical focus on connecting Customers in the education sector with Consumers interested in enrolling in a higher education course of study or individual classes.[10] DMS's education vertical primarily leverages O&Os and other marketplace solutions, including Sparkroom, a cloud-based marketing management marketplace

---

[9] The Debtor entities that conduct business in the insurance vertical include: Protect.com LLC; Edge Marketing, LLC; DMS UE Acquisition Holdings Inc.; and UE Authority, Co.

[10] The Debtor entities that conduct business in the education vertical include: DMS Education LLC; SchoolAdvisor, LLC; Sparkroom Holdings, LLC; and Sparkroom, LLC.

solutions product primarily designed for use by the Company's long-tenured Customers in the higher education industry.

32. In 2023, approximately 11% of the Company's revenue was generated from the education vertical.

33. **Consumer** – The Company's consumer vertical utilizes brand direct solutions to connect a particular Customer's brand direct advertisement with a Consumer who has an interest in that Customer's offer, product, or service.[11] The Consumer vertical serves Customers that offer products and services across a variety of sectors, including e-commerce, consumer finance, food, retail, home service, and insurance—among others. The domestic centerpiece of the consumer vertical is PAN, a brand direct business through which the Company purchases ad space on third-party websites and then uses that ad-space to place Customer ads where high-intent Consumers are likely to interact with them. The services provided by PAN are also used in the insurance and education verticals.

34. In 2023, approximately 60% of the Company's revenue was generated from the consumer vertical.

## D. Acquisitions.

35. Many of the Company's proprietary products, technology offerings, and industry-niche relationships were acquired through targeted acquisitions of businesses and their intellectual property that provided similar or complementary business lines to the Company's existing business. Since 2015, DMS has made 17 acquisitions, a timeline of which is depicted below.

---

[11] The Debtor entities that conduct business in the consumer vertical include: Aimtell LLC; Aimtell Holdco, Inc.; DealTaker, LLC; DMS Engage, LLC; Forte Media Solutions, LLC; Health Market Advisor Group, LLC; Performance Marketers Group, LLC; Pure Flow Marketing, LLC; PushPros LLC; She Is Media, LLC; SmarterChaos.com, LLC; Traverse Data, Inc.; and W4 Holding Company, LLC.




36. The Company's management team evaluates prospective business opportunities and works to integrate prior acquisitions into the Company's operations, with a typical target of full integration within approximately 12 months. These acquisitions have enabled DMS to strengthen industry relationships and capabilities within its core verticals, as well as expand its footprint globally.

37. Certain of the Company's key acquisitions include its acquisition of Aimtell, Inc. ("Aimtell"), PushPros, Inc. ("PushPros"), and Aramis Interactive, LLC ("Aramis") in 2021. Aimtell and PushPros are cloud-based marketing platforms that allow Customers across the consumer, home, auto, health, and life insurance industries to send push notifications to desktop and mobile-devices based on Consumer internet use and activity. Aramis is a network of O&Os that leverages the Aimtell and PushPros technology. In the same year, DMS also acquired the assets of Crisp Marketing, LLC, d/b/a Crisp Results, which further augmented the Company's robust insurance marketing offerings. As previously discussed, DMS acquired HomeQuote.io and the supporting media and technology assets of ClickDealer from Customer Direct Group in March

2023, with the intention of offering the Company's brand direct solutions to foreign Customers and attracting foreign Consumers.

## II. Business Combination, Organizational Structure, and Prepetition Capital Structure.

### A. Business Combination.

38. On July 15, 2020, Leo Holdings Corporation ("Leo"), a special purpose acquisition company (the "SPAC"), consummated a reverse capitalization with Digital Media Solutions, LLC ("DMS LLC") (the "Business Combination"). As part of the Business Combination, Leo acquired a portion of the equity of Digital Media Solutions Holdings, LLC ("DMSH LLC") and Leo was renamed DMS Inc.

### B. Organizational Structure.

39. The Company's organizational structure consists of 40 corporate entities, 37 of which are domestically domiciled and are Debtors in these chapter 11 cases, and 3 of which are non-U.S. entities—incorporated in the United Kingdom, Ukraine, and the Netherlands—and are not Debtors in these chapter 11 cases. An organizational chart illustrating DMS's corporate structure is attached hereto as **Exhibit A**.

### C. Prepetition Capital Structure.

40. As of the Petition Date, DMS's capital structure consists of outstanding secured funded-debt obligations in the aggregate principal amount of approximately $346.1 million, as summarized below:

| Credit Agreement Issuance | Maturity Date | Principal Amount Outstanding[12] | Amount Outstanding with Accrued Interest[13] |
|---|---|---|---|
| Initial Term Loan | May 25, 2026 | $207.5 million | $214.7 million |
| Tranche B Term Loan | May 25, 2026 | $68.0 million | $70.4 million |
| Tranche A Bridge Term Loan | February 25, 2026 | $24.1 million | $24.8 million |
| Revolving Facility | May 25, 2026 | $46.5 million | $48.1 million |
| ***Total Funded Debt*** | -- | **$346.1 million** | **$358.0 million** |

### 1. The Senior Secured Credit Agreement.

41. The Debtors are party to that certain Credit Agreement, dated as of May 25, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified in accordance with the terms thereof, the "Credit Agreement") by and between DMS LLC as borrower, DMSH LLC as holdings, 33 of the Company's subsidiaries as guarantors (the "Guarantor Subsidiaries" and together with DMS LLC and DMSH LLC the "Loan Parties"), Truist Securities, Inc. and Fifth Third Bank, National Association as joint lead arrangers, Ankura Trust Company, LLC, as successor to Truist Bank, as administrative agent and collateral agent for the lenders party thereto (the "Prepetition Agent"), and those lenders from time to time party thereto (the "Prepetition Lenders"). The Credit Agreement initially provided the Loan Parties with a senior secured term loan in an initial commitment amount of $225 million (the "Initial Term Loan") and a senior secured revolving credit facility in an initial aggregate commitment amount of $50 million (the "Revolving Facility"). Pursuant to the 2024 Amendment, as further explained herein, the Credit Agreement was amended to provide a commitment of $22 million (the "Tranche A Bridge Term Loan") and restructure certain of the Initial Term Loan and the Revolving Facility

12 Balances as of September 11, 2024.

13 Balances as of September 11, 2024.

into a Tranche B Term Loan (as defined herein). The Debtors' obligations under the Credit Agreement are secured by substantially all of the assets of the Loan Parties. The Initial Term Loan, the Tranche B Term Loan, and the Revolving Facility mature on May 25, 2026. The Tranche A Bridge Term Loan matures on February 25, 2026.

42. On August 16, 2023, the Loan Parties and the Prepetition Lenders, entered into the 2023 Amendment, discussed in further detail in Part IV.B., which, among other things, allowed the Company to PIK interest throughout the PIK Election Period, with all PIK interest to be paid in cash no later than December 31, 2025. Pursuant to the terms of the 2023 Amendment, the interest rate was calculated as follows, (i) prior to June 30, 2024, at the option of DMS LLC, either (A) in cash at a rate equal to (1) SOFR plus 8.0% or (2) the Base Rate plus 7.0% or (B) as PIK interest at a rate equal to 11.0% and (ii) after June 30, 2024, at a rate equal to (A) SOFR plus 8.0% or (B) the Base Rate plus 7.0%; with respect to this clause (ii), such rates were subject to a decrease to 6.0% and 5.0% respectively if DMS LLC achieved a certain credit rating and repaid all PIK interest previously accrued.

43. For the year ending on December 31, 2023, the Company elected to PIK $19.1 million and $4.3 million of interest on the Initial Term Loan and the Revolving Facility, respectively. As such, as of December 31, 2023, the effective interest rate increased to 13.4% for the Initial Term Loan and 13.1% for the Revolving Facility.

44. On April 17, 2024, the Loan Parties and the Prepetition Lenders entered into the 2024 Amendment, discussed in further detail in Part IV.E. Under the 2024 Amendment, the Lenders agreed to, among other things, provide commitments with respect to the Tranche A Bridge Term Loan in an aggregate amount of $22 million, with a maturity date of February 25, 2026. Pursuant to the terms of the 2024 Amendment, $53.3 million of the Initial Term Loan and $12.7

million of commitments under the Revolving Facility were exchanged for a new Tranche B Term Loan in the aggregate amount of $66 million (the "Tranche B Term Loan"). The Initial Term Loan, the Tranche A Bridge Term Loan, and the Tranche B Term Loan, collectively constitute the "Term Loans" and the Term Loans, together with the loans under the Revolving Facility, constitute the "Loans"). The 2024 Amendment provides the Company with the election to PIK interest on the Tranche A Bridge Term Loan for the interest period ending prior to March 31, 2025 and extends the PIK Election Period for all other Loans to the interest period ending on March 31, 2025.

45. Pursuant to the terms of the 2024 Amendment, with respect to the Initial Term Loan, the Tranche B Term Loan, and the Revolving Facility, the interest rate is calculated as follows, (i) prior to March 31, 2025, at the option of DMS LLC, either (A) in cash at a rate equal to (1) SOFR plus 8.0% or (2) the Base Rate plus 7.0% or (B) in PIK at a rate equal to 11.0% and (ii) after March 31, 2025, at a rate equal to (A) SOFR plus 8.0% or (B) the Base Rate plus 7.0%; with respect to this clause (ii), such rates shall decrease to 6.0% and 5.0% respectively if DMS LLC has achieved a certain credit rating and repaid all PIK interest previously accrued.

46. Pursuant to the terms of the 2024 Amendment, with respect to the Tranche A Bridge Term Loan, the interest rate is calculated as follows, (i) prior to March 31, 2025, at the option of DMS LLC, either (A) (1) SOFR plus 1.0% in cash and 7.0% PIK or (2) the Base Rate plus 2.0% in cash and 7.0% in PIK, or (B) (1) SOFR plus 8.0% in cash or (2) the Base Rate plus 9.0%, and (ii) after March 31, 2025 (A) SOFR plus 8.0% or (B) the Base Rate plus 9.0%.

**2. Equity Interests in DMS.**

**a. Preferred Stock.**

47. As of the Petition Date, DMS Inc. has two series of preferred stock authorized: (i) Series A convertible redeemable preferred stock (the "Series A Preferred Stock"), par value

$0.0001 per share; and (ii) Series B convertible redeemable preferred stock (the "Series B Preferred Stock" together with the Series A Preferred Stock, the "Preferred Stock"), par value $0.0001 per share. Pursuant to a securities purchase agreement executed on March 29, 2023 (the "Securities Purchase Agreement"), the Company issued (i) 80,000 shares of Series A Preferred Stock and (ii) 60,000 shares of Series B Preferred Stock, for an aggregate purchase price of $14 million (the "Preferred Stock Issuance"). The Securities Purchase Agreement governing the Series A Preferred Stock and Series B Preferred Stock contains two key provisions designed to grant investors in the Preferred Stock access to cash shortly after the issuance: (i) the Immediate Redemption Right, as further discussed in Part IV.A.; and (ii) the Monthly Redemption Right.

48. As of the Petition Date, 80,000 shares of Series A Preferred Stock and 60,000 shares of Series B Preferred Stock are outstanding. Both the Series A Preferred Stock and Series B Preferred Stock contain certain rights and preferences, including, among others, with respect to dividends and redemptions, and are convertible into Class A Common Stock.

**b. Common Stock.**

49. As of the Petition Date, DMS Inc. has two series of common stock authorized: (i) the Class A common stock, par value $0.0001 per share (the "Class A Common Stock"); and (ii) the Class B common stock, par value $0.0001 per share (the "Class B Common Stock" and together with the Class A Common Stock, the "Common Stock"). Approximately 4.4 million shares of Class A Common Stock and no shares of Class B Common Stock are outstanding as of the Petition Date. The Class A Common Stock formerly traded on the New York Stock Exchange (the "NYSE"), however, on September 25, 2023, the NYSE announced that the Class A Common Stock would be delisted and that trading in the Class A Common Stock was immediately suspended. On October 10, 2023, the NYSE filed a Form 25 with the Securities and Exchange Commission (the "SEC") to delist DMS Inc.'s Class A Common Stock. The delisting of the

Class A Common Stock from the NYSE and its deregistration under Section 12(b) ("Section 12(b)") of the Securities Exchange Act of 1934 (the "Exchange Act") became effective on January 8, 2024. Since September 26, 2023, DMS Inc.'s Class A Common Stock has traded on an over-the-counter broker-dealer market administered by OTC Markets Inc. and the Financial Industry Regulatory Authority ("FINRA") under the symbol "DMSL." On August 13, 2024, DMS Inc. filed a Form 15 with the SEC to terminate its obligations to file reports under Section 15(d) of the Exchange Act and immediately suspend its SEC reporting obligations.

**c. Warrants.**

50. As of the Petition Date, DMS Inc. has four series of warrants to purchase Class A Common Stock authorized: (i) the Preferred Warrants[14], consisting of (x) warrants to purchase 550,268 Class A Common Stock (the "Series A Warrants"), and (y) warrants to purchase 412,701 shares of Class A Common Stock (the "Series B Warrants"); (ii) the private placement warrants of DMS Inc. issued (x) as a matter of law upon the conversion of Leo private placement warrants, and (y) to certain entities as part of the Business Combination consideration (the "Private Placement Warrants"); and (iii) the warrants of DMS Inc. issued as a matter of law upon the conversion of the public warrants that were offered and sold by Leo as part of units in its initial public offering (the "Public Warrants," together with the Series A Warrants, the Series B Warrants and the Private Placement Warrants, the "Warrants"). There are 28,443,522 Warrants outstanding as of the Petition Date with an option to purchase 1,896,235 shares of DMS Inc.'s Class A Common Stock. The Public Warrants formerly traded on the NYSE, however, on June 14, 2023, the NYSE announced that the Public Warrants would be delisted and that trading in the Public

[14] The Company issued the Preferred Warrants to acquire 963,000 shares of Class A Common Stock pursuant to the Securities Purchase Agreement.

Warrants was immediately suspended. On June 29, 2023, the NYSE filed a Form 25 with the SEC to delist DMS Inc.'s Public Warrants. The delisting of the Public Warrants from the NYSE and their deregistration under Section 12(b) of the Exchange Act became effective on September 27, 2023. Since June 15, 2023, DMS Inc.'s Public Warrants have traded on an over-the-counter broker-dealer market administered by OTC Markets Inc. and FINRA under the symbol "DMSIW." On August 13, 2024, DMS Inc. filed a Form 15 with the SEC to terminate its obligations to file reports under Section 15(d) of the Exchange Act and immediately suspend its SEC reporting obligations.

**d. Equity Incentive Interests.**

51. Historically, DMS Inc. issued certain securities to eligible employees upon exercise of outstanding options, restricted share units ("RSUs"), or other share-based awards (the "Legacy Equity Incentive Interests") under the 2020 Omnibus Incentive Plan (the "Legacy Equity Incentive Program"). Approximately 127,000 securities are issuable upon exercise of outstanding options, warrants and rights awarded under the Company's 2020 Omnibus Incentive Plan. In connection with the deregistration of the Common Stock and Preferred Stock, the Debtors notified eligible employees that, as of August 14, 2024, the settlement of any RSUs scheduled to vest after August 14, 2024 would be delayed until further notice.

## III. Events Leading to These Chapter 11 Cases.

### A. Post-Pandemic Industry Headwinds.

52. DMS saw dramatic revenue increase during the period marked by the COVID-19 pandemic, with year-over-year revenue growth of nearly 40% between 2019 and 2020, and approximately 29% between 2020 and 2021. This success was a consequence of a number of factors, including lower than average insurance payouts across the property and casualty insurance ("P&C Insurance") sector, which resulted in increased advertising spend by Customers in the P&C

Insurance industry, as well as the overall increase in Consumer internet usage in 2020 and 2021, likely as a result of stay-at-home orders and social distancing precautions. To capture these additional Consumers and gain an advantage over their competitors, many Customers significantly increased their advertising spend with DMS. As a result, DMS enjoyed a period of rapid growth. From 2022 onward, however, DMS was confronted with a reversal of its pandemic era revenue growth. As the pandemic subsided, its trailing economic effect—including higher interest rates, inflationary pressure, and general concern for economic recession—prompted Customers across industries to significantly curb their advertising spend. Additionally, changing Consumer behavior as pandemic era restrictions lifted resulted in changes in Customer expenses and, as a result, advertising spend.

53. For example, as noted above, the P&C Insurance industry saw lower than average insurance payouts during the COVID-19 pandemic when fewer drivers were on the road. In 2021 and 2022, as drivers gradually resumed pre-pandemic behavior, the incidence of auto accidents skyrocketed, resulting in a drastic increase in insurance payouts. In response, many insurance carriers reduced their advertising budgets, leading to softened demand for advertising services and, in turn, a material decrease in pricing for these services. The macro-economic and Consumer-driven changes to Customer spending resulted in DMS's revenue decreasing by approximately 9% between 2021 and 2022 and 14% between 2022 and 2023 as a result.

54. Despite this decline, the P&C Insurance sector appears to be recovering. In March 2024, P&C Insurance carrier spend hit an inflection point, and the Company's P&C Insurance revenue exceeded that of the prior year for the first time since the industry's decline. In June and July of 2024, P&C Insurance carrier spend was up by approximately $4.1 million and $4.4 million over the same period last year, respectively. Although the steady recovery of the P&C Insurance

sector is promising for the Company's future, it unfortunately has not happened quickly enough to offset losses stemming from the Company's other challenges, including the underperformance of certain acquisitions, as discussed in further detail below in Part III.B.i. Moreover, the business improvement is insufficient to support the Company's capital structure, which has continued to grow significantly during the PIK Election Period.

**B. Operational Challenges.**

**1. Acquisition Integration Challenges.**

55. As previously discussed, the Company continued to execute on its acquisition strategy throughout spring 2023, including through its acquisition of HomeQuote.io and the assets of ClickDealer. Unfortunately, the costs associated with this complex, multi-national acquisition contributed to an 83% year-over-year increase in acquisition costs associated with effectuating and integrating the acquired assets, which placed significant pressure on the Company's liquidity.

56. Further, despite DMS's commitment to growing its business through strategic acquisitions, the Company struggled to integrate a number of its other acquisitions into its global enterprise. As a result, DMS discontinued several businesses shortly after they were acquired, turning these investments into losses. For example, Aramis, which was acquired in February 2021 as part of a $25.3 million joint transaction for the sale of several business units was discontinued in 2022 as a result of declining performance and regulatory challenges. PushPros, also acquired in 2021, was discontinued in early spring 2024 due to the loss of several strategic clients stemming from a shift in market dynamics, which led to deteriorating financial performance, and as part of an effort to reallocate employees' time and resources to higher margin products. Other acquired business units have been either consolidated or wound down due to acute underperformance, regulatory changes that rendered a business unit obsolete, or because the Company was unable to adjust acquired software or technology to be useful to its larger business plan.

**2. Business Underperformance.**

57. In addition to its acquisition integration challenges, the Company has, in recent years, also found itself cash constrained due to the underperformance of certain internally developed, new businesses.

**a. Performance Ad Network.**

58. PAN, discussed in Part I.C., is a business through which the Company partners with third-party publishers, including social media websites and search engines, to generate media traffic and connect Consumers with advertising campaigns tendered by the Company's Customers. Since this advertising space is limited, and DMS vies with its competitors to strategically place its Customers' advertising content, the success of PAN relies, in large part, on DMS's ability to maintain good relationships with these third-party publishers. Beginning in October 2023, the Company's liquidity position deteriorated, requiring the Company to stretch payments, including to third-party publishers. While the Company eventually caught up on payments, many third-party publishers continued to be concerned with the Company's liquidity profile and reallocated their business to the Company's competitors. As a result, the financial performance of PAN, which represented 27% of the Company's annual revenue in 2023, was materially affected as the Company struggled to rebuild its relationships with its partner publishers.

**b. Protect Health.**

59. DMS LLC is licensed to sell health insurance policies on behalf of certain insurance distributers via Protect Health Insurance Agency, which launched in July 2023. The Company uses an O&O operated under the Protect Health brand name to identify and generate inquiries from Consumers interested in purchasing certain health insurance plans and connect them with

insurance carriers. The Company earns a commission, paid from the insurance carrier, for each policy sold on behalf of such carrier.

60. Protect Health was designed to leverage DMS's preexisting insurance consumer data set and proprietary technology to drive Consumer traffic toward health insurance purchases that the Company could profit from, allowing DMS to earn multiple streams of revenue from one transaction while streamlining the health insurance purchase process for millions of consumers in a $130 billion Medicare insurance market. DMS expected Protect Health to be a higher-margin business and anticipated that it would be a meaningful source of revenue because of integration efficiencies. Unfortunately, the business failed to generate the projected revenue.

61. To issue policies on behalf of an insurer, a representative of the issuing entity—in this case DMS LLC—must be listed as the "agent of record" for the applicable insurer. As agent of record, DMS LLC receives commissions (paid as a percentage of overall policy revenue) based on policies that become effective. While applicable accounting rules require that the Company recognize all revenue associated with a sold policy at the time the policy is issued, there is an administrative delay between the date that a policy is issued and the date that the policy becomes effective, resulting in a significant delay between when DMS LLC recognizes revenue and when it collects revenue. This delay creates two distinct issues: *first*, the Company is required to expend high upfront costs to issue the policies, which costs are not offset until the revenue is ultimately received, and *second*, the gap between issuance and effective date provides purchasers the opportunity to cancel policies for which DMS LLC has already recognized revenue prior to their effective date. When the Company launched Protect Health, it anticipated that 40% of issued policies would be cancelled annually, but, in the first nine months of its operation, the actual

percentage of policy cancellation was much higher (approximately 55%), resulting in significantly less revenue than initially projected.

62. In addition to the accounting challenges with Protect Health, in May 2024, the Company became aware that a number of Protect Health policies were sold by an agent of record that had not been correctly assigned to the Company. As a result, the Company recognized approximately $556,000 of revenue during that timeframe that it never ultimately received. The Company subsequently elected to pause further investment in Protect Health in light of its underperformance.

**c. DMS Voice.**

63. In May 2021, DMS licensed an automated voice operations technology from a third party, Yodel Technologies, LLC. This technology, which DMS branded as DMS Voice, was an automated voice operations technology that leveraged interactive automated voice response technology to make telemarketing calls.

64. Between 2021 and 2024, DMS Voice was the subject of a litigation brought under the federal Telephone Consumer Protection Act (the "TCPA") and/or its state law equivalents. The TCPA is a strict liability statute that places certain restrictions on marketers' ability to make telemarketing calls and use automatic telephone dialing systems and prerecorded voice messages in their marketing efforts and empowers private individuals to bring litigation against companies who breach the statute. These lawsuits alleged that the Company made automated marketing phone calls to consumers, with whom it did not have an established business relationship, without those consumers' express permission, in violation of the TCPA and/or various state law equivalents.

65. In addition to certain actions brought directly against DMS, some Customers have alleged that the Company is obligated to indemnify them for violations of the TCPA or other consumer protection laws that Consumers have brought against these Customers. As a result of these allegations and the related litigation, which remains ongoing, DMS decided to wind down DMS Voice in the first quarter of 2023, and the business was fully discontinued by July 2023.

**C. 2023 Sale Process.**

66. In August 2021, the Company undertook a strategic review and began to explore the potential sale of all or part of the business. In March 2023, an interested party emerged and expressed an interest in purchasing all or substantially all of the assets of Sparkroom, the Company's cloud-based marketing management software marketplace solutions product, as well as certain other education software and technology assets (collectively, the "Education Software Business").[15]

67. As discussions with the potential buyer progressed, the sale of the Education Business was identified as a potential source of liquidity to fund the Immediate Redemption Right, discussed further in Part IV.A. In May 2023, however, the potential buyer informed the Company that it was no longer interested in acquiring the Education Business. The alternative bids received for the Education Business were significantly lower than the withdrawn bid and the Company determined that it was not in its best interest to sell the Education Business at that time.

---

[15] The Education Software Business represents approximately one-third of the Debtors' education vertical, as described in this Declaration. At the time of the potential sale in 2023, however, the Company did not organize these assets under a distinct education vertical.

## IV. Prepetition Initiatives, Sale Process, and Proposed Debtor in Possession Financing.

### A. The Preferred Stock Issuance.

68. By December 31, 2022, as a result of the foregoing external factors, operational challenges, and unanticipated contraction in the P&C Insurance business, the Company was in default of the net leverage ratio covenant under the Credit Agreement, which required that the ratio of total debt borrowed to EBITDA for the last four consecutive fiscal quarters be under a certain threshold as of end-of-year 2022. The Company explored a variety of alternatives to raise capital to fund the equity cure, and ultimately elected to consummate the Preferred Stock Issuance.

69. The Preferred Stock Issuance involved the issuance of (i) 80,000 shares of Series A Preferred Stock to third-parties and (ii) 60,000 shares of Series B Preferred Stock to related parties in consideration for $14.0 million. Approximately $6.0 million of the Preferred Stock Issuance was funded by related parties, including my co-founders, Fernando Borghese, and Matthew Goodman, and me, as well as certain investors related to Leo, due to our continued belief in the Company. The Company intended to repay the capital raised in connection with the Preferred Stock Issuance from legally available funds in the short term, as evidenced by the Immediate Redemption Right and the Monthly Redemption Right, which provided the investors with mechanisms to receive near-term repayment.

70. Unfortunately, shortly after the Preferred Stock Issuance, in the midst of further significant contraction in the P&C Insurance sector, the potential buyer for the Education Business decided not to further pursue the sale. In June 2023, the holders of the Series A Preferred Stock notified the Company that they desired to exercise the Immediate Redemption Right. Subsequently, the Board of DMS Inc. determined that the Company, as a result of its liquidity position, was not legally permitted under applicable Delaware law to effectuate a redemption for cash of any Series A Preferred Stock or Series B Preferred Stock, whether through a full

redemption pursuant to the Immediate Redemption Right or partial redemptions pursuant to the Monthly Redemption Right. As a result, the Company did not redeem (and to date has not redeemed) any Series A Preferred Stock or Series B Preferred Stock.

**B. The 2023 Amendment and Appointment of Disinterested Directors.**

71. After the sale of the Education Business failed to materialize, and in the midst of the insurance vertical's sharp downturn during the second quarter of 2023, the Company reached out to the Prepetition Lenders to discuss a potential amendment to the Credit Agreement. On August 16, 2023, after several weeks of good-faith, arm's-length negotiation, the Company and the Prepetition Lenders executed the 2023 Amendment.

72. As discussed in Part II.C.1., the 2023 Amendment, among other things:

- provided the option to PIK interest;
- provided additional financial covenant relief;
- established a minimum liquidity covenant of $9.0 million for the remainder of 2023 excluding December 31, 2023, and $10 million from December 31, 2023 until maturity;
- provided for a minimum payment of the Revolving Facility of 1.0% of the original aggregate principal amount, per annum, paid quarterly;
- instituted the Cost-Savings Program; and
- required that the Company appoint two disinterested directors to the boards of DMS LLC and DMSH LLC.

73. In September 2023, Mr. Nguyen and Ms. LaPuma were appointed to the Boards as disinterested directors on September 1 and September 18, 2023, respectively. Shortly thereafter,

on November 7, 2023, the Company formed the Strategy Committee,[16] comprised of Ms. LaPuma and Mr. Flanders, another disinterested director, to provide independent decision making in connection with the Company's Cost-Savings Program and any potential financing, recapitalization, merger, divestiture, acquisition, leasing, restructuring, or similar transaction.

**C. Cost-Savings Program.**

74. The Company implemented a number of cost-savings initiatives in connection with the Cost-Savings Program, including: (a) streamlining the business to refocus on broadly marketable marketplace solutions and O&O technologies; (b) reducing headcount; (c) diversifying the Company's portfolio of marketplace solutions and O&Os to include offerings in a variety of industries—including emerging accounts in legal services, home services, and consumer finance—to reduce reliance on struggling industries, such as the auto insurance industry; (d) eliminating cost structure inefficiencies to reduce operating expenses; (e) reducing accounting and audit fees; (f) renegotiating certain of its contracts; (g) rationalizing the Company's real estate footprint, including by evaluating options to negotiate early terminations of leases via lease buyouts; (h) reducing credit card use and credit limits; and (i) instituting a biweekly conference call with executive leadership to review vendor costs and other operating expenses. The Company also implemented internal processes to closely monitor spending and prevent cost creep. Together, these initiatives resulted in approximately $23 million in cost-savings in 2023—103% of the Company's initial target—and an additional approximately $4 million in cost-savings year-to-date in 2024.

[16] As previously noted, the Strategy Committee was formed at each of the Boards of DMS Inc., DMS LLC, and DMSH LLC, as well as the boards of DME UE Acquisition Holdings Inc., CEP V DMS US Blocker Company, and Traverse Data Inc.

**D. Retention of Advisors.**

75. Following the 2023 Amendment, the Company retained legal and financial advisors to, among other things, advise the Company with respect to governance matters, assist the Company's business forecasting efforts, assist with lender engagement, and explore potential options for addressing the Company's ongoing liquidity needs. Specifically, the Company retained Kirkland & Ellis LLP as counsel on September 18, 2023, and Triple P RTS, LLC ("Portage Point") on February 2, 2024.[17] In connection with ongoing negotiations of the 2024 Amendment, the Company also retained Houlihan as investment banker on March 14, 2024, to evaluate strategic alternatives to provide the Company with additional runway to capture and maximize value, including consideration of restructuring and financing alternatives and an out-of-court sale and marketing process.

**E. 2024 Amendment.**

76. Despite the 2023 Amendment and the success of the Cost-Savings Program, the Company continued to struggle to maintain adequate liquidity and, as of March 31, 2024, the Company was in breach of certain financial covenants under the Credit Agreement, which were subsequently cured by entering into the 2024 Amendment following several months of good-faith, arm's-length negotiations between the Debtors and the Prepetition Lenders.

77. In connection with these negotiations, the Debtors and the Prepetition Lenders discussed the Debtors' liquidity needs in connection with a range of strategic alternatives, including both a sale process to be followed by a chapter 11 filing in the event that bids were insufficient to repay the Prepetition Loans at par, and a near-term filing without a stalking horse

[17] Portage Point's engagement letter was subsequently amended on March 29, 2024 and August 8, 2024 to expand the scope of Portage Point's services to the Company. On September 11, 2024, the Debtors executed an additional engagement letter with Portage Point, which provided for the engagement of Zachary Rose as Chief Restructuring Officer.

agreement followed by a postpetition sale process. Ultimately, the Debtors, in consultation with the Prepetition Lenders, determined that a prepetition sale process was likely to generate higher or otherwise better bids, as compared to a near-term filing without a stalking horse agreement. As such, the Debtors sized the aggregate liquidity needed to execute a prepetition sale process followed by, if necessary, a chapter 11 filing and to normalize operations following a prolonged period of significant liquidity management measures.

78. The Prepetition Lenders agreed to provide the requisite capital and executed the 2024 Amendment with the Debtors, providing for a portion in incremental bridge financing in the form of a $22 million Tranche A Bridge Term Loan, as a form of pre-DIP financing, to be used to fund operating costs while the Debtors and the Prepetition Lenders worked towards a more comprehensive deleveraging transaction, and the remainder to be provided in the form of DIP financing (subject to soliciting higher or otherwise better DIP alternatives). In connection with the 2024 Amendment, a portion of the existing Prepetition Loans were "rolled" into a new Tranche B Term Loan. The 2024 Amendment provided that both the Tranche A Bridge Term Loan and the Tranche B Term Loan would "roll" into any potential debtor-in-possession financing provided by the Prepetition Lenders in any potential chapter 11 cases. The 2024 Amendment also included limited waivers related to prior defaults and events of default under the Credit Agreement, amended certain negative and affirmative covenants, and added additional covenants. For example, the 2024 Amendment reduced the minimum liquidity covenant from $10 million to $5 million and extended the PIK Election Period through March 31, 2025. The 2024 Amendment

also includes budget and variance testing requirements, as well as regular lender meetings and other reporting.

79. Notably, the 2024 Amendment required the Company to promptly commence a strategic review and marketing process for a sale of all or substantially all of its assets, subject to certain milestones set forth therein. As discussed, the Company retained Houlihan as investment banker in March 2024 to facilitate a robust marketing process for the Company's assets.

**F. Prepetition Sale Process.**

80. The Company formally launched a sale process on April 23, 2024 (the "Prepetition Sale Process"). As part of the Prepetition Sale Process, the Company, with the assistance of Houlihan, contacted 118 potential investors, including 76 financial parties and 42 strategic parties. Of those contacted, 38 executed nondisclosure agreements (the "NDA Parties") and were provided with access to a confidential information presentation and substantial additional financial, operational, and legal diligence materials.

81. On or after May 30, 2024, the Company received eight non-binding IOIs. The Company selected five bidders to advance to the second round of the Prepetition Sale Process, which included access to additional diligence materials and a management presentation to each party. Ultimately, the Company received four LOIs for either substantially all of the Debtors' assets or specific verticals. The Debtors, with the assistance of their advisors, undertook a comprehensive review of each LOI, and engaged in additional discussions and diligence with each interested party.

82. At least one of the parties that submitted a LOI expressed interest in serving as a stalking horse bidder during these chapter 11 cases. Accordingly, in the weeks leading up to the Petition Date, the Company and its advisors engaged in extensive good faith, arm's-length negotiations with this potential third-party stalking horse bidder. After the deal terms were

substantially negotiated, the third-party withdrew its offer shortly before the filing of these chapter 11 cases. As a result, the Company pivoted to negotiating a stalking horse credit bid with its DIP Lenders.

83. Ultimately these efforts resulted in the Stalking Horse Agreement filed contemporaneously herewith, pursuant to which the Stalking Horse Bidder will purchase substantially all of the Debtors' assets for the aggregate consideration of: (i) a credit bid of $95 million; (ii) the assumption of Assumed liabilities (as defined in the Stalking Horse Agreement); (iii) the payment of Cure Costs (as defined in the Stalking Horse Agreement); and (iv) an amount in cash equal to the amount set forth in the Wind Down Budget (as defined in the Stalking Horse Agreement), subject to higher or otherwise better bids. Critically, the Stalking Horse Agreement ensures that the Company's business will continue to operate without disruption post-emergence. As set forth in more detail in the Bidding Procedures Motion,[18] the Bidding Procedures (as defined in the Bidding Procedures Motion) will allow the Debtors to conduct a postpetition "market check" of the Stalking Horse Bid to ensure that the Debtors obtain the highest or otherwise best offer, or combination of offers, for the sale of their business or some or all of their assets.

**G. The DIP Facility.**

84. Contemporaneously with the negotiation of the Stalking Horse Bid, the Debtors engaged in negotiations with the DIP Lenders regarding the terms of a postpetition DIP financing

[18] *Debtors' Motion for Entry of an Order (I) Approving the Bidding Procedures, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement and Expense Reimbursement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (VI) Authorizing the Assumption and Assignment of Assumed Executory Contracts and Unexpired Leases, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief* (the "Bidding Procedures Motion") is filed contemporaneously herewith.

facility (and consensual usage of cash collateral) to be provided by the DIP Lenders (the "DIP Facility").

85. The DIP Facility contemplates approximately $122 million in senior secured superpriority priming term loans, consisting of: (a) new money loans in an aggregate principal amount up to $30 million (the "New Money DIP Loans") and (b) roll-up loans, consisting of (i) rolled up loans under the Tranche A Bridge Term Loan in an aggregate amount of up to approximately $22 million (the "Tranche A Roll-Up DIP Loans") and (ii) rolled-up loans under the Tranche B Term Loan in an aggregate amount of up to approximately $70 million (the "Tranche B Roll-Up DIP Loans," and together with the Tranche A Roll-Up DIP Loan, the "Roll-Up DIP Loans," and the Roll-Up DIP Loan with the New Money DIP Term Loans collectively, the "DIP Loans"). The Debtors are seeking authority to use the proceeds from the DIP Facility to fund general operating expenses, including, among other things, honoring employee payrolls and benefits, procuring key services, funding general and corporate operating needs, paying critical vendors and other payments that are necessary for the continued management, operation, and preservation of the Debtors' business, and administering these chapter 11 cases. Upon entry of the Interim DIP Order, $13 million out of the $30 million of New Money DIP Loans will become available (the "Interim Term Loans"), and the prepetition Tranche A Bridge Term Loans will roll into the Tranche A Roll-Up DIP Loans. Upon the entry of the Final DIP Order, the remaining $17 million under the New Money DIP Loans will become available (the "Final Term Loans"), and the prepetition loans under the Tranche B Term Loan will roll into the Tranche B Roll-Up DIP Loans.

86. The remaining material terms of the DIP Facility are described in greater detail in the DIP Motion.[19] Given the constraints imposed by the Debtors' existing capital structure, and lack of viable, third-party financing offers, the Debtors, in consultation with their advisors, concluded that the DIP Facility represents the only viable path to obtaining critically needed liquidity.

* * *

87. The Debtors, in consultation with their advisors, determined that commencing these cases to implement the Sale Transaction and incur the obligations under the DIP Facility to fund the administration of these cases represents the value maximizing path at this juncture. The proposed process will provide all parties in interest with the opportunity to submit higher or otherwise better bids, which will maximize the value of the Debtors' estates for the benefit of all parties in interest.

## V. Evidentiary Basis for Relief Requested in First Day Motions

88. Contemporaneously herewith, the Debtors have filed a number of First Day Motions in these chapter 11 cases seeking various forms of relief intended to stabilize their business operations, facilitate the efficient administration of these chapter 11 cases, and execute a swift and smooth restructuring. The First Day Motions[20] include:

---

[19] *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Senior Secured Priming Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "DIP Motion") is filed contemporaneously herewith.

[20] Capitalized terms used but not defined in this section have the correlative meaning ascribed to such term as in the corresponding First Day Motion, as applicable.

**A. Administrative Motions.**

1. *Notice of Designation as Complex Chapter 11 Bankruptcy Case* ("Complex Case Designation");

2. *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief* ("Joint Administration Motion");

3. *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors (A) File a Consolidated Creditor Matrix and a Consolidated List of the 30 Largest Unsecured Creditors and (B) Redact Certain Personally Identifiable Information of Natural Persons; (II) Waiving the Requirement to File a List of Equity Security Holders; (III) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information; and (IV) Granting Related Relief* ("Creditor Matrix Motion");

4. *Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File (A) Schedules and Statements and (B) Rule 2015.3 Financial Reports, (II) Modifying the Requirements of Bankruptcy Local Rule 2015-3, and (III) Granting Related Relief* ("SOFAs / Schedules Extension Motion");

5. *Emergency Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of Omni Agent Solutions, Inc. as Claims, Noticing, and Solicitation Agent* ("Claims Agent Retention Application");

6. *Debtors' Emergency Motion for Entry of an Order (I) Establishing Deadlines for the Filing of Proofs of Claim, (II) Approving the Form and Manner of Notice Thereof, (III) Approving the Form and Manner for Filing Proofs of Claim, and (IV) Granting Related Relief* ("Bar Date Motion"); and

7. *Debtors' Emergency Motion for Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code, (II) Approving the Related Form and Manner of Notice, and (III) Granting Related Relief* ("Automatic Stay Enforcement Motion").

**B. Operational Motions Requesting Immediate Relief.**

1. *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using the Cash Management System, (B) Maintain Existing Bank Accounts, Business Forms, and Books and Records, and (C) Continue Intercompany Transactions, (II) Granting Administrative Expense Status to Postpetition Intercompany Transactions, and (III) Granting Related Relief* ("Cash Management Motion");

2. *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief* ("Wages Motion");

3. *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors and Foreign Claimants; and (II) Granting Related Relief* ("Critical Vendors Motion");

4. *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief* ("Taxes Motion");

5. *Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief* ("Utilities Motion");

6. *Debtors' Emergency Motion for Entry of an Order (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and Preferred Stock and (II) Granting Related Relief* ("NOL Motion");

7. *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief* ("Customer Programs Motion");

8. *Debtors' Motion for Entry of an Order (I) Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business, and (II) Granting Related Relief* ("Ordinary Course Professionals Motion");[21]

9. *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Honor and Renew the Premium Financing Agreement Entered Into Prepetition, (C) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (D) Continue to Pay Brokerage Fees, and (E) Maintain Their Surety Bond Program, and (II) Granting Related Relief* ("Insurance & Surety Motion");

[21] The Ordinary Course Professionals Motion will be filed on Petition Date, but will not be heard at the "First Day Hearing."

10. *Debtors' Motion for Entry of an Order (I) Authorizing, Effective Nunc Pro Tunc to the Petition Date, (A) The Rejection of Certain Unexpired Leases and (B) Abandonment of Certain Personal Property, and (II) Granting Related Relief* ("Lease Rejection Motion");[22] and

11. *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Senior Secured Priming Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "DIP Motion").

**C. Bidding Procedures Motion.**

1. *Debtors' Motion for Entry of an Order (I) Approving the Bidding Procedures, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement and Expense Reimbursement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (VI) Authorizing the Assumption and Assignment of Assumed Executory Contracts and Unexpired Leases, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief* ("Bidding Procedures Motion").[23]

89. The First Day Motions seek authority to, among other things, honor employee-related wage and benefits obligations, pay certain prepetition accounts payable claims in the ordinary course of business, and ensure the continuation of the Debtors' cash management systems and other business operations without interruption. I believe that the relief requested in the First Day Motions is necessary to allow the Debtors to preserve the value of their enterprise and successfully implement their restructuring.

90. Specially, the relief requested in the Critical Vendors Motion is of particular importance, as the Debtors' business is dependent upon strong relationships with vendors such as search engines, social media companies, and other third-party publishers. Without the ability to pay these Critical Vendors, the Debtors would be unable to satisfy key obligations to their

[22] The Lease Rejection Motion will be filed on Petition Date, but will not be heard at the "First Day Hearing."

[23] The Bidding Procedures Motion will be filed on Petition Date, but will not be heard at the "First Day Hearing."

Customers, which would likely result in a loss of Customers and a deterioration of the Debtors' business to the detriment of all stakeholders. For example, certain Critical Vendors, provide services that no other vendors could provide, such as internal software and hosting technology services that the Debtors require to operate a majority of their technology. The Debtors would not be able to continue operating in the ordinary course of business absent such services.

91. In addition, certain other Critical Vendors, including certain third-party publishers, are critical to the Debtors' ability to fulfill key obligations to their Customers. The Debtors partner with third-party publishers to strategically place their Customers' content on valuable advertising platforms so Customers can reach their target Consumers. Absent the ability to honor obligations to these vendors in the ordinary course, certain third-party publishers may stop doing business with the Debtors, which will directly affect the Debtors' ability to satisfy their obligations to Customers, which will, in turn, directly impact the Debtors' revenue. As discussed herein, the Debtors' previously experienced the negative business impact of failing to timely honor obligations to certain third-party publishers as a result of its prior liquidity management efforts.

92. Moreover, certain Customers enter into agreements with the Debtors based on the Debtors' relationships with key vendors and other Customers require the Debtors to utilize specific vendors to implement the Customers' ad campaigns. Absent the ability to continue honoring obligations to such vendors, the Debtors' ability to continue utilizing such vendors' services may be imperiled, which would, in turn, jeopardize certain of the Debtors' key client relationships and their ability to maintain or capture additional business therefrom.

93. Finally, absent the relief requested in the Critical Vendors Motion, the Debtors risk the vendors withholding their services at a critical juncture which would jeopardize operations and diminish the value of these estates to the detriment of all stakeholders.

94. Several of the First Day Motions request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedures provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.

95. I am familiar with the content and substance of the First Day Motions. The facts stated therein are true and correct to the best of my knowledge, information, and belief, and such facts shall be deemed incorporated herein by reference as if fully stated herein. I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully restructuring the Debtors' businesses.

96. For the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of these chapter 11 cases, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

[*Remainder of Page Intentionally Blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: September 12, 2024

/s/ Joe Marinucci
Joe Marinucci
Chief Executive Officer
Digital Media Solutions, Inc