IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| DIGITAL MEDIA SOLUTIONS, INC., *et al.*,[1] | ) | Case No. 24-90468 (ARP) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) | (Emergency Hearing Requested) |

**DEBTORS' <u>EMERGENCY</u> MOTION
FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE DEBTORS TO
(A) OBTAIN POSTPETITION FINANCING AND (B) USE
CASH COLLATERAL, (II) GRANTING SENIOR SECURED
PRIMING LIENS AND SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS, (III) GRANTING ADEQUATE PROTECTION TO
PREPETITION SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY,
(V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

> **Emergency relief has been requested. Relief is requested not later than 3:00 p.m. (prevailing Central Time) on September 12, 2024.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, this Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on September 12, 2024, at 3:00 p.m. (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk Street, Houston, Texas 77002.**
>
> **Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of this Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Perez's conference room number is 282694. Video communication will be by use of the GoTo platform. Connect via the free GoTo application or click the link on Judge Perez's home page. The meeting code is "JudgePerez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

---

[1]     A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/DMS. The location of Debtor Digital Media Solutions, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 4800 140th Avenue North, Suite 101, Clearwater, Florida 33762.

> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Perez's homepage. Select the case name, complete the required fields, and click "Submit" to complete your appearance.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully submit this motion (this "Motion") [2] seeking approval of postpetition debtor-in-possession ("DIP") financing and authority to use cash collateral. In support of this Motion, the Debtors submit: (a) the *Declaration of Ryan Sandahl in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Senior Secured Priming Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "Sandahl Declaration"), filed contemporaneously herewith; (b) the *Declaration of Zachary Rose in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Senior Secured Priming Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "Rose Declaration" and together with the Sandahl Declaration, the "DIP Declarations"), filed contemporaneously herewith; and (c) the First Day Declaration. In further support of this Motion, the Debtors respectfully state the following:[3]

---

[2]     A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Joe Marinucci, Co-Founder and Chief Executive Officer of Digital Media Solutions, Inc. and Certain of its Affiliates, in Support of Chapter 11 Filing and First Day* (the "First Day Declaration"), filed contemporaneously herewith.

[3]     Capitalized terms used but not immediately defined in this Motion shall have the meanings ascribed to them in the First Day Declaration, the DIP Documents, or the Interim DIP Order (each as defined herein), as applicable.

## Preliminary Statement

1.      The Debtors have been carefully managing liquidity for the last 18 months in the face of persistent industry headwinds.  Despite their best efforts, including, among other things, raising incremental equity capital, implementing a successful cost-savings program, and securing interest relief pursuant to an amendment to the Prepetition Credit Agreement, the Debtors continued to struggle to maintain adequate liquidity.  In March 2024, the Debtors entered into discussions with the Prepetition Lenders in anticipation of upcoming defaults under the Prepetition Credit Agreement and in the face of tightening liquidity.  These discussions centered on the Debtors' go-forward liquidity needs to execute on their business plan, normalize operations following several months of significant cash management measures, and explore strategic alternatives.

2.      In connection with these discussions, the Debtors and the Prepetition Lenders discussed a range of strategic alternatives, including both a prepetition sale process to be followed by a chapter 11 filing in the event bids were insufficient to repay the Prepetition Obligations at par, and a near-term filing without a stalking horse agreement followed by a postpetition sale process.  Ultimately, the Debtors, in consultation with the Prepetition Lenders, determined that a prepetition sale process was likely to generate higher or otherwise better bids compared to a near-term filing without a stalking horse agreement.

3.      The Debtors sized the aggregate liquidity needed to execute a prepetition sale process followed by, if necessary, a chapter 11 filing and to normalize operations following a prolonged period of significant liquidity management measures.  The Prepetition Lenders agreed to provide the requisite capital, with a portion to be funded in the form of incremental bridge

---

Capitalized terms used but not immediately defined in the preliminary statement shall have the meanings ascribed to them in later in the Motion.

financing (the "Pre-DIP") and the remainder to be funded in the form of DIP financing (subject to soliciting higher or otherwise better DIP alternatives).

4.      As discussed in greater detail in the First Day Declaration and the Sandahl Declaration, the Pre-DIP was provided pursuant to the 2024 Amendment in the form of the Tranche A Bridge Term Loan.   In connection with this Pre-DIP, a portion of the existing prepetition term loans were "rolled" into a new Tranche B Term Loan.   The 2024 Amendment provided that both the Tranche A Bridge Term Loan and the Tranche B Term Loan would "roll" into any potential debtor-in-possession financing provided by the Prepetition Lenders in any potential chapter 11 cases.

5.      The Debtors, with the assistance of their proposed investment banker Houlihan Lokey Capital, Inc. ("Houlihan"), launched a comprehensive sale and marketing process for all or substantially all of their assets (the "Prepetition Sale Process") on April 23, 2024.   In connection with the Prepetition Sale Process, the Debtors received eight indications of interest, selected five bidders to move to the second round, and received four letters of intent.   The Debtors, with the assistance of their advisors, undertook a comprehensive review of each letter of intent and engaged in additional discussions and diligence with each interested party.   Ultimately, the Debtors, in consultation with their advisors, selected a third-party strategic buyer as the highest or otherwise best bidder and engaged in weeks of negotiations therewith regarding a stalking horse purchase agreement.   Unfortunately, the buyer informed the Debtors on the eve of bankruptcy that it was no longer willing to serve as the stalking horse bidder.

6.      As a result, the Debtors quickly pivoted and negotiated a $95 million stalking horse credit bid with an acquisition entity designated by the DIP Lenders (the "Stalking Horse Bidder").   The stalking horse bid contemplates that the Stalking Horse Bidder will purchase substantially all of the Debtors' assets, subject to higher or otherwise better bids.   The Debtors need access to

additional liquidity to complete the sale process and consummate the proposed sale with the Stalking Horse Bidder (or such higher or otherwise better bid).

7.     To finance these cases, the Debtors negotiated the terms of an approximately $121.9 million senior secured superpriority priming debtor-in-possession term loan facility (the "DIP Facility") with certain of their Prepetition Lenders.  The proposed DIP Facility consists of (a) new money loans in an aggregate principal amount of $30 million (the "New Money DIP Loans") and (b) roll-up loans, consisting of (i) rolled-up prepetition loans under the Tranche A Bridge Term Loan held by Prepetition Lenders funding the New Money DIP Loans in an aggregate amount of approximately $21.7 million (the "Tranche A Roll-Up DIP Loans") and (ii) (A) rolled-up prepetition loans under the Tranche B Term Loan held by Prepetition Lenders funding the New Money DIP Loans in an aggregate amount of approximately $61.3 million and (B) rolled-up prepetition loans under the Initial Term Loan held by Prepetition Lenders funding the New Money DIP Loans in an aggregate amount of approximately $8.9 million (the roll-up loans set forth in clauses (A) and (B), collectively, the "Tranche B Roll-Up DIP Loans," and together with the Tranche A Roll-Up DIP Loan, the "Roll-Up DIP Loans," and the Roll-Up DIP Loans with the New Money DIP Loans collectively, the "DIP Loans").  Upon entry of the Interim DIP Order, $13 million out of the $30 million of New Money DIP Loans will become available (the "Interim Term Loans"), and the Tranche A Roll-Up DIP Loans shall be deemed funded.  Upon the entry of the Final DIP Order, the remaining $17 million under the New Money DIP Loans will become available (the "Final Term Loans"), and the Tranche B Roll-Up DIP Loans shall be deemed funded.

8.     The Debtors have less than $1 million in cash on hand as of the Petition Date and require immediate access to the DIP Facility to operate in the ordinary course during these cases and administer them.  The DIP Facility is the product of extensive, hard-fought, arm's-length

negotiations between the Debtors and the DIP Lenders over the last several weeks. During that time, the Debtors and the DIP Lenders (through their respective advisors) exchanged multiple drafts of term sheets outlining the terms of the DIP Facility, the DIP Credit Agreement, and the DIP Orders, rigorously negotiated drafts of the same, and undertook significant analysis to determine the appropriate size of the DIP Facility. Through these negotiations, the Debtors additionally secured the DIP Lenders' commitment to support certain wind-down procedures regardless of whether the DIP Obligations are repaid in full, including funding of a Wind-Down Budget (as defined in the DIP Credit Agreement) that will ensure the orderly administration of the Debtors' estates following consummation of an asset sale.

9.     While negotiating the DIP Facility with the Prepetition Lenders, the Debtors, with the assistance of Houlihan, evaluated the availability and viability of third-party DIP financing. As described in the Sandahl Declaration, Houlihan solicited a number of prospective third parties to evaluate alternative DIP financing, but no solicited party expressed interest in financing the Debtors' chapter 11 cases. In particular, no third party was willing to provide DIP financing on an unsecured or junior basis or engage in a priming fight with the Prepetition Lenders in light of the outstanding Prepetition Obligations and lack of tangible collateral. Accordingly, the proposed DIP Facility represents the only viable postpetition financing available for the Debtors.

10.     By this Motion, the Debtors also seek the authority to access and use cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral"). Access to Cash Collateral, in addition to the liquidity provided by the DIP Facility, will enable the Debtors to operate their businesses and administer their estates for the benefit of their stakeholders. In connection with providing the DIP Facility, the Prepetition Lenders have consented or are deemed to have consented to the continued use of Cash Collateral in exchange for the adequate protection package provided in the DIP Orders and in accordance with the Cash Flow Forecast.

11.     The relief requested by this Motion is necessary to preserve the Debtors' operations, complete the Prepetition Sale Process, and maximize the value of the Debtors' estates for the benefit of all creditors.  For the reasons set forth in this Motion, the First Day Declaration, the Sandahl Declaration, and the Rose Declaration, the DIP Facility and the continued use of Cash Collateral on the terms set forth in the DIP Orders are necessary to avoid immediate and irreparable harm and are in the best interests of the Debtors, their estates, and all stakeholders.  Accordingly, the Debtors respectfully request that this Court enter the DIP Orders.

### Jurisdiction and Venue

12.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157 (b).  The Debtors confirm their consent to the entry of a final order by this Court.

13.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

14.     The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rules 2002-1, 4001-1, 4002-1, and 9013-1(i) of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules"), and the *Procedures for Complex Chapter 11 Cases in the Southern District of Texas* (the "Complex Rules").

### Background

15.     On September 11, 2024 (the "Petition Date"), the Debtors commenced filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors have filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule

1015(b).  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

## Relief Requested

16.     By this Motion, the Debtors seek entry of an interim order, substantially in the form attached hereto (the "Interim DIP Order"), and a final order (the "Final DIP Order,"[4] and together with the Interim DIP Order, the "DIP Orders") approving the following relief:

(a)     **DIP Facility**:  authorization for Debtor Digital Media Solutions, LLC, in its capacity as borrower (the "Borrower"), to obtain postpetition financing, and for each of the other Debtor-guarantors as set forth in the DIP Credit Agreement to guarantee unconditionally (the "Guarantors"), on a joint and several basis, the Borrower's obligations in connection with the DIP Facility, consisting of (i) $30 million in New Money DIP Loans (the commitments thereunder, the "New Money DIP Commitments") to be funded by the DIP Lenders, and (ii) (A) upon entry of this Interim DIP Order, an aggregate principal amount of approximately $21.7 million constituting rolled-up loans under the Tranche A Bridge Term Loan held by the Prepetition Lenders that are providing directly or indirectly, through their affiliates, designees, beneficial holders, or total return swap counterparties, their pro rata portion of New Money DIP Commitments, so as to be deemed issued under the DIP Credit Agreement, and (B) subject to and upon entry of the Final DIP Order, an aggregate principal amount of approximately $70.2 million constituting (I) approximately $61.3 million in rolled-up loans under the Tranche B Term Loan held by the Prepetition Lenders that are providing directly or indirectly, through their affiliates, designees, beneficial holders, or total return swap counterparties, their pro rata portion of New Money DIP Commitments and (II) approximately $8.9 million in rolled-up loans under the Initial Term Loan held by the Prepetition Lenders that are providing directly or indirectly, through their affiliates, designees, beneficial holders, or total return swap counterparties, the portion of New Money DIP Commitments to which certain other Prepetition Lenders declined to subscribe (with each $1.00 of New Money DIP Commitments rolling up $3.00 of the Initial Term Loan), so as to be deemed issued under the DIP Credit Agreement, and all of the DIP Loan Parties' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility and the DIP Documents;

---

[4]     The Debtors will file the form of Final DIP Order prior to the Final Hearing.

(b)     ***DIP Credit Agreement***:  authorization for the Debtors to enter into that certain Senior Secured Superpriority Priming Debtor-In-Possession Credit Agreement (as amended, restated, or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement"), by and among the Borrower, Debtor Digital Media Solutions, Holdings, LLC, as holdings ("Holdings"), the other Debtors as Guarantors (together with Holdings and the Borrower, the "DIP Loan Parties"), the lenders from time to time party thereto (collectively, the "DIP Lenders"), and Ankura Trust Company, LLC, as administrative agent and collateral agent (in such capacities, the "DIP Agent" and, together with the DIP Lenders, the "DIP Secured Parties") and to execute and deliver the DIP Credit Agreement and any other agreements, documents, and instruments delivered or executed in connection therewith and all other "Loan Documents" (as defined in the DIP Credit Agreement) (each as amended, supplemented, or otherwise modified, collectively with the DIP Credit Agreement, the "DIP Documents"), all substantially in the form attached to the Interim DIP Order as Exhibit 2, and to perform their respective obligations thereunder, and all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP Documents;

(c)     ***Cash Flow Forecast***:  authorization for the Debtors to use the proceeds of the DIP Facility in accordance with the terms of the DIP Orders, the cash flow forecast prepared by the Debtors, attached to the Interim DIP Order as Exhibit 1 (the "Initial Cash Flow Forecast," and as updated, amended, supplemented, otherwise modified, or replaced, from time to time, pursuant to the DIP Documents and the DIP Orders, the "Cash Flow Forecast"), subject to the Permitted Variances set forth in the DIP Credit Agreement, and the DIP Documents;

(d)     ***Cash Collateral***:  authorization for the Debtors to use Cash Collateral in accordance with the terms of the DIP Orders, the Cash Flow Forecast, and the DIP Documents;

(e)     ***Adequate Protection***:  the granting of adequate protection to the Prepetition Secured Parties as set forth in the DIP Orders (the "Adequate Protection") to protect against any diminution in value of the Prepetition Secured Parties' interests in the "Collateral" (as defined in the Prepetition Documents) (the "Prepetition Collateral"), including Cash Collateral (collectively, the "Diminution in Value");

(f)     ***DIP Obligations***:  authorization for the Debtors to incur and pay on a final and irrevocable basis, the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due and payable, and the reasonable fees and disbursements of the DIP Agent's and DIP Lenders' attorneys, advisors, accountants, appraisers, bankers and other consultants (the "DIP Obligations"), all to the extent provided in, and in accordance with, the DIP Orders and the DIP Documents;

(g)     ***DIP Liens***:  the granting to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, of valid, enforceable, non-avoidable, and fully perfected first priority liens on and security interests in and liens upon all real and personal property of the DIP Loan Parties, except as otherwise specifically provided in the

DIP Orders or in the DIP Documents, of any kind or nature whatsoever, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, and all other estate property, including, upon entry of the Final DIP Order, the Avoidance Actions Proceeds, but excluding, in all cases, the Avoidance Actions, subject only to the Carve Out on the terms and conditions (including with respect to lien priority) set forth in the DIP Orders and in the DIP Documents;

(h) **Administrative Expense Claims**:  the granting of superpriority administrative expense claims (the "DIP Superpriority Claims") against each of the DIP Loan Parties' estates in favor of the DIP Secured Parties on account of the DIP Obligations to the extent set forth in the DIP Orders;

(i) **Stipulations**:  approval of certain stipulations by the Debtors with respect to the Prepetition Credit Agreement and the Prepetition Secured Parties' liens on and security interests in (the "Prepetition Liens") the Prepetition Collateral, as set forth in the Interim DIP Order;

(j) **Sections 506(c) and 552(b) Waivers**:  subject to entry of the Final DIP Order, the waiver of the Debtors' and the estates' right to surcharge the Prepetition Collateral and the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code and any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

(k) **No Marshaling**:  subject to entry of the Final DIP Order, a finding that neither the DIP Secured Parties nor the Prepetition Secured Parties, in their respective capacities as such, shall be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable;

(l) **DIP Secured Parties' Remedies**:  authorization for the DIP Agent and the DIP Lenders to exercise remedies under the DIP Documents on the terms described in the DIP Orders, upon the occurrence and during the continuance of an Event of Default;

(m) **Automatic Stay**:  the modification of the automatic stay imposed under section 362 of the Bankruptcy Code, solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Orders;

(n) **Immediate Enforcement**:  waiver of any applicable stay with respect to the effectiveness and enforceability of the Interim DIP Order and the Final DIP Order, as applicable, and authorization for the Borrower, upon entry of the Interim DIP Order, to immediately request, borrow, and draw New Money DIP Loans, as set forth in the DIP Credit Agreement;

(o) **Final Hearing**:  the scheduling of a final hearing (the "Final Hearing") to consider the relief requested herein and entry of the Final DIP Order within 30 days of the

Petition Date, or as soon as practicable thereafter based on the Court's availability; and

(p)     ***Related Relief***:  granting such other and further relief as is just and proper.

**Concise Statement of the Material Terms of the**
**Interim DIP Order Pursuant to Bankruptcy Rule 4001 and the Complex Rules**

17.     The following chart contains a summary of the material terms of the proposed Interim DIP Order, together with references to the applicable sections of the Interim DIP Order and other relevant source documents, including the DIP Credit Agreement, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B)[5] and the Complex Rules.[6]

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | Digital Media Solutions, LLC<br>*See* DIP Credit Agreement, Preamble. |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Each of the Debtor-guarantors set forth in the DIP Credit Agreement, including all guarantors under the Prepetition Credit Agreement and Debtors Aimtell Holdco, Inc. and Best Rate Referral, Inc.<br>*See* DIP Credit Agreement § 1.01. |
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Certain Prepetition Lenders, in their capacity as postpetition financing lenders.<br>*See* DIP Credit Agreement, § 1.01. |
| **Maturity Date**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | Subject to the terms of the DIP Credit Agreement and the DIP Orders, the DIP Loans shall be repaid in full and in cash, and the DIP Commitments shall terminate, upon the earliest to occur of the following (the "Final Maturity Date"):<br>(a)  the day that is 90 days after the Petition Date, or if such day is not a Business Day, the immediately [preceding] Business Day,<br>(b)  30 days after the Petition Date (or if such day is not a Business Day, the immediately preceding Business Day) unless on or before such day the Final DIP Order shall have been entered by the Court, |

---

[5]   The Debtors have not included a summary of liens on Avoidance Actions in this chart, because the requirements of Bankruptcy Rule 4001(c)(1)(B)(xi) do not apply where, as here, liens are granted solely on the proceeds of any Avoidance Actions, and not on the Avoidance Actions themselves.  The Debtors believe this distinction is significant because granting liens on the proceeds of Avoidance Actions, but not the Avoidance Actions themselves, preserves the Debtors' rights to pursue any Avoidance Actions free from encumbrances.  For the avoidance of doubt, the proposed granting of liens on the proceeds of Avoidance Actions is discussed further herein as a "Significant Provision" (as defined herein).

[6]   The summaries contained in this chart are for illustrative purposes only and are qualified in their entirety by the provisions of the DIP Credit Agreement and the Interim DIP Order, as applicable.  Capitalized terms used, but not otherwise defined, in these summaries have the meanings prescribed to them in the DIP Credit Agreement and the Interim DIP Order, as applicable.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | (c) the date the Court converts any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, |
| | (d) the date the Court dismisses any of the Chapter 11 Cases, |
| | (e) the effective date of a Chapter 11 Plan that has been confirmed by an order of the Court, and |
| | (f) such earlier date on which the Loan Document Obligations shall become due and payable by acceleration or otherwise in accordance with the terms of this Agreement and the other Loan Documents. |
| | *See* DIP Credit Agreement § 1.01. |
| **DIP Commitments** Bankruptcy Rule 4001(c)(1)(B) | The DIP Facility consists of a secured, superpriority, priming debtor-in-possession, delayed-draw term loan facility with a maximum principal amount of approximately $121.9 million, to be funded as follows: |
| | (a) $13 million of Interim Term Loans upon entry of the Interim DIP Order approving the DIP Facility and satisfaction of other conditions in the DIP Documents; |
| | (b) $17 million of Final Term Loans upon entry of the Final DIP Order upon satisfaction of the conditions set forth in the DIP Documents; |
| | (c) approximately $21.7 million of Tranche A Roll-Up DIP Loans upon entry of the Interim DIP Order upon satisfaction of the conditions set forth in the DIP Documents; and |
| | (d) approximately $70.2 million of Tranche B Roll-Up DIP Loans upon entry of the Final DIP Order upon satisfaction of the conditions set forth in the DIP Documents. |
| | *See* DIP Credit Agreement, § 2.01(a); Interim DIP Order ¶ 2(b). |
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B) | The DIP Documents include standard and customary conditions of borrowing, the satisfaction of which is a condition precedent to the obligations of the DIP Lenders to provide the DIP Facility. |
| | *See* DIP Credit Agreement §§ 4.01–4.02. |
| **Interest Rates** Bankruptcy Rule 4001(c)(1)(B) | Interest on the DIP Loans shall accrue at a rate *per annum* equal to (i) with respect to Base Rate Loans (as defined in the DIP Credit Agreement), the Base Rate (as defined in the DIP Credit Agreement) plus 7.0%, which shall be payable (A) in cash, in a percentage per annum equal to 1.0% and (B) in kind, in a percent per annum equal to 6.0% and (ii) with respect to SOFR Loans (as defined in the DIP Credit Agreement), Adjusted Term SOFR (as defined in the DIP Credit Agreement), plus 8.0%, which shall be payable (A) in cash, in a percentage per annum equal to 1.0% and (B) in kind, in a percent per annum equal to 7.0% (the "Interest Rate"). The Debtors may elect whether any New Money DIP Loans are Base Rate Loans or SOFR Loans; *provided* that all Roll-Up DIP Loans shall be SOFR Loans. Interest shall be calculated on the basis of (x) with respect to Base Rate Loans, on the basis of a 365-day year and (y) with respect to SOFR Loans, on the basis of a 360-day year. |
| | *See* DIP Credit Agreement §§ 1.01; 2.03; 2.13. |
| **Use of DIP Facility and Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(ii) | The proceeds of the DIP Facility will be used in accordance with the terms of the Cash Flow Forecast, subject to the Permitted Variances, including: |
| | (a) The New Money DIP Loans shall be used to: |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | i.   pay professional fees and other restructuring charges arising on account of these chapter 11 cases, including statutory fees of the United States Trustee for the Southern District of Texas (the "<u>U.S. Trustee</u>") and allowed professional fees and expenses of an unsecured creditors' committee appointed in these chapter 11 cases (if any) (the "<u>Committee</u>");<br><br>ii.   pay agency and professional fees and expenses (including legal, financial advisor, appraisal, and valuation-related fees and expenses) incurred by the DIP Secured Parties;<br><br>iii.   provide for the working capital, and for other general corporate purposes of the Debtors; and<br><br>iv.   fund obligations benefiting from the Carve Out and pay administration costs of these chapter 11 cases and claims or amounts approved by this Court.<br><br>(b)  The Roll-Up DIP Loans will be used solely to refinance (through a cashless conversion) the same amount of Tranche A Bridge Term Loan and Tranche B Term Loan, as applicable.<br><br>In addition, proceeds of the DIP Facility may be used to fund the Wind-Down Budget, and any chapter 11 plan shall provide for payment in full of the Wind-Down Budget, regardless of whether the DIP Obligations are paid in full in cash.<br><br>*See* DIP Credit Agreement §§ 3.17, 5.10; Interim DIP Order ¶ 4(a). |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(i) | The Prepetition Secured Parties.<br><br>*See* Interim DIP Order ¶ F(5). |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Facility includes the following fees:<br><br>(a)  Closing Premium:  8.00%;<br><br>(b)  Exit Premium:  $1,500,000; and<br><br>(c)  Annual DIP Agent Fee:  $37,500.<br><br>*See* DIP Credit Agreement, § 2.12; Agency Fee Letter. |
| **DIP Cash Flow Forecast and Reporting**<br>Bankruptcy Rule 4001 (c)(1)(B) | The Debtors' use of proceeds from the DIP Facility are subject to the Cash Flow Forecast. The Initial Cash Flow Forecast is attached as <u>Exhibit 1</u> to the Interim DIP Order.<br><br>Commencing with the first full calendar week following the Petition Date and for each calendar week thereafter, by no later than 11:59 p.m. New York City time on the Wednesday of such calendar week, the Debtors shall deliver to the DIP Agent, on behalf of each DIP Lender, a variance report in form and substance satisfactory to the DIP Required Lenders for the applicable Variance Testing Period (as defined herein) (each, a "<u>Variance Report</u>"), setting forth, in reasonable detail, any differences between (i) the DIP Loan Parties' aggregate cumulative cash receipts, expenditures, and disbursements for such Variance Testing Period and (ii) the variance in dollar amounts of the aggregate cumulative actual expenditures and cash disbursements (excluding (x) all professional fees and expenses, (y) all fees due and payable pursuant to 28 U.S.C. § 1930(a), and (z) any interest due and payable under 31 U.S.C. § 3717) for each Variance Testing Period (any such difference in clauses (i) and (ii), the "<u>Variance</u>"), together with a statement from the Borrower's chief financial officer certifying the information contained in such |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | Variance Report. The Variance Report shall also provide a reasonably detailed explanation for any variance that exceeds the Permitted Variances. |
| | Unless otherwise consented to by the DIP Required Lenders, the Debtors shall not permit a Variance except one that (x) is not more than 15% above the aggregate amount of actual disbursements during any Variance Testing Period against the projected "Total Disbursements" in the Cash Flow Forecast for such period and (y) (a) during the first week period after the Petition Date is not less than 80% of the aggregate amount of actual cash receipts during such Variance Testing Period against the projected "Net Cash Receipts" in the Cash Flow Forecast for such period, (b) during the second week period after the Petition Date is not less than 80% of the aggregate amount of actual cash receipts during such Variance Testing Period against the projected "Net Cash Receipts" in the Cash Flow Forecast for such period, (c) during the three week period after the Petition Date is not less than 82.5% of the aggregate amount of actual cash receipts during such Variance Testing Period against the projected "Net Cash Receipts" in the Cash Flow Forecast for such period, and (d) during the four week period after the Petition Date and thereafter, is not less than 85% of the aggregate amount of actual cash receipts during such Variance Testing Period against the projected "Net Cash Receipts" in the Cash Flow Forecast for such period (the permitted variances in this paragraph, the "<u>Permitted Variances</u>"). Notwithstanding the foregoing, in no event shall an amount of proceeds of the DIP Loans equal to the amount designated in respect to Cure Costs in the applicable Cash Flow Forecast be utilized for any purpose other than Cure Costs.<br><br>*See* Interim DIP Order ¶ 4; DIP Credit Agreement, §§ 3.17; 5.01(h)–(i); 6.15. |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Documents shall contain the following chapter 11 milestones:<br><br>(a) no later than 3 days after the Petition Date, this Court shall have entered the Interim DIP Order;<br><br>(b) no later than 30 days after the Petition Date, this Court shall have entered (i) the Final DIP Order and (ii) an order with respect to the stalking horse agreement and any bidding procedures (the "<u>Bidding Procedures</u>");<br><br>(c) no later than 45 days after the Petition Date, an auction (if any) shall have commenced pursuant to the terms of the Bidding Procedures;<br><br>(d) no later than 50 days after the Petition Date, subject to this Court's availability, a hearing approving one or more sales of all, substantially all, or a portion of the Debtors' assets shall have occurred (the "<u>Sale Hearing</u>"); and<br><br>(e) no later than 30 days after the Sale Hearing, the sale approved at the Sale Hearing shall have closed.<br><br>*See* DIP Credit Agreement, §5.22, Schedule 5.22. |
| **Liens and Priorities**<br>Bankruptcy Rule 4001(c)(l)(B)(i) | Pursuant to sections 364(c)(2), (c)(3), and (d)(1) of the Bankruptcy Code, subject to and subordinate to the Carve Out, all amounts owing by the DIP Loan Parties under the DIP Facility and the obligations of the Guarantors in respect thereof will be secured by a perfected, first-priority security interest in and lien on (the "<u>DIP Liens</u>") all assets of the DIP Loan Parties and the proceeds thereof (collectively, the "<u>DIP Collateral</u>"), including, subject to the Final DIP Order, the proceeds of all claims and causes of action arising under chapter 5 of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable state-law equivalents (such claims and causes of action, the "<u>Avoidance Actions</u>," and any such proceeds thereof, the "<u>Avoidance Actions Proceeds</u>"), but excluding, in all cases, the Avoidance Actions.<br><br>The liens and security interests granted under the DIP Facility (i) will prime and be senior to the valid, perfected, and unavoidable liens and security interests in the Prepetition |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | Collateral, (ii) will be senior to the Adequate Protection Liens, and (iii) will be junior to (a) the Carve Out and (b) valid, perfected, and unavoidable liens in favor of third parties (other than liens on the Prepetition Collateral) that were in existence immediately prior to the Petition Date.<br><br>In each chapter 11 case of a DIP Loan Party, the DIP Agent, on behalf of itself and the other DIP Secured Parties, will also be granted in each of the Interim DIP Order and the Final DIP Order a superpriority administrative claim under section 364(c)(1) of the Bankruptcy Code for the payment of the DIP Obligation with priority above all other administrative claims to the extent allowed under the Bankruptcy Code, subject and subordinate to the Carve Out.<br><br>*See* Interim DIP Order ¶¶ 6–7. |
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B) | The Interim DIP Order provide a "Carve Out" of certain statutory fees and allowed professional fees of the Debtors and the Committee (if any), and a Post-Carve Out Trigger Notice Cap of $1.0 million, all as detailed in the Interim DIP Order.<br><br>*See* Interim DIP Order ¶ 8. |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | The adequate protection provided to the Prepetition Secured Parties shall be in accordance with the Interim DIP Order, and shall include (i) Adequate Protection Liens; (ii) Adequate Protection Superpriority Claims; (iii) Adequate Protection Fees; and (iv) Accrued Adequate Protection Payments.<br><br>*See* Interim DIP Order ¶ 13. |
| **Stipulations**<br>Bankruptcy Rule 4001(c)(l)(B)(iii) | The Interim DIP Order contains customary stipulations with respect to (i) the outstanding Prepetition Obligations as of the Petition Date, (ii) the validity, enforceability, and non-avoidability of the Prepetition Liens on the Prepetition Collateral, (iii) the Prepetition Secured Parties' lack of control over the Debtors or their property or operations, (iv) the lack of claims or causes of actions existing against, or with respect to, the Prepetition Secured Parties under the Prepetition Documents, and (v) the extent to which the Debtors' cash and other amounts on deposit or maintain in any account or accounts by the Debtors constitutes Cash Collateral.<br><br>*See* Interim DIP Order ¶ F. |
| **Releases**<br>Bankruptcy Rule 4001(c)(l)(B)(viii) | Subject to the rights and limitations set forth in paragraphs 24 and 25 of the Interim DIP Order, effective upon the entry of the Interim DIP Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge each of the DIP Lenders, the DIP Agent, the Prepetition Secured Parties, and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, affiliated investment funds or investment vehicles, managed, advised or sub-advised accounts, funds or other entities, investment advisors, sub-advisors or managers, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, each in their capacity as such (each, a "<u>Released Party</u>"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP Obligations, the DIP Superpriority |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | Claims, the DIP Liens, or the Prepetition Obligations or the Prepetition Liens, as applicable, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties other than any claims and liabilities arising from the actual fraud, gross negligence, or willful misconduct of a Released Party.<br><br>*See* Interim DIP Order ¶ 26. |
| **Challenge Deadline**<br>Bankruptcy Rule 4001(c)(l)(B) | A challenge shall be filed by no later than the date that is the earlier of:  (a) with respect to the Debtors and the Committee (if any), within 60 calendar days after appointment of the Committee and (b) with respect to any other party in interest with requisite standing, within 60 calendar days after entry of the Interim DIP Order (such time period, the "Challenge Period"); *provided* that in the event that, prior to the expiration of the Challenge Period, (x) these chapter 11 cases are converted to cases under chapter 7 of the Bankruptcy Code or (y) a chapter 11 trustee is appointed in these chapter 11 cases, then, in each such case, the Challenge Period shall be extended, solely with respect to such Trustee, until the later of (1) the Challenge Period and (2) the date that is ten calendar days from the date such Trustee is appointed.<br><br>*See* Interim DIP Order ¶ 25. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B) | The DIP Credit Agreement contains events of default (each, an "Event of Default") that are usual and customary for debtor-in-possession financings, including without limitation, failure to comply with the Cash Flow Forecast (subject to the Permitted Variances) and failure to satisfy any of the Milestones (unless waived by the DIP Required Lenders).<br><br>*See* DIP Credit Agreement § 7.01. |
| **Waiver/Modification of the Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv) | Pursuant to the Interim DIP Order, the automatic stay provisions of section 362 of the Bankruptcy Code are modified solely to the extent necessary to implement and effectuate the terms of the Interim DIP Order.<br><br>*See* Interim DIP Order ¶ 2(d). |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Loan Parties will, jointly and severally, indemnify the DIP Lenders, the DIP Agent, and other Indemnified Persons (as defined in the Interim DIP Order), and hold them harmless from and against any and all losses, claims, damages, costs, expenses, and liabilities arising out of or relating to the execution or delivery of the DIP Documents, transactions contemplated thereby, and any use of the proceeds of the DIP Facility and all other indemnified losses, claims, damages, costs, expenses, and liabilities to which the Indemnified Persons are entitled under the DIP Credit Agreement; *provided* that no Indemnified Person will be indemnified for costs, expenses, or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the actual fraud, gross negligence, or willful misconduct of such person (or their related persons).<br><br>*See* DIP Credit Agreement § 9.03; Interim DIP Order ¶ 23. |
| **Waiver of Section 506(c)**<br>Bankruptcy Rule 4001(c)(1)(B)(x) | Subject to entry of the Final DIP Order (but retroactive to the Petition Date), no expenses of administration of these chapter 11 cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code or otherwise, shall be charged against or recovered from the Prepetition Collateral or the DIP Collateral (except to the extent of the Carve Out), the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties pursuant to sections 105(a) or 506(c) |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the DIP Agent (acting at the direction of the DIP Required Lenders) and the Prepetition Agent (acting at the direction of the Required Lenders (as defined in the Prepetition Credit Agreement, the "Prepetition Required Lenders")), as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties. |
| | *See* Interim DIP Order ¶ 9. |

### Statement Regarding Significant Provisions

18.     The Interim DIP Order contains certain of the provisions (the "Significant Provisions")[7] identified in paragraph 8 of the Complex Rules as set forth below:

a.  ***Sale or Plan Confirmation Milestones.***  The DIP Credit Agreement contains milestones regarding the sale of the Debtors' assets, as outlined in the summary of material terms.  *See* DIP Credit Agreement § 5.22; Schedule 5.22.

b.  ***No-Cross Collateralization***.  The DIP Orders do not authorize, and the DIP Facility does not provide for, any cross-collateralization of the Debtors' funded debt.

c.  ***Roll Up***.  Upon the entry of the Interim DIP Order and the DIP Lenders' funding of the Interim Term Loans, approximately $21.7 million in outstanding balance under the Tranche A Bridge Term Loan under the Prepetition Credit Agreement held by the DIP Lenders shall be converted into Tranche A Roll-Up DIP Loans on a cashless, dollar-for-dollar basis.  Upon the entry of the Final DIP Order and the DIP Lenders' funding of the Final Term Loans, $70.2 million in outstanding balance under the Tranche B Term Loan and the Initial Term Loan under the Prepetition Credit Agreement held by the DIP Lenders shall be converted into Tranche B Roll-Up DIP Loans on a cashless, dollar-for-dollar basis.  *See* Interim DIP Order ¶ 2(b).

d.  ***Liens on Avoidance Actions or Proceeds of Avoidance Actions***.  The Interim DIP Order does not grant any liens on any Avoidance Actions or Avoidance Actions Proceeds.  Subject only to entry of the Final DIP Order, the DIP Secured Parties

---

[7]   Significant Provisions refer to those provisions that contain:  (a) sale or plan confirmation milestones; (b) cross collateralization; (c) roll ups; (d) liens on avoidance actions or proceeds of avoidance actions; (e) default provisions and remedies that are self-executing or preclude court oversight, including: (i) provisions terminating the automatic stay without further order, (ii) provisions waiving rights to challenge lenders' ability to exercise post-default remedies, and (iii) provisions limiting required proof or altering the burden of proof at post-default hearings; (f) releases of claims; (g) limitations on the use of cash collateral or DIP proceeds (other than general "carve outs") to pay approved fees and expenses of advisors to official committees or future trustees; (h) non-consensual priming liens; or (i) any other provision that limits the ability of estate fiduciaries to fulfill their duties under the Bankruptcy Code and applicable law.  *See* Complex Rules ¶ 8.

shall receive liens on the Avoidance Actions Proceeds, but in no event shall they receive liens on the Avoidance Actions. *See* Interim DIP Order ¶ 7(a).

e. ***Default Provisions and Remedies***. The Interim DIP Order provides for a five-day Notice Period (as defined in the Interim DIP Order) for all Events of Default, and thus such Notice Period is appropriate. *See* Interim DIP Order ¶ 19. In addition, there is no limit as to what parties in interest may raise at an emergency hearing scheduled during a Notice Period. *Id*.

f. ***Releases of Claims.*** Subject to the Challenge Period, effective upon the entry of the Interim DIP Order, each of the Debtors and the Debtors' estates shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge each of the DIP Lenders, the DIP Agent, the Prepetition Secured Parties, and each of their Related Parties, of and from any and all claims and causes of action as of the date of the entry of the Interim DIP Order with respect to or relating to the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, or the Prepetition Obligations or the Prepetition Liens, as applicable. *See* Interim DIP Order ¶ 26.

g. ***Limitations on the Use of DIP Facility Proceeds, DIP Collateral, and Cash Collateral.*** None of the DIP Facility, the DIP Collateral, or the proceeds thereof (including Cash Collateral) may be used (a) for any purpose prohibited under the Bankruptcy Code or by the DIP Orders (including not in accordance with the Cash Flow Forecast), (b) to finance any adversary action, investigation, or other litigation of any type that would be adverse to the interests of any of the DIP Secured Parties, solely in their capacities as such, or would result in an Event of Default, or (c) to make any distribution under a chapter 11 plan that does not provide for the indefeasible payment of the DIP Obligations in full and in cash, except to the extent the DIP Obligations are not paid in full in cash to fund the Wind-Down Budget, or unless otherwise agreed by the DIP Agent and DIP Required Lenders. Notwithstanding the foregoing, in no event shall an amount of proceeds of the DIP Loans equal to the amount designated in respect to Cure Costs in the applicable Cash Flow Forecast be utilized for any purpose other than Cure Costs. *See* DIP Credit Agreement § 5.10; Interim DIP Order ¶¶ 4; 24.

h. ***Non-Consensual Priming Liens***. The DIP Orders grant the DIP Agent for the benefit of the DIP Secured Parties fully perfected first priority priming liens on all DIP Collateral to the extent that such DIP Collateral is subject to any of the Prepetition Liens. *See* Interim DIP Order ¶ 7(c).

i. ***No Limitation on the Ability of Estate Fiduciaries to Fulfill Their Duties***. The DIP Orders do not limit the ability of the estate fiduciaries to fulfill their duties under the Bankruptcy Code and applicable law.

19. As required by paragraph 8 of the Complex Rules, the inclusion of each of the applicable Significant Provisions in the DIP Facility is appropriate and necessary to permit the

Debtors' access to the DIP Facility.  The terms and conditions of each of the Significant Provisions included in the DIP Orders are the result of arm's-length and hard-fought negotiations between the Debtors and the DIP Lenders, who are unwilling to provide the DIP Facility absent the inclusion of these provisions.  Further, no other existing stakeholder or third party has presented a lower cost or otherwise better DIP financing proposal.  As set forth herein, in the First Day Declaration, and in the Rose Declaration, granting the relief requested pursuant to the Interim DIP Order is critical to the continued operation of the Debtors' businesses and will permit the Debtors to smoothly transition into these chapter 11 cases, complete the prepetition sale process, and preserve the value of the Debtors' estates for all parties in interest.  In light of the foregoing, the Debtors submit that the Significant Provisions in the Interim DIP Order are appropriate and necessary under the facts and circumstances of these chapter 11 cases and should be approved.

### The Debtors' Prepetition Capital Structure

20.     As of the Petition Date, the Debtors' capital structure consists of outstanding funded-debt obligations in the aggregate principal amount of approximately $346.1 million, as summarized below:

| Credit Agreement Issuance | Maturity Date | Principal Amount Outstanding[8] | Amount Outstanding with Accrued Interest[9] |
|---|---|---|---|
| Initial Term Loan | May 25, 2026 | $207.5 million | $214.7 million |
| Tranche B Term Loan | May 25, 2026 | $68.0 million | $70.4 million |
| Tranche A Bridge Term Loan | February 25, 2026 | $24.1 million | $24.8 million |
| Revolving Facility | May 25, 2026 | $46.5 million | $48.1 million |
| *Total Funded Debt* | -- | **$346.1 million** | **$358.0 million** |

---

[8]     Balances as of September 11, 2024.

[9]     Balances as of September 11, 2024.

I.      **Prepetition Credit Agreement.**

21.     Certain of the Debtors are party to that certain Credit Agreement, dated as of May 25, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified in accordance with the terms thereof, the "Prepetition Credit Agreement" and, together with all security, pledge and guaranty agreements and all other "Loan Documents" (as defined in the Prepetition Credit Agreement, each as amended, supplemented or otherwise modified), the "Prepetition Documents") by and between DMS LLC, as borrower, DMSH LLC as holdings, 33 of DMSH LLC's affiliates as guarantors (the "Guarantor Subsidiaries" and together with DMS LLC and DMSH LLC the "Prepetition Loan Parties"), Truist Securities, Inc. and Fifth Third Bank, National Association as joint lead arrangers, Ankura Trust Company, LLC, as successor to Truist Bank, as administrative agent and collateral agent for the lenders party thereto (the "Prepetition Agent"), and those lenders from time to time party thereto (the "Prepetition Lenders" and together with the Prepetition Agent, the "Prepetition Secured Parties"). The Prepetition Credit Agreement initially provided the Prepetition Loan Parties with a senior secured term loan in an initial commitment amount of $225 million (the "Initial Term Loan") and a senior secured revolving credit facility in an initial aggregate commitment amount of $50 million (the "Revolving Facility"). Pursuant to the 2024 Amendment, as further explained herein, the Prepetition Credit Agreement was amended to provide a commitment of $22 million (the "Tranche A Bridge Term Loan") and restructure certain of the Initial Term Loan and the Revolving Facility into a Tranche B Term Loan (as defined herein). The Debtors' obligations under the Prepetition Credit Agreement (the "Prepetition Obligations") are secured by substantially all of the assets of the Prepetition Loan Parties. The Initial Term Loan, the Tranche B Term Loan, and the Revolving Facility mature on May 25, 2026. The Tranche A Bridge Term Loan matures on February 25, 2026.

22.     On August 16, 2023, the Prepetition Loan Parties and the Prepetition Lenders entered into an amendment of the Prepetition Credit Agreement (the "2023 Amendment"), which, among other things, allowed the Debtors to elect to make the quarterly interest payments due and payable on September 30, 2023 and each of the following three quarters (*i.e.*, through the second quarter of 2024) (the "PIK Election Period") via payment-in-kind ("PIK"), with all PIK interest to be paid in cash no later than December 31, 2025.  Pursuant to the terms of the 2023 Amendment, with respect to the Initial Term Loan and the Revolving Facility, the interest rate was calculated as follows, (i) prior to June 30, 2024, at the option of DMS LLC, either (A) in cash at a rate equal to (1) SOFR plus 8.0% or (2) the Base Rate plus 7.0% or (B) as PIK Interest at a rate equal to 11.0% and (ii) after June 30, 2024, at a rate equal to (A) SOFR plus 8.0% or (B) the Base Rate plus 7.0%; with respect to this clause (ii), such rates were subject to a decrease to 6.0% and 5.0% respectively if DMS LLC achieved a certain credit rating and repaid all PIK interest previously accrued.

23.     For the year ending on December 31, 2023, the Debtors elected to PIK $19.1 million and $4.3 million of interest on the Initial Term Loan and the Revolving Facility, respectively.  As such, as of December 31, 2023, the effective interest rate increased to 13.4% for the Initial Term Loan and 13.1% for the Revolving Facility.

24.     On April 17, 2024, the Prepetition Loan Parties and the Prepetition Lenders entered into another amendment of the Prepetition Credit Agreement (the "2024 Amendment").  Under the 2024 Amendment, the Prepetition Lenders agreed to, among other things, provide commitments with respect to the Tranche A Bridge Term Loan in an aggregate amount of $22 million with a maturity date of February 25, 2026.  Pursuant to the terms of the 2024 Amendment, $53.3 million of the Initial Term Loan and $12.7 million of commitments under the Revolving Facility were exchanged for a new Tranche B Term Loan in the aggregate amount

of $66 million (the "Tranche B Term Loan").  The 2024 Amendment provides the Debtors with the election to pay PIK interest on the Tranche A Bridge Term Loan for the interest period ending prior to March 31, 2025 and extends the PIK Election Period for all other Loans to the interest period ending on March 31, 2025.

25.     Pursuant to the terms of the 2024 Amendment, with respect to the Initial Term Loan, the Tranche B Term Loan, and the Revolving Facility, the interest rate is calculated as follows, (i) prior to March 31, 2025, at the option of DMS LLC, either (A) in cash at a rate equal to (1) SOFR plus 8.0% or (2) the Base Rate plus 7.0% or (B) in PIK at a rate equal to 11.0% and (ii) after March 31, 2025, at a rate equal to (A) SOFR plus 8.0% or (B) the Base Rate plus 7.0%; with respect to this clause (ii), such rates shall decrease to 6.0% and 5.0% respectively if DMS LLC has achieved a certain credit rating and repaid all PIK interest previously accrued.

26.     Pursuant to the terms of the 2024 Amendment, with respect to the Tranche A Bridge Term Loan, the interest rate is calculated as follows, (i) prior to March 31, 2025, at the option of DMS LLC, either (A) (1) SOFR plus 1.0% in cash and 7.0% in PIK Interest or (2) the Base Rate plus 2.0% in cash and 7.0% PIK, or (B) (1) SOFR plus 8.0% in cash or (2) the Base Rate plus 9.0%, and (ii) after March 31, 2025 (A) SOFR plus 8.0% or (B) the Base Rate plus 9.0%.

## II.     Equity Interests.

### A.     Preferred Stock.

27.     As of the Petition Date, DMS Inc. has two series of preferred stock authorized: (i) Series A convertible redeemable preferred stock (the "Series A Preferred Stock"), par value $0.0001 per share; and (ii) Series B convertible redeemable preferred stock (the "Series B Preferred Stock" together with the Series A Preferred Stock, the "Preferred Stock"), par value $0.0001 per share.  Pursuant to a securities purchase agreement executed on March 29, 2023 (the "Securities Purchase Agreement"), DMS Inc. issued (i) 80,000 shares of Series A Preferred

Stock and (ii) 60,000 shares of Series B Preferred Stock, for an aggregate purchase price of $14 million (the "Preferred Stock Issuance"). The Securities Purchase Agreement governing the Series A Preferred Stock and Series B Preferred Stock contain two key provisions designed to grant investors in the Preferred Stock access to cash shortly after the issuance: (i) the Immediate Redemption Right; and (ii) the Monthly Redemption Right.

28.     As of the Petition Date, 80,000 shares of Series A Preferred Stock and 60,000 shares of Series B Preferred Stock are outstanding. Both the Series A Preferred Stock and Series B Preferred Stock contain certain rights and preferences, including, among others, with respect to dividends and redemptions, and are convertible into Class A Common Stock.

**B.      Common Stock.**

29.     As of the Petition Date, DMS Inc. has two series of common stock authorized: (i) the Class A common stock, par value $0.0001 per share (the "Class A Common Stock"); and (ii) the Class B common stock, par value $0.0001 per share (the "Class B Common Stock" and together with the Class A Common Stock, the "Common Stock"). Approximately 4.4 million shares of Class A Common Stock and no shares of Class B Common Stock are outstanding as of the Petition Date. The Class A Common Stock formerly traded on the New York Stock Exchange (the "NYSE"), however, on September 25, 2023, the NYSE announced that the Class A Common Stock would be delisted and that trading in the Class A Common Stock was immediately suspended. On October 10, 2023, the NYSE filed a Form 25 with the Securities and Exchange Commission (the "SEC") to delist DMS Inc.'s Class A Common Stock. The delisting of the Class A Common Stock from the NYSE and its deregistration under Section 12(b) ("Section 12(b)") of the Securities Exchange Act of 1934 (the "Exchange Act") became effective on January 8, 2024. Since September 26, 2023, DMS Inc.'s Class A Common Stock has traded on an over-the-counter broker-dealer market administered by OTC Markets Inc. and the Financial

Industry Regulatory Authority ("<u>FINRA</u>") under the symbol "DMSL."  On August 13, 2024, DMS

Inc. filed a Form 15 with the SEC to terminate its obligations to file reports under Section 15(d)

of the Exchange Act and immediately suspend its SEC reporting obligations.

     **C.**    **Warrants.**

     30.    As of the Petition Date, DMS Inc. has four series of warrants to purchase Class A

Common Stock authorized:  (i) the Preferred Warrants, consisting of (x) warrants to purchase

550,268 Class A Common Stock (the "<u>Series A Warrant</u>s"), and (y) warrants to purchase 412,701

shares of Class A Common Stock (the "<u>Series B Warrants</u>"); (ii) the private placement warrants

of DMS Inc. issued (x) as a matter of law upon the conversion of Leo private placement warrants,

and (y) to certain entities as part of the Business Combination consideration (the "<u>Private</u>

<u>Placement Warrants</u>"); and (iii) the warrants of DMS Inc. issued as a matter of law upon the

conversion of the public warrants that were offered and sold by Leo as part of units in its initial

public offering (the "<u>Public Warrants</u>," together with the Series A Warrants, the Series B Warrants

and the Private Placement Warrants, the "<u>Warrants</u>").  There are 28,443,522 Warrants outstanding

as of the Petition Date with an option to purchase 1,896,235 shares of DMS Inc.'s Class A

Common Stock.  The Public Warrants formerly traded on the NYSE, however, on June 14, 2023,

the NYSE announced that the Public Warrants would be delisted and that trading in the Public

Warrants was immediately suspended.  On June 29, 2023, the NYSE filed a Form 25 with the SEC

to delist DMS Inc.'s Public Warrants.  The delisting of the Public Warrants from the NYSE and

their deregistration under Section 12(b) of the Exchange Act became effective on

September 27, 2023.  Since June 15, 2023, DMS Inc.'s Public Warrants have traded on an

over-the-counter broker-dealer market administered by OTC Markets Inc. and FINRA under the

symbol "DMSIW."  On August 13, 2024, DMS Inc. filed a Form 15 with the SEC to terminate its

obligations to file reports under Section 15(d) of the Exchange Act and immediately suspend its SEC reporting obligations.

**D.      Equity Incentive Interests.**

31.      Historically, DMS Inc. issued certain securities to eligible employees upon exercise of outstanding options, restricted share units ("RSUs"), or other share-based awards (the "Legacy Equity Incentive Interests") under the 2020 Omnibus Incentive Plan (the "Legacy Equity Incentive Program").  Approximately 127,000 securities are issuable upon exercise of outstanding options, warrants and rights awarded under the Debtors' 2020 Omnibus Incentive Plan.  In connection with the deregistration of the Common Stock and Preferred Stock, the Debtors notified eligible employees that, as of August 14, 2024, the settlement of any RSUs scheduled to vest after August 14, 2024 would be delayed until further notice.

**The DIP Facility**

**I.      The Debtors' Need for Immediate Access to the DIP Facility and Cash Collateral.**

32.      As described in the First Day Declaration and the Rose Declaration, the Debtors require immediate access to the DIP Facility, in addition to continued use of Cash Collateral, to fund operations, capital expenditures, and the administrative costs of these chapter 11 cases, including the continuation of the Prepetition Sale Process.  The Debtors filed these chapter 11 cases with less than $1 million in cash on hand, which is insufficient liquidity to operate their enterprise and continue paying their obligations as they come due.  Rose Decl. ¶ 8.

33.      The proposed DIP Facility will provide stability to the Debtors' business operations and facilitate a smooth entry into these chapter 11 cases.  The DIP Facility will also provide the funding necessary for the Debtors to complete the sale process for their assets.  Further, the DIP Facility will ensure the Debtors' ability to operate as a going-concern during these cases,

preserving the value of the Debtors' estates for the benefit of their stakeholders and minimizing disruption to the sale process. Rose Decl. ¶ 10.

34.     Absent the ability to access the funds available under the DIP Facility and Cash Collateral, the Debtors would likely face a value-destructive and immediate interruption to their operations and lose support from key stakeholders on which the Debtors' business depends, including vendors and employees. Rose Decl. ¶ 12. These interruptions, in turn, would hinder the Debtors' ability to pursue a sale for all or substantially all of their assets and maximize the value of their estates, since the Debtors would be forced to curtail their operations significantly, if not completely, to the detriment of all stakeholders. *Id.*

## II.     Alternative Sources of Financing Are Not Available on Better Terms.

35.     After solicitation of alternative postpetition financing by the Debtors and their advisors, no other party was willing to offer any DIP Financing, let alone DIP financing on terms better than the terms of the DIP Facility provided by the DIP Lenders. Specifically, potential third-party financing providers declined to provide financing in light of, among other things, the lack of basket capacity under the Prepetition Credit Agreement for any senior financing, the $95 million value of the stalking horse bid compared to the almost $350 million in Prepetition Obligations, and the limited unencumbered collateral and lack of tangible collateral in the Debtors' estates. *See* Sandahl Decl. ¶ 14.

36.     Accordingly, in consultation with their advisors, the Debtors determined that the DIP Facility provided by the Prepetition Lenders represented the only viable path to obtaining critical funding. The Debtors engaged in extensive negotiations with the Prepetition Lenders regarding the terms of the DIP Facility, including the size thereof and fees associated therewith. *See Id*. ¶¶ 16, 23. The Debtors believe that the DIP Facility contains reasonable and appropriate

terms and provisions under these extraordinary circumstances and is the Debtors' best—and only—available option for postpetition funding.

**III.    The DIP Facility Is Necessary to Preserve the Value of the Debtors' Estates.**

37.    Absent the liquidity to be provided by the DIP Facility, the Debtors may be forced to curtail their operations significantly and may not be able to consummate a sale of their assets through these chapter 11 cases.  *See* Sandahl Decl. ¶ 14; Rose Decl. ¶ 12.  Accordingly, the Debtors' businesses will be irreparably harmed absent a new source of postpetition liquidity.  Rose Decl. ¶ 12.  Consequently, the DIP Facility is necessary to preserve the Debtors' operations and maximize the value of the Debtors' estates.

<u>**Basis for Relief**</u>

**I.    The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Documents.**

**A.    Entry into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.**

38.    This Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Credit Agreement and the other DIP Documents, obtain access to the DIP Facility, and continue using Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  *See generally* 11 U.S.C. § 364.  Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re N Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re Trans World Airlines, Inc.*, 163 B.R.

964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment").

39.     To determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of the debtor's authority under the [Bankruptcy] Code").

40.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable).

41.     The Debtors' decision to enter into the DIP Facility is a sound exercise of the Debtors' business judgment following an arm's-length and hard-fought negotiation process with the Prepetition Lenders and their advisors and a failure to receive any viable alternative via the third-party DIP financing marketing process. *See* Sandahl Decl. ¶¶ 16, 24. The Debtors require postpetition financing to support their working capital needs and to operate smoothly in chapter 11. Rose Decl. ¶ 11. The Debtors and their advisors determined that the DIP Facility represented the only viable postpetition financing option available to the Debtors given the Debtors' liquidity needs and the realities imposed by the Debtors' existing capital structure. *See* Sandahl Decl. ¶¶ 16, 24. The DIP Facility provides certainty with respect to the capital necessary for the administration of these chapter 11 cases through the anticipated effective date, including with respect to funding

the Wind-Down Budget to ensure the orderly administration of the Debtors' estates following consummation of an asset sale. The fees, rates, and other economics provided for in the DIP Facility are in the Debtors' best interests given the circumstances and were, in the aggregate, a prerequisite to the DIP Lenders' funding of the New Money DIP Loans. Sandahl Decl. ¶¶ 24, 27. The DIP Facility, taken as a whole, offers the best and only available financing option to the Debtors under the facts and circumstances of these chapter 11 cases. *See id*. ¶ 18. Accordingly, this Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of the Debtors' business judgment.

**B.    The Debtors Should Be Authorized to Grant DIP Liens and DIP Superpriority Claims to the DIP Secured Parties.**

42.    The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Documents pursuant to section 364(c) of the Bankruptcy Code. Specifically, the Debtors propose to provide to the DIP Agent for the benefit of the DIP Secured Parties postpetition security interest in and liens on the DIP Collateral and Prepetition Collateral that are valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute, or subordination immediately upon entry of the Interim DIP Order.

43.    The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

      a.      the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

      b.      the credit transaction is necessary to preserve the assets of the estate; and

      c.      the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Group*, 71 B.R. at 549.

44.      The Debtors satisfy each part of this test.  As described above, no DIP financing proposals were available to the Debtors on an unsecured or junior basis.  *See* Sandahl Decl. ¶¶ 14, 15.  Additionally, given the Debtors' cash position as of the Petition Date and the value-destructive result if the Debtors could not sufficiently finance these chapter 11 cases and consummate a sale of their assets, entry into the DIP Facility is necessary to preserve the Debtors' assets.  Finally, taken as a whole and in light of the Debtors' cash position, capital structure, and lack of unencumbered assets, the terms of the DIP Facility are fair, reasonable, and adequate under the circumstances.

45.      In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt: [(a)] with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien."  11 U.S.C. § 364(c).  As described above, the Debtors are unable to obtain junior, let alone unsecured, credit.  Therefore, approving (a) superpriority claims in favor of the

DIP Secured Parties, (b) liens in favor of the DIP Agent for the benefit of the DIP Secured Parties on the unencumbered property of the estate, and (c) junior liens in favor of the DIP Agent for the benefit of the DIP Secured Parties subject to Prepetition Permitted Liens (as defined in the Interim DIP Order) is reasonable and appropriate.

46.      Section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). The Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition Secured Parties have consented or (b) the Prepetition Secured Parties' interest in collateral is adequately protected. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

47.      Here, the Prepetition Secured Parties consented or are deemed to have consented to the DIP Facility, and those parties constituting DIP Lenders actively participated in facilitating the proposed DIP Facility. As set forth more fully herein and in the Interim DIP Order, the Debtors propose to provide a variety of adequate protection to protect the interests of such parties. Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

**C.      No Comparable Alternative to the DIP Facility Is Reasonably Available on More Favorable Overall Terms.**

48.      A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986). In circumstances where only a few

lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area).

49.     No favorable alternative DIP financing is available to the Debtors given the realities imposed by the Debtors' existing capital structure and the nature of the Debtors' assets. Despite outreach to numerous sophisticated third-party institutions who regularly lend to distressed companies on a postpetition basis, the Debtors were unable to obtain any DIP financing proposals, or any interest at all in providing an alternative DIP facility, other than the proposed DIP Facility. *See* Sandahl Decl. ¶¶ 15, 26. Therefore, the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

## II.     The Debtors Should Be Authorized to Use Cash Collateral.

50.     Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor in possession to use cash collateral with the consent of the secured party. Here, the DIP Lenders and the Prepetition Secured Parties consent or are deemed to consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim DIP Order.

51.     As described above and in the First Day Declaration and the Rose Declaration, access to Cash Collateral during these cases is essential to the continued operation of the Debtors' businesses and smooth entry into these chapter 11 cases. *See* Rose Decl. ¶ 13. The projections contained in the Initial Cash Flow Forecast rely on the assumption that the Debtors will continue to access cash generated through ordinary course operations, and the Debtors would require further

postpetition financing if they could not access Cash Collateral. *Id.* ¶ 9. Access to Cash Collateral is critical to supplement the proceeds of the DIP Facility and support the necessary liquidity required for the Debtors to maintain ordinary course operations and administer these chapter 11 cases. Accordingly, continued use of Cash Collateral is in the best interests of the Debtors' estates and all of their stakeholders, including the Prepetition Secured Parties, and should be approved.

## III. Adequate Protection Provided to the Prepetition Secured Parties Is Appropriate and Should be Approved.

52.     Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral. Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994).

53.     The Debtors propose to provide the Prepetition Secured Parties with a variety of adequate protection to protect against the postpetition Diminution in Value of the Prepetition Collateral, including Cash Collateral, resulting from the use, sale, or lease of the Prepetition Collateral by the Debtors and the imposition of the automatic stay. The Adequate Protection package includes (a) the Adequate Protection Liens, (b) the Adequate Protection Superpriority Claim, (c) the Adequate Protection Fees, and (d) the Accrued Adequate Protection Payment (collectively, the "Adequate Protection Package"). In light of the foregoing, the proposed Adequate Protection Package to be provided for the benefit of the Prepetition Secured Parties is appropriate. The Debtors' provision of the Adequate Protection Package is not only necessary to

protect against any Diminution in Value but is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using Cash Collateral, subject to the terms and limitations set forth in the Interim DIP Order and the DIP Documents, including pursuant to the Cash Flow Forecast, for the benefit of all parties in interest and the Debtors' estates.

## IV. The Roll-Up Is Appropriate.

54.     The DIP Facility provides for the roll-up (a) effective as of the Interim DIP Order, of a portion of the Tranche A Bridge Term Loan and (b) effective of the Final DIP Order, of portions of the Tranche B Term Loan and the Initial Term Loan.  Specifically, the Debtors anticipate that approximately $21.7 million of the Tranche A Bridge Term Loan held by Prepetition Lenders funding the New Money DIP Loans will be converted to Tranche A Roll-Up DIP Loans on a cashless, dollar-for-dollar basis and approximately $61.3 million of the Tranche B Term Loan and $8.9 million of the Initial Term Loan held by Prepetition Lenders funding the New Money DIP Loans will be converted to Tranche B Roll-Up DIP Loans on a cashless, dollar-for-dollar basis.  For the avoidance of doubt, only the portions of the Tranche A Bridge Term Loan and the Tranche B Term Loan held by Prepetition Lenders funding the New Money DIP Loans and the potion of the Initial Term Loan held by the Prepetition Lenders that are funding New Money DIP Loans in lieu of non-participating Prepetition Lenders will be "rolled-up" on a pro rata basis.

55.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  Payment of existing obligations is appropriate where necessary to protect and preserve the estate, including an operating business's going concern value.  *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000)

(business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation). The business judgment rule shields a debtor's management from judicial second-guessing. *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

56.     Repayment of prepetition debt through a roll-up is a common feature in debtor-in-possession financing arrangements. The importance of roll-up features in DIP facilities has been repeatedly recognized by courts in this district and others, and such courts have granted relief similar to the relief requested herein. *See e.g.*, *In re Genesis Care Pty Ltd.*, No. 23-90614 (DRJ) (Bankr. S.D. Tex. July 17, 2023) (authorizing a "three to one" roll up of approximately $200 million new money DIP financing and approximately $600 million of roll-up DIP financing); *In re Cineworld Grp. Plc*, No. 22-90168 (Bankr. S.D. Tex. Sept. 8, 2022) (authorizing approximately $665 million in new money DIP financing and approximately $1.27 billion in DIP Financing used to refinance or purchase prepetition debt obligations); *In re Gastar Exploration, Inc.*, No. 18-36057 (MI) (Bankr. S.D. Tex. Nov. 26, 2018) (approving a DIP Facility consisting of approximately $100 million in new money DIP financing and approximately $283 million of roll-up DIP financing).

57.     The Roll-Up DIP Loans are a strict requirement of the DIP Lenders in agreeing to provide the DIP Facility. In fact, the Roll-Up DIP Loans were specifically contemplated in the 2024 Amendment as a condition for the Prepetition Lenders to provide the Tranche A Bridge Term Loan. *See* Sandahl Decl. ¶ 20. As discussed, the incremental funding from the 2024 Amendment was a Pre-DIP, funded on a prepetition basis to fund operations during, and execution of, the

Prepetition Sale Process, which the Debtors believed would maximize value relative to a near-term filing and exclusively postpetition sale process, and facilitate a "soft landing" into chapter 11.

58.     Notably, the Roll-Up DIP Loans are only provided to those Prepetition Lenders that agreed to provide the New Money DIP Loans, which was negotiated for by the Debtors in the lead up to these chapter 11 cases.  Sandahl Decl. ¶ 20.  Further, the Roll-Up DIP Loans are reasonable consideration for the DIP Lenders' willingness to fund the Wind-Down Budget and ensure the orderly administration of these cases, even if the Debtors do not repay the DIP Obligations in full.

59.     The DIP Facility would not be accessible to the Debtors absent the Debtors' agreeing to the Roll-Up DIP Loans.  Absent the DIP Facility, the Debtors would be unable to generate sufficient levels of operating cash to cover their working capital needs and the costs of these chapter 11 cases, which likely would prevent them from maximizing the value of their estates for the benefit of all parties in interest.  Given these circumstances, the Roll-Up DIP Loans are a reasonable and appropriate component of the DIP Facility and should be approved.

## V.     The Scope of the Carve Out Is Appropriate

60.     All liens and claims granted by the DIP Orders as security for the DIP Obligations and the Prepetition Obligations, including, without limitation, the DIP Liens, the DIP Superpriority Claims, and the proposed Adequate Protection Package, are subject to the Carve Out contained in the DIP Orders.  Without the Carve Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these chapter 11 cases would be restricted.  *See In re Ames Dep't Stores*, 115 B.R. at 40 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced.").  The Carve Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers.  Additionally, the Carve Out protects against administrative

insolvency during the course of these chapter 11 cases by ensuring that assets remain for the payment of the Clerk of this Court, U.S. Trustee fees, and professional fees of the Debtors and any statutory committee appointed under section 1102 of the Bankruptcy Code in these chapter 11 cases.

**VI.    The Debtors Should Be Authorized to Pay the Fees Required by the DIP Agent and DIP Lenders under the DIP Documents.**

61.    In connection with negotiating the DIP Facility, the Debtors have agreed, subject to Court approval, to pay certain fees and premiums to the DIP Agent and the DIP Lenders. In particular, as noted above, the Debtors have agreed to pay the fees consisting of the following:[10]

a.    ***Interest Rates***.  Interest on the DIP Loans shall accrue at a rate *per annum* equal to (i) with respect to Base Rate Loans (as defined in the DIP Credit Agreement), the Base Rate (as defined in the DIP Credit Agreement) plus 7.0%, which shall be payable (A) in cash, in a percentage per annum equal to 1.0% and (B) in kind, in a percent per annum equal to 6.0% and (ii) with respect to SOFR Loans (as defined in the DIP Credit Agreement), Adjusted Term SOFR (as defined in the DIP Credit Agreement), plus 8.0%, which shall be payable (A) in cash, in a percentage per annum equal to 1.0% and (B) in kind, in a percent per annum equal to 7.0% (the "Interest Rate").  The Debtors may elect whether any New Money DIP Loans are Base Rate Loans or SOFR Loans; *provided* that all Roll-Up DIP Loans shall be SOFR Loans;

b.    ***Closing Premium***.  8.00% of the New Money DIP Loans, payable in-kind upon the Closing Date (as defined in the DIP Credit Agreement);

c.    ***Exit Premium***.  $1,500,000, payable in cash upon the Final Maturity Date or, if sooner, the date of any prepayment of the New Money DIP Loans or a deemed payment or reduction of the New Money DIP Loans in connection with any credit bid by the DIP Agents or the DIP Lenders; and

d.    ***Annual DIP Agent Fee***.  $37,500.

62.    As set forth in the Sandahl Declaration, the principal economic terms proposed under the DIP Facility, such as the contemplated pricing, fees, interest rate, and default rate, are

---

[10]    The below description of fees is intended as an illustrative summary only and is qualified in its entirety by the terms of the DIP Credit Agreement and the other DIP Documents.

necessary to secure debtor-in-possession financing of this size, type, and purpose. *See* Sandahl Decl. ¶ 23. The fees and rates to be paid under the proposed DIP Facility (a) were the subject of hard fought and arm's-length negotiation, and (b) were expressly required as a condition to providing the DIP Facility. *Id.* Specifically, the Debtors have agreed, subject to Court approval, to pay the fees described above, pursuant to the DIP Documents, as consideration for the extension of postpetition financing. The Debtors considered the fees described above when determining that the DIP Facility constituted the best terms on which the Debtors could obtain the postpetition financing necessary to continue their operations and fund their cases. Accordingly, this Court should authorize the Debtors to pay the interest and fees provided under the DIP Documents.

## VII. The DIP Secured Parties Should Be Afforded Good-Faith Protection under Section 364(e) of the Bankruptcy Code.

63.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

64.     As explained herein, the DIP Documents are the result of:  (a) the Debtors' reasonable and informed determination that the DIP Lenders offered the best and only viable postpetition financing alternative available under the circumstances; and (b) extensive arm's-length, hard fought, and good-faith negotiations between the Debtors and the DIP Lenders, including their respective legal and financial advisors. The terms and conditions of the DIP

38

Documents are reasonable under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code and in accordance with the DIP Orders and the Cash Flow Forecast.  Accordingly, this Court should find that the DIP Secured Parties are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**VIII.   The Automatic Stay Should Be Modified on a Limited Basis.**

65.     The proposed Interim DIP Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Secured Parties to file any financing statements, security agreements, notices of liens, and other similar instruments and documents to validate and perfect the liens and security interests granted to them under the Interim DIP Order.  The proposed Interim DIP Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant liens to the DIP Secured Parties and the Prepetition Secured Parties and to incur all liabilities and obligations set forth in the Interim DIP Order.  The relief requested herein is necessary to give full force and effect to the DIP Facility, and, accordingly, the automatic stay should be modified as set forth in the DIP Orders.

**IX.   Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.**

66.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use Cash Collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, this Court may conduct a preliminary, expedited hearing on such motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  *See* Bankruptcy Rules 4001(b)(2), 4001(c)(2).  Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct

a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3).  Furthermore, the Complex Rules provide that "on motion by the debtors, a hearing will routinely be conducted as a first-day hearing to consider either cash collateral use and/or interim debtor-in-possession financing."  Complex Rules ¶ 5.

67.     The Debtors have an immediate postpetition need to use Cash Collateral and access the liquidity provided by the DIP Facility.  The Debtors cannot maintain the value of their estates during the pendency of these chapter 11 cases without access to the DIP Facility and Cash Collateral.  *See* Rose Decl. ¶¶ 12, 13.  The Debtors entered these chapter 11 cases with less than $1 million in cash on hand.  *Id*. ¶ 8.  Without immediate access to financing, the Debtors project that they will be unable to pay essential costs required to continue operating as a going concern, resulting in immediate and irreparable harm to their business.  *Id.* ¶ 13.  In particular, the Debtors require immediate access to liquidity to satisfy the day-to-day financing needs of their business operations, including to maintain business relationships with their vendors, pay wages and benefits, and satisfy other essential working capital and operational needs, all of which are required to preserve and maintain the Debtors' going-concern value during these chapter 11 cases for the benefit of all parties in interest.  *Id. ¶* 10.

68.     The Debtors will be unable to operate their business or otherwise fund these chapter 11 cases, including the sale process, without access to Cash Collateral and the liquidity provided by the DIP Facility and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest absent access thereto.  *Id.* ¶ 13.  The Debtors' ability to administer these chapter 11 cases through the use of Cash Collateral and the liquidity provided by the DIP Facility is vital to preserving and maximizing the value of the Debtors' estates.

69.     The Debtors request that this Court hold and conduct a hearing on an emergency basis to consider entry of the Interim DIP Order authorizing the Debtors, from and after entry of the Interim DIP Order until the Final Hearing, to receive initial funding under the DIP Facility and to utilize Cash Collateral.  The Debtors require access to Cash Collateral and the initial funding under the DIP Facility immediately following entry of the Interim DIP Order, on an emergency basis, to preserve operations and estate value.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

### Notice

70.     The Debtors will provide notice of this Motion to the following parties or their respective counsel:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the Prepetition Agent; (d) counsel to the DIP Lenders; (e) the agent under the DIP Facility and counsel thereto; (f) the office of the attorney general for each of the states in which the Debtors operate; (g) the Office of the United States Attorney for the Southern District of Texas; (h) the Internal Revenue Service; (i) the Securities and Exchange Commission; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no other or further notice is required.

*[Remainder of page intentionally left blank]*

41

WHEREFORE, the Debtors request that this Court enter the DIP Orders granting the relief requested herein and granting and such other relief as this Court deems appropriate under the circumstances.

Houston, Texas
Dated:  September 12, 2024

/s/  *John F. Higgins*

**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
James A. Keefe (TX Bar No. 24122842)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone:       (713) 226-6000
Facsimile:       (713) 226-6248
Email:           jhiggins@porterhedges.com
                 sjohnson@porterhedges.com
                 myoung-john@porterhedges.com
                 jkeefe@porterhedges.com


*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Elizabeth H. Jones (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900
Email:           joshua.sussberg@kirkland.com
                 elizabeth.jones@kirkland.com

-and-

Alexandra F. Schwarzman, P.C. (*pro hac vice* pending)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200
Email:           alexandra.schwarzman@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**<u>Certificate of Accuracy</u>**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Joe Marinucci*
Joe Marinucci

**<u>Certificate of Service</u>**

I certify that on September 12, 2024, I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ John F. Higgins*
John F. Higgins