## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| DIGITAL MEDIA SOLUTIONS, INC., *et al.*,[1] | ) Case No. 24-90468 (ARP) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER
(I) APPROVING THE BIDDING PROCEDURES, (II) SCHEDULING
CERTAIN DATES WITH RESPECT THERETO, (III) APPROVING
THE FORM AND MANNER OF NOTICE THEREOF, (IV) APPROVING
THE STALKING HORSE AGREEMENT AND EXPENSE REIMBURSEMENT,
(V) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION
AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES,
(VI) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF ASSUMED
EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (VII) AUTHORIZING
THE SALE OF ASSETS, AND (VIII) GRANTING RELATED RELIEF**

> **If you object to the relief requested, you must respond in writing. Unless otherwise directed by this Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within 21 days from the date this Motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within 21 days from the date this Motion was filed. Otherwise, this Court may treat the pleading as unopposed and grant the relief requested.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state

the following in support of this motion (this "Motion")[2] and in support thereof file the *Declaration*

---

[1]   A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/DMS. The location of Debtor Digital Media Solutions, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 4800 140th Avenue North, Suite 101, Clearwater, Florida 33762.

[2]   A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Joe Marinucci, Co-Founder and Chief Executive Officer of Digital Media Solutions, Inc. and Certain of its Affiliates, in Support of Chapter 11 Filing and First Day Motions* (the "First Day Declaration"), filed contemporaneously with the filing of this Motion and incorporated by reference herein. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration, the Sandahl Declaration, or the Bidding Procedures, as applicable.

*of Ryan Sandahl in Support of Debtors' Motion for Entry of an Order (I) Approving the Bidding Procedures, (II) Scheduling Certain Dates With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement and Expense Reimbursement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (VI) Authorizing the Assumption and Assignment of Assumed Executory Contracts and Unexpired Leases, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief*, contemporaneously herewith (the "Sandahl Declaration").

## Preliminary Statement[3]

1.      The Debtors commenced these chapter 11 cases to implement one or more value maximizing transactions for some or substantially all of their assets.  To that end, the Debtors file this Motion with a "stalking horse" asset purchase agreement (the "Stalking Horse Agreement") with an acquisition entity to be formed by their DIP Lenders (the "Stalking Horse Bidder") for a sale of substantially all of the Debtors' assets (the "Assets").  Importantly, the Stalking Horse Agreement contemplates a ***going-concern*** transaction with respect to the Assets, which will inure to the benefit of all stakeholders and minimize any disruption to the Debtors' business.

2.      The Debtors and Houlihan Lokey Capital, Inc. ("Houlihan"), the Debtors' proposed investment banker, launched a sale and marketing process for the Assets on April 23, 2024 (the "Prepetition Sale Process").  As part of the Prepetition Sale Process, the Debtors, with the assistance of Houlihan, contacted 118 potential investors, including 76 financial parties and 42 strategic parties.  Of those contacted, 38 executed nondisclosure agreements (the "NDA Parties")

---

[3]    Capitalized terms used in this Preliminary Statement but not otherwise defined shall have the meanings ascribed to them in this Motion.

and were provided with access to a confidential information presentation and substantial additional financial, operational, and legal diligence materials.

3.     On or after May 30, 2024, the Debtors received eight non-binding indications of interest ("IOIs") for some or substantially all of the Assets.  After receipt of the IOIs, the Debtors, together with Houlihan, undertook a comprehensive review of each and engaged in negotiations with each of the interested parties to improve initial bids.  From these IOIs, the Debtors selected five bidders to advance to the second round of the Prepetition Sale Process.  The Debtors received three letters of intent (the "LOIs") on July 16, 2024, for either substantially all of the Debtors' Assets or specific verticals, and a fourth LOI a few weeks later—two of the LOIs were from parties who did not originally submit IOIs.  After receipt of the LOIs, the Debtors, together with Houlihan, undertook a comprehensive review of each, including discussions with each interested party as to their intentions around their potential involvement in a postpetition auction.

4.     In the weeks leading up to the Petition Date, the Debtors and their advisors were engaged in extensive negotiations with a potential third-party stalking horse bidder.  After significant diligence and negotiation of deal terms, the potential third-party stalking horse bidder withdrew its offer shortly before the filing of these chapter 11 cases.  As a result, the Debtors pivoted to negotiating a stalking horse credit bid from the DIP Lenders.  Ultimately, the Debtors, in their business judgment and in consultation with their advisors, determined that the value maximizing path, based on market feedback and third-party interest, was to negotiate a stalking horse agreement with the Stalking Horse Bidder and initiate these chapter 11 cases to implement the sale.

5.     Pursuant to the relief requested in this Motion, the Debtors propose to continue their Prepetition Sale Process on an expedited, postpetition basis that aligns with the milestones set forth

in the DIP Facility.  Specifically, this Motion requests, and the bidding procedures attached to the Bidding Procedures Order as <u>Exhibit 1</u> (the "<u>Bidding Procedures</u>")[4] provide, approximately a 50 day process to close out any remaining leads from the Debtors' Prepetition Sale Process, assess any potential bidders that may emerge, solicit final Bids, and effectuate an orderly transition of the Debtors' Assets to the Stalking Horse Bidder if no better offer arises.  If approved, the Bidding Procedures will provide sufficient time for the Debtors to market the Assets, receive and evaluate Bids, and hold an auction to determine the highest or otherwise best Bids for the Assets.  Conversely, if the Bidding Procedures are not approved or there is any material delay to the proposed sale timeline, then the Debtors' ability to maximize value for the benefit of all stakeholders will be jeopardized.

6.     Accordingly, the Debtors respectfully request that this Court grant the relief requested herein.

<u>**Relief Requested**</u>

7.     The Debtors seek entry of an order, substantially in the form attached hereto (the "<u>Bidding Procedures Order</u>"):

    (a)    authorizing and approving the Bidding Procedures attached as <u>Exhibit 1</u> to the Bidding Procedures Order;

    (b)    scheduling certain dates and deadlines in connection with the Bidding Procedures;

    (c)    approving the form and manner of notice of an auction (the "<u>Auction</u>"), if any, and the sale or sales (each, a "<u>Sale Transaction</u>," and such notice the "<u>Sale and Auction Notice</u>"), attached as <u>Exhibit 2</u> to the Bidding Procedures Order, and the notice of the successful bidder (the "<u>Successful Bidder Notice</u>") attached as <u>Exhibit 4</u> to the Bidding Procedures Order;

---

[4]   All references to the Bidding Procedures herein are qualified in their entirety to the Bidding Procedures themselves.

(d)  authorizing the Debtors to (i) enter into the Stalking Horse Agreement on the terms substantially set forth therein, attached as <u>Exhibit 1</u> to the Bidding Procedures, and (ii) in connection with the Stalking Horse Agreement, agree to reimburse the Stalking Horse Bidder's reasonable and documented out-of-pocket fees and expenses (including attorney's fees and expenses) actually incurred in connection with the negotiation, diligence, execution, performance and enforcement of the Stalking Horse Agreement up to $1 million (the "<u>Expense Reimbursement</u>");

(e)  approving procedures for the assumption and assignment of executory contracts and unexpired leases in connection with the Sale Transactions (the "<u>Assumption and Assignment Procedures</u>"), and approving the form and notice thereof (the "<u>Cure Notice</u>"), attached as <u>Exhibit 3</u> to the Bidding Procedures Order; and

(f)  granting related relief.

8.  Additionally, the Debtors will seek entry of one or more orders (the "<u>Sale Order</u>") authorizing the sale of the Debtors' Assets to the Stalking Horse Bidder or other Successful Bidder on the terms set forth in the Stalking Horse Agreement or Modified APA (as defined in the Bidding Procedures), as applicable, which agreement shall be attached to the Sale Order.  The Debtors will file a proposed form of Sale Order and the Stalking Horse Agreement or Modified APA, as applicable, in advance of the hearing to consider the Sale Order.[5]

<u>**Jurisdiction and Venue**</u>

9.  The United States Bankruptcy Court for the Southern District of Texas (this "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent to the entry of a final order by this Court.

10.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[5]  If the Sale Order is seeking approval of the Stalking Horse Bid, such Sale Order shall be reasonably acceptable to the Stalking Horse Bidder.

11.     The bases for the relief requested herein are sections 105, 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") and rules 2002, 6004, 6006(a), 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rules 1075-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules"), and the *Procedures for Complex Cases in the Southern District of Texas* (the "Complex Rules").

### Background

12.     On September 11, 2024 (the "Petition Date"), the Debtors commenced filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors have filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

### The Proposed Sale Process and the Stalking Horse Bid

**I.      The Proposed Schedule.**

13.     Pursuant to the Bidding Procedures, the Debtors will solicit the highest or otherwise best Bids for their Assets according to the following proposed schedule, subject to Court approval and availability:

| Event or Deadline | Date and Time (All times in Central Time) |
|---|---|
| Bidding Procedures Objection Deadline and Stalking Horse Agreement Objection Deadline | October 2, 2024, at 4:00 p.m. |
| Bidding Procedures Hearing | October [●], 2024, at [●]:00 a.m./p.m. |
| Deadline to Serve the Sale and Auction Notice and Publish the Publication Notice | No later than three business days after entry of the Bidding Procedures Order |
| Deadline to Serve the Cure Notice | As soon as reasonably practicable after entry of the Bidding Procedures Order |
| Bid Deadline | October 18, 2024, at 4:00 p.m. |
| Cure Objection Deadline | October 22, 2024, at 4:00 p.m. |
| Auction (if Necessary) | October 22, 2024 |
| Deadline to file Successful Bidder Notice | As soon as reasonably practicable after the Auction |
| Sale Transaction Objection Deadline | October 25, 2024, at 4:00 p.m. |
| Assumption and Assignment Objection Deadline | October 25, 2024, at 4:00 p.m. |
| Adequate Assurance Objection Deadline | October 25, 2024, at 4:00 p.m. |
| Sale Transaction Reply Deadline | October 28, 2024, at 11:59 p.m. |
| Sale Hearing | October 29, 2024, or as soon as reasonably practicable thereafter |

14.    The proposed timeline provides the Debtors with an opportunity to conduct a thorough postpetition market test of the Stalking Horse Bid, conclude their Prepetition Sale Process, and pursue the highest or otherwise best offer(s) for their Assets without unduly burdening their estates.  During the Debtors' lengthy Prepetition Sale Process, relevant information regarding the Debtors' business was made available in the Data Room, allowing potential bidders to conduct diligence on the Debtors' business prior to the Petition Date.  To the extent any bidder has not previously conducted such diligence, such bidder will have immediate access to the information in the Data Room, subject to the execution of a Confidentiality Agreement.

15.     Moreover, the Debtors will use the time in the lead up to and following the entry of the Bidding Procedures Order to continue to actively market their business to solicit higher or otherwise better Bids.  In light of the foregoing, the Debtors have determined that the proposed schedule is in the best interests of the Debtors' creditors, other stakeholders, and all other parties in interest, and provides interested parties with sufficient opportunity to participate in the Sale Transactions.

## II.     The Stalking Horse Bid, the Material Terms of the Stalking Horse Agreement, and the Expense Reimbursement.

16.     The Debtors also request approval of the terms of the Stalking Horse Agreement. On September 11, 2024, the Debtors and the Stalking Horse Bidder reached agreement on the terms of the Stalking Horse Agreement.  Pursuant to the Stalking Horse Agreement, the Stalking Horse Bidder proposes to acquire substantially all of the Debtors' Assets for aggregate consideration of: (i) a "credit bid" pursuant to section 363(k) of the Bankruptcy Code of $95 million; (ii) the assumption of Assumed Liabilities; and (iii) the payment of Cure Costs, subject to higher or otherwise better bids (collectively, the "Purchase Price" and such bid the "Stalking Horse Bid").  Additionally, in recognition of the Stalking Horse Bidder's expenditure of time, energy, and resources, the Debtors also seek to offer the Stalking Horse Bidder the Expense Reimbursement.

17.     The following chart summarizes the terms and conditions of the Stalking Horse Agreement attached to the Bidding Procedures as Exhibit 1.[6]

---

[6]     This summary is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Stalking Horse Agreement, the Stalking Horse Agreement shall govern in all respects.  All references to schedules or sections in the following summary shall refer to schedules or sections of the Stalking Horse Agreement.  Terms used but not defined in this summary description have the meaning ascribed to such term as in the Stalking Horse Agreement.

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| **Stalking Horse Agreement Parties**<br><br>*See* **Preamble** | <u>Seller</u>:  Digital Media Solutions, Inc. and the subsidiaries listed in the Stalking Horse Agreement<br><br><u>Purchaser</u>:  The designee of the Credit Bid Party at the direction of the Required Lenders which joins the Stalking Horse Agreement as the "Purchaser" thereunder in accordance with the Stalking Horse Agreement |
| **Purchase Price**<br><br>*See* **§ 2.1** | The aggregate consideration (collectively, the "<u>Purchase Price</u>") to be paid for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities by Purchaser; (ii) a credit bid by the Credit Bid Party of $95,000,000 (or such lesser amount of the DIP Credit Agreement Indebtedness then outstanding under the DIP Credit Agreement, excluding indemnities, expenses, and agency fees) (the "<u>Credit Bid Amount</u>") pursuant to Section 363(k) of the Bankruptcy Code against certain obligations owed by Sellers under the DIP Financing Agreements as of the Closing (the "<u>Credit Bid</u>"), with the Credit Bid Amount allocated to payment of any such obligations under the DIP Financing Agreements until paid in full; and (iii) the payment of Cure Costs by Purchaser. |
| **Acquired Assets**<br><br>*See* **§ 1.1** | "<u>Acquired Assets</u>" means all of the properties, rights, interests and other assets of each Seller as of the Closing, whether tangible or intangible, real, personal or mixed, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP, including any such properties, rights, interests and other assets acquired by any Seller after the date hereof and prior to the Closing, and including Sellers' right, title and interest in and to, as of the Closing, the following assets of each Seller, but excluding in all cases the Excluded Assets:<br><br>(a)     subject to adjustment pursuant to <u>Section 1.5</u>, all Contracts listed on <u>Schedule 1.1(a)</u> (the "<u>Assigned Contracts</u>");<br><br>(b)     all Accounts Receivable owing from Persons that are not Sellers;<br><br>(c)     all Documents (including Personnel Files (to the extent that such information can be transferred under applicable Law));<br><br>(d)     the Leased Real Property listed on <u>Schedule 1.1(d)</u> (the "<u>Acquired Leased Real Property</u>"), including any Leasehold Improvements;<br><br>(e)     all tangible assets (including Equipment) of Sellers, including the tangible assets of Sellers located at any Acquired Leased Real Property and any tangible assets on order to be delivered to any Seller;<br><br>(f)     all rights against third parties (including customers, suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Assigned Contract), including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds (other than Tax refunds or attributes, in each case described in <u>Section 1.2(a)(viii)</u>), causes of action, rights of set off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties, and other similar rights, in each case, whether direct or derivative, known or unknown, liquidated or unliquidated, contingent or otherwise, in each case, arising out of or relating to events or circumstances occurring from and after the Closing Date with respect to any of the Acquired Assets or Assumed Liabilities (in each case, other than against any Seller);<br><br>(g)     all shares of capital stock and other equity interests that any Seller owns in the Persons set forth on <u>Schedule 1.1(g)</u> (the "<u>Transferred Subsidiaries</u>" and, together with the Subsidiaries of any Transferred Subsidiary, the "<u>Acquired Entities</u>"), including any securities convertible into, or exchangeable or exercisable |

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| | for, any such shares of capital stock or other equity interests in the Transferred Subsidiaries; |
| | (h)      to the extent transferable under applicable Law, all of the rights, interests and benefits (if any) accruing under all Permits and Governmental Authorizations, and all pending applications therefor; |
| | (i)      all avoidance claims or causes of action available to Sellers under Chapter 5 of the Bankruptcy Code (including Sections 544, 545, 547, 548, 549, 550 and 553) or any similar actions under any other applicable Law against the following: (i) any of Sellers' vendors, suppliers, employees, customers or trade creditors in regards or related to the Acquired Assets; (ii) any of Sellers' counterparties under any Assigned Contracts; and (iii) any Affiliates of any of the Persons listed in clauses (i) and (ii); |
| | (j)      the sponsorship of, and all rights, interests and assets associated with, the Seller Plans listed on Schedule 1.1(j), which (other than with respect to the Acquired Entity Plans) may be revised to add or remove any Seller Plans, in each case by Purchaser at its sole and absolute discretion, at any time prior to the date that is 30 days prior to the Closing (each Acquired Entity Plan and such other Seller Plans listed on Schedule 1.1(j), as may be so revised collectively, the "Assumed Benefit Plans"), together with all Contracts and funding arrangements related thereto (including any trusts, accounts, insurance policies, and administrative service Contracts), and all interests of Sellers in the assets of or relating to the applicable Assumed Benefit Plan, in each case, to the extent transferable in accordance with the existing terms and conditions thereof; |
| | (k)      all Owned IP, together with all goodwill associated therewith, all rights to sue and recover for infringements, dilutions, misappropriations of, or other conflicts with, such Owned IP, and all corresponding rights that, now or hereafter, may be secured throughout the world; |
| | (l)      all goodwill, payment intangibles and general intangible assets and rights of Sellers; |
| | (m)      all insurance proceeds, condemnation awards or other compensation, in respect of loss or damage to any of the Acquired Assets (excluding, for the avoidance of doubt, any recoveries under any directors' and officers' insurance policies, but including recoveries under any directors' and officers' insurance policies maintained by the Acquired Entities) to the extent occurring on or after the date hereof, and all rights and claims of Sellers to any such insurance proceeds, condemnation awards or other compensation not paid by the Closing; |
| | (n)      all rights of each Seller under Contracts containing non-disclosure or confidentiality, non-disparagement, non-compete, non-solicitation, assignment of or license under Intellectual Property, or other restrictive covenants with the Transferred Employees or any employees of each Seller terminated within 12 months prior to the Closing Date, or with any agents of each Seller or with third parties, in each case, primarily used in the Business; |
| | (o)      all Cash and Cash Equivalents, less the aggregate amount of Cash and Cash Equivalents necessary to fund the Wind-Down Budget; and |
| | (p)      all intercompany claims of any Seller against any Subsidiary of a Seller that is not a Debtor. |
| **Assumed Liabilities** <br><br> *See* § 1.3 | On the terms and subject to the conditions set forth in the Stalking Horse Agreement and subject to the entry and terms of the Sale Order, effective as of the Closing, Purchaser shall irrevocably assume from each Seller (or with respect to Taxes, if |

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| | applicable, from such Seller's applicable Affiliate) (and from and after the Closing pay, perform, discharge or otherwise satisfy in accordance with their respective terms), and Sellers (or with respect to Taxes, if applicable, Seller's applicable Affiliate) shall irrevocably transfer, assign, convey and deliver to Purchaser, only the following Liabilities, without duplication and only to the extent not paid on or prior to the Closing (collectively, the "Assumed Liabilities"): |
| | (a) all Liabilities and obligations of any Seller under the Assigned Contracts and Acquired Leased Real Property that arise and accrue from and after the Closing; |
| | (b) all cure costs required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts and Acquired Leased Real Property, including but not limited to the amounts listed on Schedule 10.3 (the actual amount of any such costs, the "Cure Costs"), to the extent not paid and discharged prior to or at the Closing; |
| | (c) all Liabilities (including all government charges or fees) arising out of the ownership or operation of the Acquired Assets by Purchaser from and after the Closing Date; |
| | (d) (i) all post-Petition Date accrued trade payables of Sellers that are reflected in the Cash Flow Forecast with respect to the Acquired Assets, up to $22,500,000 (the "Post-Petition AP Threshold"), plus (ii) all post-Petition Date accrued trade payables of Sellers with respect to the Acquired Assets that are in excess of the Post-Petition AP Threshold that are no more than 30 days past due; |
| | (e) all Liabilities relating to amounts required to be paid, or actions required to be taken or not to be taken, by Purchaser under the Stalking Horse Agreement; |
| | (f) all Liabilities related to, resulting from or arising out of, on or after the Closing, any (i) unredeemed refund amounts or similar items, (ii) customer deposits, or (iii) customer promotions and related programs; |
| | (g) without duplication, (i) all Taxes with respect to the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date, and (ii) all Taxes or other Liabilities with respect to the Acquired Assets with respect to which "responsible person" or similar claims may be made against any of any Seller's or any Affiliate of any Seller's employees, managers, officers, directors or similar persons, including pursuant to any wage payment statute ("Responsible Person Liabilities"); provided, that such Responsible Person Liabilities shall constitute Assumed Liabilities solely to the extent Sellers are unable to discharge such Responsible Person Liabilities due to the operation of the Bankruptcy Code or a lack of available funds; provided, further, that (A) Sellers shall take all commercially reasonable steps to discharge Responsible Person Liabilities in a manner that avoids such Taxes becoming Assumed Liabilities and (B) Sellers shall promptly notify Purchaser if they become aware of a material possibility that any Responsible Person Liabilities will become Assumed Liabilities; |
| | (h) other than as set forth under Section 6.3, all Liabilities arising on or after the Closing Date relating to Purchaser's employment of the Transferred Employees and all Liabilities and obligations assumed by Purchaser under Section 6.3; |
| | (i) the sponsorship of, and all Liabilities under or with respect to, the Assumed Benefit Plans; and |

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| | (j)      all Liabilities set forth on <u>Schedule 1.3(l)</u> (the Liabilities set forth on <u>Schedule 1.3(l)</u>, collectively, the "<u>Other Assumed Liabilities</u>"). |
| **Excluded Assets**<br>*See* § 1.2 | Notwithstanding anything to the contrary in the Stalking Horse Agreement, in no event shall Sellers be deemed to sell, transfer, assign, convey or deliver, and Sellers shall retain all right, title and interest to, in and under the following properties, rights, interests and other assets of Sellers (collectively, the "<u>Excluded Assets</u>"):<br><br>(a)      subject to adjustment pursuant to <u>Section 1.5</u>, all Contracts of Sellers listed on <u>Schedule 1.2(a)(i)</u> or that is not an Assigned Contract or Acquired Leased Real Property (the "<u>Excluded Contracts</u>");<br><br>(b)      all Documents (including information stored on the computer systems, data networks or servers of any Seller) (i) to the extent they relate solely to any of the Excluded Assets or Excluded Liabilities, (ii) that are Sellers' financial accounting Documents, all minute books, organizational documents, stock certificates, stock registers and such other books and records of any Seller as pertaining to ownership, organization or existence of such Seller, Tax Returns (and any related work papers), corporate seal, checkbooks and canceled checks, or (iii) that any Seller is required by Law to retain; <u>provided</u>, that Purchaser shall have the right to make copies of any portions of such Documents to the extent not prohibited by applicable Law;<br><br>(c)      all Documents prepared or received by any Seller or any of its Affiliates or on their behalf in connection with the sale of the Acquired Assets, the Stalking Horse Agreement or the other Transaction Agreements, the Transactions or the Bankruptcy Cases, including (i) all records and reports prepared or received by Sellers or any of their respective Affiliates or Advisors in connection with the sale of the Acquired Assets and the Transactions, including all analyses relating to the business of Purchaser or its Affiliates so prepared or received, (ii) all bids and expressions of interest received from third parties with respect to the acquisition of any of Sellers' businesses or assets (including any bids and expressions of interest unrelated to the sale process undertaken by Sellers in connection with the Stalking Horse Agreement), (iii) all privileged materials, documents and records of any Seller or any of its Affiliates, including any privileged materials, documents and records that are in the possession of any Acquired Entity, (iv) confidentiality agreements with prospective purchasers of the Acquired Assets or the Assumed Liabilities or any portion thereof, and (v) any other files or records to the extent relating exclusively to any Excluded Assets or Excluded Liabilities;<br><br>(d)      except as provided in <u>Section 1.1(m)</u>, all current and prior insurance policies of any Seller that are not Assumed Benefit Plans (including all director and officer insurance policies) and all rights and benefits of any nature of Sellers with respect thereto (including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries);<br><br>(e)      all shares of capital stock and other equity interests of any Seller or any of their respective Subsidiaries or securities convertible into, or exchangeable or exercisable for, any such shares of capital stock, or other equity interests, in all cases, other than any of the foregoing issued by any Acquired Entity;<br><br>(f)      all claims that any Seller may have against any Person solely with respect to any Excluded Assets or any Excluded Liabilities;<br><br>(g)      Sellers' claims, causes of action or other rights under the Stalking Horse Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument or other document executed and delivered between any Seller and Purchaser in connection with the Transactions, or any other agreement between any Seller and Purchaser entered into on or after the date hereof; |

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| | (h)    all Tax refunds, Tax attributes and Tax assets of Sellers; |
| | (i)    every asset of Sellers that would otherwise constitute an Acquired Asset (if owned immediately prior to the Closing) if conveyed or otherwise disposed of during the period from the date hereof until the Closing Date as permitted by the terms of the Stalking Horse Agreement; |
| | (j)    all demands, credits, statements, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising against suppliers, vendors, merchants, manufacturers and counterparties to any Contract that is not an Assigned Contract, arising out of or relating to matters occurring prior to the Petition Date; |
| | (k)    all materials, documents and records, in any form, whether written, electronic or oral, containing or reflecting any communications to or from, or the work product of, legal counsel to any Seller or any of its Affiliates; |
| | (l)    the properties, rights, interests and assets set forth on Schedule 1.2(a)(xii); |
| | (m)    other than the Assumed Benefit Plans, all Seller Plans, together with all Contracts and funding arrangements related thereto (including any trusts, accounts, insurance policies, and administrative service Contracts), and all interests of Sellers or the Acquired Entities in the assets of or relating to such Seller Plans; and |
| | (n)    Cash and Cash Equivalents in an amount equal to, and not in excess of, the aggregate amount of Cash and Cash Equivalents necessary to fund the Wind-Down Budget. |
| **Excluded Liabilities**<br><br>*See* § 1.4 | Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, any Seller or any of its Affiliates (other than the Acquired Entities) of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of, or in connection with, any act, omission or circumstances taking place prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities"). Purchaser hereby acknowledges and agrees that no Liability of any Acquired Entity (other than a Liability described in Section 1.4(e)) shall be an Excluded Liability and that all Liabilities of any Acquired Entity as of the Closing shall continue to be the Liabilities of such Acquired Entity.  Excluded Liabilities shall include all Liabilities of Sellers that are not expressly included in the Assumed Liabilities, including the following:<br><br>(a)    all costs and expenses incurred or to be incurred by Sellers in connection with the Stalking Horse Agreement and the consummation of the transactions contemplated by the Transaction Agreements, and the restructuring pursuant to the Bankruptcy Cases, including the restructuring and transaction fees and costs, as well as all consultancy fees and other professional expenses related to the Bankruptcy Cases;<br><br>(b)    all Liabilities to any broker, finder or agent or similar intermediary for any broker's fee, finders' fee or similar fee or commission relating |

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| | to the Transactions for which any Seller or its Subsidiaries or Affiliates are responsible; |
| | (c)      all Liabilities of Sellers relating to or arising from any CBA (including any related multiemployer pension plan), except as required by applicable Law; |
| | (d)      all Liabilities, to the extent not an Assumed Liability, arising out of, relating to, or with respect to any notice pay or benefits; |
| | (e)      all Liabilities of Sellers in respect of Indebtedness, including any intercompany Indebtedness among Sellers or due from an Acquired Entity to a Seller; |
| | (f)      all Liabilities of Sellers to their equity holders; |
| | (g)      all Liabilities of Sellers arising under or pursuant to any Environmental Laws, including with respect to any real property owned, operated, leased, or otherwise used by Sellers, whether or not used in the Ordinary Course, including any Liabilities for noncompliance with any Environmental Laws (including the release of Hazardous Substances), in each case to the extent arising as a result of any act, omission, or circumstances taking place on or prior to the Closing, whether known or unknown as of the Closing; |
| | (h)      all Liabilities arising in connection with any violation of any applicable Law either (i) commenced, filed, initiated or threatened as of the Closing, or (ii) relating to facts, events or circumstances arising or occurring prior to the Closing; |
| | (i)      all accounts payable of Sellers outstanding as of the Closing Date (other than any accounts payable assumed by Purchaser pursuant to <u>Section 6.14</u>) |
| | (j)      all Liabilities for Taxes that are not expressly assumed by Purchaser under <u>Section 1.3</u>, including (i) all Liabilities with respect to Taxes imposed on the Business or the Acquired Assets that are attributable to the Pre-Closing Tax Period, (ii) all income Tax Liabilities of Sellers for any Tax period, and (iii) any Tax or similar Liability related to the Excluded Assets; and |
| | (k)      all Liabilities arising out of, relating to, or with respect to any Action alleging violations of Privacy Obligations prior to the Closing. |
| **Representations and Warranties of the Debtors**<br><br>*See* Art. III | The Stalking Horse Agreement contains customary representations and warranties, including, but not limited to, representations of Seller regarding: (a) organization and qualification; (b) authorization of agreement; (c) conflicts and consents; (d) equity interests of acquired entities; (e) financial statements; (f) accounts receivables; (g) title to properties; (h) absence of certain changes; (i) contracts; (j) no litigation; (k) permits, compliance with laws; (l) environmental matters; (m) intellectual property; (n) data privacy, IT assets; (o) tax matters; (p) seller plans; (q) employees; (r) affiliate transactions; (s) insurance; (t) trade and anti-corruption; (u) brokers; and (v) disclaimer of other representations and warranties. |
| **Representations and Warranties of the Stalking Horse Bidder**<br><br>*See* Art. IV | The Stalking Horse Agreement contains customary representations and warranties, including, but not limited to, representations of Purchaser regarding: (a) organization and qualification; (b) authorization of agreement; (c) conflicts, consents; (d) financing; (e) brokers; (f) no litigation; (g) investment representation; (h) certain arrangements; (i) no foreign person; (j) disclaimer of additional representations or warranties; and (k) no outside reliance. |

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| **Expense Reimbursement**<br><br>*See* § 8.2(b) | If the Stalking Horse Agreement is terminated pursuant to Sections 8.1(e), 8.1(g), 8.1 (i), 8.1(j), 8.1(k), 8.1(l), or 8.1(m), then DMS will pay or cause to be paid to Purchaser by wire transfer of immediately available funds within three Business Days following such termination of the Stalking Horse Agreement an amount equal to the reasonable and documented out-of-pocket costs and expenses (including fees and expenses of counsel) incurred by Purchaser in connection with the negotiation, diligence, execution, performance and enforcement of the Stalking Horse Agreement, which amount will shall not exceed $1,000,000 (the "Expense Reimbursement"). |

18.     Approving the Stalking Horse Bid, including the Expense Reimbursement set forth therein, gives the Debtors the ability to maximize the value of the Assets for creditors and other stakeholders by setting the floor at the Auction, if any, and prompting an efficient conclusion to the Debtors' extended marketing process.  Thus, the designation of the Stalking Horse Bidder and decision to offer the Expense Reimbursement is a reasonable and sound exercise of the Debtors' business judgment and provides an actual benefit to the Debtors' estates.

## III.     The Bidding Procedures.

19.     To optimally and expeditiously solicit, receive, and evaluate Bids in a fair and accessible manner, the Debtors have developed and proposed the Bidding Procedures, attached as Exhibit 1 to the Bidding Procedures Order.

20.     Because the Bidding Procedures are attached to the proposed Bidding Procedures Order, they are not restated fully herein.  In sum, however, the Bidding Procedures establish, among other things:[7]

- the process by which the Debtors will provide the Bidding Procedures Order, the Bidding Procedures, the Sale and Auction Notice, and the Cure Notice to interested parties as soon as reasonably practicable after entry of the Bidding Procedures Order;

---

[7]     This summary is provided for the convenience of the Court and for parties in interest.  To the extent there is any conflict or inconsistencies between this summary and the Bidding Procedures, the Bidding Procedures control in all respects.

- the requirements that Potential Bidders must satisfy to participate in the sale process and become Qualified Bidders;

- the availability of and access to due diligence by the Potential Bidders;

- the deadlines and requirements for submitting Bids and the method and criteria by which such Bids will be evaluated to determine if such Bids are deemed to be Qualified Bids sufficient to trigger the Auction;

- the manner in which Qualified Bids will be evaluated by the Debtors to determine the Starting Bid;

- the conditions for having an Auction and procedures for conducting the Auction, if any;

- the criteria by which the Successful Bidder will be selected by the Debtors; and

- various other matters relating to the sale process generally, including the designation of the Back-Up Bid, return of any Good Faith Deposits, and certain reservations of rights.

21.     Importantly, the Bidding Procedures recognize and comply with the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all Bids and preserve the Debtors' rights to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates.

**IV.     Form and Manner of Sale and Auction Notice and Successful Bidder Notice.**

22.     The Auction, if any, shall take place on **October 22, 2024**, in person at Kirkland & Ellis LLP, 333 W Wolf Point Plaza, Chicago, IL 60654, or such other time or other place as the Debtors determine.

23.     Within three business days after entry of the Bidding Procedures Order, the Debtors will cause the Sale and Auction Notice, substantially in the form attached as <u>Exhibit 2</u> to the Bidding Procedures Order, to be served on the following parties or their respective counsel, if known: (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the Prepetition Agent and counsel thereto; (d) counsel to the DIP Lenders; (e) the agent under the DIP

Facility and counsel thereto; (f) the office of the attorney general for each of the states in which the Debtors operate; (g) the Office of the United States Attorney for the Southern District of Texas; (h) the Internal Revenue Service; (i) the Securities and Exchange Commission; (j) any statutory committee appointed in these chapter 11 cases; (k) each governmental agency that is an interested party with respect to the proposed Sale Transaction; (l) all parties that have expressed a written interest in the Assets; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002.

24.     In addition, within three business days, or as soon as reasonably practicable thereafter, after entry of the Bidding Procedures Order, the Debtors will publish the Sale and Auction Notice, with any modifications necessary for ease of publication, on one occasion in *New York Times* (national edition), *Financial Times* (global edition), and any such other national publications that the Debtors deem appropriate and disclose in the Claims and Noticing Agent's affidavits of service to provide notice to any other potential interested parties.  The Debtors will also publish the Sale and Auction Notice through publication on the Case Website: https://omniagentsolutions.com/DMS.

25.     The Sale and Auction Notice is reasonably calculated to provide all interested parties with timely and proper notice of any proposed Sale Transaction, including the date, time, and place of the Auction (if one is held) and the Bidding Procedures and the dates and deadlines related thereto.  Accordingly, the Debtors request that the form and manner of the Sale and Auction Notice be approved and no other or further notice of the Sale Transaction or the Auction, if any, be required.

26.     Promptly after the conclusion of the Auction (if any), the Debtors shall file with this Court and serve on the parties that received notice of the Motion, the Successful Bidder Notice,

attached to the Bidding Procedures Order as <u>Exhibit 4</u>.  The Debtors will also publish the Successful Bidder Notice through publication on the Case Website:  https://omniagentsolutions.com/DMS.

27.     The Successful Bidder Notice is reasonably calculated to provide all interested parties with timely and proper notice of any proposed Sale Transaction, including, without limitation:  (a) the Successful Bidder; (b) the Back-Up Bidder; and (c) the date, time, and place of the Sale Hearing.  Accordingly, the Debtors request that the form and manner of the Successful Bidder Notice be approved.

**V.     Summary of the Assumption and Assignment Procedures.**

28.     The Debtors are also seeking approval of the Assumption and Assignment Procedures set forth below to facilitate the fair and orderly assumption, assumption and assignment, or rejection of certain of the Debtors' executory contracts and unexpired leases (collectively, the "<u>Contracts</u>," and each, a "<u>Contract</u>") in connection with any Sale Transaction. The proposed Assumption and Assignment Procedures are as follows:

(a)     **Cure Notice.**  As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors shall file with this Court and serve via first class mail, electronic mail, or overnight delivery, the Cure Notice, attached as <u>Exhibit 3</u> to the proposed Bidding Procedures Order, on certain non-Debtor Contract counterparties (collectively, the "<u>Contract Counterparties</u>," and each, a "<u>Contract Counterparty</u>"), and post the Cure Notice to the Case Website:  https://omniagentsolutions.com/DMS.

(b)     **Content of Cure Notice.**  The Cure Notice shall notify the applicable Contract Counterparties that the Contracts may be subject to assumption and assignment in connection with the Sale Transaction, and contain the following information:  (i) a list of the applicable Contracts that may be assumed and assigned in connection with the Sale Transaction (the "<u>Assigned Contracts</u>," and each individually, an "<u>Assigned Contract</u>"); (ii) the applicable Contract Counterparties; (iii) the Debtors' good faith estimate of the proposed amount necessary, if any, to cure all monetary defaults, if any, under each Assigned Contract (the "<u>Cure Costs</u>"); and (iv) the deadline by which any Contract Counterparty to an Assigned Contract must file an objection to the proposed assumption, assignment,

cure, and/or adequate assurance and the procedures relating thereto (the "Cure Objection"); *provided* that service of a Cure Notice does not constitute an admission that such Contract is an executory contract or unexpired lease or that such Contract will be assumed at any point by the Debtors or assumed and assigned pursuant to any Successful Bid.

(c)     **Cure Objections**.   Cure Objections, if any, must:   (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, the Bankruptcy Local Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the Cure Objection pertains to the proposed Cure Costs, state the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with this Court prior to **October 22, 2024 at 4:00 p.m. (prevailing Central Time)** (the "Cure Objection Deadline"); *provided* that the Debtors may modify the Cure Objection Deadline by filing a notice of such modification on this Court's docket.

(d)     **Effects of Filing a Cure Objection.**   A properly filed Cure Objection will reserve such objecting party's rights against the Debtors only with respect to the assumption and assignment of the Contract at issue, and/or objection to the accompanying Cure Costs, as set forth in the Cure Objection, but will not constitute an objection to the remaining relief requested in the Motion.

(e)     **Dispute Resolution**.   Any Cure Objection to the proposed assumption and assignment of a Contract or Cure Costs that remains unresolved after the Sale Hearing, shall be heard at such later date as may be agreed upon by the parties or fixed by this Court.   To the extent that any Cure Objection cannot be resolved by the parties, such Contract shall be assumed and assigned only upon satisfactory resolution of the Cure Objection, to be determined in the applicable Successful Bidder's reasonable discretion.   To the extent a Cure Objection remains unresolved, the Contract may be conditionally assumed and assigned, subject to the consent of the Successful Bidder, pending a resolution of the Cure Objection after notice and a hearing.   If a Cure Objection is not satisfactorily resolved, the Successful Bidder may determine that such Contract should be rejected and not assigned, in which case the Successful Bidder will not be responsible for any Cure Costs in respect of such Contract.   Notwithstanding the foregoing, if a Cure Objection relates solely to the Cure Costs (any such objection, a "Cure Dispute"), the applicable Contract may be assumed by the Debtors and assigned to the Successful Bidder provided that the cure amount the Contract Counterparty asserts is required to be paid under Bankruptcy Code section 365(b)(1)(A) and (B) (or such lower amount as agreed to by the Contract Counterparty) is deposited in a segregated account by the Debtors pending this Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

19

(f) **Supplemental Cure Notice.** If the Debtors discover Contracts inadvertently omitted from the Cure Notice or the Successful Bidder identifies other Contracts that it desires to assume or assume and assign in connection with a Sale Transaction, the Debtors may, after consultation with the Successful Bidder, at any time before the closing of the Sale Transaction supplement the Cure Notice with previously omitted Contracts or modify a previously filed Cure Notice, including by modifying the previously stated Cure Costs associated with any Contracts (the "Supplemental Cure Notice"). The Debtors shall serve such Supplemental Cure Notice on the Contract Counterparties to Contracts that were added or removed or to the Contract Counterparties to Contracts for which the Cure Costs were changed.

(g) **Objection to the Supplemental Cure Notice.** Any Contract Counterparty listed on the Supplemental Cure Notice may file an objection (a "Supplemental Cure Objection") only if such objection is to the proposed assumption or assumption and assignment of the applicable Contracts or the proposed Cure Costs included in the Supplemental Cure Notice, if any. All Supplemental Cure Objections must: (i) state, with specificity, the legal and factual basis for the objection as well as what Cure Costs are required, if any; (ii) include appropriate documentation in support thereof; and (iii) be filed no later than 4:00 p.m. (prevailing Central Time) on the date that is 14 days following the date of service of such Supplemental Cure Notice, which date will be set forth in the Supplemental Cure Notice.

(h) **Dispute Resolution of Supplemental Cure Objection.** If a Contract Counterparty files a Supplemental Cure Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors shall seek an expedited hearing before this Court to determine the Cure Costs, if any, and approve the assumption of the relevant Contracts. If there is no such objection, then the Debtors shall obtain an order of this Court fixing the Cure Costs and approving the assumption of any Contract listed on a Supplemental Cure Notice. Notwithstanding the foregoing, if a Supplemental Cure Objection relates solely to the Cure Costs, the applicable Contract may be assumed by the Debtors and assigned to the Successful Bidder provided that the cure amount the Contract Counterparty asserts is required to be paid under Bankruptcy Code section 365(b)(1)(A) and (B) (or such lower amount as agreed to by the Contract Counterparty) is deposited in a segregated account by the Debtors pending this Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

(i) **No Cure Objections.** If there are no Cure Objections or Supplemental Cure Objections, or if a Contract Counterparty does not file and serve a Cure Objection or a Supplemental Cure Objection in a manner that is consistent with the requirements set forth above, and absent a subsequent order of this Court establishing an alternative Cure Cost, (i) the Cure Costs, if any, set

forth in the Cure Notice (or Supplemental Cure Notice) shall be controlling, notwithstanding anything to the contrary in any Contract or any other document, and (ii) the Contract Counterparty will be deemed to have consented to the assumption or assumption and assignment of the Contract and the Cure Costs, if any, and will be forever barred from objecting to the assumption or assumption and assignment of such Contract and rights thereunder, including the Cure Costs, if any, and from asserting any other claims related to such Contract against the Debtors or the Successful Bidder, or the property of any of them.

(j)    **Other Assumption Objections.**   All other assumption objections ("Other Assumption Objections") shall be made by the Sale Transaction Objection Deadline.  If there are no Other Assumption Objections, or if an objecting party does not file and serve an Other Assumption Objection in a manner that is consistent with the requirements set forth above for Cure Objections, and absent a subsequent order of this Court, (i) the assumption shall be effective, notwithstanding anything to the contrary in any Contract or any other document, and (ii) the Contract Counterparty will be deemed to have consented to the assumption or assumption and assignment of the Contract, and will be forever barred from asserting any other claims related to such Contract against the Debtors or the Successful Bidder, or the property of any of them.

### Basis for Relief

**I.**    **The Bidding Procedures Are Fair, Designed to Maximize the Value Received for the Assets, and Consistent with the Debtors' Reasonable Business Judgment**.

29.    A debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets.  *See, e.g.*, *In re Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc., et al. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Crutcher Resources Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business but the movant must articulate some business justification for the sale.").

30. The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See In re Adams Res. Expl. Corp.*, No. 17-10866 (KG), 2017 WL 5484017, at *3 (Bankr. D. Del. Sept. 20, 2017) ("The relief requested in the Sale Motion . . . is a necessary and appropriate step toward enabling the Debtor to maximize the value of its bankruptcy estate, and it is in the best interests of the Debtor, its estate and its creditors."); *In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets"); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."). To that end, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy transactions. *See, e.g.*, *In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets").

31. Here, the Bidding Procedures will continue the Debtors' significant prepetition efforts and promote active bidding from interested parties to elicit the highest or otherwise best offers available for some or all of the Assets. The Bidding Procedures are designed to facilitate orderly yet competitive bidding to maximize the value realized by these estates from any eventual transactions. In particular, the Bidding Procedures contemplate an open auction process and provide potential bidding parties—many of whom have been engaged with the Debtors for months—with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed Bid.

32.     Moreover, where there is a court-approved auction process, a full and fair price is presumed obtained for the assets sold, as the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999).  This is especially true here, where any Sale Transaction will have been subjected to an extensive pre- and postpetition marketing process and intensively scrutinized by the Debtors and their advisors. In addition, entry into the Stalking Horse Agreement will further ensure that the Debtors obtain fair market value by setting a minimum purchase price for the Debtors' Assets that will be tested in the marketplace.  As such, creditors of the Debtors' estates can be assured that the consideration obtained will be fair and reasonable and at or above market.

33.     In addition, as described herein, even as the Debtors move forward with their sale process, Houlihan will continue to market the Debtors' Assets and solicit other offers consistent with the Bidding Procedures, including, for example, by contacting previously solicited parties, continuing to provide acceptable bidders with Data Room access and requested information, and otherwise assisting the Debtors with all efforts to increase transaction value.  In this way, the number of bidders that are eligible to participate in a competitive Auction process will be maximized, or, if no Auction is held because no Auction is necessary, the Stalking Horse Agreement's Purchase Price will, conclusively, be fair value.

34.     The proposed Bidding Procedures will encourage competitive bidding and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.  Accordingly, this Court should enter the Bidding Procedures Order.  *See, e.g., In re Genesis Care Pty Ltd.*, No. 23-90614 (DRJ) (Bankr. S.D. Tex. July 19, 2023) (approving bidding procedures); *In re Center for Autism and Related Disorders, LLC*, No. 23-90709 (DRJ)

(Bankr. S.D. Tex. June 16, 2023) (same); *In re Pipeline Health System, LLC*, No. 22-90291 (MI)

(Bankr. S.D. Tex. Oct. 12, 2022) (same).

## II.   The Form and Manner of the Sale and Auction Notice and Notice of Successful Bidder Should Be Approved.

35.   Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors

with 21 days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rules 2002(c) and 6004(a), (b),

such notice must include the time and place of the Auction and the Sale Hearing and the deadline

for filing any objections to the relief requested herein.   As required under Bankruptcy

Rule 2002(c), the Debtors seek approval of the Sale and Auction Notice as proper notice of the

Auction.  Additionally, the Debtors seek approval of the notice of Successful Bidder as proper

notice of the Sale Transaction and related objection deadline.  Notice of this Motion and the related

hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale and

Auction Notice and the notice of Successful Bidder as provided for herein, constitutes good and

adequate notice of the Sale Transaction and the proceedings with respect thereto in compliance

with, and satisfaction of, the applicable requirements of Bankruptcy Rules 2002 and 6004.

Accordingly, the Debtors request that this Court approve the form and manner of the Sale and

Auction Notice and the notice of Successful Bidder.

## III.   The Expense Reimbursement Has a Sound Business Purpose and Should Be Approved.

36.   The Debtors also seek to approval of the Stalking Horse Bid, including the Expense

Reimbursement contemplated thereby.  The use of a stalking horse in a public auction process for

sales is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many

circumstances, the best way to maximize value in an auction process by "establish[ing] a

framework for competitive bidding and facilitat[ing] a realization of that value."  *Off. Comm. of*

*Unsecured Creditors v. Interforum Holding, LLC*, No. 11-CV-219, 2011 WL 2671254 at *1 n.1

(E.D. Wis. July 7, 2011).  Stalking horse bidders virtually always require expense reimbursement and, in many cases, other forms of bidding protections such as breakup fees as an inducement for "setting the floor at auction, exposing [their] bid[s] to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement." *Id.* (citation omitted).  Thus, the use of bid protections, including expense reimbursements, has become an established practice in chapter 11 cases.

37.     Indeed, stalking horse expense reimbursements are a normal, and, in many cases, necessary component of significant sales conducted under section 363 of the Bankruptcy Code. For example, courts have found that because a "corporation [has] a duty to encourage bidding, [bid protections] can be ***necessary*** to discharge [such] duties to maximize value. . . . [Bid protections] may 'be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking.'" *In re Integrated Res., Inc.*, 147 B.R. at 660–61 (emphasis added).  Courts have recognized that various forms of bid protections "may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking." *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (citation and quotations omitted); *see also Integrated Res.*, 147 B.R. at 660–61 (noting bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid").

38.     Courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate.  *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999) ("In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the

estate."). The allowance of the Expense Reimbursement is in the best interests of the Debtors'
estates and their creditors, as the Stalking Horse Agreement establishes a floor for further bidding
that may increase the consideration given in exchange for the Assets that are the subject of the
Stalking Horse Agreement, which will inure to the benefit of the Debtors' estates and all parties in
interest.

39.     Courts in the Fifth Circuit apply the "business judgment rule" standard and consider
whether (a) the incentive hampers, rather than encourages, bidding, and (b) the amount of the
incentive is unreasonable relative to the proposed purchase price. *See In re ASARCO, L.L.C.*, 650
F.3d 593 (5th Cir. 2011) (affirming bankruptcy court's decision to apply the business judgment
rule to evaluate whether an expense reimbursement bid protection was permissible); *see also
In re ASARCO LLC*, 441 B.R. 813, 826 (S.D. Tex. 2010) (explaining three-part test used to
determine whether expense reimbursement was permissible under business judgment rule).

40.     The Expense Reimbursement provided to the Stalking Horse Bidder (a) is an actual
and necessary cost and expense of preserving the Debtors' estates within the meaning of
sections 503(b) and 507(a)(2) of the Bankruptcy Code, (b) is commensurate to the real and
material benefits conferred upon the Debtors' estates by the Stalking Horse Bidder, and (c) is fair,
reasonable, and appropriate, including in light of the size and nature of the proposed transactions,
the commitments that have been made, and the efforts that have been and will be expended by the
Stalking Horse Bidder. Sandahl Decl. ¶ 23.

41.     The Expense Reimbursement was necessary to induce the Stalking Horse Bidder to
enter into the Stalking Horse Agreement. *Id.* In the weeks leading up to the Petition Date, the
Debtors and their advisors engaged in extensive good faith, arm's-length negotiations with a
potential third-party stalking horse bidder. After significant diligence and negotiation of deal

terms, the third-party withdrew its offer shortly before the filing of these chapter 11 cases.  Sandahl

Decl. ¶ 11.  As a result, the Debtors pivoted to negotiating a stalking horse credit bid with its DIP

Lenders.  *Id.*  To adequately protect the DIP Lenders from the time and expense related to finalizing

the Stalking Horse Agreement in an expedited timeframe, the Stalking Horse Bidder requested a

reasonable Expense Reimbursement.  In short, the proposed Expense Reimbursement is fair and

reasonable under the circumstances because it constitutes a "fair and reasonable percentage of the

proposed purchase price" and are "reasonably related to the risk, effort, and expenses of the

prospective purchaser."  *Integrated Res.*, 147 B.R. at 662.

42.     The Expense Reimbursement is a sound exercise of the Debtors' business judgment

and is in the best interests of the Debtors, their estates, and all parties in interest.  Accordingly, this

Court should approve the Expense Reimbursement and similar Expense Reimbursements have

been approved by this Court.  *See, e.g.*, *In re Center for Autism and Related Disorders, LLC*, No.

23-90709 (DRJ) (Bankr. S.D. Tex. June 16, 2023) (authorizing stalking horse expense

reimbursement up to $350,000); *In re Genesis Care Pty Limited*, No. 23-90614 (DRJ) (Bankr. S.D.

Tex. July 19, 2023) (authorizing stalking horse expense reimbursement subject to a cap to be

agreed upon by the debtors and the applicable stalking horse bidder); *In re Pipeline Health System,

LLC*, No. 22-90291 (MI) (Bankr. S.D. Tex. Oct. 12, 2022) (same);  *In re BJ Services, LLC*,

No. 20-33627 (MI) (Bankr. S.D. Tex. July 29, 2020) (authorizing stalking horse expense

reimbursement subject to a cap of three percent of the purchase price on account of all bid

protections).

## IV.     This Court Should Approve the Debtors' Entry into One or More Asset Purchase Agreements as a Sound Exercise of Business Judgment.

43.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and

a hearing, may use, sell or lease, other than in the ordinary course of business, property of the

estate." 11 U.S.C. § 363(b)(1).  Bankruptcy courts routinely authorize the sale of a debtor's assets if such sale is based upon "some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."  *In re Continental Air Lines, Inc.*, 780 F.2d at 1226; *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996).

44.    The business judgment rule shields a debtor's management's decisions from judicial second-guessing.  *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) (a "presumption of reasonableness attaches to a debtor's management decisions" and courts generally will not entertain objections to the debtor's conduct after a reasonable basis is set forth).  Once a debtor articulates a valid business justification, the court should review that request under the business judgment rule.  *See In re Gulf Coast Oil Corp.*, 404 B.R. 407, 415 (Bankr. S.D. Tex. 2009) (noting that a debtor in possession has the discretionary authority to exercise business judgment given to an officer or director of a corporation).   The business judgment rule protects certain debtor decisions—such as the Debtors' entry into one or more definitive purchase agreements—from reevaluation by a court with the benefit of hindsight.  *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F. 2d 1303, 1311 (5th Cir. 1985) ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.").  Thus, if a debtor's actions satisfy the business judgement rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

### A.    A Sound Business Purpose Exists for the Sale Transaction.

45.    The Debtors have a sound business justification for selling the Assets.  The Debtors believe the Sale Transaction will maximize the value of their Assets after exposing them to the market as part of a competitive, arm's-length process.

46.     The Stalking Horse Bidder and Stalking Horse Agreement will be subject to competing Bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets.  Consequently, the ultimate Successful Bid(s), being the product of an extensive prepetition marketing process and a further "market check" in the form of the Auction (if warranted), will constitute, in the Debtors' reasonable business judgment, the highest or otherwise best offer for the Assets and will provide a greater recovery for their estates than any known or practicably available alternative.  *See, e.g., In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure . . . the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction").  As such, the Debtors' determination to sell the Assets through an Auction process and subsequently to enter into the Stalking Horse Agreement or the Modified APA, as applicable, will be a valid and sound exercise of the Debtors' business judgment.  The Debtors will submit evidence at the Sale Hearing to support these conclusions.  Therefore, the Debtors request that this Court authorize the proposed Sale Transaction as a proper exercise of the Debtors' business judgment.

## B.      The Sale Transaction Should Be Approved "Free and Clear" Under Section 363(f) of the Bankruptcy Code.

47.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if:  (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f).

48.     Section 363(f) of the Bankruptcy Code is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Assets free and clear of any and all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon (collectively, the "Interests"), except with respect to any Interests that may be assumed Interests under definitive purchase agreement of the applicable Successful Bidder. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

49.     Any interest that will not be an assumed liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and any such Interest will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sale Transaction, subject to any claims and defenses the Debtors may possess with respect thereto.  The Debtors accordingly request authority to convey the Assets to the Successful Bidder(s) free and clear of all Interests including liens, claims, rights, interests, charges, and encumbrances, with any such liens, claims, rights, interests, charges, and encumbrances to attach to the proceeds of the applicable Sale Transaction.

**C.      The Bidding Procedures Ensure that the Sale Transaction Will Be Proposed in Good Faith and Without Collusion, and the Stalking Horse Bidder or Successful Bidder Are "Good Faith Purchasers."**

50.     The Debtors request that this Court find the Stalking Horse Bidder and/or other Successful Bidder arising from the Auction, if any, are entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale Transaction for

the Assets, and that the Stalking Horse Bidder and/or any other Successful Bidder, is or would be

a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code.[8]

Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

51.    Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold

pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the

purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser

leased or purchased the assets in "good faith."  While the Bankruptcy Code does not define "good

faith," courts have held that a purchaser shows its good faith through the integrity of its conduct

during the course of the sale proceedings, finding that where there is a lack of such integrity, a

good-faith finding may not be made.  *See, e.g., In re Abbotts Dairies of Pa., Inc*., 788 F.2d 143 (3d

Cir. 1986) ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial

sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an

attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Servs.,*

---

[8]    A finding of good faith within the meaning of section 363(m) of the Bankruptcy Code will be appropriate for any Successful Bidder arising from the Auction.  Pursuant to the Bidding Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bidding Procedures.  In addition, the Debtors will not choose as the Successful Bidder or Back-Up Bidder any entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted, and will be prepared to present this Court with sufficient evidence at the Sale Hearing for this Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

*Inc.*, 798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

52.     The Debtors submit that the Stalking Horse Bidder, or any other Successful Bidder arising from the Auction (if any), is or would be "good faith purchasers" within the meaning of section 363(m) of the Bankruptcy Code, and the Stalking Horse Agreement, or any Modified APA, are or would be good-faith agreements on arms'-length terms entitled to the protections of section 363(m) of the Bankruptcy Code.  *First*, as set forth in more detail above, the consideration to be received by the Debtors pursuant to the Stalking Horse Agreement is substantial, fair, and reasonable.  *Second*, the parties entered into the Stalking Horse Agreement in good faith and after extensive, arm's-length negotiations, during which all parties were represented by competent counsel, and any sale agreement with a Successful Bidder will be the culmination of a competitive Auction process in which all parties will presumably be represented by counsel and all negotiations will be conducted on an arm's-length, good-faith basis.  *Third*, there is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders," or similar conduct that would cause or permit the Sale Transaction or Stalking Horse Agreement to be avoided under section 363(n) of the Bankruptcy Code.  Moreover, with respect to potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process.  *Finally*, the Stalking Horse Bid was evaluated and approved by the Debtors in consultation with their advisors, and any other Bids that the Debtors ultimately determine to be a Successful Bid will have been evaluated in a similar fashion.  Accordingly, the Debtors believe that the Stalking Horse Bidder (or other Successful Bidder arising from the Auction, if any) and Stalking Horse Agreement (or

Modified APA) should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

> **D.     Credit Bidding Should Be Authorized Under Section 363(k) of the Bankruptcy Code.**

53.     A secured creditor is allowed to "credit bid" the amount of its claim in a sale. Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k).  Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) of the Bankruptcy Code allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the claim's economic value.  *See In re Submicron Sys. Corp.*, 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining that "[i]t is well settled among district and bankruptcy courts that creditors can bid the full face value of their secured claims under section 363(k)").

54.     Accordingly, the DIP Lenders and Prepetition Lenders should be entitled to credit bid some or all of the claims secured by their collateral pursuant to section 363(k) of the Bankruptcy Code.

> **V.     The Assumption and Assignment Procedures Are Appropriate and Should Be Approved**.

> **A.     The Assumption and Assignment of the Assigned Contracts Reflects the Debtors' Reasonable Business Judgment**.

55.     To facilitate and effectuate the Sale Transaction, the Debtors seek authority to assign or transfer the Assigned Contracts to a Successful Bidder (including, for the avoidance of doubt, the Stalking Horse Bidder) to the extent required by such bidder.  Section 365 of the

Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court; *provided* that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g.*, *Richmond Leasing*, 762 F.2d at 1309 (applying a business judgment standard to debtor's determination to assume unexpired lease).

56.     The Debtors also request that any party that fails to object to the proposed assumption and assignment of any Assigned Contract be deemed to consent to the assumption and assignment of the applicable Assigned Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the cure amounts identified in the Cure Notice. *See, e.g.*, *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent).

57.     Here, this Court should approve the decision to assume and assign the Assigned Contracts in connection with the Sale Transaction as a sound exercise of the Debtors' business judgment. *First*, the Assigned Contracts are essential to the value of the Assets and, as such, they are essential to inducing the highest or otherwise best offer for the Assets. *Second*, it is unlikely that any purchaser would want to acquire certain of the Assets unless the Assigned Contracts needed to conduct business and manage day-to-day operations of those Assets were included in the transaction. *Third*, the Assigned Contracts will be assumed and assigned through the process approved by this Court pursuant to the Bidding Procedures Order and, thus, the Debtors' decisions will be reviewed by the Debtors' stakeholders who will have the opportunity to object.

58.     Accordingly, the assumption and assignment of the Assigned Contracts pursuant to the Assumption and Assignment Procedures should be approved as an exercise of the Debtors' business judgment.

**B.     Defaults Under the Assumed Contracts Will Be Cured in Connection with any Sale Transaction.**

59.     Upon finding that a debtor has exercised its business judgment in deciding to assume an executory contract, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder.  This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

60.     The statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be satisfied because the Assumption and Assignment Procedures provide a clear process by which to resolve disputes over cure amounts or other defaults.  The Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-Debtor parties.

**C.     Non-Debtor Parties Will Be Adequately Assured of Future Performance.**

61.     Similarly, the third requirement of section 365(b) of the Bankruptcy Code— adequate assurance of future performance—is also satisfied given the facts and circumstances present here.   "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic

construction based upon the facts and circumstances of each case." *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982).  Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance." *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

62.     The Debtors will demonstrate that the requirements for assumption and assignment of the Assigned Contracts to the Successful Bidder will be satisfied.  The Debtors will evaluate the financial wherewithal of Potential Bidders before designating such party a Qualified Bidder or Successful Bidder (*e.g.*, financial credibility, willingness, and ability of the interested party to perform under the Contracts), including as it relates to such Qualified Bidder's willingness and ability to perform under the Assigned Contracts.  Further, the Assumption and Assignment Procedures provide this Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder to provide adequate assurance of future performance and object to the assumption of the Contracts or proposed cure amounts.  This Court therefore will have a sufficient basis to authorize the Debtors to reject or assume and assign the Contracts as set forth in the definitive purchase agreement of the Successful Bidder.

**Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

63.     The Debtors request that this Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Reservation of Rights**

64.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as:  (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion/ or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.  If this Court grants the relief sought herein, any payment made pursuant to this Court's order is not intended and should not be construed as an admission as to the validity of any

particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

### Notice

65.     The Debtors will provide notice of this Motion to the following parties or their respective counsel:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the Prepetition Agent and counsel thereto; (d) counsel to the DIP Lenders; (e) the agent under the DIP Facility and counsel thereto; (f) the office of the attorney general for each of the states in which the Debtors operate; (g) the Office of the United States Attorney for the Southern District of Texas; (h) the Internal Revenue Service; (i) the Securities and Exchange Commission; (j) any statutory committee appointed in these chapter 11 cases; (k) each governmental agency that is an interested party with respect to the proposed Sale Transaction; (l) all parties who have expressed a written interest in the Assets; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no other or further notice is required.


*[Remainder of Page Left Intentionally Blank.]*

WHEREFORE, the Debtors request that this Court enter the Bidding Procedures Order granting the relief requested herein and such other relief as this Court deems appropriate under the circumstances.

Houston, Texas
Dated:  September 12, 2024

/s/ *John F. Higgins*

**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
James A. Keefe (TX Bar No. 24122842)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone:      (713) 226-6000
Facsimile:      (713) 226-6248
Email:          jhiggins@porterhedges.com
                sjohnson@porterhedges.com
                myoung-john@porterhedges.com
                jkeefe@porterhedges.com


*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Elizabeth H. Jones (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                elizabeth.jones@kirkland.com

-and-

Alexandra F. Schwarzman, P.C. (*pro hac vice* pending)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          alexandra.schwarzman@kirkland.com


*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

I certify that on September 12, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ John F. Higgins*
John F. Higgins