**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| | ) Case No. 24-90468 (ARP) |
| DIGITAL MEDIA SOLUTIONS, INC., *et al.*,[1] | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) **Re: Docket Nos. 18, 22** |

**OMNIBUS OBJECTION OF THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS
TO DEBTORS' EMERGENCY MOTIONS TO OBTAIN POST-PETITION
DEBTOR-IN-POSSESSION FINANCING AND APPROVE BIDDING PROCEDURES**

The Official Committee of Unsecured Creditors (the "Committee") of Digital Media Solutions, Inc. and its debtor affiliates (collectively, the "Debtors" or "Company") in the above-captioned cases (the "Chapter 11 Cases") by and through its undersigned proposed counsel, hereby submits this omnibus objection (this "Objection") to final approval of the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Senior Secured Priming Liens And Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 18] (the "DIP Motion") and approval of the *Debtors' Motion for Entry of an Order (I) Approving the Bidding Procedures, (II) Scheduling Certain Dates With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement and Expense Reimbursement, (V) Establishing Notice and*

---

[1]  A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/DMS.  The location of Debtor Digital Media Solutions, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 4800 140th Avenue North, Suite 101, Clearwater, Florida 33762.

*Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (VI) Authorizing the Assumption and Assignment of Assumed Executory Contracts and Unexpired Leases, (VII) Authorizing the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. 22] (the "Bidding Procedures Motion" and with the DIP Motion, the "Motions").[2]

## PRELIMINARY STATEMENT

1.      The Debtors are proposing to utilize the chapter 11 process to quickly transfer ownership of substantially all of their assets to a group of the Debtors' prepetition lenders via a $95 million stalking horse credit bid, subject to the receipt of a higher or otherwise better bid from a third party that satisfies whatever threshold the prepetition lenders deem acceptable.   Those lenders (the "DIP Lenders") are funding the chapter 11 cases through an expensive, $30 million debtor-in-possession financing facility (the "DIP Facility")—which will create $120 million in administrative expense claims as a result of a 3:1 roll up feature—that is conditioned on an expedited marketing process.   Unsurprisingly, general unsecured creditors, who have not had a seat at the table for any of the negotiations, are projected to receive no recovery in the chapter 11 cases.

2.      The benefits to the Debtors and DIP Lenders of a quick section 363 sale, as opposed to a foreclosure process utilizing state law, are obvious:   obtaining a "free and clear" sale order from a federal court, leaving behind legacy liabilities, and cherry-picking which assets to acquire just to name a few.   But those benefits are not free.   Importantly, the Bankruptcy Code ensures the protection of creditors' rights in chapter 11 by empowering official committees of unsecured creditors to closely monitor the chapter 11 cases and ample precedent exists to support the premise

---

[2]    Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed to them in the First Day Declaration (as defined below) or the DIP Motion, as applicable.

that secured lenders cannot use chapter 11 to effectuate a foreclosure without providing at least some consideration to other stakeholders impacted by the process.

3.     The Bankruptcy Code specifically empowers this Committee to participate in these Chapter 11 Cases to represent the rights of all unsecured creditors.  *First*, section 1103(c)(3) of the Bankruptcy Code codifies the Committee's right to participate in the formulation of a chapter 11 plan.  *See* 11 U.S.C. § 1103(c)(3).  *Second*, section 1103(c)(2) of the Bankruptcy Code authorizes empowers this Committee to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor…and other matter relevant to the case or the formulation of a plan."  *See* 11 U.S.C. § 1103(c)(2).  To facilitate the Committee's ability to fulfill these duties, the Procedures for Complex Cases in the Southern District of Texas (the "Complex Case Rules") mandate that a committee should have a minimum of 60 days from its appointment to investigate the prepetition claims and liens of the lenders.  *See* Procedures for Complex Cases in the Southern District of Texas ¶ C(9) (Jan. 2023).

4.     The Committee has not yet had time to carry out its duties.   If the Debtors and the DIP Lenders are allowed to proceed with their proposed DIP Facility and sale process on final orders without the Committee's support, the Committee will not be able to fulfill its fundamental duties and the due process rights of unsecured creditors would be severely compromised.  The Committee would be left, at best, with a chance to negotiate a recovery for unsecured creditors after such proposed final orders placed substantially all of the Debtors' assets in the hands of the DIP Lenders from a winddown budget that the DIP Lenders deem appropriate to wind down these Chapter 11 Cases.  That outcome would be devastating for general unsecured creditors who would be all but ensured to receive no recovery in these cases.[3]

---

[3]   The Committee recognizes that the Debtors and the DIP Lenders are proposing to pay up to $30.3 million on account of general unsecured claims pursuant to the Debtors' Critical Vendor Motion [Docket No. 8] (the "Critical

5.      For these reasons, Committee is obligated to object to the DIP Motion and the Bidding Procedures Motion.  With respect to these Motions, the Committee has identified a number of threshold issues that the Debtors and the lenders must address.  *First,* the DIP Lenders are demanding approval of a 3:1 roll up, meaning that in exchange for $30 million in new financing, the Debtors' estates will incur $120 million of administrative expense claims free from any challenge to the validity and enforceability of such prepetition debt (and from potential claims including Avoidance Actions and director and officer breach of fiduciary duty claims).  Because the DIP Lenders' credit bid is for $95 million, the combination of the Final DIP Order and a purchase by the DIP Lenders (regardless of the proposed winddown budget), would give the DIP Lenders approximately $25 million in stub administrative expense claims that will both sit in front of general unsecured creditors and ensure that the Debtors' estates are instantly rendered administratively insolvent.  *Second*, the Final DIP Order should protect the common law and statutory rights of general unsecured creditors by (a) not giving the DIP Lenders a lien on Avoidance Action proceeds and liens on "causes of action" (i.e., potential claims against directors and officers), and (b) not providing pre-emptive waivers of rights under Bankruptcy Code sections 506(c), 552(b) and the common law doctrine of marshaling.  *Third,* the Debtors and the DIP Lenders propose to fund the Committee with only a $50,000 budget to investigate the DIP Lenders' claims and liens.  *Fourth,* the proposed DIP Facility is unreasonably expensive and therefore provides separate grounds for denial.

6.      With respect to the Bidding Procedures Motion, the Debtors have proposed a sale objection deadline of October 25 and a sale hearing on October 29.  When read in conjunction

---

Vendor Motion") albeit while also buying, and preserving right with respect to, certain avoidance actions in connection with those payments.

with the relief requested in the DIP Motion, the Committee would be forced to finalize its investigation and commence challenge actions before the October 25 sale objection deadline. At the same time, the Debtors do not intend to file schedules of assets and liabilities and statements of financial affairs until late October and the Debtors' section 341 meeting is not scheduled to occur until October 18. Again, under the Complex Case Rules, the Committee should have at least until November 22 to complete these investigations and not be prejudiced by the proposed final DIP Order and sale order, the effect of which would require the Committee to unscramble eggs.

7.      At bottom, the Debtors' and DIP Lenders' timeline makes no sense absent global consensus. Although the Committee is in the very early stages of its investigation, the Committee has already found reason to doubt the validity and enforceability of certain of the DIP Lenders' liens and claims. Likewise, the Committee is exploring multiple potential causes of action that cast doubt on the Debtors' ability to close on the stalking horse credit bid. For example, there may be liens subject to avoidance actions and/or facts establishing "cause" under Bankruptcy Code section 363(k) to preclude the DIP Lenders from credit bidding (including the fact that the lenders have not allocated values to the Debtors' assets in their stalking horse bid). The Committee is also exploring whether liens should be granted on certain causes of action, including claims for breaches of fiduciary duty that appear to exist against the Debtors' officers and directors that should not become subject to a *de facto* release as a result of the stalking horse credit bid acquiring any such claims.[4] To be sure, more work is required.

---

[4]   It is unclear whether, pursuant to the Stalking Horse Agreement, the DIP Lenders are acquiring or not acquiring such claims. See e.g., Bidding Procedures Motion, Exhibit 1, § 1.1(i).

8.    Notwithstanding the foregoing, the Committee does appreciate the obvious benefits of closing a sale quickly and preserving the going concern value of the Debtors' businesses.  The Committee has endeavored to get up to speed swiftly over the last two weeks and has already engaged with the Debtors and DIP Lenders in negotiations about how to resolve the Committee's objections to the Motions and the DIP Lenders' proposed path forward.   Late last week, the Committee provided a global settlement term sheet to the Debtors that would, among other things, (a) allow the sale process to move forward on a slightly delayed timeline, (b) resolve potential causes of action that the Committee could assert against the DIP Lenders and the validity of their liens, and (c) provide unsecured creditors with a recovery under a liquidating chapter 11 plan, partially through a cash recovery, and partially from proceeds, if any, of potential estate claims. Debtors' counsel promptly provided the Committee with informal feedback on that term sheet and the Committee looks forward to receiving a counterproposal from the Debtors and progressing those discussions (but free from the prejudice of a final DIP Order and sale order).

9.    The Committee is committed to moving these cases forward in a timely manner, but recognizes that the discussions between the Debtors, the DIP Lenders and the Committee will likely take time to progress.  Rather than running up administrative expenses through aimless litigation, the Committee has suggested to the Debtors that the DIP Motion should be adjourned and considered on a final basis at the same time the Court considers approval of the sale transaction.  This practical solution would ensure that the rights of general unsecured creditors are and Debtors are not prejudiced while the Committee, DIP Lenders and Debtors continue to work through their issues.  As demonstrated in the *Declaration of John Madden* filed in support of this Objection (the "Madden Declaration"), the Committee does not believe that the Debtors' would need an incremental draw under the DIP Facility if the hearing on the DIP Motion was delayed to

coincide with a sale hearing in early November.[5]   Unfortunately, the Debtors have not agreed.

Accordingly, the Committee respectfully requests that the Court deny entry of a final order on the

DIP Motion at this time and deny the Bidding Procedures Motion to the extent it contemplates a

sale timeline that contravenes the Committee' rights to conduct its investigation prior to approval

of any credit bid pursuant to section 363(k) of the Bankruptcy Code.

**BACKGROUND**

A.     **The Chapter 11 Cases to Date**

10.     As of September 11, 2024 (the "Petition Date"), the Debtors owed approximately

$346.1 million to the lenders under a credit agreement (respectively, the "Prepetition Credit

Agreement" and "Prepetition Lenders").   As discussed in *Declaration of Joe Marinucci, Co-*

*Founder and Chief Executive Officer of Digital Media Solutions, Inc. and Certain of its Affiliates,*

*in Support of Chapter 11 Filing and First Day Motions* [Docket No. 17] (the "First Day

Declaration"), throughout 2023 and 2024, the Debtors and certain Prepetition Lenders—who

would eventually become the DIP Lenders—were discussing strategic alternative transactions for

the Company.   Those discussions ultimately culminated in these Chapter 11 Cases.

11.     On the Petition Date, the Debtors filed several important documents setting forth

their proposed path forward in these chapter 11 cases.

- ***DIP Motion***.   Pursuant to the DIP Motion, the Debtors are seeking authorization to obtain a $121.9 million debtor-in-possession financing facility (the "DIP Facility") consisting of (a) $30.0 million of new money, and (b) a "roll up" of $91.9 million in prepetition secured debt (the "Roll Up Loans").

- ***Bidding Procedures Motion***.   Pursuant to the Bidding Procedures Motion, the Debtors are seeking approval of the timeline and procedures for the Debtors' sale and marketing process.   As discussed in the Bidding Procedures Motion, prior to the Petition Date, the

---

[5]    The Debtors have the burden of proof to show the need for additional debtor in possession financing in their proposed timetable.

Debtors entered into a purchase and sale agreement (the "Stalking Horse Agreement") with Ankura Trust Company, LLC, as collateral agent under the DIP Credit Agreement (the "DIP Agent"), at the direction of the DIP Lenders.  Pursuant to the Stalking Horse Agreement, the DIP Agent—at the direction of the DIP Lenders—will credit bid $95 million of the DIP Loans in exchange for substantially all of the Debtors' assets.  The Stalking Horse Agreement contemplates that following the sale, the Debtors will have some *de minimis* amount of funds to wind down operations as set forth in a yet-to-be agreed upon budget (the "Wind Down Budget").

12.     The DIP Motion and Bidding Procedures Motion work together to ensure that various procedural milestones are satisfied in these cases.  The DIP Credit Agreement provides the Debtors will be in default if they fail to complete certain sale related tasks by specific dates. Specifically, the DIP Credit Agreement calls for, among other milestones, the Debtors' auction to commence no later than October 26 and for the Debtors' subsequent sale hearing to occur no later than October 31.  As such, the Debtors' Bidding Procedures Motion sets out a timeline that would satisfy these milestones through court approval of the following key sale dates, each long before the Committee's challenge period is set to expire on November 22:

| Event | Date |
|---|---|
| Bid Deadline | October 18 |
| Auction | October 22 |
| Objection Deadline to Sale Hearing | October 25 |
| Sale Hearing | October 29 |

13.     The Bankruptcy Court held a first day hearing on September 12, 2024.   On September 13, 2024, the Bankruptcy Court approved the DIP Motion on an interim basis [Docket No. 66] (the "Interim DIP Order"), which provided the Debtors with access of up to $13.0 million of new financing.  That same day, the Bankruptcy Court approved the Debtors' Critical Vendor Motion on an interim basis, which allows the Debtors to make payments to handpicked critical vendors whose ongoing support the Debtors (and DIP Lenders) view as critical to preserving the Debtors' going concern value.

**B.** **Prepetition Credit Agreement & Prepetition Transactions with the Prepetition Lenders**

14.     Various debtor entities are parties to the Prepetition Credit Agreement, including Digital Media Solutions, LLC ("<u>DMS LLC</u>") as borrower, Digital Media Solutions Holdings LLC ("<u>Holdings</u>") and 33 of the Company's subsidiaries as guarantors ("<u>Guarantor Subsidiaries</u>"). The Prepetition Credit Agreement initially provided the Company with a senior secured term loan of $225 million, and revolving credit facility of $50 million. Prior to the Petition Date, the Prepetition Credit Agreement was amended twice:

- *2023 Amendment*. On August 16, 2023, the Company and Prepetition Lenders entered into an amendment to the Prepetition Credit Agreement (the "<u>2023 Amendment</u>") which, among other things, (a) provided the Company with the option to pay interest in-kind, (b) provided certain financial covenant relief, but required and established a new, onerous minimum liquidity covenant. *See* First Day Declaration at 31. Notably, the Prepetition Lenders did not provide the Debtors with any actual new money financing in connection with the 2023 Amendment. Based on the Debtors' own filings with the Securities and Exchange Commission, it appears that in connection with the 2023 Amendment ***the Company pledged their previously unencumbered equity interests in the entities holding the ClickDealer business and the HomeQuote.io business, which were acquired by the Debtors in March 2023 for $35.3 million***. *See* First Day Declaration at 4 n.5; Digital Media Solutions, Inc., Quarterly Report (Form 10-Q) (Aug. 18, 2023) at 16, 54 (describing the ClickDealer acquisition as acquiring HomeQuote.io and also showing that in the August 16, 2023 amendment, the Lenders were granted "a perfected, first priority Lien on and security interest in all of the Collateral (including an 100% equity pledge of the Clickdealer Entities)").

- *2024 Amendment*. On April 18, 2024, the Company and Prepetition Lenders again amended the Prepetition Credit Agreement (the "<u>2024 Amendment</u>"). Pursuant to the 2024 Amendment, the Prepetition Lenders provided $22 million of new money financing. In exchange, the Committee believes that certain debtor entities guaranteed the outstanding obligations under the Prepetition Credit Agreement, specifically Digital Media Solutions, Inc. (the publicly traded parent company) ("<u>Parent</u>") and CEP V DMS US Blocker Company ("<u>Blocker</u>") without receiving any reasonably equivalent value.

## <u>OBJECTION</u>

## II.    THE DIP MOTION CANNOT BE APPROVED SINCE DEBTORS CANNOT SATISFY THEIR BURDEN UNDER SECTION 364(D) OF THE BANKRUPTCY CODE.

15.    To obtain post-petition financing under section 364(d) of the Bankruptcy Code, "a debtor has the burden of demonstrating that (i) the credit transaction is necessary to preserve the estate, and (ii) the terms of the transaction are fair and reasonable given the circumstances." *In re Futures Equity L.L.C.*, No. 00-33682 (BJH), 2001 Bankr. LEXIS 2229, at *14 (Bankr. N.D. Tex. April 11, 2001); *see also In re L.A. Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011).  For example, courts will not find that a debtor exercised reasonable business judgment by entering into debtor-in-possession financing that: (a) is designed to favor secured lenders at the expense of other creditors; (b) converts the bankruptcy process from one designed to benefit all creditors in to one designed for the sole or primary benefit of the debtor's secured lenders; or (c) is not in the best interests of the estate.  *See In re Laffite's Harbor Dev. I, LP*, No. 17-36191 (KKB), 2018 WL 272781, at *2-3 (Bankr. S.D. Tex. Jan. 2, 2018); *see also In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (9th Cir. BAP 1992) ("[C]ourts look to whether the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors and leverage the Chapter 11 process by granting the lender excessive control over the debtor or its assets as to unduly prejudice the rights of other parties in interest.") (internal citations omitted).  Here, the DIP Facility includes a number of provisions that are designed to favor the DIP Lenders over general unsecured creditors.  Accordingly, under the circumstances, the DIP Motion should be denied without prejudice.

### A.    *The Roll Up Should be Eliminated or Must Be Modified*

16.    As a general matter, roll ups are disfavored forms of post-petition financing because they (a) typically help one creditor constituency rather than provide an economic benefit to the debtor, (b) are contrary to the fundamental priority scheme of the Bankruptcy Code, and

(c) severely limit a debtor's ability to pursue different reorganization paths.  *See, e.g., In re Saybrook Mfg. Co.*, 963 F.2d 1490, 1493–96 (11th Cir. 1992) (noting that post-petition cross-collateralization is an "extremely controversial form of Chapter 11 financing" before holding it was not authorized by section 364); Jul. 17, 2020 Hr'g Tr. 67:9-10, *In re Bruin E&P Partners, LLC,* No. 20-33605(MI) (Bankr. S.D. Tex.) (where Judge Isgur noted roll ups are "heavily disfavored under the Bankruptcy Code").  One of the reasons courts view roll ups with skepticism is that they have the effect of severely limiting a debtor's ability to pursue different reorganization paths.  *See* 3 COLLIER ON BANKRUPTCY 364.06[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (noting that roll up financings "shift the dynamics of chapter 11 reorganization dramatically," by, among other things, creating structural impediments to plan alternatives).  This is because roll ups have the effect of giving prepetition debt administrative expense status, meaning a debtor is required to repay such claims in full, in cash if it intends to pay off the facility during the case or in connection with a confirmed plan of reorganization.  Moreover, roll up loans—like the DIP Facility at issue here—enhance lenders' collateral packages by providing liens over unencumbered assets.

17.     Here, approval of the Roll Up Loans will all but ensure that general unsecured creditors will not receive a distribution in these cases.  The DIP Motion seeks approval of a $120 million DIP Facility with a 3:1 roll up: $30 million of loans on account of new money and approximately $90 million on account of Roll Up Loans.  At the same time, the DIP Lenders are seeking approval of a $95 million stalking horse credit bid.  If the DIP Lenders' credit bid transaction closes, the DIP Lenders will have $25 million in "stub" administrative expense claims that the Debtors' estates will be entirely unable to satisfy and will preclude general unsecured creditors from receiving any distribution.  This problem—which disproportionately impacts

general unsecured creditors—is a direct result of the DIP Lenders' insistence on a 3:1 roll up. Indeed, if the DIP Facility's roll up feature was eliminated—or even reduced to a 1:1 "creeping" roll up—general unsecured creditors would be much more likely to receive a distribution on account of their claims because only $30 million in value would be needed to satisfy the DIP Facility's obligations.  Unsurprisingly, the Debtors have provided no evidence showing how a 3:1 roll up—which will guarantee administrative insolvency of the estates—is in the Debtors' best interests.  Accordingly, the Court should decline to approve the Roll Up Loans.

**B.** ***The Final DIP Order Should Protect Unsecured Creditors' Statutory and Common Law Rights***

18.    General unsecured creditors are currently being asked to subsidize a sale process that is only benefitting the DIP Lenders.  While the Bankruptcy Code and common law provides unsecured creditors with protections to avoid this outcome, the proposed Final DIP Order would strip the Committee of these protections through preemptive waivers.  The Bankruptcy Court should not approve a final DIP Order that includes these waivers, especially when the Debtors have not established how this entry into the DIP Facility—which will leave the estates administratively insolvent—is in the Debtors' best interests.  *See* May 3, 2024 Hr'g Tr. 36:6-10, *In re Casa Systems Inc.*, No. 24-10695 (KBO) (Bankr. D. Del.) [Docket No. 290] ("[I]t starts with Judge Walsh's statement, long, long ago, that he will never approve waivers over a Committee objection, and I don't think we deviate as a collective Court here from that position.").  As set forth below, the proposed Final DIP Order should be modified to preserve the following protections benefitting unsecured creditors (a) the right to realize the proceeds of avoidance actions; (b) right to surcharge collateral pursuant to Bankruptcy Code section 506(c); (c) the right to invoke the "equities of the case" exception under Bankruptcy Code section 552(b); and (d) the right to invoke the equitable doctrine of marshaling.

      **i.**      **The Final DIP Order Should Not Grant the DIP Lenders Liens on Avoidance Actions or Avoidance Action Proceeds**

19.     In its efforts to ensure that general unsecured creditors are denied every potential avenue for a recovery in these cases, the proposed final DIP Order seeks to give the DIP Lenders a lien on the proceeds of the estate's Avoidance Actions. Such Avoidance Actions (and the proceeds thereof) are for the benefit of general unsecured creditors—not secured creditors— because avoidance actions are not property of a debtor's estate, but rather a construct of bankruptcy law for the benefit of unsecured creditors. *See* 5 COLLIER ON BANKRUPTCY ¶ 541.14 at n.1 ("The avoiding powers of a debtor in possession granted in chapter 5 of the [Bankruptcy] Code are not property of the estate but statutorily created powers to recover property.").

20.     Here, the combination of the Roll Up Loans and liens on Avoidance Action proceeds would effectively insulate the DIP Lenders from any Committee challenge. Under the proposed final DIP Order, if the Committee successfully asserted a constructive fraudulent conveyance claim, the DIP Lenders would simply assert that any proceeds arising from that avoidance action is their collateral. In other words, the value of a successful avoidance action would be round-tripped back to the DIP Lenders to satisfy the DIP Lenders' $25 million stub administrative expense claim. Under these circumstances, the DIP Lenders should not be allowed to expand their collateral package to theses potentially valuable assets at the expense of general unsecured creditors. Accordingly, any Final DIP Order should expressly exclude such assets from the definition of DIP Collateral and clarify that any superpriority or adequate protection claims will not be paid from such assets or the proceeds thereof. *See In re Klaas Talsma Frisia Hartley, LLC*, No. 10–43790–DML–11, 2010 WL 5209363, at *4 (Bankr. N.D. Tex. Jun. 10, 2010) (excluding avoidance actions and proceeds thereof from the adequate protection package provided to Wells Fargo, a prepetition secured lender); *In re HSAD 3949 Lindell, Ltd.*, No. 10–33986–BJH,

2010 WL 5209266, at *5 (Bankr. N.D. Tex. Sept. 2, 2010) (adequate protection package excluded "any and all avoidance actions under Chapter 5 of the Bankruptcy Code and any proceeds thereof").[6]

> ii.     **The Final DIP Order Should Not Preemptively Waive Rights Under Bankruptcy Code Section 506(c)**

21.     Bankruptcy Code section 506(c) provides in relevant part: "[t]he trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim…." 11 U.S.C. § 506(c).  Courts have noted that section 506(c) helps ensure that general unsecured creditors do not bear the costs of a secured lender liquidating its collateral.  *See, e.g., In re Visual Indus., Inc.*, 57 F. 3d 321, 325 (3d Cir. 1995) ("section 506(c) is designed to prevent a windfall to the secured creditor").  Notably, many courts have found that *per se* section 506(c) waivers are unenforceable.  *See, e.g.*, *In re Hen House Interstate, Inc.*, 150 F.3d 868, 872 (8th Cir. 1998) (deeming a section 506(c) waiver "unenforceable"), *vacated on other grounds*, 177 F.3d 719 (8th Cir. 1999); *In re Ridgeline Structures, Inc.*, 154 B.R. 831, 832 (Bankr. D. N.H. 1993) (deeming a section 506(c) waiver "against public policy and unenforceable per se").  Other courts view such waivers skeptically and decline to approve them absent committee consent.  *See, e.g.*, Mar. 20, 2007 Hr'g Tr. 21:7-13, *In re Mortg. Lenders Network USA, Inc.*, Case No. 07-10146 (PJW) (Bankr. D. Del.),  [Docket No. 346] (the court noting: "If the Committee doesn't agree with the waiver, it doesn't happen.").

---

[6]  The DIP Lenders' efforts to ensure that the DIP Lenders will also be the beneficiaries of all causes of action that could otherwise benefit general unsecured creditors including the claims against officers and directors for breaches of fiduciary duties.  *See e.g.* Bidding Procedures Motion, Exhibit  1 § 1.1(f) (providing that Acquired Assets includes rights against third parties).

22.     The Committee does not consent to the Debtors' proposed waiver of its rights under section 506(c).  Here, the Debtors are running an extremely expedited sale process at the behest of the DIP Lenders.  If the proposed final DIP Order is approved and the DIP Lenders' stalking horse credit bid closes, the estates will be administratively insolvent and general unsecured creditors will have virtually no path to recovery in these cases.  Under these circumstances, the Final DIP Order should expressly preserve all parties' rights under Bankruptcy Code section 506(c).

### iii.     The Final DIP Order Should Not Preemptively Waive of the "Equities of the Case" Exception

23.     Section 552(b) of the Bankruptcy Code provides that a secured creditor's prepetition lien will attach to the postpetition proceeds of its prepetition collateral "except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise." 11 U.S.C.§ 552(b)(1).  Unlike many other provisions of the Bankruptcy Code, the equities of the case exception is not a power that must be invoked by the debtor and is instead vested in "the court."  Consistent with the plain terms of the Bankruptcy Code, a number of courts have declined to impose section 552(b) waivers over committee objections.  *See, e.g.,* July 28, 2016, Hr'g Tr. 134:19-25 *In re Linn Energy, LLC*, Case No. 16-60040 (DRJ) (Bankr. S.D. Tex.), [Docket No. 746] (noting that preservation of the official committee's right to seek application of section 552(b) exception "really just conforms with applicable Circuit law anyway").  Here, to the extent the proposed final DIP Order purports to preclude the Court (or any creditors) from invoking section 552(b), such preemption should not be enforceable.

### iv.     The Final DIP Order Cannot Waive Creditors' Marshalling Rights

24.     The equitable doctrine of marshaling is a creditor right that "rests upon the principle that a creditor having two funds to satisfy his debt may not, by his application of them to his demand, defeat another creditor, who may resort to only one of the funds." *Meyer v. U.S.*, 375 U.S.

233, 236 (1963) (citation omitted).  The equitable right of marshaling belongs to creditors, not the debtors.  Thus, the Debtors cannot forcibly waive the rights of creditors as to do so would amount to a nonconsensual third-party release.  *See Harrington v. Purdue Pharma L. P.*, 144 S. Ct. 2071, 2086-2087 (2024) (finding Bankruptcy Code does not allow non-consensual third-party releases). Accordingly, the Final DIP Order should be modified to remove any purported waiver of creditors' marshalling rights.

25.     Separately, the Roll Up Loans preclude the Committee from being able to agree to what is often referred to as "soft marshaling" whereby the DIP Lenders would agree look last to previously unencumbered collateral when satisfying the DIP Facility's obligations.  If the Final DIP Order only required the Debtors to satisfy $30 million in DIP Loans, the Committee could likely get comfortable that the value of the Avoidance Action proceeds would flow to unsecured creditors.  However, when the amount of DIP Loans to be satisfied is trebled to $120 million— and the DIP Lenders are only willing to credit bid $95 million—soft marshalling language in the Final DIP Order would be illusory protection for unsecured creditors.

### C.     The Committee's Investigation Budget Should Be Increased

26.     Under section 1103(c)(2) of the Bankruptcy Code, the Committee has a statutory duty to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor" and "any other matter relevant to the case or to the formulation of a plan."  11 U.S.C. § 1103(c)(2). The Final DIP Order will contain a number of stipulations, admissions, agreements, and releases by the Debtors that are binding on their estates and all parties in interest unless timely challenged by the Committee.  At the same time, the Final DIP Order would significantly impair the Committee's ability to investigate potential claims against the Prepetition Lenders by limiting the size of the Committee's investigation budget to $50,000.  Although investigation budgets of such

size might be reasonable in straightforward cases, the claims are not straightforward and are worthy of a detailed investigation.

27.     Since the Committee engaged professional advisors, it has identified (a) two potential constructive fraudulent conveyance claims, (b) potential breach of fiduciary duty claims against certain officers and directors, and (c) potential aiding and abetting claims against the Prepetition Lenders related to several transactions that took place between September 2022 and August 2023.  Each of these sets of claims will require additional significant investigation.

- *2023 Amendment*.  The granting of equity pledges in connection with the 2023 Amendment is likely a constructive fraudulent conveyance.  As part of the 2023 Amendment, the Debtors did not receive any new money financing and therefore did not receive reasonably equivalent value.  While the Debtors appear to have been the beneficiaries of some contractual concessions, it is far from obvious that those concessions were reasonably equivalent value to what they were required to give up, including previously unencumbered equity pledges in valuable subsidiaries that held the operations of the ClickDealer and HomeQuote.io subsidiaries.  Moreover, it is highly likely that the Debtors were either (a) insolvent at the time the equity pledges were granted to the Prepetition Lenders or (b) were inadequately capitalized, as evidenced by the fact that (i) as of March 30, 2023, it was not in compliance with regulations of the New York Stock Exchange ("NYSE") because its average closing stock price over 30 consecutive days had dropped to less than $1.00 and (ii) by September 25, 2023, its stock was delisted from the NYSE.  *See* Digital Media Solutions, Inc., Current Reports Pursuant To Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 8-K) (Apr. 5, 2023, May 4, 2023, and September 28, 2023).  If the Committee is successful in bringing these claims, the DIP Lenders would be precluded from acquiring that portion of the Debtors' business through a credit bid.  In other words, that business could only be sold for cash, the proceeds of which would benefit general unsecured creditors.  At the very least, the DIP Lenders should be required to provide a price allocation in their stalking horse bid for the ClickDealer/HomeQuote.io businesses so the Court understands the value being ascribed to these assets that might constitute unencumbered collateral.[7]

- *2024 Amendment*.  The 2024 Amendment also included aspects that may be avoided under Bankruptcy Code section 548.  Pursuant to that amendment—which involved the injection

---

[7]     Indeed, if the ClickDealer/HomeQuote.io businesses has been unencumbered collateral, they could have potentially served as collateral for cheaper debtor in possession financing.

of $22 million in new financing into the Company—both Parent and Blocker appear to have become guarantors under the Prepetition Credit Agreement (together, the "Downstream Guarantees"). *See* Digital Media Solutions, Inc., Current Report Pursuant To Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 8-K) (Apr. 18, 2024) at Ex. 10.1 (Second Amendment to Credit Agreement in which Parent and Blocker are, for the first time, signatories under the subsidiary guarantor block whereas they were not signatories on either the original Credit Agreement or the First Amendment). However, there is no evidence that those entities—as distinct from their operating subsidiaries— received any value (let alone reasonably equivalent value) in exchange for incurring those obligations. Whether the Prepetition Lenders have a valid claim against those entities is an issue critical to general unsecured creditors. Based on its investigation to date, the Committee believes that there may be valuable breach of fiduciary duty claims against officers and directors at those entities (and potentially aiding and abetting claims against the Prepetition Lenders as well). The main financial beneficiaries of those claims should be general unsecured creditors—not the DIP Lenders.

- ***Breach of Fiduciary Duty Claims***. Upon its receipt and review of initial diligence, the Committee believes there may be breach of fiduciary duty claims against certain officers and directors for transactions that took place between September 2022 and August 2023. Conveniently, the DIP Lenders' Stalking Horse Agreement acquires all of these claims and therefore provides a *de facto* release. The Committee believes these claims (and potentially claims against the Prepetition Lenders for aiding and abetting such breaches) are of significant value to the general unsecured creditors, and—similar to the ClickDealer/HomeQuote.io businesses—the DIP Lenders should be required to provide a price allocation in their Stalking Horse Bid for these assets.

28.     While these issues would typically be investigated during the Committee's challenge period, the DIP Lenders are seeking to deny that fundamental protection to general unsecured creditors. Under the Complex Case Rules, Committees are given a 60-day Challenge Period to investigate prepetition lenders' liens and claims starting from the date the Committee is formed. *See* Procedures for Complex Cases in the Southern District of Texas ¶ C(9) (Jan. 2023). Here, the Committee was formed on September 23, 2024, meaning the Challenge Period should run through November 22, 2024. By setting objection deadline to a credit bid sale on October 25, the Bidding Procedures Order effectively requires the Committee to conclude its investigation 28 days before the period required under the Complex Case Rules —a reduction of roughly half the

minimum amount of time provided for the by the Complex Case Rules. Under these circumstances, where there are viable constructive fraudulent conveyance claims that will need to be addressed before any sale can be approved, such limitations on the Committee's investigatory powers should not be approved.

29.     In light of the foregoing—and the significant investigation that lies ahead—the Committee's investigation budget should be increased to at least $500,000 and no less than $250,000. *See, e.g.*, *In re Speedcast Int'l Ltd.*, No. 20-32243 (MI) (Bankr. S.D. Tex. May 20, 2020) [Docket No. 239] (providing a $250,000 cap for the investigation budget); *In re Sanchez Energy Corp.*, No. 19-34508 (MI) (Bankr. S.D. Tex. Jan. 22, 2020) [Docket No. 865] (same); *In re CJ Holding Co.*, No. 16-33590 (DRJ) (Bankr. S.D. Tex. Sept. 25, 2016) [Docket No. 497] (providing a $500,000 cap for the investigation of liens and claims). The current $50,000 investigation budget is wholly insufficient to address the two issues identified above, let alone other potential issues that the Committee may uncover.

### D.     The Cost of the DIP Facility is Excessive

30.     As set forth in the Madden Declaration, the Committee's proposed financial advisor, Emerald Capital Advisors ("Emerald"), compared the economic fees and terms of the DIP Facility relative to comparable debtor-in-possession financing facilities in other cases. In selecting its comparison set, Emerald analyzed chapter 11 cases and debtor-in-possession financing facilities for companies that met certain criteria: (a) filed for bankruptcy on or after January 31, 2023 in the Southern District of Texas; (b) filed with secured funded liabilities in excess of $100 million, but not more than $500 million; (c) the financing facility included a roll up component, and (d) the facility granted on a final basis was for amounts ranging from $50 million to $250 million. This search yielded 6 comparable debtor-in-possession financing facilities that served as the basis for the Committee's analysis (the "Peer Set").

31.     As noted above, under section 364 of the Bankruptcy Code, the Debtors have the burden of showing that the terms of the DIP Facility are fair and reasonable under the circumstances.  *See In re L.A. Dodgers LLC*, 457 B.R. at 312.  Based on Emerald's analysis, the DIP Facility is not fair and reasonable for the following reasons:

- **The DIP Facility is Materially More Expensive Than Comparable Financing Facilities**.  As set forth in the Madden Declaration, the proposed DIP Facility far exceeds the cost of DIP financing facilities for companies in the Peer Set.  Here, the fees and expenses associated with the DIP Facility amount to approximately 26.2% of the $30 million in new money being provided to the Debtors.  *See* Madden Declaration at 6.  This is far above market terms where the all-in costs of a DIP financing facility as a percent of new money have a median of 16.4%.  *See* Madden Declaration at 7.

- **The Closing Premium is Unreasonably Expensive**.  A significant factor driving the above market cost of the Debtors' proposed DIP Facility are the fees being requested.  *See id.*  Specifically, the Debtors' proposed DIP Facility contemplates a staggering 8% closing premium.  This is the most expensive upfront cost among the Peer Set. *See id.*

- **The DIP Facility's Roll Up Loans Are Above Market**.  Under the Debtors' proposed financing facility, the $30 million in new money financing will only account for 25% of the total DIP Facility (i.e., an implied 3:1 ratio).  As shown in the Madden Declaration, this is above market and the Peer Set demonstrates that new money financing typically accounts for approximately 40% of the total DIP Facility (i.e., an implied 1.5:1 ratio).  *See* Madden Declaration at 7-8.

## III.    THE BIDDING PROCEDURES MOTION CANNOT BE APPROVED ABSENT REASONABLE MODIFICATIONS.

32.     Paragraphs 1-32 of this Objection are explicitly incorporated herein by reference. As noted above, under the Local Rules, Committees are given a minimum of 60 days to complete their investigations into prepetition lenders' liens and claims.  *See* Procedures for Complex Cases in the Southern District of Texas, ¶ C(9).  Here, the Bidding Procedures Motion seeks to undermine this rule and require the Committee to reach conclusions about its investigation in roughly half this time by the sale objection deadline of October 25.  To ensure the Committee has the requisite amount of time to complete its investigation—and assert whatever claims it needs to in connection

with the Sale Hearing—the Debtors' sale milestones should be adjusted as follows:

| Event | Date |
|---|---|
| Bid Deadline | November 15 |
| Auction | November 19 |
| Objection Deadline to Sale Hearing | November 22 |
| Sale Hearing | November 26 |

33.     Consistent with the arguments made herein, the DIP Lenders should be required as soon as possible to allocate its purchase price—at a minimum—with respect to the ClickDealer/HomeQuote.io businesses and the directors and officers claims and/or other Avoidance Actions.

## **RESERVATION OF RIGHTS**

34.     This Objection is submitted without prejudice to, and with a full reservation of, the Committee's rights to supplement and amend this Objection, including by filing declarations in support thereof, to introduce evidence at any hearing relating to this Objection, and to further object to the Motions on any grounds that may be appropriate.

## **CONCLUSION**

35.     WHEREFORE, the Committee requests that the Court deny the Motions without prejudice.

*[remainder of page left intentionally blank]*

Dated:     Houston, Texas
            October 14, 2024

Respectfully Submitted,

**WILLKIE FARR & GALLAGHER LLP**

By:   */s/ Jennifer J. Hardy*
Jennifer J. Hardy (Texas Bar No. 24096068)
600 Travis Street
Houston, Texas 77002
Telephone:  713-510-1700
Facsimile:  713-510-1799
Email:  jhardy2@willkie.com

**AND**

Brian S. Lennon (admitted *pro hac vice*)
James H. Burbage (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: 212-728-8000
Facsimile: 212-728-8111
Email: blennon@willkie.com
       jburbage@willkie.com

-and-

**VENABLE LLP**
Jeffrey S. Sabin (admitted *pro hac vice*)
Carol Weiner Levy (admitted *pro hac vice*)
Arie Peled
151 West 42nd Street
New York, New York 10036
Email:  jssabin@venable.com
       cwlevy@venable.com
       apeled@venable.com

**AND**

Andrew J. Currie (*pro hac vice* motion pending)
600 Massachusetts Avenue, NW
Washington, District of Columbia 20001
Email: ajcurrie@venable.com

*Proposed Co-Counsels to the Official Committee of*
*Unsecured Creditors*

**<u>Certificate of Service</u>**

I certify that on October 14, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

By:   <u>/s/ *Jennifer J. Hardy*</u>
        Jennifer J. Hardy