**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DIGITAL MEDIA SOLUTIONS, INC., *et al.*,[1] | ) | Case No. 24-90468 (ARP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF
AN ORDER (I) APPROVING THE DEBTORS' DISCLOSURE
STATEMENT ON A FINAL BASIS AND (II) CONFIRMING THE
JOINT CHAPTER 11 PLAN OF DIGITAL MEDIA SOLUTIONS, INC. AND ITS
DEBTOR AFFILIATES AND OMNIBUS REPLY TO OBJECTIONS THERETO**

**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
James A. Keefe (TX Bar No. 24122842)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone:     (713) 226-6000
Facsimile:     (713) 226-6248
Email:          jhiggins@porterhedges.com
                  sjohnson@porterhedges.com
                  myoung-john@porterhedges.com
                  jkeefe@porterhedges.com

*Co-Counsel to the Debtors and Debtors in
Possession*

**KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Elizabeth H. Jones (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                  elizabeth.jones@kirkland.com

-and-

Alexandra F. Schwarzman, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          alexandra.schwarzman@kirkland.com

*Co-Counsel to the Debtors and Debtors in
Possession*

Dated: January 14, 2025

---

[1]    A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/DMS.  The location of Debtor Digital Media Solutions, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 4800 140th Avenue North, Suite 101, Clearwater, Florida 33762.

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND .......................................................................................................................2

I.      Company Background and the Sale Transactions. ............................................................2

II.     The Solicitation Process and Voting Results. ..................................................................5

ARGUMENT ..........................................................................................................................10

I.      Approval of the Disclosure Statement Is Warranted. .....................................................11

        A.      The Disclosure Statement Contains "Adequate Information" as Required
                Under Section 1125 of the Bankruptcy Code and Satisfies Notice
                Requirements. ..............................................................................................11

                1.      The Disclosure Statement Contains Adequate Information.......................11

        B.      The Debtors Complied with the Bankruptcy Code, the Bankruptcy Rules,
                and the Conditional Disclosure Statement Order....................................................15

                1.      The Debtors Complied with the Notice Requirements Set Forth in
                        the Conditional Disclosure Statement Order and the Bankruptcy
                        Rules. ........................................................................................15

                2.      The Ballots Used to Solicit Holders of Claims Entitled to Vote on
                        the Plan Complied with the Conditional Disclosure Statement
                        Order. ........................................................................................16

                3.      The Debtors' Solicitation Period Complied with the Conditional
                        Disclosure Statement Order. ..............................................................17

                4.      The Debtors' Vote Tabulation Procedures Complied with the
                        Conditional Disclosure Statement Order. ..............................................18

                5.      Solicitation of the Plan Complied with the Bankruptcy Code and
                        Was in Good Faith. .........................................................................19

II.     The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code and
        Should Be Confirmed. .............................................................................................19

        A.      The Plan Complies with the Applicable Provisions of the Bankruptcy Code
                (Section 1129(a)(1)). ......................................................................................20

                1.      The Plan Satisfies the Classification Requirements of Section 1122
                        of the Bankruptcy Code. ..................................................................20

**Page(s)**

2.      The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.....................................................23

3.      The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.....................................................26

4.      The Plan Complies with Section 1123(d) of the Bankruptcy Code...........52

B.      The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).....................................................53

1.      The Debtors Complied with Section 1125 of the Bankruptcy Code. ........54

2.      The Debtors Complied with Section 1126 of the Bankruptcy Code. ........54

C.      The Plan Is Proposed in Good Faith (Section 1129(a)(3)). ................................56

D.      The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (Section 1129(a)(4)). ..........................57

E.      The Debtors Disclosed All Necessary Information Regarding Directors, Managers, and Officers (Section 1129(a)(5)). ........................................................58

F.      The Plan Does Not Require Governmental Regulatory Approval (Section 1129(a)(6)).....................................................................................................59

G.      The Plan Is in the Best Interests of All the Debtors' Creditors (Section 1129(a)(7)).....................................................................................................59

H.      The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code. ........................................................61

I.      The Plan Provides for Payment in Full of All Allowed Priority Claims (Section 1129(a)(9)).....................................................................................................61

J.      At Least One Impaired Class of Non-Insider Claims Accepted the Plan (Section 1129(a)(10)).................................................................................................63

K.      The Plan Is Feasible (Section 1129(a)(11)). ..........................................................63

L.      All Statutory Fees Have Been or Will Be Paid (Section 1129(a)(12)). ...............65

M.      Sections 1129(a)(13) through 1129(a)(16) Do Not Apply to the Plan. ................66

N.      The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code..........................................................................................67

1.      The Plan Does Not Unfairly Discriminate with Respect to the Rejecting Classes (Section 1129(b)(1)). ....................................................67

**Page(s)**

2.      The Plan Is Fair and Equitable (Section 1129(b)(2)(B)(ii)).......................69

O.      The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Section 1129(c)–(e))................................................................70

III.      Good Cause Exists to Waive the Stay of the Confirmation Order. ...................................71

**Page(s)**

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*In re 203 N. LaSalle St. Ltd. P'ship*,
   190 B.R. 567 (Bankr. N.D. Ill. 1995), *rev'd on other grounds*,
   *203 N. LaSalle St. P'ship*, 526 U.S. 434 ....................................................................67

*In re Age Ref., Inc.*,
   801 F.3d 530 (5th Cir. 2015) ...................................................................................30

*In re Aleris Int'l*,
   2010 WL 3492664 (Bankr. D. Del. May 13, 2010).................................................68

*In re Ambanc La Mesa Ltd. P'ship*,
   115 F.3d 650 (9th Cir. 1997) ...................................................................................68

*In re Ameriforge Group, Inc.*,
   No. 17-32660 (Bankr. S.D. Tex. May 19, 2017) ....................................................36

*In re Applegate Prop., Ltd.*,
   133 B.R. 827 (Bankr. W.D. Tex. 1991).....................................................................12

*Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.)*,
   203 F.3d 914 (5th Cir. 2000) ...................................................................................36

*In re Armstrong World Indus., Inc.*,
   348 B.R. 111 (D. Del. 2006)...........................................................................20, 68

*In re Armstrong World Indus., Inc.*,
   432 F.3d 507 (3d Cir. 2005) ...................................................................................69

*In re AWECO, Inc.*,
   725 F.2d 293 (5th Cir. 1984) ...................................................................................29

*In re Avaya Inc.*,
   No. 23-90088 (DRJ) (Bankr. S.D. Tex. Mar. 22, 2023) ........................................51

*In re Aztec Co.*,
   107 B.R. 585 (Bankr. M.D. Tenn. 1989) .................................................................67

*Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
   526 U.S. 434 (1999)...............................................................................59, 67, 69

*Bank of N.Y. Trust Co. v. Official Unsecured Creditors' Comm.*
   *(In re The Pacific Lumber Co.)*,
   584 F.3d 229 (5th Cir. 2009) ...........................................................................37, 48

**Page(s)**

*In re Bartleson*,
   253 B.R. 75 (9th Cir. B.A.P. 2000)............................................................43

*In re Benefytt Techs., Inc*.,
   No. 23-90566 (CML) (Bankr. S.D. Tex. Aug. 30, 2023) ...........................51

*In re Bigler LP*,
   442 B.R. 537 (Bankr. S.D. Tex. 2010) ......................................................28

*In re Block Shim Dev. Company-Irving*,
   939 F.2d 289 (5th Cir. 1991) ....................................................................56

*In re Cajun Elec. Power Coop., Inc.*,
   150 F.3d 503 (5th Cir. 1998) ...............................................................12, 57

*In re Camp Arrowhead, LTD.*,
   451 B.R. 678 (Bankr. W.D. Tex. 2011).........................................44, 50, 52

*In re Capmark Fin. Grp. Inc.*,
   2011 WL 6013718 (Bankr. D. Del. Aug. 24, 2011) ..................................64

*In re CiCi's Holdings, Inc*.,
   2021 WL 819330 (Bankr. N.D. Tex. Mar. 3, 2021) ..................................30

*In re CJ Holding Co.*,
   No. 16-33590 (Bankr. S.D. Tex. Dec. 16, 2017) ......................................37

*In re Cobalt Int'l Energy, Inc.*,
   No. 17-36709 (MI) (Bankr. S.D. Tex. Apr. 4, 2018)................................42

*In re Coram Healthcare Corp.*,
   315 B.R. 321 (D. Del. 2004).....................................................................68

*Commodity Futures Trading Comm'n v. Weintraub*,
   471 U.S. 343 (1985)..................................................................................48

*In re Diamond Sports Grp*.,
   No. 23-90116 (CML) (Bankr. S.D. Tex. 2023) ..................................38, 44

*In re DRF Logistics, LLC*,
   No. 24-90447 (CML) (Bankr. S.D. Tex. Nov. 25, 2024) ..........................44

*DISH Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*,
   634 F.3d 79 (2d Cir. 2011)........................................................................69

*In re Energy & Expl. Partners, Inc.*,
   No. 15-44931 (Bankr. N.D. Tex. April 21, 2016) ...............................36, 37

Page(s)

*In re Envision Healthcare Corp.*,
  No. 23-90342 (CML) (Bankr. S.D. Tex. Oct. 11, 2023) ..........................................................51

*In re Flintkote Co.*,
  486 B.R. 99 (Bankr. D. Del. 2012) ..........................................................................................64

*Floyd v. Hefner*,
  2006 WL 2844245 (S.D. Tex. Sept. 29, 2006) ........................................................................12

*FOM Puerto Rico, S.E. v. Dr. Barnes Eyecenter Inc.*,
  255 F. App'x 909 (5th Cir. 2007) ............................................................................................36

*In re Foster Mortg. Corp.*,
  68 F.3d 914 (5th Cir. 1995) ............................................................................................29, 30

*In re Freymiller Trucking, Inc.*,
  190 B.R. 913 (Bankr. W.D. Okla. 1996) ..................................................................................67

*In re Gen. Homes Corp.*,
  134 B.R. 853 (Bankr. S.D. Tex. 1991) ........................................................................28, 29, 30

*In re Genesis Care Pty Limited*,
  No. 23-90614 (MI) (Bankr. S.D. Tex. Nov. 21, 2023) ..............................................................51

*Harrington v. Purdue Pharma, L.P.*,
  603 U.S. 204 (2024) .........................................................................................................37, 38, 44

*Heartland Fed. Sav. & Loan Assoc. v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*,
  994 F.2d 1160 (5th Cir. 1993) ................................................................................................21

*Hernandez v. Larry Miller Roofing, Inc.*,
  628 F. App'x 281 (5th Cir. 2016) ............................................................................................36

*In re Heritage Org., L.L.C.*,
  375 B.R. 230 (Bankr. N.D. Tex 2007) ................................................................................21, 28

*In re Hornbeck Offshore Servs., Inc.*,
  No. 20-32679 (Bankr. S.D. Tex. June 19, 2020) ....................................................................36

*In re Hous. Reg'l Sports Network, L.P.*,
  505 B.R. 468 (Bankr. S.D. Tex. 2014) ....................................................................................48

*In re Idearc, Inc.*,
  423 B.R. 138 (Bank. N.D. Tex. 2009) ....................................................................................67

*In re Intrum AB et al.*,
  No. 24-90575 (CML) (Bankr. S.D. Tex. Dec. 31, 2024) ..........................................................44

**Page(s)**

*In re Ion Media Networks, Inc.,*
419 B.R. 585 (Bankr. S.D.N.Y. 2009) ...................................................................69

*In re Jackson Brewing Co.,*
624 F.2d 599 (5th Cir. 1980) ...............................................................28, 29, 30

*In re J.D. Mfg., Inc.,*
2008 WL 4533690 (Bankr. S.D. Tex. Oct. 2, 2008)............................................11

*In re Johns-Manville Corp.,*
68 B.R. 618 (Bankr. S.D.N.Y. 1986) ...................................................................68

*Kane v. Johns-Manville Corp.,*
843 F.2d 636 (2d Cir. 1988) .................................................................................64

*In re Lakeside Glob. II, Ltd.,*
116 B.R. 499 (Bankr. S.D. Tex. 1989) ...........................................................19, 64

*In re Lapworth,*
1998 WL 767456 (Bankr. E.D. Pa. Nov. 2, 1998)...............................................53

*In re Lernout & Hauspie Speech Prods., N.V.,*
301 B.R. 651 (Bankr. D. Del. 2003) *aff'd sub nom.*
*In re Lernout & Hauspie Speech Prod. N.V.,*
308 B.R. 672 (D. Del. 2004).................................................................................68

*In re Lone Star Utils., LLC,*
2014 WL 4629129 (Bankr. N.D. Tex. Sept. 15, 2014).........................................19

*In re MCorp Fin., Inc.,*
160 B.R. 941 (Bankr. S.D. Tex. 1993) .................................................................29

*In re Metrocraft Publ'g. Servs., Inc.,*
39 B.R. 567 (Bankr. N.D. Ga. 1984) ...................................................................13

*In re Mirant Corp.,*
348 B.R. 725 (Bankr. N.D. Tex. 2006)..................................................................29

*In re Neff,*
60 B.R. 448 (Bankr. N.D. Tex. 1985)....................................................................60

*NexPoint Advisors, L.P., et al. v. Highland Capital Mgmt., L.P.*
*(In re Highland Capital Mgmt., L.P.),*
48 F.4th 419 (5th Cir. 2022) .................................................................................48

*In re Nielsen & Bainbridge, LLC,*
No. 23-90071 (DRJ) (Bankr. S.D. Tex. June 30, 2023) ......................................51

**Page(s)**

*In re Nuverra*,
590 B.R. 75 (D. Del. 2018) ........................................................................68

*In re Nutritional Sourcing Corp.*,
398 B.R. 816 (Bankr. D. Del. 2008) ..........................................................20

*In re Performance Nutrition, Inc.*,
289 B.R. 93 (Bankr. N.D. Tex. 1999) .........................................................48

*In re Phx. Petrol.*,
278 B.R. 365 (Bankr. E.D. Pa. 2001) ........................................................13

*In re Pilgrim's Pride Corp.*,
2010 WL 200000 (Bankr. N.D. Tex. Jan. 14, 2010) ..................................37

*In re Pisces Energy, LLC*,
2009 WL 7227880 (Bankr. S.D. Tex. Dec. 21, 2009) ................................21

*Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*,
761 F.2d 1374 (9th Cir. 1985) ...................................................................64

*In re Premier Int'l Holdings, Inc.*,
2010 WL 2745964 (Bankr. D. Del. April 29, 2010) ...................................47

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
390 U.S. 414 (1968) ...................................................................................30

*In re Prussia Assocs.*,
322 B.R. 572 (Bankr. E.D. Pa. 2005) ........................................................64

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000)........................................................................47

*In re Qualtek Servs. Inc.*,
No. 23-90584 (CML) (Bankr. S.D. Tex. June 30, 2023).............................51

*Republic Supply Co. v. Shoaf*,
815 F.2d 1046 (5th Cir. 1987) .........................................................36, 37, 42

*In re RCS Cap. Corp.*,
No. 16-10223 (MFW) (Bankr. D. Del. Mar. 21, 2016) ..............................44

*In re Robertshaw US Holding Corp.*,
662 B.R. 300 (Bankr. S.D. Tex. 2024) ..............................................38, 45, 46

*In re Robertshaw US Holding Corp.*,
No. 24-90052 (CML) (Bankr. S.D. Tex Aug. 16, 2024) .............................44

**Page(s)**

*In re Roqumore*,
   393 B.R. 474 (Bankr. S.D. Tex. 2008) ............................................................29, 30

*In re Schepps Food Stores, Inc*.,
   160 B.R. 792 (Bankr. S.D. Tex. 1993) ....................................................................48

*In re Scioto Valley Mortg. Co.*,
   88 B.R. 168 (Bankr. S.D. Ohio 1988) .....................................................................13

*In re Sea Garden Motel & Apartments*,
   195 B.R. 294 (D. N.J. 1996) ...................................................................................64

*In re Sentry Operating Co. of Tex., Inc.*,
   64 B.R. 850 (Bankr. S.D. Tex. 2001) .......................................................................21

*In re Southcross Holdings, LP*,
   No. 16-20111 (Bankr. S.D. Tex. April 11, 2016) ....................................................37

*In re Sun Country Dev., Inc.*,
   764 F.2d 406 (5th Cir. 1985) ..................................................................................56

*In re S&W Enter.*,
   37 B.R. 153 (Bankr. N.D. Ill. 1984) .......................................................................20

*Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*,
   844 F.2d 1142 (5th Cir. 1988) ..........................................................................12, 60

*In re T-H New Orleans Ltd. P'ships*,
   116 F.3d 790 (5th Cir. 1997) ............................................................................56, 64

*In re Tribune Co.*,
   464 B.R. 126 (Bankr. D. Del. 2011),
   *on reconsideration,* 464 B.R. 208 (Bankr. D. Del. 2011).........................................64

*In re U.S. Brass Corp.*,
   194 B.R. 420 (Bankr. E.D. Tex. 1996) ..............................................................11, 13

*In re Vitro Asset Corp.*,
   2013 WL 6044453 (Bankr. N.D. Tex. Nov. 14, 2013) ............................................21

*Watts v. Williams*,
   154 B.R. 56 (Bankr. S.D. Tex. 1993) ......................................................................30

*In re Wesco Aircraft Holdings, Inc., et al.*,
   No. 23-90611 (MI) (Bankr. S.D. Tex. Jan. 6, 2025)................................................44

*Westland Oil Dev. Corp. v. MCorp Mgmt. Sols., Inc.*,
   157 B.R. 100 (S.D. Tex. 1993) ................................................................................13

x

Page(s)

*In re Wool Growers*,
371 B.R. 768 (N.D. Tex. 2007)....................................................................36, 37

*In re WorldCom, Inc.*,
2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) ...............................53

*In re W.R. Grace & Co.*,
475 B.R. 34 (D. Del. 2012)..............................................................................64

*In re Zale Corp.*,
62 F.3d 746 (5th Cir. 1995) ............................................................................37

**Statutes**

11 U.S.C. § 101(51D)(B) ................................................................................71

11 U.S.C. § 365 ..................................................................................................27

11 U.S.C. § 365(f) ............................................................................................71

11 U.S.C. § 502 ....................................................................................................4

11 U.S.C. § 503(b) ............................................................................................62

11 U.S.C. § 507(a)(1) ......................................................................................62

11 U.S.C. § 507(a)(2) .................................................................................61, 67

11 U.S.C. § 507(a)(4) ......................................................................................62

11 U.S.C. § 507(a)(5) ......................................................................................62

11 U.S.C. § 507(a)(6) ......................................................................................62

11 U.S.C. § 507(a)(7) ......................................................................................62

11 U.S.C. § 507(a)(8) ......................................................................................62

11 U.S.C. § 1114 ..............................................................................................66

11 U.S.C. § 1122 ........................................................................................20, 21

11 U.S.C. § 1122(a) ..............................................................................20, 21, 23

11 U.S.C. § 1123 ....................................................................................20, 27, 32

11 U.S.C. § 1123(a) ..........................................................................................23

Page(s)

11 U.S.C. § 1123(a)(1).................................................................................................23

11 U.S.C. § 1123(a)(2).................................................................................................23

11 U.S.C. § 1123(a)(3).................................................................................................23

11 U.S.C. § 1123(a)(4).................................................................................................23

11 U.S.C. § 1123(a)(5).................................................................................................24

11 U.S.C. § 1123(a)(6).................................................................................................25

11 U.S.C. § 1123(a)(7)...........................................................................................25, 26

11 U.S.C. § 1123(b)...............................................................................................26, 28

11 U.S.C. § 1123(b)(3)................................................................................................28

11 U.S.C. § 1123(b)(3)(A).............................................................................28, 29, 30, 33

11 U.S.C. § 1123(d)..............................................................................................52, 53

11 U.S.C. § 1125...................................................................................................passim

11 U.S.C. § 1125(a).....................................................................................................14

11 U.S.C. § 1125(a)(1).................................................................................................11

11 U.S.C. § 1125(e).....................................................................................................19

11 U.S.C. § 1126..............................................................................................6, 53, 54, 55

11 U.S.C. § 1126(a)................................................................................................54, 55

11 U.S.C. § 1126(c)................................................................................................19, 55

11 U.S.C. § 1126(f).................................................................................................7, 55

11 U.S.C. § 1126(g)................................................................................................7, 55

11 U.S.C. § 1129...................................................................................................passim

11 U.S.C. § 1129(a)............................................................................................19, 20, 67

11 U.S.C. § 1129(a)(1).................................................................................................20

11 U.S.C. § 1129(a)(2)............................................................................................53, 56

11 U.S.C. § 1129(a)(3)........................................................................................47, 56, 57

Page(s)

11 U.S.C. § 1129(a)(4)...........................................................................................57, 58

11 U.S.C. § 1129(a)(5)...........................................................................................58, 59

11 U.S.C. § 1129(a)(5)(A)...........................................................................................58

11 U.S.C. § 1129(a)(6)...................................................................................................59

11 U.S.C. § 1129(a)(7)...........................................................................................59, 60

11 U.S.C. § 1129(a)(8)...................................................................................61, 63, 67

11 U.S.C. § 1129(a)(9)..........................................................................61, 62, 63, 65

11 U.S.C. § 1129(a)(9)(A)...................................................................................61, 62

11 U.S.C. § 1129(a)(9)(B)..............................................................................................62

11 U.S.C. § 1129(a)(9)(C)......................................................................................62, 63

11 U.S.C. § 1129(a)(10)................................................................................................63

11 U.S.C. § 1129(a)(11).........................................................................63, 64, 65

11 U.S.C. § 1129(a)(12)................................................................................................65

11 U.S.C. § 1129(a)(13)................................................................................................66

11 U.S.C. § 1129(a)(14)................................................................................................66

11 U.S.C. § 1129(a)(15)................................................................................................66

11 U.S.C. § 1129(a)(16)................................................................................................66

11 U.S.C. § 1129(b)..............................................................................................*passim*

11 U.S.C. § 1129(b)(1)..........................................................................................67, 68

11 U.S.C. § 1129(b)(2)................................................................................................69

11 U.S.C. § 1129(b)(2)(B)(i)......................................................................................69

11 U.S.C. § 1129(b)(2)(B)(ii).....................................................................................69

11 U.S.C. § 1129(c)...........................................................................................................70

11 U.S.C. § 1129(d)..........................................................................................................70

11 U.S.C. § 1129(e)..........................................................................................................71

**Page(s)**

28 U.S.C. § 1930 ...................................................................................................65

Securities Act of 1933, § 5 ...................................................................................70

**Rules**

Fed. R. Bankr. P. 2002(b) .....................................................................................15

Fed. R. Bankr. P. 3017 ...............................................................................15, 17, 55

Fed. R. Bankr. P. 3017(d) .....................................................................................17

Fed. R. Bankr. P. 3018 ..........................................................................................54

Fed. R. Bankr. P. 3018(c) ......................................................................................17

Fed. R. Bankr. P. 3020 ..........................................................................................71

Fed. R. Bankr. P. 3020(e) ......................................................................................71

Fed. R. Bankr. P. 6004 ..........................................................................................71

Fed. R. Bankr. P. 6004(h) ......................................................................................71

Fed. R. Bankr. P. 6006 ..........................................................................................71

Fed. R. Bankr. P. 6006(d) ......................................................................................71

Fed. R. Bankr. P. 9019 .............................................................................28, 29, 30, 32

**Other Authorities**

H.R. Rep. No. 95-595,
   *reprinted in* 1978 U.S.C.C.A.N. 5963 ............................................................20, 53

Procedures for Complex Cases
   in the Southern District of Texas § O.40 ............................................................17

S. Rep. No. 95-989,
   *reprinted in* 1978 U.S.C.C.A.N. 5787 ............................................................20, 53

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this memorandum of law (this "Memorandum") in support of (a) final approval of the *Disclosure Statement for the Joint Chapter 11 Plan of Digital Media Solutions, Inc. and Its Debtor Affiliates* [Docket No. 522] (as modified, amended, or supplemented from time to time, the "Disclosure Statement"), pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and (b) confirmation of the *Joint Chapter 11 Plan of Digital Media Solutions, Inc. and Its Debtor Affiliates* [Docket No. 521] (as modified, amended, or supplemented from time to time, the "Plan"), pursuant to sections 1125, 1126, and 1129 of the Bankruptcy Code.  In further support of approval of the Disclosure Statement and confirmation of the Plan, the Debtors have filed the *Declaration of Zachary Rose, Chief Restructuring Officer of Digital Media Solutions, Inc., in Support of Confirmation of the Joint Chapter 11 Plan of Digital Media Solutions, Inc. and Its Debtor Affiliates,* filed contemporaneously herewith (the "Rose Declaration"), and the *Declaration of Jeriad Paul of Omni Agent Solutions, Inc. Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Joint Chapter 11 Plan of Digital Media Solutions, Inc. and Its Debtor Affiliates*, filed contemporaneously herewith (the "Voting Report").  In support of approval of the Disclosure Statement and confirmation of the Plan, the Debtors respectfully state as follows.

## PRELIMINARY STATEMENT[2]

1.     The Debtors commenced these Chapter 11 Cases to effectuate one or more value-maximizing sale transactions.  The Debtors achieved that goal.  The Bankruptcy Court

---

[2]     A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Joe Marinucci, Co-Founder and Chief Executive Officer of Digital Media Solutions, Inc. and Certain of its Affiliates, in Support of Chapter 11 Filing and First Day Motions* [Docket No. 17] (the "First Day Declaration").  Capitalized terms used but not immediately or

approved the Imon APA and the Stalking Horse Agreement on November 4, 2024, which together provide for the sale of substantially all of the Debtors' assets.  The Debtors now seek confirmation of the Plan to effectuate a wind-down of their Estates to conclude these Chapter 11 Cases.  The Plan enjoys widespread support from the DIP Lenders, the Prepetition Lenders, and the Committee, and almost all voting classes voted to accept the Plan.

2.       The Plan is the best outcome available for the Debtors, their Estates, and all parties in interest.  It provides meaningful recoveries to Holders of General Unsecured Claims, who are otherwise hundreds of millions of dollars out of the money, and a mechanism to wind-down the Debtors' Estates in an orderly fashion.  For the reasons set forth herein, the Disclosure Statement should be approved on a final basis and confirmation of the Plan should be approved.

3.       The Debtors received two formal objections to the Plan.[3]  Notably, neither relates to the economic treatment of Claims and Interests.  Rather, each relates to the Third-Party Release and/or Exculpation Provision.  As discussed herein, the Objections are without merit and should be overruled.

**BACKGROUND**

**I.       Company Background and the Sale Transactions.**

4.       Digital Media Solutions, Inc. ("DMS Inc.," and together with its Debtor and non-Debtor affiliates, "DMS" or the "Company") was a leading technology-enabled digital advertising company that leveraged its advanced technology and proprietary customer data to efficiently and

---

otherwise defined herein shall have the meanings ascribed to them in this Memorandum, the Plan, the Disclosure Statement, or the Conditional Disclosure Statement Motion, as applicable.

[3]      The two objections to the Plan are:  (a) *United States Trustee's Objection to Confirmation of the Joint Chapter 11 Plan of Digital Media Solutions, Inc. and its Debtor Affiliates* [Docket No. 625] (the "U.S. Trustee Objection"); and (b) *Presidio Interactive Corporation's Objection to Confirmation of Chapter 11 Plan* [Docket No. 626] (the "Presidio Objection" together with the U.S. Trustee Objection, the "Objections").

effectively connect its Customers with their target Consumers. DMS's first-party data asset, proprietary technology, expansive digital media reach, and data-driven processes helped digital advertising clients within the insurance, education, and consumer sectors, among others, de-risk their advertising spend while scaling their customer bases. From its inception, DMS grew rapidly by acquiring complimentary businesses and their intellectual property. As of the Petition Date, DMS operated in approximately 15 countries and territories around the world and employed approximately 247 individuals in the United States and Canada.

5.      The Company's investment in organic growth, coupled with its successful acquisition strategy, resulted in a stable, diversified business. From 2022 onward, however, the Company was challenged by unanticipated macroeconomic headwinds and an associated significant reduction in Customer advertising spend—the lifeblood of the Company's business—stemming from rising inflation and post-pandemic changes in Consumer behavior. Despite the Company's efforts to implement cost-savings programs, the efforts were ultimately insufficient to overcome its liquidity challenges.

6.      Accordingly, in early 2024, the Company engaged with its Prepetition Lenders to address its liquidity needs and discuss additional covenant relief. The Company, in consultation with the Prepetition Lenders, determined that a prepetition sale process was likely to generate the highest or otherwise best bids, as compared to a near-term filing without a stalking horse agreement. As a result, the Company and the Prepetition Lenders entered into an amendment to the Credit Agreement on April 17, 2024 (the "2024 Amendment"), pursuant to which the Prepetition Lenders provided a $22 million "pre-DIP" new money financing in the form of the Tranche A Bridge Term Loan to fund the Company's operations and the marketing process for a sale of all or substantially all of its assets, in addition to other covenant relief.

7.     The Debtors, with their assistance of the advisors, commenced an almost five-month prepetition marketing and sale process starting in April 2024.  The Debtors' prepetition sale process included outreach to approximately 118 potential investors, execution of 38 nondisclosure agreements, and receipt of eight indications of interest and four binding letters of intent.  The Debtors, with the assistance of their advisors, ultimately negotiated a $95 million stalking horse credit bid with an acquisition entity formed by the DIP Lenders.  Simultaneously, the Company negotiated a $122 million DIP Facility, consisting of $30 million in new money, to provide the Company with sufficient liquidity to commence these cases and consummate the stalking horse bid, subject to higher or otherwise better bids at an auction.

8.     To effectuate the postpetition sale process, the Debtors filed the Bidding Procedures Motion, which was approved on October 16, 2024 [Docket No. 194].  Through the Bidding Procedures Order, the Debtors facilitated an open process that generated significant incremental value for the Estates.

9.     The Debtors received three qualified bids by the bid deadline and hosted an auction on October 29, 2024.  The auction included three bid packages and over 14 rounds of bidding, the result of which was an approximately $10.7 million Cash bid from Imon Media LTD for the Debtors' equity interest in its non-Debtor subsidiaries, and a $95 million credit bid with the Stalking Horse Bidder.  The Debtors filed a *Notice of Successful Bidders* [Docket No. 338] on October 30, 2024, and the Court approved the Sale Transactions on November 4, 2024.

## II.     The Solicitation Process and Voting Results.

10.     On November 20, 2024, the Debtors filed the Conditional Disclosure Statement Motion[4] seeking a combined hearing to consider approval of the Disclosure Statement and confirmation of the Plan (the "Combined Hearing").  On December 9, 2024, the Bankruptcy Court entered the Conditional Disclosure Statement Order that, in relevant part, (a) conditionally approved the Disclosure Statement, (b) established January 7, 2025, at 4:00 p.m., prevailing Central Time, as the deadline to object to the Plan and the Disclosure Statement (the "Objection Deadline"), (c) approved the solicitation procedures set forth in the Conditional Disclosure Statement Motion (the "Solicitation Procedures"), (d) approved the form and manner of the Combined Hearing Notice, the Non-Voting Notices, the Ballots, the Opt-Out Form, and the Solicitation Packages, and (e) approved the Opt-Out Deadline, all as more fully set forth in the Conditional Disclosure Statement Motion.

11.     On December 12, 2024 (the "Solicitation Commencement Date"), the Debtors caused their notice, claims, and solicitation agent, Omni Agent Solutions, Inc. (the "Claims and Balloting Agent"), to distribute solicitation packages (the "Solicitation Packages") containing the Cover Letter and the appropriate Ballots[5] for voting on the Plan to the Holders of Prepetition Loan Claims (Class 3) and General Unsecured Claims (Class 4) (each, a "Voting Class," and collectively, the "Voting Classes") holding such Claims as of November 20, 2024 (the "Voting

---

[4]     The "Conditional Disclosure Statement Motion" means the *Debtors' Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures with Respect to Confirmation of the Debtors' Proposed Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. 448].

[5]     The approved form of Ballots used in solicitation are attached as Exhibit 3 to the Conditional Disclosure Statement Order.

Record Date") in accordance with sections 1125 and 1126 of the Bankruptcy Code.   The Solicitation Packages also included the Combined Hearing Notice, the Solicitation Procedures (defined below), and a support letter from the Committee encouraging Holders of General Unsecured Claims to vote in favor of the Plan.   Also on December 12, 2024, the Debtors caused the Claims and Noticing Agent to serve the Combined Hearing Notice and the Opt-Out Form in accordance with the terms of the Conditional Disclosure Statement Order.[6]

12.     The Claims and Balloting Agent transmitted the Solicitation Packages to the Voting Classes via first class U.S. mail.[7]   The Debtors also arranged for the Publication Notice to be published in *The New York Times* (national edition) and the *Financial Times* (global edition) on December 16 and December 17, 2024, respectively.[8]   On December 23, 2024, the Debtors filed the *Notice of Plan Supplement* [Docket No. 592] and served notice of the filing on their master service list.[9]   On January 10, 2025, the Debtors filed the *Notice of First Amended Plan Supplement* [Docket No. 632] (together with Docket No. 592, as may be further amended, modified or supplemented from time to time, the "Plan Supplement").

13.     The Voting Classes were directed in the Disclosure Statement and the Ballots to follow the instructions contained in the Ballots (and further described in the Disclosure Statement) to complete and submit their respective Ballots to cast a vote to accept or reject the Plan.   Each

---

[6]     *See Affidavit of Service* [Docket No. 599], *Affidavit of Supplemental Service* [Docket No. 600], *Affidavit of Second Supplemental Service* [Docket No. 601], and *Affidavit of Third Supplemental Service* [Docket No. 602] (collectively, the "Solicitation Affidavits").

[7]     *See* Solicitation Affidavits.

[8]     *See Proof of Publication* [Docket No. 541] and *Affidavit of Publication* [Docket No. 542] (collectively, the "Publication Affidavits").

[9]     *See Affidavit of Service* [Docket No. 598] and *Affidavit of Second Supplemental Service* [Docket No. 603].

Holder of a Claim in the Voting Classes was informed in both the Disclosure Statement and its respective Ballot that such Holder needed to submit its Ballot such that it was actually received by the Claims and Balloting Agent by January 7, 2025, at 4:00 p.m., prevailing Central Time (the "Voting Deadline") to be counted.  Further, each Holder of a Claim in the Voting Classes was informed in its Ballot that by voting to accept the Plan, such Holder was consenting to the Third-Party Releases and could not opt-out of such releases.  Holders of Claims in the Voting Classes submitted 36 Ballots that indicated a vote to reject the Plan or did not indicate a vote on the Plan and checked the box to opt-out of the Third-Party Release.[10]

14.     Holders of Claims and Interests that are either (a) Unimpaired and conclusively presumed to accept the Plan under section 1126(f) of the Bankruptcy Code or (b) Impaired and entitled to receive no distribution on account of such Claims or Interests under the Plan, and therefore deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code (collectively, the "Non-Voting Holders"), in each case, received the Combined Hearing Notice, the Non-Voting Status Notice, and the Opt-Out Form by first class U.S. mail.[11]

15.     The Non-Voting Holders were directed in the Opt-Out Form to check a prominently featured and clearly labeled box and submit their respective Opt-Out Form if they elected to opt-out of the Third-Party Release.  Each Non-Voting Holder was informed in the Opt-Out Form that such Non-Voting Holder needed to submit their respective Opt-Out Form such that it was actually received by the Claims and Balloting Agent by January 7, 2025, at 4:00 p.m., prevailing Central Time (the "Opt-Out Deadline") to be counted.  Eight Opt-Out Forms, five of which were Master

---

[10]   *See* Voting Report, <u>Exhibit B</u>.  This number is exclusive of aggregated Ballots as further explained in the Voting Report.  This number is also exclusive of two Ballots that indicated a vote to accept the Plan and checked the box to opt-out of the release under the Plan.

[11]   *See* Solicitation Affidavits.

Opt-Out Forms, were returned to the Claims and Balloting Agent with the box checked to opt-out of the Third-Party Release.[12]

16.     The Debtors, with the assistance of the Claims and Balloting Agent, completed their final tabulation of Ballots after the Voting Deadline, following a complete review and audit of all Ballots received.[13]  As set forth below and in the Voting Report, a majority of the parties that were entitled to vote on the Plan and that submitted a Ballot, voted to accept the Plan.[14]  Of the Holders of Claims in the Voting Classes that voted on the Plan, 86.22% of the Holders in Class 3 and 70.59% of the Holders in Class 4 voted to accept the Plan.[15]

---

[12]   *See* Voting Report.  As further explained in the Voting Report, these eight Opt-Out Forms represent an opt-out election for more than eight parties.

[13]   For additional discussion regarding the solicitation and vote tabulation processes, see the Voting Report.

[14]   *See generally* Voting Report.

[15]   In the event of any inconsistencies in the summary of voting results in this Memorandum and the Voting Report, the Voting Report shall control.

| VOTING CLASS | ACCEPT | | REJECT | | RESULTS |
|---|---|---|---|---|---|
| | NUMBER | AMOUNT | NUMBER | AMOUNT | |
| *All Debtor Entities Other than Debtor Best Rate Referrals, Inc.*[16] | | | | | |
| **Prepetition Loan Claims (Class 3)** | 169<br><br>**86.22%** | $136,662,534.08<br><br>**86.38%** | 27<br><br>**13.78%** | $21,553,493.71<br><br>**13.62%** | **ACCEPT** |
| *Debtor Digital Media Solutions, Inc.* | | | | | |
| **General Unsecured Claims (Class 4)** | 7<br><br>**77.78%** | $2,877,135.19<br><br>**73.76%** | 2<br><br>**22.22%** | $1,023,488.00<br><br>**26.24%** | **ACCEPT** |
| *Debtor She is Media, LLC* | | | | | |
| **General Unsecured Claims (Class 4)** | 1<br><br>**100%** | $20.00<br><br>**100%** | 0<br><br>**0%** | $0<br><br>**0%** | **ACCEPT** |
| *Debtor Digital Media Solutions, LLC* | | | | | |
| **General Unsecured Claims (Class 4)** | 2<br><br>**50%** | $180,847.80<br><br>**24.39%** | 2<br><br>**50%** | $560,568.95<br><br>**75.61%** | **REJECT** |
| *Debtor Schooladvisor, LLC* | | | | | |
| **General Unsecured Claims (Class 4)** | 1<br><br>**100%** | $14,670.32<br><br>**100%** | 0<br><br>**0%** | $0<br><br>**0%** | **ACCEPT** |
| *Debtor W4 Holding Company, LLC* | | | | | |
| **General Unsecured Claims (Class 4)** | 1<br><br>**100%** | $4,019.00<br><br>**100%** | 0<br><br>**0%** | $0<br><br>**0%** | **ACCEPT** |
| *Debtor Forte Media Solutions, LLC* | | | | | |
| **General Unsecured Claims (Class 4)** | 0<br><br>**0%** | $0<br><br>**0%** | 1<br><br>**100%** | $174.00<br><br>**100%** | **REJECT** |

---

[16] Debtor Best Rate Referrals, Inc. is not obligated under the Credit Agreement, and as such, there are no Holders of Class 3 Claims at Debtor Best Rate Referrals, Inc.

17. The Debtors did not receive any votes on the Plan from Holders of Claims in Class 4 at the following Debtor Entities:  Debtor Aramis Interactive, LLC; Debtor Aimtell Holdco, Inc.; Debtor Aimtell LLC; Debtor Apex Digital Solutions, LLC; Debtor Art Brock Holdings, LLC; Debtor Best Rate Holdings; Debtor Best Rate Referrals, Inc.; Debtor Car Loan Pal Holdings LLC; Debtor CEP V DMS US Blocker Company; Debtor CGIW Marking Services, LLC; Debtor Dealtaker, LLC; Debtor Digital Media Solutions Holdings, LLC; Debtor DMS Education LLC; Debtor DMS Engage LLC; Debtor DMS UE Acquisition Holdings Inc.; Debtor Edge Marketing, LLC; Debtor Health Market Advisor Group, LLC; Debtor Orange Cedar Holdings, LLC; Debtor Peak Vertex LLC; Debtor Performance Marketers Group, LLC; Debtor Protect.com LLC; Debtor Pure Flow Marketing, LLC; Debtor PushPros LLC; Debtor RGO Media LLC; Debtor Smarterchaos.com LLC; Debtor Sparkroom Holdings, LLC; Debtor Sparkroom, LLC; Debtor Swwsmedia.com LLC; Debtor Traverse Data, Inc.; Debtor UE Authority, Co.; and Debtor White Star Email LLC.  As such, pursuant to Article III.E of the Plan, the Plan is presumed accepted by the Holders of Claims in Class 4 at each of those Debtors.[17]

18. The Debtors filed a proposed Confirmation Order contemporaneously with the filing of this Memorandum.

## **ARGUMENT**

19. This Memorandum is organized into three sections.  **First**, this Memorandum requests approval of Disclosure Statement and a finding that the Debtors complied with the Conditional Disclosure Statement Order.  **Second**, the Debtors' "case in chief" that the Plan satisfies section 1129 of the Bankruptcy Code.  **Third**, the Debtors submit that good cause exists

---

[17] *See* Plan Art. III.E.

to waive the stay of the Confirmation Order.  The Debtors' responses to the Objections, and certain

informal objections, are set forth throughout this Memorandum or resolved in the Confirmation

Order, as applicable.

## I.     Approval of the Disclosure Statement Is Warranted.

### A.     The Disclosure Statement Contains "Adequate Information" as Required Under Section 1125 of the Bankruptcy Code and Satisfies Notice Requirements.

#### 1.     The Disclosure Statement Contains Adequate Information.

20.     Pursuant to section 1125 of the Bankruptcy Code, the proponent of a proposed

chapter 11 plan must provide "adequate information" regarding that plan to holders of impaired

claims and interests entitled to vote on the plan.[18]   Specifically, section 1125(a)(1) of the

Bankruptcy Code provides, in relevant part, as follows:

> '[A]dequate information' means information of a kind, and in
> sufficient detail, as far as is reasonably practicable in light of the
> nature and history of the debtor and the condition of the debtor's
> books and records, including a discussion of the potential material
> Federal tax consequences of the plan to the debtor, any successor to
> the debtor, and a hypothetical investor typical of the holders of
> claims or interests in the case, that would enable such a hypothetical
> investor of the relevant class to make an informed judgment about
> the plan . . .[19]

21.     The primary purpose of a disclosure statement is to provide all material

information, or "adequate information," that allows parties entitled to vote on a proposed plan to

make an informed decision about whether to vote to accept or reject the plan.[20]   "Adequate

---

[18]   11 U.S.C. § 1125(a)(1).

[19]   *Id.*

[20]   *See, e.g.*, *In re J.D. Mfg., Inc.*, No. 07-36751, 2008 WL 4533690, at *2 (Bankr. S.D. Tex. Oct. 2, 2008)
("'Adequacy' of information is a determination that is relative both to the entity (e.g. assets/business being
reorganized or liquidated) and to the sophistication of the creditors to whom the disclosure statement is
addressed."); *In re U.S. Brass Corp.*, 194 B.R. 420, 423 (Bankr. E.D. Tex. 1996) ("The purpose of the disclosure

information" is a flexible standard, based on the facts and circumstances of each case.[21]  Courts within the Fifth Circuit and elsewhere have acknowledged that determining what constitutes "adequate information" for the purpose of satisfying section 1125 of the Bankruptcy Code resides within the broad discretion of the court.[22]  Accordingly, the determination of whether a disclosure statement contains adequate information must be made on a case-by-case basis, focusing on the unique facts and circumstances of each case.[23]

22.    In making the determination as to whether a disclosure statement contains adequate information as required by section 1125 of the Bankruptcy Code, courts typically look for disclosures related to topics such as:

a.    the events that led to the filing of the bankruptcy petition;

b.    the relationship of a debtor with the affiliates;

c.    a description of the available assets and their value;

d.    the debtor's condition while in chapter 11;

---

statement is . . . to provide enough information to interested persons so they may make an informed choice . . . ."); *In re Applegate Prop., Ltd.*, 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991) ("A court's legitimate concern under Section 1125 is assuring that hypothetical reasonable investors receive such information as will enable them to evaluate for *themselves* what impact the information might have on their claims and on the outcome of the case, and to decide for themselves what course of action to take.") (emphasis in original).

[21]    *In re Cajun Elec. Power Coop., Inc.*, 150 F.3d 503, 518 (5th Cir. 1998) ("The legislative history of § 1125 indicates that, in determining what constitutes 'adequate information' with respect to a particular disclosure statement, both the kind and form of information are left essentially to the judicial discretion of the court and that the information required will necessarily be governed by the circumstances of the case.") (internal citations omitted); *Floyd v. Hefner*, No. CIV.A. H-03-5693, 2006 WL 2844245, at *30 (S.D. Tex. Sept. 29, 2006) (noting that what constitutes "adequate information" is a flexible standard); *In re Applegate Prop., Ltd.*, 133 B.R. at 829 ("The issue of adequate information is usually decided on a case by case basis and is left largely to the discretion of the bankruptcy court.").

[22]    *Id.*

[23]    *See, e.g.*, *Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1157 (5th Cir. 1988) ("The determination of what is adequate information is subjective and made on a case by case basis.  This determination is largely within the discretion of the bankruptcy court.") (internal citations omitted).

e.     the company's anticipated future performance;

f.     the claims asserted against a debtor;

g.     the source of information stated in the disclosure statement;

h.     the estimated return to creditors under a chapter 7 liquidation;

i.     the future management of a debtor;

j.     the chapter 11 plan or a summary thereof;

k.     the financial information, valuations, and projections relevant to a claimants' decision to accept or reject the chapter 11 plan;

l.     the information relevant to the risks posed to claimants under the plan;

m.     the actual or projected realizable value from recovery of preferential or otherwise avoidable transfers;

n.     the litigation likely to arise in a nonbankruptcy context; and

o.     the tax attributes of a debtor.[24]

23.     The Disclosure Statement contains, among other things, descriptions and summaries of:  (a) the Debtors' corporate history and corporate structure, business operations, and prepetition capital structure and indebtedness;[25] (b) the events leading to these Chapter 11 Cases, including the Debtors' prepetition restructuring efforts and the filing of these Chapter 11 Cases;[26] (c) the classification and treatment of Claims and Interests under the Plan, including who is entitled

---

[24]     *See In re U.S. Brass Corp.*, 194 B.R. at 424–25 (Bankr. E.D. Tex. 1996); *Westland Oil Dev. Corp. v. MCorp Mgmt. Sols., Inc.*, 157 B.R. 100, 102 (S.D. Tex. 1993) (listing factors courts have considered in determining the adequacy of information provided in a disclosure statement); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170–71 (Bankr. S.D. Ohio 1988) (same); *In re Metrocraft Publ'g. Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984) (same).  Disclosure regarding all topics is not necessary in every case.  *In re Phx. Petrol.*, 278 B.R. 365, 393 (Bankr. E.D. Pa. 2001).

[25]     *See* Disclosure Statement Art. V.

[26]     *See id.* Arts. VI - VII.

to vote and how to vote on the Plan;[27] (d) a summary of the Plan;[28] (e) the releases, exculpations, and injunctions contemplated by the Plan;[29] (f) certain financial information about the Debtors, including a liquidation analysis;[30] (g) the statutory requirements for confirming the Plan;[31] (h) certain risk factors that Holders of Claims should consider before voting to accept or reject the Plan and information regarding alternatives to confirmation of the Plan;[32] and (i) certain United States federal income tax consequences of the Plan.[33]

24.     In addition, prior to solicitation, the Disclosure Statement was subject to review and comment by various parties, including the DIP Lenders, the Committee, and the U.S. Trustee. On December 9, 2024, the Bankruptcy Court approved the Disclosure Statement on an interim basis as containing adequate information to commence solicitation.  No party in interest has requested additional information or disputed that the Disclosure Statement contained information sufficient for Impaired claimants in the Voting Classes to be able to cast an informed vote on the Plan.  For the reasons set forth above, the Debtors submit that the Disclosure Statement contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code and thus should be approved.

---

[27] *See id*. Art. III.E.

[28] *See id*. Art. IV.

[29] *See id*. Art. III.Q.

[30] *See id*. Exhibit B.

[31] *See id*. Art. IX.B.

[32] *See id*. Art. X.

[33] *See id*. Art. XI.

**B.      The Debtors Complied with the Bankruptcy Code, the Bankruptcy Rules, and the Conditional Disclosure Statement Order.**

25.      On December 9, 2024, the Bankruptcy Court entered the Conditional Disclosure Statement Order, establishing the Voting Record Date, the Solicitation Commencement Date, the Voting Deadline, the Objection Deadline, and the Opt-Out Deadline, and approving the form and manner of the Combined Hearing Notice, the Opt-Out Form, and the Ballots.   The Debtors complied with the procedures and timeline approved by the Conditional Disclosure Statement Order.

**1.      The Debtors Complied with the Notice Requirements Set Forth in the Conditional Disclosure Statement Order and the Bankruptcy Rules.**

26.      The Debtors satisfied the notice requirements set forth in the Conditional Disclosure Statement Order and Bankruptcy Rules 2002(b) and 3017.   *First*, on December 12, 2024, the Debtors caused the Claims and Balloting Agent to distribute the Solicitation Packages containing the Cover Letter, the Combined Hearing Notice, a support letter from the Committee encouraging Holders of General Unsecured Claims to vote in favor of the Plan, and the applicable Ballots to Holders of Claims in the Voting Classes.[34]   *Second*, on December 12, 2024, in accordance with the Conditional Disclosure Statement Order, the Debtors caused the Claims and Balloting Agent to mail the Combined Hearing Notice to all parties in interest listed on the Debtors' creditor matrix, informing the recipients of, among other things:   (a) the date for the hearing to consider final approval of the Disclosure Statement and confirmation of the Plan; (b) the date for determining which Holders of Claims in Voting Classes are entitled to vote on the

---

[34]      *See* Solicitation Affidavits.

Plan; and (c) the deadline for filing objections to the Plan and the Disclosure Statement.[35]  **_Third_**, on December 16 and December 17, 2024, the Debtors caused the Publication Notice to be published in _The New York Times_ (national edition) and the _Financial Times_ (global edition), respectively.[36]  **_Fourth_**, on December 12, 2024, in accordance with the Conditional Disclosure Statement Order, the Debtors caused the Claims and Balloting Agent to mail the Opt-Out Forms to all Non-Voting Holders, as applicable.[37]  **_Fifth_**, the Combined Hearing Notice included instructions on how to obtain the Plan and the Disclosure Statement without a fee through the Debtors' restructuring website or for a fee at the Bankruptcy Court's PACER website.[38]

> ### 2.   The Ballots Used to Solicit Holders of Claims Entitled to Vote on the Plan Complied with the Conditional Disclosure Statement Order.

27.     The form of Ballots used by the Debtors to solicit votes on the Plan comply with the Bankruptcy Code, Bankruptcy Rules, and Bankruptcy Local Rules and were approved by the Bankruptcy Court in the Conditional Disclosure Statement Order.[39]  As set forth in the Voting Report, Holders of Claims in the Voting Classes were transmitted Solicitation Packages.[40]

28.     The U.S. Trustee Objection alleges the Ballots included in the Solicitation Packages were deficient for two reasons.  **_First_**, the U.S. Trustee asserts that the Ballots were deficient because they fail to disclose that a vote to accept the Plan binds such party to the Third-Party

---

[35]   _See id_.

[36]   _See_ Publication Affidavits.

[37]   _See_ Solicitation Affidavits.

[38]   _See_ Conditional Disclosure Statement Order, Exhibit 7.

[39]   _See_ Conditional Disclosure Statement Order ¶ 5.

[40]   _See_ Voting Report ¶ 8.

Release.[41]  This is incorrect.  The Ballots clearly state (in bold and underlined) the following:  "IF YOU VOTE TO ACCEPT THE PLAN, YOU CANNOT OPT OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN.  BY VOTING TO ACCEPT THE PLAN, YOU ARE CONSENTING TO GRANT THE THIRD-PARTY RELEASES."[42]

29.      **_Second_**, the U.S. Trustee asserts that "the Debtors' procedure deeming consent for those who vote to accept the Plan" does not comply with the Complex Rules.[43]  The Complex Rules only require that the Ballots contain a box for Holders of Claims to check to indicate assent or opposition to the Third-Party Releases.[44]  As noted above, the Ballots provide a box for Holders of Claims to check to opt-out of the Third-Party Releases and clearly state that by either (a) voting to accept the Plan _or_ (b) failing to affirmatively opt-out of the Third-Party Releases, such party will be deemed to consent to the Third-Party Releases.  Moreover, the Ballots were previously approved on a final basis.  In light of the foregoing, the U.S. Trustee's objections with respect to the Ballots should be overruled.

30.      Therefore, the Debtors submit that they complied with the Conditional Disclosure Statement Order and satisfied the requirements of Bankruptcy Rules 3017(d) and 3018(c).

### 3.      The Debtors' Solicitation Period Complied with the Conditional Disclosure Statement Order.

31.      The Debtors' solicitation period complied with the Conditional Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules.

---

[41]    U.S. Trustee Obj. ¶ 16.

[42]    _See generally_ Ballots.

[43]    U.S. Trustee Obj. ¶ 39.

[44]    Complex Rules § O.40.

**First**, the Solicitation Packages, including instructions for accessing electronic or hard-copy versions of the Plan, were transmitted to all Holders of Claims entitled to vote on the Plan.[45] **Second**, the solicitation period, which lasted from December 12, 2024, through January 7, 2025, complied with the Conditional Disclosure Statement Order and was adequate under the particular facts and circumstances of these Chapter 11 Cases.[46]   **Third**, the Bankruptcy Court previously approved the Voting Record Date and the Voting Deadline in the Conditional Disclosure Statement Order.[47]   Accordingly, the Debtors submit that the solicitation period complied with the Conditional Disclosure Statement Order.

### 4.    The Debtors' Vote Tabulation Procedures Complied with the Conditional Disclosure Statement Order.

32.    As described in the Conditional Disclosure Statement Motion, the Debtors used standard tabulation procedures in tabulating votes received by Holders of Claims in the Voting Classes.  The Claims and Balloting Agent reviewed all Ballots received in accordance with the procedures described in the Conditional Disclosure Statement Motion.[48]  The Debtors respectfully submit that the Bankruptcy Court should approve the Debtors' tabulation of votes confirming that for each Class 3 and for each Class 4, other than for Class 4 with respect to Debtor Digital Media

---

[45]    *See* Solicitation Affidavits.

[46]    *See* Conditional Disclosure Statement Order ¶ 3.

[47]    *See id*.

[48]    *See* Voting Report ¶ 9.

Solutions, LLC and Debtor Forte Media Solutions, LLC, the requisite majorities in amount and number of Claims voted to accept the Plan pursuant to section 1126(c) of the Bankruptcy Code.

**5.    Solicitation of the Plan Complied with the Bankruptcy Code and Was in Good Faith.**

33.    Section 1125(e) of the Bankruptcy Code provides that "[a] person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title . . . is not liable" on account of such solicitation for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan.[49]

34.    As set forth in the Disclosure Statement, the Rose Declaration, the Voting Report, and as demonstrated by the Debtors' compliance with the Conditional Disclosure Statement Order, the Bankruptcy Code, and the Bankruptcy Rules, the Debtors at all times engaged in good faith, arm's-length negotiations and took appropriate actions in connection with the solicitation of the Plan in compliance with section 1125 of the Bankruptcy Code.  Therefore, the Debtors respectfully request that the Bankruptcy Court grant the Debtors, the DIP Lenders, the Prepetition Lenders, the Committee, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys, the protections provided under section 1125(e) of the Bankruptcy Code.

**II.    The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code and Should Be Confirmed.**

35.    To confirm the Plan, the Bankruptcy Court must find that the Debtors have satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[50]  As

---

[49]    11 U.S.C. § 1125(e).

[50]    *See In re Lakeside Glob. II, Ltd.*, 116 B.R. 499, 505 (Bankr. S.D. Tex. 1989) ("In order to confirm a reorganization plan, the bankruptcy court must be satisfied that the plan complies with all of the requirements of § 1129(a) of the Bankruptcy Code."); *In re Lone Star Utils., LLC*, No. 13-34302-SGJ-11, 2014 WL 4629129, at *2 (Bankr. N.D. Tex. Sept. 15, 2014) ("The Debtor has the burden of proving the elements of Bankruptcy Code

set forth herein, the Plan fully complies with all relevant sections of the Bankruptcy Code—including sections 1122, 1123, 1125, 1126, and 1129—as well as the Bankruptcy Rules and applicable nonbankruptcy law.

**A.      The Plan Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).**

36.      Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."[51]  The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the content of a plan, respectively.[52]  As explained below, the Plan complies with the requirements of sections 1122, 1123, and 1129 of the Bankruptcy Code, as well as other applicable provisions.

**1.      The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.**

37.      The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part, that "[e]xcept as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[53]  For a classification structure to satisfy section 1122 of

---

section 1129(a) by a preponderance of the evidence."); *see also In re Armstrong World Indus., Inc.*, 348 B.R. 111, 119-20 (D. Del. 2006) ("To confirm the Plan, the Court must determine whether it meets the specific requirements of Section 1129.").

[51]      11 U.S.C. § 1129(a)(1).

[52]      S. Rep. No. 95-989, at 126, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912; H.R. Rep. No. 95-595, at 412, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368; *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008); *In re S&W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were [s]ections 1122 and 1123.").

[53]      11 U.S.C. § 1122(a).

the Bankruptcy Code, substantially similar claims or interests need not be grouped in the same class.[54] Instead, claims or interests placed in a particular class must be substantially similar to each other.[55] Courts in this jurisdiction and others have recognized that plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational basis for doing so.[56]

38.     The Plan's classification of Claims and Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into eight separate Classes, with Claims and Interests in each Class differing from the Claims and Interests in each other Class based on legal or factual distinctions or other relevant criteria.[57] Specifically, the Plan provides for the separate classification of Claims and Interests into the following Classes:

a.     <u>Class 1</u>:  Other Secured Claims;

b.     <u>Class 2</u>:  Other Priority Claims;

c.     <u>Class 3</u>:  Prepetition Loan Claims;

---

[54]   *See In re Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850, 860 (Bankr. S.D. Tex. 2001) (recognizing that section 1122 is broadly "permissive of any classification scheme that is not specifically proscribed, and that substantially similar claims may be *separately* classified") (emphasis in original).

[55]   *In re Vitro Asset Corp.*, No. 11-32600-HDH, 2013 WL 6044453, at *5 (Bankr. N.D. Tex. Nov. 14, 2013) ("[A] plan may provide for multiple classes of claims or interests so long as each claim or interest within a class is substantially similar to other claims or interests in that class.").

[56]   Courts have identified grounds justifying separate classification, including:  (a) where there are good business reasons for separate classification, and (b) where members of a class possess different legal rights.  *Heartland Fed. Sav. & Loan Assoc. v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1167 (5th Cir. 1993) (recognizing that "there may be good business reasons to support separate classification"); *see also In re Pisces Energy, LLC*, No. 09-36591-H5-11, 2009 WL 7227880, at *8 (Bankr. S.D. Tex. Dec. 21, 2009) ("[A] plan proponent is afforded significant flexibility in classifying claims under section 1122(a) of the Bankruptcy Code provided there is a reasonable basis for the classification scheme and all claims within a particular class are substantially similar."); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex 2007).

[57]   *See* Plan Art. III.

d.       Class 4:  General Unsecured Claims;

e.       Class 5:  Intercompany Claims;

f.       Class 6:  Intercompany Interests;

g.       Class 7:  Existing DMS Inc. Interests; and

h.       Class 8:  Section 510(b) Claims.

39.     Claims and Interests assigned to each particular Class described above are substantially similar to the other Claims and Interests in such Class.[58]  In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.[59]  Namely, the Plan separately classifies the Claims and Interests because each Holder of such Claims or Interests may hold (or may have held) rights in the Debtors' Estates legally dissimilar to the Claims or Interests in other Classes or because substantial administrative convenience resulted from such classification.

40.     For example, Claims (rights to payment) are classified separately from Interests (representing ownership in the business), and Holders of Prepetition Loan Claims (Class 3) are distinguished from Holders of General Unsecured Claims (Class 4) because of the different circumstances of each Class, including that the Debtors' obligations with respect to the former are secured by collateral.  Further, Other Priority Claims (Class 2) are classified separately due to their required treatment under the Bankruptcy Code.

41.     Accordingly, the Claims or Interests assigned to each particular Class described above are substantially similar to the other Claims or Interests in each such Class and the

---

[58]    *See* Rose Decl. ¶ 49.

[59]    *See id.*

distinctions among Classes are based on valid business, factual, and legal reasons.  The Plan fully complies with and satisfies section 1122(a) of the Bankruptcy Code.  No party has asserted otherwise.

> **2.      The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.**

42.      The seven applicable requirements of section 1123(a) of the Bankruptcy Code generally relate to the specification of claims treatment and classification, the equal treatment of claims within classes, and the mechanics of implementing a plan.  The Plan satisfies each of these requirements.

> **a.      Designation of Classes of Claims and Interests, Specification of Unimpaired Classes, and Treatment of Impaired Classes (Section 1123(a)(1)–(3)).**

43.      The first three requirements of section 1123(a) of the Bankruptcy Code require that a plan specify (a) the classification of claims and interests, (b) whether such claims and interests are impaired or unimpaired, and (c) the treatment of any impaired class under the plan.[60]  Article III of the Plan sets forth these specifications in detail, in satisfaction of these three requirements.[61]  No party has asserted otherwise.

> **b.      Equal Treatment Within Classes (Section 1123(a)(4)).**

44.      Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[62]  The Plan

---

[60]      11 U.S.C. §§ 1123(a)(1)–(3).

[61]      *See* Plan Art. III.A–B.

[62]      11 U.S.C. § 1123(a)(4).

satisfies this requirement because Holders of Allowed Claims or Interests will receive the same treatment as other Holders of Allowed Claims or Interests within such Holders' respective Class.[63] No party has asserted otherwise.

### c.    Means for Implementation (Section 1123(a)(5)).

45.    Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation.[64] The Plan satisfies this requirement because Article IV of the Plan, as well as other provisions thereof, provides how the Plan will be implemented. Among other things, Article IV of the Plan describes the means for the cancelation of documents evidencing existing Claims and Interests and implementation of the transactions provided for in the Plan, including, among other things:  (a) the Sale Transactions; (b) implementation of the Committee Settlement; (c) the sources of consideration for Plan distributions; (d) a description of the Wind-Down; and (e) establishment of the Plan Administrator.   In addition to these core transactions, the Plan sets forth other critical mechanics of the Debtors' Wind-Down, such as the cancellation of securities and agreements and payment of certain fees.

46.    The precise terms governing the execution of these transactions are set forth in the applicable definitive documents or forms of agreements included in the Plan Supplement and Sale Transaction Documentation.[65] Thus, the Plan sets forth adequate means for its implementation and satisfies section 1123(a)(5) of the Bankruptcy Code.  No party has asserted otherwise.

---

[63]    *See* Plan Art. III.

[64]    11 U.S.C. § 1123(a)(5).

[65]    *See generally* Plan Supplement; Sale Transaction Documentation.

### d.  Issuance of Non-Voting Securities (Section 1123(a)(6)).

47.     Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of non-voting equity securities.[66] Because the Debtors are not issuing any new securities under the Plan, section 1123(a)(6) of the Bankruptcy Code does not apply to the Plan.

### e.  Directors and Officers (Section 1123(a)(7)).

48.     Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy."[67] The Plan satisfies this requirement by providing for the deemed resignation of the Debtors' managers and officers from their duties and the appointment of the Plan Administrator as the sole manager and sole officer of the Debtors and successor to the powers of the Debtors' managers and officers as of the Effective Date.[68] The identity of the Plan Administrator – Emerald Capital Advisors – is set forth in the Plan Supplement.[69] The Plan provides that the Plan Administrator shall implement the Wind-Down in the same fiduciary capacity as applicable to a board of managers and officers, subject to terms of the Plan (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the

---

[66]   11 U.S.C. § 1123(a)(6).

[67]   11 U.S.C. § 1123(a)(7).

[68]   *See* Plan Art. IV.K.

[69]   *See* Plan Supplement, Exhibit B.

same).  Accordingly, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.  No party has asserted otherwise.

> ### 3.     The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.

49.     Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.  Section 1123(b) of the Bankruptcy Code provides that a plan, among other things, may:  (a) impair or leave unimpaired any class of claims or interests; (b) provide for the assumption or rejection of executory contracts and unexpired leases; (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates or the retention and enforcement by a debtor, trustee, or other representative of claims or interests; (d) modify or leave unaffected the rights of holders of secured or unsecured claims; or (e) include any other appropriate provision not inconsistent with the applicable provisions of the Bankruptcy Code.[70]

50.     As set forth below, the Plan includes certain of these discretionary provisions consistent with section 1123(b) of the Bankruptcy Code.  The Debtors have determined, as fiduciaries of their Estates and in the exercise of their reasonable business judgment, that each of the discretionary provisions of the Plan is appropriate given the circumstances of these Chapter 11 Cases.

51.     *First*, under Article III of the Plan, Classes 1, 2, and potentially 5 and 6 are Unimpaired and Classes 3, 4, 7, 8, and potentially 5 and 6 are Impaired.[71]

---

[70]   *See* 11 U.S.C. §§ 1123(b)(1)–(6).

[71]   *See* Plan Art. III.  Holders of Intercompany Claims and Intercompany Interests in Class 5 and Class 6, respectively, will either be reinstated and therefore, Unimpaired, or distributed, contributed, set off, settled, canceled and released, without any distribution on account of such Claims, and therefore, Impaired, at the option of the applicable Debtors.  *Id.*

52.    ***Second***, under Article V, the Plan provides the treatment for Executory Contracts and Unexpired Leases that may be assumed, rejected or assigned under the Plan.[72]  Specifically, the Plan provides that, pursuant to sections 365 and 1123 of the Bankruptcy Code, all Executory Contracts or Unexpired Leases will be deemed automatically rejected, unless (i) specifically scheduled to be assumed under the Plan, (ii) subject to a pending motion to assume as of the Confirmation Date (unless agreed otherwise), (iii) previously assumed or rejected by the Debtors by Bankruptcy Court order, (iv) a contract, instrument, release, indenture, or other agreement entered into in connection with the Plan, (v) a D&O Liability Insurance Policy, (vi) the Sale Transaction Documentation, or (vii) it is to be assumed by the Debtor or assumed and assigned to a third party in connection with the Sale Transactions.[73]

53.    ***Third***, the Plan provides for a general settlement of all Claims and Interests, including the Committee Settlement.  The Plan's general settlement of all Claims and Interest is consistent with section 1123 of the Bankruptcy Code for the reasons set forth in section II.A.3.a, *infra*.

54.    ***Fourth***, the Plan modifies the rights of Holders of Prepetition Loan Claims, Holders of General Unsecured Claims, Holders of Intercompany Claims, and Holders of Section 510(b) Claims and leaves unaffected the rights of Holders of Other Secured Claims and Holders of Other Priority Claims.[74]

---

[72]    *See id*. at Art. V.

[73]    *Id.* at Art. V.A.

[74]    *Id*. at Art. III.

55.     *Fifth*, the Plan includes debtor and third-party releases, an exculpation provision, and an injunction provision, which, for the reasons set forth herein, are not inconsistent with the Bankruptcy Code.

### a.     The Plan Appropriately Incorporates a Settlement of Claims and Causes of Action.

56.     As described above, the Plan provides for a general settlement of all Claims and Interests, including the Committee Settlement.  The general settlement of Claims and Interests under the Plan is critical to the resolution of these Chapter 11 Cases and is consistent with section 1123(b) of the Bankruptcy Code and Rule 9019.

57.     The Bankruptcy Code states that a plan may "provide for . . . . the settlement or adjustment of any claims or interest belonging to the debtor or the estate."[75]  Specifically, debtors may release causes of action held by their estates pursuant to section 1123(b)(3)(A) of the Bankruptcy Code as consideration for concessions made by various stakeholders pursuant to the plan.[76]  Settlements are favored in chapter 11 because they minimize litigation and expedite the administration of the bankruptcy case.[77]

---

[75]   11 U.S.C. § 1123(b)(3)(A).

[76]   *See In re Bigler LP*, 442 B.R. 537, 547 (Bankr. S.D. Tex. 2010) (finding that plan release provision "constitutes an acceptable settlement under § 1123(b)(3) because the Debtors and the Estate are releasing claims that are property of the Estate in consideration for funding of the Plan by a [creditor]"); *In re Heritage Org., LLC*, 375 B.R. at 308  (holding that a proposed settlement resolved potential claims "belonging to the estate, which the plan may unquestionably do under the express authority of § 1123(b)(3)"); *In re Gen. Homes Corp.*, 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991) ("To the extent that the language contained in the plan purports to release any causes of action against the [creditor] which the Debtor could assert, such provision is authorized by § 1123(b)(3)(A) . . . .").

[77]   *See In re Jackson Brewing Co*., 624 F.2d 599, 602 (5th Cir. 1980) (stating that settlements are considered "a normal part of the process of reorganization" and a "desirable and wise method[] of bringing to a close proceedings otherwise lengthy, complicated[,] and costly.") (quotations and citations omitted).

28

58.     Ultimately, approval of a compromise is within the "sound discretion" of the bankruptcy court.[78]  In proposing a settlement, the debtor bears the burden of demonstrating that such settlement "falls within the 'range of reasonable litigation alternatives.'"[79]  In considering whether a settlement meets this standard, courts in the Fifth Circuit consider whether the settlement is (a) "fair and equitable" and (b) "in the best interest of the estate."[80]

59.     The "fair and equitable" requirement generally is interpreted, consistent with that term's usage in section 1129(b) of the Bankruptcy Code, to require compliance with the Bankruptcy Code's absolute priority rule.[81]  In determining whether a settlement meets the best interests requirement under Bankruptcy Rule 9019, courts within the Fifth Circuit consider: "(1) the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of litigation and any

---

[78]     See *In re AWECO, Inc.*, 725 F.2d 293, 297–98 (5th Cir. 1984) ("The decision of whether to approve a particular compromise lies within the discretion of the trial judge . . . . The term 'discretion' denotes the absence of a hard and fast rule.  When invoked as a guide to judicial action, it means a sound discretion, that is to say, a discretion exercised not arbitrarily or willfully, but with regard to what is right and equitable under the circumstances and the law, and directed by the reason and conscience of the judge to a just result.") (citations omitted); s*ee also In re Jackson Brewing, Co.*, 624 F.2d at 602–03 (same).

[79]     *In re Roqumore*, 393 B.R. 474, 480 (Bankr. S.D. Tex. 2008) (internal citations omitted).

[80]     *See In re Foster Mortg. Corp.*, 68 F.3d 914, 917 (5th Cir. 1995) ("[T]he court should approve the settlement only when the settlement is fair and equitable and in the best interest of the estate."); *see also Gen. Homes*, 134 B.R. at 861 ("To the extent that the language contained in the plan purports to release any causes of action against the [creditor] which the Debtor could assert, such provision is authorized by § 1123(b)(3)(A), subject to compliance with provisions of the code requiring that the plan be fair and equitable as to creditors and that the plan be proposed in good faith.").

[81]     *See In re Mirant Corp.*, 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006) ("Because 'fair and equitable' translates to the absolute priority rule, in order for a settlement to meet that test it must be consistent with the requirement that dissenting classes of creditors must be fully satisfied before any junior creditor receives anything on account of its claim.") (internal citations omitted); *see also In re MCorp Fin., Inc.*, 160 B.R. 941, 960 (Bankr. S.D. Tex. 1993) (approving a gifting settlement as meeting the "fair and equitable" test, reasoning that "[senior creditors] may share their proceeds with creditors junior to the [junior creditors], as long as the [junior creditors] continue to receive as least as much as what they would without the sharing."); *cf. AWECO*, 725 F.2d at 298 (holding that a settlement must comply with the absolute priority rule).

attendant expense, inconvenience, and delay; and (3) all other factors bearing on the wisdom of the compromise."[82]   The Fifth Circuit imposes two additional factors that bear on the decision to approve a proposed settlement:  (a) "the paramount interest of creditors with proper deference to their reasonable views;" and (b) "the extent to which the settlement is truly the product of arm's-length bargaining, and not of fraud or collusion."[83]

60.     Generally, the role of the bankruptcy court is not to decide the individual issues in dispute when evaluating a settlement, instead, the court should determine whether the settlement as a whole is fair and equitable.[84]   Court also afford debtors discretion in determining for themselves the appropriateness of granting plan releases of estate causes of action when doing so is within their sound business judgement.[85]

61.     The Debtors believe the general settlement of Claims and Interests under the Plan, including the Committee Settlement, satisfies the above factors.  ***First***, as set forth in greater detail in Part II.N of this Memorandum, the Plan (including the Committee Settlement contemplated therein) is "fair and equitable," because it does not violate the absolute priority rule.  While Class 4 is receiving a recovery without Class 3 being paid in full, Class 3 has voted to accept the Plan and

---

[82]   *In re Roqumore*, 393 B.R. at 479–80 (citing the factors set forth by the court in *Jackson Brewing Co.*, 624 F.2d at 602; *see also In re Age Ref., Inc.*, 801 F.3d 530, 540 (5th Cir. 2015) (same).

[83]   *Foster Mortg.*, 68 F.3d at 918–19 (citations omitted)

[84]   *See Watts v. Williams*, 154 B.R. 56, 59 (Bankr. S.D. Tex. 1993) ("In considering these factors, the bankruptcy court must review the facts supporting a compromise, yet not decide the merits of individual issues.  Rather, the bankruptcy court determines whether the settlement is fair and equitable as ***a whole***.") (emphasis added) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)).

[85]   *See Gen. Homes*, 134 B.R. at 861 ("The court concludes that such a release is within the discretion of the Debtor."); *see also In re CiCi's Holdings, Inc.*, No. 21-30146 (SGJ), 2021 WL 819330, at *8 (Bankr. N.D. Tex. Mar. 3, 2021) ("In accordance with section 1123(b)(3)(A) of the Bankruptcy Code, the releases of claims and Causes of Action by the Debtors described in . . . the Plan represent a valid exercise of the Debtors' business judgment under Bankruptcy Rule 9019.").

no class junior to Class 4 is receiving a recovery.  Furthermore, the Plan (including the Committee Settlement contemplated therein) and the Confirmation Order are the product of hard-fought, arm's-length negotiations between the Debtors and their key stakeholders.  Accordingly, the general settlement of Claims and Interests under the Plan, including the Committee Settlement, satisfies the "fair and equitable" requirement.

62.    **Second,** the Plan, including the Committee Settlement, is in the best interest of the Debtors' Estates and a sound exercise of the Debtors' business judgement.  As an initial matter, the Committee Settlement embodied in the Plan was necessary to resolve the Committee's objection to the final approval of the DIP Facility and potential challenges to the Sale Transactions.[86]  Because of the Committee Settlement, the Sale Transactions were approved without objection, which eliminated significant administrative costs and resulted in meaningful recoveries for various stakeholders, including the assumption and assignment of various contracts and payment of cures related thereto, and the assignment of various prepetition and postpetition General Unsecured Claims to the Stalking Horse Bidder.[87]

63.    Moreover, the Committee Settlement is the only means by which certain Holders of Allowed General Unsecured Claims will receive a recovery.  Holders of General Unsecured Claims sit behind more than $400 million of priority and secured debt in the Debtors' post-petition capital structure.[88]  The proceeds from the Sale Transactions are insufficient to repay such debt in full, and as such, without the Committee Settlement, Holders of General Unsecured Claims not

---

[86]    *See* Rose Decl. ¶ 61.

[87]    *Id*.

[88]    *See* Liquidation Analysis.

assigned to the Stalking Horse Bidder would not be entitled to any recovery.[89]  Now, as a result of the Committee Settlement, Holders of Allowed General Unsecured Claims will share Pro Rata in the Unsecured Claims Recovery Pool, which provides for $750,000 in Cash plus the proceeds of the Reserved Claims.[90]

64.     **Third**, the Committee Settlement is the product of robust, good-faith, and arm's-length negotiations among the Settling Parties.[91]  Accordingly, the general settlement of Claims and Interests under the Plan, including the Committee Settlement, satisfies the "in the best interest of the estate" requirement.

65.     For these reasons, the general settlement of Claims and Interests under the Plan, including the Committee Settlement, satisfies the requirements of section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and should be approved.  No party has asserted otherwise.

   **b.     The Plan's Release, Exculpation, and Injunction Provisions Are Appropriate and Comply with the Bankruptcy Code.**

66.     The Plan also includes certain Debtor and third-party releases, an exculpation provision, and an injunction provision.  These provisions are proper because, among other things, they are the product of extensive good-faith, arm's-length negotiations, were a material inducement for parties to enter into the Committee Settlement and support the Plan, are supported by the Debtors and their key stakeholders (including a majority of the Voting Classes), and are consistent with applicable precedent.  Furthermore, these provisions were fully and conspicuously disclosed to all parties in interest through the Combined Hearing Notice, the Opt-Out Form, and

---

[89]   *See* Rose Decl. ¶ 62.

[90]   *See* Plan Art. III.B.4.

[91]   *See* Rose Decl. ¶ 63.

the Ballots, each of which excerpted the full text of the releases, exculpation, and injunction provisions as set forth in the Plan.

### (i) The Debtor Release Is Appropriate and Complies with the Bankruptcy Code.

67.     Article VIII.C of the Plan sets forth certain releases granted by the Debtors, as of the Effective Date, of, among other things, certain claims, rights, and causes of action that the Debtors, the Wind-Down Debtors, and their Estates may have against the Released Parties (the "Debtor Release").[92]

68.     The Debtor Release is permitted under section 1123(b)(3)(A) of the Bankruptcy Code and satisfies the applicable Fifth Circuit standard such that it is (a) "fair and equitable" and (b) "in the best interest of the estate."[93]  As an initial matter, the terms of the Debtor Release are "fair and equitable" because the Debtor Release does not violate the absolute priority rule.  While Class 4 is receiving a recovery without Class 3 being paid in full, Class 3 has voted to accept the Plan and no class junior to Class 4 is receiving recovery.[94]  Thus, the Debtor Release is fair and equitable in line with Fifth Circuit precedent.

69.     In addition to being fair and equitable, the Debtor Release is in the best interest of the Debtors' Estates.  *First*, without the contributions of the Released Parties, the Plan and the transactions contemplated therein, which maximizes the value of the Estates for the benefit of all

---

[92]    Article II.113 of the Plan defines "Released Parties" as, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the DIP Lenders; (d) the Agents; (e) all Releasing Parties; (f) the members of the Committee; and (g) each Related Party of each such Entity in clause (a) through (f); *provided, however* that any Holder of a Claim or Interest that opts out of the releases contained in the Plan shall not be a "Released Party."

[93]    11 U.S.C. § 1123(b)(3)(A).

[94]    *See* Voting Report.

stakeholders, would not be possible. Specifically, the Plan provides for meaningful recoveries for the Classes effected by the Debtor Release—recoveries that would be unavailable absent the Plan, especially with respect to certain Holders of General Unsecured Claims that seek to recover their Pro Rata share of the Unsecured Claims Recovery Pool, which is a direct result of the Committee Settlement. The DIP Lenders, the Prepetition Lenders, and the Committee and each of its members, among other Released Parties, were critical participants in the Plan process, both in terms of negotiating and formulating a consensual deal for the benefit of all stakeholders and securing approval of the Sale Transactions, which were integral to maximizing the value of the Debtors' Estates.

70.     **Second,** the Debtor Release is limited in scope and is given in exchange for valuable consideration provided by the Released Parties for the benefit of all parties in interest. The Debtor Release appropriately offers protection to parties that participated in the Debtors' restructuring process, each of whom made significant contributions to and concessions in these Chapter 11 Cases.[95] Absent the support of the Released Parties, the Debtors would not have: (i) secured DIP financing to fund these Chapter 11 Cases; (ii) had a stalking horse bidder that generated an incremental $10 million in value for the Estates through the postpetition sale process; (iii) been able to run an orderly and robust marketing process; (iv) been able to provide a recovery for Holders of General Unsecured Claims; and (v) been able to obtain the votes necessary to confirm the Plan on an efficient timeline.[96] This strong support was predicated on the Debtors' agreement

---

[95]     *See* Rose Decl. at ¶ 67.

[96]     *Id*.

to provide the Debtor Release contemplated in the Plan.[97]   The Debtors do not believe that they have material causes of action against any of the Released Parties that would justify the risk, expense, and delay of pursuing any such causes of action as compared to the results and benefits achieved under the Plan.[98]   The Debtor Release provides finality, underpins the global settlement and compromise of issues achieved by the Plan, and avoids significant delay in consummating the Plan; therefore, the inclusion of the Debtor Release is worthwhile and for the benefit of all the Debtors' stakeholders.

71.     **Third**, the Debtor Release enjoys the support of all relevant economic stakeholders, including the majority of creditors entitled to vote on the Plan.   The Plan, including the Debtor Release contained therein, is supported by the Committee.

72.     Accordingly, the Debtor Release is justified under the controlling Fifth Circuit standard and should be approved.

(ii)     **The Third-Party Release Is Consensual and Appropriate.**

73.     The Plan also provides for the Third-Party Release.[99]   The Third-Party Release provides that each Releasing Party[100]—including Holders of Claims and Interests who do not

---

[97]   *Id.*

[98]   *Id.*

[99]   *See* Plan Art. IV.D.

[100]   Article II.114 of the Plan defines "*Releasing Parties*" as, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the DIP Lenders; (d) the Agents; (e) all Holders of Claims that vote to accept the Plan; (f) all Holders of Claims or Interests that are deemed to accept the Plan who do not affirmatively opt-out of the releases provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the releases provided in the Plan; (g) all Holders of Claims that abstain from voting on the Plan and who do not affirmatively opt-out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (h) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt-out of the releases provided by the Plan by checking the box on the applicable ballot or notice of non-voting status indicating that they opt not to grant the releases provided in the Plan; and (i) each Related

specifically opt-out to their inclusion as a Releasing Party—and Related Parties, solely in their respective capacities as such and to the maximum extent permitted by the law, shall release any and all Causes of Action such parties could assert against the Released Parties.[101]

74.     The Fifth Circuit consistently has held that the Bankruptcy Code does not preclude a third-party release provision where "it has been accepted and confirmed as an integral part of a plan of reorganization."[102]   Specifically, *Republic Supply* and its progeny,[103] stand for the proposition that "[c]onsensual nondebtor releases that are specific in language, integral to the plan, a condition of settlement, and given for consideration do not violate" the Bankruptcy Code.[104]   At the core of this analysis is whether the third-party release is consensual.

75.     In determining whether a third-party release is consensual, bankruptcy courts in Texas focus on process— *i.e.*, whether "notice has gone out, parties have actually gotten it, they've had the opportunity to look over it, [and] the disclosure is adequate so that they can actually understand what they're being asked to do and the options that they're being given."[105]   These

---

Party of each Entity in clauses (a) through (h), solely in their respective capacities as such and to the maximum extent permitted by the law.

[101]   The foregoing description is meant as a summary of the operative plan provisions only.  To the extent there is any conflict between the foregoing summary and the Third-Party Release contained in Article III of the Plan, the the Plan shall control.

[102]   *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987).

[103]   *See, e.g., Hernandez v. Larry Miller Roofing, Inc*., 628 F. App'x 281, 286–88 (5th Cir. 2016); *FOM Puerto Rico, S.E. v. Dr. Barnes Eyecenter Inc.*, 255 F. App'x 909, 911–12 (5th Cir. 2007); *Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.)*, 203 F.3d 914, 919 (5th Cir. 2000).

[104]   *In re Wool Growers*, 371 B.R. 768, 776 (N.D. Tex. 2007) (citing *Republic Supply*, 815 F.2d at 1050); *see also Dr. Barnes Eyecenter*, 255 F. App'x at 911–12.

[105]   Confirmation Hr'g Tr. at 47:7–11, *In re Energy & Expl. Partners, Inc.*, No. 15-44931 (Bankr. N.D. Tex. April 21, 2016) [Docket No. 730] (hereinafter "ENXP Tr."); *see also* Confirmation Hr'g Tr. at 32, *In re Ameriforge Group, Inc.*, No. 17-32660 (Bankr. S.D. Tex. May 19, 2017) [Docket No. 144]; Confirmation Hr'g Tr. at 19–20, *In re Hornbeck Offshore Servs., Inc.*, No. 20-32679 (Bankr. S.D. Tex. June 19, 2020) [Docket No. 227].

courts acknowledge that parties in interest waive their rights with respect to a third-party release if they do not opt-out or object.[106]

76.     The Third-Party Release satisfies the Fifth Circuit standard for consensual third-party releases. *Purdue* does not change this analysis.[107]

77.     In *Purdue*, the United States Supreme Court held "only that the bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants."[108]  The Supreme Court's holding only applies to nonconsensual releases and does not address consensual releases.[109]  The Fifth Circuit already limited the availability of non-consensual third-party releases prior to *Purdue*.[110]  Unsurprisingly then, the Bankruptcy Court in the Southern District of Texas has continued to approve opt-out third party releases post-*Purdue*,

---

[106]   *See Wool Growers*, 371 B.R. at 775 (citing *In re Zale Corp.*, 62 F.3d 746, 761 (5th Cir. 1995)) ("The Fifth Circuit has held that a nondebtor release violates section 524(e) when the affected creditor *timely objects* to the provision.") (emphasis added); *see also* ENXP Tr. at 47:2–15 ("[T]he [*Republic Supply*] case being that the Debtor is authorized, I think, I don't think there's anything that's necessarily bad faith about the Debtor putting release provisions like this into a plan. And if we assume that the Debtor has otherwise satisfied procedural due process . . . and then they choose not to participate one way or the other, can they be bound by it? I would say that this is one of those situations where [*Republic Supply*] says those people can waive substantive rights by not affirmatively participating in the case."); Confirmation Hr'g Tr. at 29:7–19, *In re CJ Holding Co.*, No. 16-33590 (Bankr. S.D. Tex. Dec. 16, 2017) [Docket No. 1076] (approving as consensual a third-party release provision that bound all holders of claims and interest that did not object); Confirmation Hr'g Tr. at 42:2–14, *In re Southcross Holdings, LP*, No. 16-20111 (Bankr. S.D. Tex. April 11, 2016) [Docket No. 191] (approving as consensual a third-party release provision in favor of the debtors' prepetition equity sponsors that bound all holders of claims and interest that did not object).

[107]   *See generally Harrington v. Purdue Pharma, L.P.*, 603 U.S. 204 (2024).

[108]   *Purdue*, 603 U.S. at 227.

[109]   *Id.* at 226.

[110]   *See, e.g., In re Pilgrim's Pride Corp.*, No. 08-45664-DML-11, 2010 WL 200000, at *5 (Bankr. N.D. Tex. Jan. 14, 2010) (finding that under *Pacific Lumber* "the court may not, *over objection*, approve through confirmation of the Plan third-party protections") (emphasis added).

explicitly articulating that "*Purdue* did not change the law in [the Fifth] Circuit" and that "[h]undreds of chapter 11 cases have been confirmed in [the Southern] District with consensual third-party releases with an opt-out."[111]

> ### *a.     The Debtors Provided Sufficient Notice to Parties Bound by the Third-Party Release.*

78.     The consensual Third-Party Release in the Plan is "appropriate, afforded affected parties constitutional due process, and a meaningful opportunity to opt out."[112]  Parties in interest were provided detailed notice about the Plan, the Objection Deadline, the Voting Deadline, and the opportunity to out-out of the Third-Party Release through the information in the Solicitation Materials, specifically the Ballots and Opt-Out Forms, as applicable.[113]  The Disclosure Statement also included a detailed description of the Third-Party Release and the opt-out mechanism.[114]  The Solicitation Affidavits show that Ballots and Opt-Out Forms were served on the Voting Classes and Non-Voting Classes, such that all parties in interest had the opportunity to opt-out.[115]

79.     The Ballots each quoted the entirety of the Third-Party Release in bold, conspicuous font and clearly informed Holders in the Voting Classes that a vote to accept the Plan

---

[111]   *See In re Diamond Sports Grp.*, No. 23-90116 (CML) (Bankr. S.D. Tex. Nov. 14, 2024) [Docket No. 2671] (confirming chapter 11 plan's opt-out third-party releases as consensual); *see also In re Robertshaw US Holding Corp.*, 662 B.R. 300, 323 (Bankr. S.D. Tex. 2024) ("There is nothing improper with an opt-out feature for consensual third-party releases in a chapter 11 plan . . . . Hundreds of chapter 11 cases have been confirmed in this District with consensual third-party releases with an opt-out . . . . *Purdue* did not change the law in this Circuit.").

[112]   *Robertshaw*, 662 B.R. at 323.

[113]   *See* Conditional Disclosure Statement Order, including the exhibits thereto.

[114]   *See* Disclosure Statement Art. III.Q.

[115]   *See* Solicitation Affidavits.

is deemed consent to the Third-Party Release.[116]   The Ballots further instructed Holders that if they

do not consent to the Third-Party Release, they should opt-out of the releases and either reject the

Plan or abstain from voting on the Plan.[117]   Similarly, the Opt-Out Form quoted the Third-Party

Release and included an option to check a box to opt-out of the Third-Party Release, meaning that

every known stakeholder, including Unimpaired creditors and holders of equity interests, was

actually served with the means by which such stakeholder could opt-out of the Third-Party

Release.[118]

80.     The Debtors also caused the Third-Party Release language to be published in *The

New York Times* and the *Financial Times*.[119]   The Voting Report shows that 44 Ballots and Opt-

Out Forms were returned checking the box to opt out of the Third-Party Release.[120]   Accordingly,

the notice provided by the Debtors, specifically in the Ballots and the Opt-Out Forms, was

unambiguous that Holders of Claims and Interests—regardless of whether they were entitled to

vote, or not entitled to vote—could either consent to or opt-out of the Third-Party Release.

### b.     The Third-Party Release Is Specific.

81.     The Third-Party Release is sufficiently specific—listing the potential Causes of

Action to be released—so as to put the Releasing Parties on notice of the released claims.[121]   The

---

[116]   *See* Conditional Disclosure Statement Order, Exhibit 3A and Exhibit 3B.

[117]   *See id.*

[118]   *Id.* at Exhibit 5.

[119]   *See* Publication Affidavits.

[120]   *See* Voting Report for a further explanation.

[121]   Plan Art. VIII.D (describing specifically the nature and type of claims released); Plan Art. I.A.113 (describing specifically the parties released).

Third-Party Release explicitly lists out the Causes of Action released, including, among others, those related to the Debtors, these Chapter 11 Cases, the Plan, the Disclosure Statement, and the Sale Transaction Documentation.[122]  Notably, the Third-Party Release also explicitly excludes (a) any obligations related to customary banking products, banking services, or other financial accommodations (except as may be expressly amended or modified by the Plan) and (b) any post-Effective Date obligations of any party or Entity under the Plan, Confirmation Order, any Sale Transaction Documentation, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or any Claim or obligation arising under the Plan.[123]

> ### c.      The Third-Party Release Is Critical to the Success of the Plan and Was Heavily Negotiated.

82.      The circumstances of these Chapter 11 Cases warrant the Third-Party Release.  The Third-Party Release is an integral aspect of the Committee Settlement, without which, there would be no value available to Holders of General Unsecured Claims under the Plan.[124]  Moreover, the availability of the Third-Party Release was key in securing the support of the Released Parties to, among other things, provide the DIP Financing, actively participate in the Sale Transactions, and negotiate the Committee Settlement, all of which inured to the benefit of all stakeholders, as more fully discussed, *supra* section II.A.3.b.ii.d.[125]  Put simply, the Debtors' key stakeholders are unwilling to support the Plan without the assurance that they and their collateral would not be

---

[122]   *See* Plan Art. VIII.D.

[123]   *See id.*

[124]   Rose Decl. ¶ 74.

[125]   *Id.*

subject to post-emergence litigation or other disputes related to these cases.[126]  The Third-Party

Release therefore not only benefits the non-Debtor Released Parties, but the Estates as a whole.

> ### d.      The Third-Party Release Is Given for Consideration.

83.      The Third-Party Release is given for consideration.  Many of the Released Parties,

including the the Prepetition Lenders and the DIP Lenders, have made significant concessions and

commitments that will allow the Debtors to maximize the value of their Estates.  Specifically, the

Prepetition Lenders and the DIP Lenders:  (a) provided a $122 million DIP Facility, which

included $30 million in new money that provided the Debtors with Cash to support the

continuation of the Debtors marketing process and fund prepetition obligations under the Debtors'

"first day" relief; (b) agreed to assume millions of dollars of liabilities under the Stalking Horse

Agreement; (c) consented to the creation of a Unsecured Claims Recovery Pool for the benefit of

Holders of Allowed General Unsecured Claims as a part of the Committee Settlement; and

(d) waived the right to receive any distribution from the Unsecured Claims Recovery Pool under

the Plan with respect to their DIP Facility Deficiency Claims and Prepetition Loan Deficiency

Claims, each of which provided significant value to the Debtors' Estates.[127]  The Prepetition

Lenders, the DIP Lenders, and the Committee for months prior to the commencement of these

Chapter 11 Cases and throughout the pendency of these Chapter 11 Cases, as applicable, worked

constructively with the Debtors to negotiate and implement a series of value-maximizing

transactions, including those embodied in the Plan, that will enable the Debtors to conduct an

---

[126]   *Id*.

[127]   *Id*. at ¶ 75.

orderly wind-down of their Estates.[128]   And the Debtors' directors and officers steadfastly maintained their duties to maximize value for the benefit of all stakeholders, investing countless hours both prior to and after filing these Chapter 11 Cases in addition to performing their ordinary course responsibilities.[129]

84.     Finally, the mutuality of such releases—a "proverbial peppercorn-for-peppercorn"—provides adequate consideration to support the Third-Party Release with respect to all Releasing Parties, including those that are not otherwise receiving any recovery under the Plan.[130]

85.     For the foregoing reasons, the Third-Party Release is permissible and should be approved.

> **e.      The U.S. Trustee's Objections to the Third-Party Release Should Be Overruled.**

86.     Despite the Third-Party Release's compliance with *Republic Supply* and its progeny, the U.S. Trustee nevertheless objects to the Third-Party Release as impermissible, in line with its institutional opposition to opt-out releases.  Specifically, the U.S. Trustee asserts:  (a) that a vote for the Plan cannot be construed as affirmative consent;[131]  (b) multiple arguments that silence or a failure to opt out are insufficient to confer consent,[132]  (c) the Debtors have not provided

---

[128]   *Id.*

[129]   *Id.*

[130]   Hr'g Tr. at 244:16-18, *In re Cobalt Int'l Energy, Inc.*, No. 17-36709 (MI) (Bankr. S.D. Tex. Apr. 4, 2018) [Docket No. 790] ("I simply find that this is, in effect, the proverbial peppercorn-for-peppercorn and that that is adequate consideration for the release, given its mutuality.").

[131]   U.S. Trustee Obj. ¶¶ 30–40.

[132]   *Id.* ¶¶ 41–70.

sufficient notice to all parties affected by the Third-Party Release;[133] and (d) opt-outs in a class action are distinct from opt-outs in a chapter 11 plan.[134]   The U.S. Trustee further objects to the release of claims by governmental entities under the Plan.  Each of these arguments fails.

(1)  *Voting for the Plan Can Be Construed as Affirmative Consent.*

87.     Voting on the Plan constitutes consent to the Third-Party Release, because a voting creditor agrees to accept (or reject) the entire Plan.  A Holder that votes to accept the Plan must agree to the Plan *in toto*, not just select which provisions of the Plan it finds most preferable, and is bound by the entire agreement.[135]

88.     The U.S. Trustee agrees that the Plan is "a package deal" and that a person "votes yes or no on an entire plan, not particular aspects of it."[136]   Nevertheless, the U.S. Trustee simultaneously argues that the Third-Party Release should be an exception to this rule because it is too "coercive" and voters that accept the Plan should not also be required to accept the Third-Party Release.[137]   This argument ignores that the economic recovery available under the Plan is *only* available because of the Committee Settlement and the Third Party Release that was specifically negotiated as part thereof.

---

[133]   *Id.* ¶¶ 71–74.

[134]   *Id.* ¶¶ 75–86.

[135]   *See, e.g.*, *In re Bartleson*, 253 B.R. 75, 84 (9th Cir. B.A.P. 2000) ("A chapter 11 plan is a contract between the debtor and its creditors in which general rules of contract interpretation apply.").

[136]   U.S. Trustee Obj. ¶ 36.

[137]   *Id.* (implying that the Plan is coercive because it requires voters "who believe the plan is the best way to maximize the return of their money from the debtor . . . to vote 'no' on the Plan solely because of an objectional non-debtor release" and that the Plan "would be penalizing them for exercising their vote in favor of the Plan.").

> (2) An "Opt-out" Release Is a Consensual Release in the Fifth Circuit.

89.     The U.S. Trustee presents multiple different arguments in support of his baseline proposition that the only way a party can consent to a third-party release is through an affirmative "opt-in" election.[138]   Courts in the Fifth Circuit are clear that silence and/or failing to opt-out of a third-party release is sufficient to confer consent.[139]   Nothing in *Purdue* now requires courts in the Fifth Circuit to alter its approach or revisit what qualifies as a consensual release.[140]

90.     Further, post-*Purdue*, courts in the Fifth Circuit continue to uphold opt-out releases as consensual.[141]   In *Robertshaw*, for example, Judge Lopez expressly rejected and overruled similar arguments to those advanced by the U.S. Trustee here, stating that "[t]here is nothing

---

[138]   *See* U.S. Trustee Obj. ¶¶ 41–70.

[139]   *See In re Camp Arrowhead, LTD.*, 451 B.R. 678, 701–02 (Bankr. W.D. Tex. 2011) ("[T]he Fifth Circuit does allow permanent injunctions *so long as there is consent.*  Without an objection, this court was entitled to rely on [a creditor's] silence to infer consent at the confirmation hearing . . . .") (emphasis in original, citation omitted); Hr'g Tr. 59:21-60:2, *In re RCS Cap. Corp.*, No. 16-10223 (MFW) (Bankr. D. Del. Mar. 21, 2016) [Docket No. 366] ("If a creditor doesn't want to grant a release, they can vote no and opt out, or just not vote.").

[140]   The Supreme Court expressly did not "call into question *consensual* third-party releases" nor "express a view on what qualifies as a consensual release."  *Purdue*, 603 U.S. at 226 (emphasis in original).

[141]   *See, e.g.*, Dec. 31 H'rg Tr. 32:18-35:9, *In re Intrum AB et al.*, No. 24-90575 (CML) (Bankr. S.D. Tex. Dec. 31, 2024) [Docket No. 275] (approving third party releases for which consent was confirmed through opt outs); Nov. 14 H'rg Tr. 66:3-6, *In re Diamond Sports Grp., LLC*, No. 23-90116 (CML) (Bankr. S.D.Tex. Nov. 18, 2024) [Docket No. 2680] ("When I look at everything, I'm going to approve the Plan under the law. I think it complies with every provision under the law. I think the opt-outs worked."); *In re Wesco Aircraft Holdings, Inc., et al.*, No. 23-90611 (MI) (Bankr. S.D. Tex. Jan. 6, 2025) [Docket No. 2550]; Memorandum Decision on Plan Confirmation at 28, *In re Robertshaw US Holding Corp.*, No. 24-90052 (CML) (Bankr. S.D. Tex Aug. 16, 2024) [Docket No. 959] ("[T]he consensual third-party releases in the Plan are appropriate, afforded affected parties constitutional due process, and a meaningful opportunity to opt out.  There is nothing improper with an opt-out feature for consensual third-party releases in a chapter 11 plan . . . . And, again, *Purdue* did not change the law in this Circuit."); Findings of Fact, Conclusions of Law, and Order Confirming Debtors' Third Amended Joint Plan of Reorganization at ¶ P, *In re DRF Logistics, LLC*, No. 24-90447 (CML) (Bankr. S.D.Tex. Nov. 25, 2024) [Docket No. 530] ("The releases granted by non-Debtors . . . are consensual because all Releasing Parties have either affirmatively consented to such releases or were given due and adequate notice thereof and sufficient opportunity and instruction to elect to opt out of such releases.").

improper with an opt-out feature for consensual third-party releases in a chapter 11 plan."[142]  The U.S. Trustee is the only party in interest that objected to the Third-Party Release.  Thus, the Third-Party Release is consensual and should be approved.

(3)     *Notice of the Third-Party Release Is Sufficient.*

91.     The U.S. Trustee objects to the Third-Party Release on the basis that the Debtors provided insufficient notice to those affected by the Third-Party Release.  To the contrary, the Debtors provided sufficient notice.  Notably, 36 Ballots were submitted by Holders entitled to vote on the Plan electing to Opt-Out of the releases and eight Opt-Out Forms, five of which were Master Opt-Out Forms, were submitted by Non-Voting Holders checking the opt-out box in the Opt-Out Form.[143]  The significant number of Holders that opted-out of the Third-Party Release demonstrates that the Ballots and Opt-Out Forms had sufficient instructions to allow parties of interest to opt-out of the Third-Party Release if desired.[144]

(4)     Robertshaw's *finding on class action opt-outs is inapplicable.*

92.     Finally, the U.S. Trustee's argument that class action opt-outs are different than the opt-outs in the Plan is an attempt to relitigate a legal finding in *Robertshaw* not at issue here.  Although the Debtors agree with the analysis and ultimate holding in *Robertshaw*, the Debtors do not believe that the *Robertshaw* court's holding that opt-out releases are appropriate hinges on the availability of such releases in class action lawsuits.  Rather, the *Robertshaw* court merely

---

[142]   *Robertshaw*, 662 B.R. at 322.

[143]   *See generally* Voting Report.

[144]   *See* Voting Report.

references class action lawsuits as a proceeding in which opt-outs may be deemed consensual.[145] The *Robertshaw* court's analysis is substantially more robust than presented by the U.S. Trustee, explaining that the opt-out mechanism at issue was proper because the opt-out releases under the plan were consensual, afforded affected parties constitutional due process, and offered a meaningful opportunity to opt-out.[146]  The same reasoning applies to the Third-Party Release here.

                *(5)*      *Governmental Entities Had the Opportunity to Opt-Out.*

93.      The U.S. Trustee also objects to the inclusion of any governmental entity in the definition of "Releasing Parties."[147]  The Debtors do not believe such objection is actually at issue in light of the Plan's opt-out mechanism.  Because each governmental entity that may be affected by the Third-Party Release had the opportunity to opt-out of the Plan releases, each applicable governmental entity may opt-out of the Third-Party Release and ensure no such governmental claims are released by third parties.

94.      Accordingly, the Debtors submit that the Bankruptcy Court should overrule the U.S. Trustee Objection.

### (iii)     The Exculpation Provision Is Appropriate.

95.      Article VIII.E of the Plan provides that each Exculpated Party—*i.e.*, (a) each of the Debtors and (b) each member of the Committee, solely in their capacity as such—shall be released and exculpated from any Causes of Action arising out of acts or omissions in connection with these Chapter 11 Cases and certain related transactions, except for acts or omissions that are found to

---

[145]   *In re Robertshaw*, 662 B.R. at 323, n. 120.

[146]   *Id.* at 323.

[147]   U.S. Trustee Obj. ¶¶ 93–94.

have been the product of actual fraud, willful misconduct or gross negligence (the "Exculpation Provision").[148]

96.     Unlike third-party releases, exculpation provisions do not affect the liability of third parties *per se*, but rather set a standard of care of gross negligence or willful misconduct in future litigation by a non-releasing party against an "exculpated party" for acts arising out of the Debtors' restructuring.[149]  A bankruptcy court has the power to approve an exculpation provision in a chapter 11 plan because a bankruptcy court cannot confirm a chapter 11 plan unless it finds that the plan has been proposed in good faith.[150]  As such, an exculpation provision represents a legal conclusion that flows inevitably from the findings a bankruptcy court must reach in confirming a plan.  Once the court makes its good faith finding, it is appropriate to set the standard of care of the fiduciaries involved in the formation of that plan.[151]

97.     The Exculpation Provision is consistent with Fifth Circuit law.  The Fifth Circuit in *Highland Capital*, expressly endorsed provision of qualified immunity to "creditors' committee members for actions within the scope of their statutory duties" and "bankruptcy trustees," which extends to a debtor in possession under section 1107 of the Bankruptcy Code, unless they act with

---

[148]   The foregoing description is meant as a summary of the operative plan provisions only.  To the extent there is any conflict between the forgoing summary and the definition of "Exculpated Party" contained in Article I and Article VIII of the Plan, the Plan shall control.

[149]   *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code . . . ."); *see also In re Premier Int'l Holdings, Inc.*, No. 09-12019 (CSS), 2010 WL 2745964, at *10 (Bankr. D. Del. April 29, 2010) (approving a similar exculpation provision as that provided for under the Plan).

[150]   *See* 11 U.S.C. § 1129(a)(3).

[151]   *See In re PWS Holding Corp.*, 228 F.3d at 246 (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity . . . for actions within the scope of their duties").

"gross negligence."[152]   Where a bankruptcy trustee is not appointed, a debtor in possession's directors are considered fiduciaries both to the debtor in possession and to the creditors, just as a trustee would be if one were appointed.[153]   The Plan therefore appropriately includes the Debtors as well as the Committee and its members as Exculpated Parties, consistent with *Highland Capital* and this Bankruptcy Court's precedent, for actions prior to the Effective Date.

98.     Here, the Exculpation Provision is fair and appropriate under both applicable law and the facts and circumstances of these Chapter 11 Cases.   The Exculpated Parties have participated in good faith in formulating and negotiating the Plan as it relates to the Debtors, and they should be entitled to protection from exposure to any lawsuits filed by disgruntled creditors or other unsatisfied parties.   The Fifth Circuit has specifically recognized that official committees and their members are entitled to exculpatory relief for conduct within the scope of their duties (*i.e.*, excluding acts of fraud or gross negligence).[154]   The Exculpation Provision was important to the development of a feasible, confirmable Plan, and the Exculpated Parties participated in these

---

[152]   *See NexPoint Advisors, L.P., et al. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 48 F.4th 419, 437–38 (5th Cir. 2022).

[153]   *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) ("[I]f a debtor remains in possession—that is, if a trustee is not appointed—the debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession.") (citation omitted); *see also In re Hous. Reg'l Sports Network, L.P.*, 505 B.R. 468, 481 (Bankr. S.D. Tex. 2014) ("[T]he willingness of courts to leave debtors in possession 'is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.'") (emphasis and citation omitted); *In re Schepps Food Stores, Inc*., 160 B.R. 792, 797 (Bankr. S.D. Tex. 1993) ("Section 1107(a) of the [Bankruptcy] Code enables a debtor to take the place of the trustee, with a few exceptions, as a [d]ebtor-in-[p]ossession . . . . Recognizing that corporations are in reality legal fictions, in such instances it is the debtor's management which takes on the heightened fiduciary obligations of the trustee."); *In re Performance Nutrition, Inc.*, 289 B.R. 93, 111 (Bankr. N.D. Tex. 1999) ("The officers and directors of a debtor in possession owe the same fiduciary duties as a trustee in bankruptcy.").

[154]   *Bank of N.Y. Trust Co. v. Official Unsecured Creditors' Comm. (In re The Pacific Lumber Co.)*, 584 F.3d 229, 252–53 (5th Cir. 2009).

48

Chapter 11 Cases in reliance upon the protections afforded to those constituents by the Exculpation Provision.

99.     The Debtors actively negotiated with Holders of Claims and Interests across the Debtors' capital structure and the Committee in connection with the Plan and these Chapter 11 Cases.  Such negotiations were extensive and the resulting agreements were implemented in good faith with a high degree of transparency.[155]  Accordingly, the Bankruptcy Court's findings of good faith vis-à-vis the Debtors' Chapter 11 Cases should also extend to the Exculpated Parties.  The Exculpation Provision represents an integral piece of the overall settlement embodied in the Plan and is the product of good-faith, arm's-length negotiations, and significant sacrifice by the Exculpated Parties.

100.     As set forth in the Plan, the scope of the Exculpation is narrowly tailored to exclude certain acts, relates only to acts or omissions in connection with or arising out of the Debtors' restructuring, is limited to the duration of time between the Petition Date and Effective Date, and ultimately inures to the benefit of only those parties traditionally considered estate fiduciaries.

101.     Presidio Interactive Corporation ("Presidio") objects to the Exculpation Provision to the extent that the Exculpation Provision can be interpreted to limit the alleged liability asserted against the Debtors in the Presidio Adversary Proceeding.[156]  In its adversary proceeding, Presidio asserts claims arising out of the Debtors' alleged prepetition willful misconduct, which clearly falls outside the scope of the Exculpation Provision.  The approval of the Exculpation Provision

---

[155]   *See* Rose Decl. ¶¶ 80, 88.

[156]   *See* Presidio Obj. ¶ 7.  "Presidio Adversary Proceeding" mean the adversary proceeding initiated by Presidio in these Chapter 11 Cases, No. 24-90468.

does not rescind Presidio's ability to pursue its claim against the Debtors in the Presidio Adversary Proceeding.

102.    Accordingly, under the circumstances, it is appropriate for the Bankruptcy Court to overrule the Presidio Objection, approve the Exculpation Provision, and find that the Exculpated Parties have acted in good faith and in compliance with the law.

### (iv)    The Injunction Provision Is Appropriate.

103.    Prevailing Fifth Circuit Law permits inclusion of an injunction in a plan provided it is consensual.[157]    The injunction provision set forth in Article VIII.F of the Plan (the "Injunction Provision") implements the Plan's release and exculpation provisions by permanently enjoining all Entities from commencing or maintaining any action against the Debtors, the Released Parties, or the Exculpated Parties on account of, or in connection with, or with respect to, any such Claims or Interests released, exculpated, or settled under the Plan.  Thus, the Injunction Provision is a necessary component of the Plan precisely because it enforces the release and exculpation provisions that are centrally important to the Plan and the settlements contained therein.[158]

104.    The Injunction Provision affords the Debtors and their stakeholders (including, among others, the Released Parties and the Exculpated Parties) a greater degree of certainty with respect to these Chapter 11 Cases by requiring the Bankruptcy Court's authorization for the Releasing Parties to commence or pursue Claims or Causes of Action that relate to or are reasonably likely to relate to any act or omission in connection with, relating to, or arising out of

---

[157]    *See, e.g., In re Camp Arrowhead*, 451 B.R. at 701–02 (Bankr. W.D. Tex. 2011) ("[T]he Fifth Circuit does allow permanent injunctions so long as there is consent . . . [w]ithout an objection, this court was entitled to rely on . . . silence to infer consent at the confirmation hearing . . . .") (citations and emphasis omitted).

[158]    *See* Rose Decl. ¶ 82.

a Claim or Cause of Action subject to the Debtor Release, the Third-Party Release, or the Exculpation Provision.[159]   Further, the injunction provided for in the Plan is narrowly tailored to achieve its purpose.

105.    Nonetheless, the U.S. Trustee asserts that the Injunction Provision is an improper extension of the Third-Party Release and Exculpation Provision.  Specifically, the U.S. Trustee argues that "[i]f the release is truly consensual, there is no threatened litigation and no need for an injunction to prevent irreparable harm to either the estates or the released parties."[160]   This argument rests on a false assumption that the relationship between the parties at the time of granting the releases is fixed in perpetuity.  The purpose of the Injunction Provision is to bind the agreement between the Debtors and their stakeholder, as embodied in the Plan, with finality, in the event that certain parties may one day change their mind or fail to honor the release that they affirmatively, and consensually, granted.

106.    Importantly, the Injunction Provision contained in the Plan is necessary, narrowly tailored, and in line with injunction provisions in chapter 11 plans approved by this Bankruptcy Court.[161]   Further, the "gatekeeper" provision of the Injunction requires any party subject to the injunction to seek a determination from the Bankruptcy Court prior to commencing any litigation. To the extent that any stakeholder asserts that they hold a Claim or Cause of Action against the

---

[159]   *See* Plan Art. VIII.F.

[160]   U.S. Trustee Obj. ¶ 91.

[161]   *See, e.g.*, *In re Genesis Care Pty Limited*, No. 23-90614 (MI) (Bankr. S.D. Tex. Nov. 21, 2023) [Docket No. 1192]; *In re Envision Healthcare Corp.*, No. 23-90342 (CML) (Bankr. S.D. Tex. Oct. 11, 2023) [Docket No. 1687]; *In re Benefytt Techs., Inc.*, No. 23-90566 (CML) (Bankr. S.D. Tex. Aug. 30, 2023) [Docket No. 481]; *In re Nielsen & Bainbridge, LLC*, No. 23-90071 (DRJ) (Bankr. S.D. Tex. June 30, 2023) [Docket No. 611]; *In re Qualtek Servs.*, Inc., No. 23-90584 (CML) (Bankr. S.D. Tex. June 30, 2023) [Docket No. 234]; *In re Avaya Inc.*, No. 23-90088 (DRJ) (Bankr. S.D. Tex. Mar. 22, 2023) [Docket No. 350].

Released Parties and/or Exculpated Parties that is not subject to the Injunction Provision, the Bankruptcy Court will assess the applicability of the Injunction Provision and may issue a ruling permitting pursuit of such Claims or Cause of Action.

107.    Finally, the U.S. Trustee's use of non-bankruptcy related case law to support its position regarding injunctive relief is not appropriate here.[162]   While the Bankruptcy Code may not specifically provide a provision authorizing injunctions to enforce releases or exculpations, such an injunction is permissible under prevailing Fifth Circuit law so long as such injunction is consensual.[163]   Accordingly, to the extent the Bankruptcy Court finds that the Third-Party Release and Exculpation Provision are appropriate, the Bankruptcy Court should approve the Injunction Provision and overrule the U.S. Trustee's Objection.

**4.    The Plan Complies with Section 1123(d) of the Bankruptcy Code.**

108.    Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law."[164]

109.    The Plan complies with section 1123(d) of the Bankruptcy Code.   The Plan provides for the satisfaction of monetary defaults under each Executory Contract and Unexpired Lease to be assumed under the Plan, by payment of the default amount, if any, on or about the

---

[162]   The U.S. Trustee cites two cases that analyze the Patent Act (*eBay*) and the Federal Water Pollution Control Act (*Weinberger*), but do not analyze the Bankruptcy Code.  Although each statute may adhere to the same principal of laws, there is no analysis in the bankruptcy context to support the assertion that the Bankruptcy Code itself does not permit such an injunction.

[163]   *See, e.g.*, *In re Camp Arrowhead*, 451 B.R. at 701–02 (Bankr. W.D. Tex. 2011) ("the Fifth Circuit does allow permanent injunctions so long as there is consent . . . [w]ithout an objection, this court was entitled to rely on . . . silence to infer consent at the confirmation hearing") (citations omitted).

[164]   11 U.S.C. § 1123(d).

Effective Date, subject to certain limitations set forth in the Plan.[165] Where such amounts are under review, cure amounts will be reconciled post-Effective Date pursuant to the terms of any such assumed Executory Contract or Unexpired Lease, as applicable.

110.    Under the Plan, the Debtors and the Wind-Down Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule Assumed Executory Contracts and Unexpired Leases List at any time up to 45 days after the Effective Date.[166]

111.    Accordingly, the Debtors submit that the Plan fully complies with section 1123(d) of the Bankruptcy Code.

### B.    The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).

112.    The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires the plan proponent to comply with the applicable provisions of the Bankruptcy Code.[167] The legislative history to section 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.[168] As set forth herein, the Debtors have complied with these provisions, including sections 1125 and 1126 of the Bankruptcy Code, as well as Bankruptcy

---

[165]  For the avoidance of doubt, any Executory Contract or Unexpired Lease assumed or assumed and assigned by the Debtors and approved by the Sale Orders shall be governed by the terms of the applicable Sale Order, which are Final Orders.

[166]  Plan Art. V.A.

[167]  11 U.S.C. § 1129(a)(2).

[168]  S. Rep. No. 95-989, at 126, *reprinted in* 1978 U.S.C. C.A.N. 5787, 5912 (1978); H.R. Rep. No. 95-595, at 412, *reprinted in* 1978 U.S.C. C.A.N. 5963, 6368 (1977); *In re Lapworth*, No. 97-34529DWS, 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2)."); *In re WorldCom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at *49 (Bankr. S.D.N.Y. Oct. 31, 2003) (stating that section 1129(a)(2) requires plan proponents to comply with applicable provisions of the Bankruptcy Code, including "disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code").

Rules 3017 and 3018, by distributing the Disclosure Statement and soliciting acceptances of the Plan through their Claims and Balloting Agent in accordance with the Conditional Disclosure Statement Order.

### 1. The Debtors Complied with Section 1125 of the Bankruptcy Code.

113.    As discussed in Part I of this Memorandum, the Debtors complied with the notice and solicitation requirements of section 1125 of the Bankruptcy Code.

### 2. The Debtors Complied with Section 1126 of the Bankruptcy Code.

114.    Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a chapter 11 plan.  Specifically, under section 1126 of the Bankruptcy Code, only holders of allowed claims and allowed interests in impaired classes of claims or interests that will receive or retain property under a plan on account of such claims or interests may vote to accept or reject such plan.  Section 1126 of the Bankruptcy Code provides, in pertinent part, that:

> (a)    The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan. . . .

> (f)    Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.

> (g)    Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive any property under the plan on account of such claims or interests.[169]

115.    As set forth in Part I of this Memorandum, in accordance with section 1125 of the Bankruptcy Code, the Debtors solicited acceptances or rejections of the Plan from the Holders of

---

[169]    11 U.S.C. §§ 1126(a), (f)–(g).

Allowed Claims in Class 3 (Prepetition Loan Claims) and Class 4 (General Unsecured Claims). The Debtors did not solicit votes from Holders of Claims and Interests in Class 1 (Other Secured Claims) and Class 2 (Other Priority Claims) because Holders of Claims in these Classes are Unimpaired and, pursuant to section 1126(f) of the Bankruptcy Code, are conclusively presumed to have accepted the Plan.[170]  Depending on their ultimate treatment by the Debtors, Holders of Claims and Interests in Class 5 (Intercompany Claims) and Class 6 (Intercompany Interests) will be either conclusively deemed to accept or conclusively deemed to reject the Plan, and in either scenario are not entitled to vote on the Plan.[171]  Finally, Holders of Claims and Interests in Class 7 (Existing DMS Inc. Interests) and Class 8 (Section 510(b) Claims) will receive no distribution on account of their Claims or Interests and, pursuant to section 1126(g) of the Bankruptcy Code, are deemed to reject the Plan.[172]  Thus, pursuant to section 1126(a) of the Bankruptcy Code, only Holders of Claims in Classes 3 and 4 were entitled to vote to accept or reject the Plan.

116.    With respect to the Voting Classes, section 1126(c) of the Bankruptcy Code provides that a class accepts a plan where holders of claims holding at least two-thirds in amount and more than one-half in number of allowed claims in such class of those voting vote to accept such plan.

117.    The Voting Report reflects the results of the voting process in accordance with section 1126 of the Bankruptcy Code.[173]  As set forth in the Voting Declaration and as summarized

---

[170]   *See* Plan Art. III.

[171]   *Id.*

[172]   *Id.*

[173]   *See generally* Voting Report.

above, the Holders of Claims in Class 3 and the Holders of Claims in Class 4, except for Debtor Digital Media Solutions, LLC and Debtor Forte Media Solutions, LLC, voted in favor of confirmation of the Plan.  Based upon the foregoing, the Debtors submit that they satisfy the requirements of section 1129(a)(2) of the Bankruptcy Code.  No party has asserted otherwise.

**C.      The Plan Is Proposed in Good Faith (Section 1129(a)(3)).**

118.    Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[174]  In assessing good faith, courts in the Fifth Circuit consider whether the plan was proposed with "the legitimate and honest purpose to reorganize and has a reasonable hope of success."[175]  A plan must also achieve a result consistent with the Bankruptcy Code.[176]  To determine whether a plan seeks relief consistent with the Bankruptcy Code, courts consider the totality of the circumstances surrounding the development of the plan.[177]

119.    The Debtors negotiated, developed, and proposed the Plan in good faith. Throughout these Chapter 11 Cases, the Debtors worked to build consensus among their stakeholders.  The Plan and the Committee Settlement embodied therein are the result of extensive arm's-length negotiations among the Debtors, the DIP Lenders, the Prepetition Lenders, and the

---

[174]  11 U.S.C. § 1129(a)(3).

[175]  *See In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985).

[176]  *See In re Block Shim Dev. Company-Irving*, 939 F.2d 289, 292 (5th Cir. 1991).

[177]  *E.g.*, *In re T-H New Orleans Ltd. P'ships*, 116 F.3d 790, 802 (5th Cir. 1997) ("The requirement of good faith must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start.") (quoting *In re Sun Country Dev., Inc.*, 764 F.2d at 408).

Committee. The Plan was proposed in good faith and not by any means forbidden by law and will achieve a result consistent with the objectives of the Bankruptcy Code.[178]

120.    Throughout the negotiation of the Plan and these Chapter 11 Cases, the Debtors have upheld their fiduciary duties to stakeholders and protected the interests of all constituents with an even hand. Accordingly, the Plan and the Debtors' conduct satisfy section 1129(a)(3) of the Bankruptcy Code. No party has asserted otherwise.

**D.    The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (Section 1129(a)(4)).**

121.    Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent or by the debtor be subject to approval by the Bankruptcy Court as reasonable.[179] The Fifth Circuit has held this is a "relatively open-ended standard" that involves a case-by-case inquiry and, under appropriate circumstances, does not necessarily require that a bankruptcy court review the amount charged.[180] As routine legal fees and expenses that have been approved as reasonable in the first instance, "the court will ordinarily have little reason to inquire further with respect to the amount charged."[181]

122.    The Plan provides that Professional Fee Claims and corresponding payments are subject to prior Bankruptcy Court approval and the reasonableness requirements under

---

[178]    *See* Rose Decl. ¶ 88.

[179]    *See* 11 U.S.C. § 1129(a)(4).

[180]    *Cajun Elec.*, 150 F.3d at 517 ("What constitutes a reasonable payment will clearly vary from case to case and, among other things, will hinge to some degree upon who makes the payments at issue, who receives those payments, and whether the payments are made from assets of the estate.").

[181]    *Id.*

sections 328 and 330 of the Bankruptcy Code.[182]  Moreover, Article II.B.1 of the Plan provides

that all final requests for payment of Professional Fee Claims shall be filed no later than 60 days

after the Effective Date for determination by the Bankruptcy Court, after notice and a hearing, in

accordance with the procedures established by the Bankruptcy Court.  Accordingly, the Plan fully

complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.  No party has

asserted otherwise.

> **E.    The Debtors Disclosed All Necessary Information Regarding Directors, Managers, and Officers (Section 1129(a)(5)).**

123.    Section 1129(a)(5)(A) of the Bankruptcy Code requires the plan proponent to

disclose the identity and affiliation of any individual proposed to serve as a director or officer of

the debtor or a successor to the debtor under the plan and that the appointment or continuance of

such officers and directors be consistent with the interests of creditors and equity security holders

and public policy.[183]

124.    The Plan provides that, on the Effective Date, any existing board or managers shall

be dissolved and any remaining officers, directors, managers, or managing members of the Debtor

shall be dismissed without any further action required.[184]  After the Effective Date, the Plan

provides that the Plan Administrator shall act as the sole officer, director, and manager, as

applicable, of the Wind-Down Debtors.[185]  The Plan states that the Plan Administrator shall act in

the same fiduciary capacity as applicable to a board of managers, directors, officers and Governing

---

[182]   11 U.S.C. §§ 328(a), 330(a)(1)(A).

[183]   11 U.S.C. § 1129(a)(5)(A)(i)–(ii).

[184]   *See* Art. IV.K.

[185]   *See id.* at IV.F.

Bodies, subject to the provision of Article IV.F of the Plan.  Thus, the Plan complies with section 1129(a)(5).  No party has asserted otherwise.

> ### F.    The Plan Does Not Require Governmental Regulatory Approval (Section 1129(a)(6)).

125.    Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan.  The Plan does not provide for any rate changes, and the Debtors are not subject to any such regulation.  Section 1129(a)(6) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases.

> ### G.    The Plan Is in the Best Interests of All the Debtors' Creditors (Section 1129(a)(7)).

126.    Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," requires that, with respect to each impaired class of claims or interests, each individual holder of a claim or interest has either accepted the plan or will receive or retain property having a value of not less than the value such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.[186]  The best interests test applies to individual dissenting holders of impaired claims and interests rather than classes,[187] and is generally satisfied through a comparison

---

[186]    *See* 11 U.S.C. § 1129(a)(7)(A)(ii).

[187]    *See Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 442 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan.").

of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's chapter 11 plan.[188]

127.    The Plan satisfies section 1129(a)(7) of the Bankruptcy Code and the best interests test.  As set forth in the Disclosure Statement and the Rose Declaration, the Debtors, with the assistance of their financial advisors, prepared a liquidation analysis that estimates recoveries for members of each Impaired Class.[189]  As reflected in the Liquidation Analysis, liquidation of the Debtors' business under chapter 7 of the Bankruptcy Code would result in the same or lower value to be realized by Holders of Allowed Claims as compared to distributions contemplated under the Plan.  Importantly, because this is a liquidating plan, creditors are receiving all of the remaining assets in the Debtors' Estates, subject to the priority under the Bankruptcy Code and the contributions and waiver from the Prepetition Lenders and DIP Lenders for the benefit of certain General Unsecured Creditors as reflected in the Committee Settlement.  In light of the minimal remaining assets and incremental costs of a liquidation, no party would do better in an alternative structure, including a chapter 7 liquidation.[190]  Accordingly, the Plan satisfies section 1129(a)(7) of the Bankruptcy Code.  No party has asserted otherwise.

---

[188]   *See In re Neff*, 60 B.R. 448, 452 (Bankr. N.D. Tex. 1985) (stating that "best interests" of creditors means "creditors must receive distributions under the Chapter 11 plan with a present value at least equal to what they would have received in a Chapter 7 liquidation of the Debtor as of the effective date of the plan"), *aff'd*, 785 F.2d 1033 (5th Cir. 1986); *In re Tex. Extrusion Corp*., 844 F.2d at 1159 n.23 (5th Cir. 1988) (stating that under section 1129(a)(7) of the Bankruptcy Code, a bankruptcy court was required to determine whether impaired claims would receive no less under a reorganization than through a liquidation).

[189]   *See* Liquidation Analysis.

[190]   *Id*.

### H.    The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code.

128.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.  If not, the plan must satisfy section 1129(b) with respect to the claims and interests in that class.[191]

129.    Of the Impaired Classes and Interests under the Plan, the Holders of Claims in Class 3 and Holder of Claims in Class 4 at all but two Debtors voted or are deemed to vote to accept the Plan.[192]  Holders of Claims and Interests in Class 4 with respect to two Debtors and Classes 5, 6, 7, and 8 (if the Debtors elect to impair Intercompany Claims and Intercompany Interests) (collectively, the "Rejecting Classes") are deemed to have rejected the Plan and thus were not entitled to vote.  While the Plan does not satisfy section 1129(a)(8) of the Bankruptcy Code with respect to the Rejecting Classes, the Plan is confirmable nonetheless because it satisfies section 1129(b) of the Bankruptcy Code, as discussed below.

### I.    The Plan Provides for Payment in Full of All Allowed Priority Claims (Section 1129(a)(9)).

130.    Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan or receive certain other specified treatment as agreed by the claim holder in satisfaction of the claim and that the holders of certain other priority claims receive deferred cash payments.[193]  In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the

---

[191]    11 U.S.C. § 1129(b).

[192]    *See* Voting Report ¶ 10.

[193]    *See* 11 U.S.C. § 1129(a)(9).

Bankruptcy Code—administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.[194] Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally domestic support obligations, wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).[195]   Finally, section 1129(a)(9)(C) provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority tax claims—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim.[196]

131.    The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.  ***First***, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each Holder of an Allowed Administrative Claim will receive the full unpaid amount of such Allowed Administrative Claim.  ***Second***, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no Holders of the types of claims specified by 1129(a)(9)(B) are Impaired under the Plan. ***Third***, Article II.D of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it provides that Holders of Allowed Priority Tax Claims shall be treated in accordance with the terms

---

[194]   11 U.S.C. § 1129(a)(9)(A).

[195]   11 U.S.C. § 1129(a)(9)(B).

[196]   11 U.S.C. § 1129(a)(9)(C).

of section 1129(a)(9)(C) of the Bankruptcy Code.  Thus, the Plan satisfies each of the requirements of section 1129(a)(9) of the Bankruptcy Code.  No party has asserted otherwise.

### J.   At Least One Impaired Class of Non-Insider Claims Accepted the Plan (Section 1129(a)(10)).

132.   Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by any insider," as an alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan.[197]  Here, Class 3, which is Impaired, voted to accept the Plan at every Debtor entity independent of any insiders' votes.[198]  Accordingly, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.  No party has asserted otherwise.

### K.   The Plan Is Feasible (Section 1129(a)(11)).

133.   Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that a plan is feasible as a condition precedent to confirmation.  Specifically, the Bankruptcy Court must determine that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."[199]  The

---

[197]   11 U.S.C. § 1129(a)(10).

[198]   Debtor Best Rate Referrals, Inc. is not obligated under the Credit Agreement, and as such, there are no Holders of Class 3 Claims at Debtor Best Rate Referrals, Inc.  Pursuant to Article III.E of the Plan, Class 4, which is Impaired, is presumed to accept the Plan at Debtor Best Rate Referrals, Inc.

[199]   11 U.S.C. § 1129(a)(11).

feasibility standard "contemplates whether the debtor can realistically carry out its plan."[200]   To

demonstrate that a plan is feasible, it is not necessary for a debtor to guarantee success.[201]   Rather,

a debtor must provide only a reasonable assurance of success.[202]   There is a relatively low threshold

of proof necessary to satisfy the feasibility requirement.[203]   As demonstrated below, the Plan is

feasible within the meaning of section 1129(a)(11) of the Bankruptcy Code.

134.   Here, the Plan is feasible as it is an orderly wind-down with sufficient funding.   The

Debtors and their advisors have thoroughly analyzed their ability to meet their obligations under

the Plan.   The Wind-Down Debtors and the Plan Administrator, as applicable, shall fund the

distributions and obligations under the Plan with the Wind-Down Amount in accordance with the

Wind-Down Budget.

135.   The Debtors sized the Wind-Down Amount to fund the obligations under the Plan.

Accordingly, the Debtors have sufficient funds to make all distributions contemplated by the Plan

and have reserved or earmarked sufficient funds to satisfy their obligations under the Plan,

---

[200]   *In re Lakeside Glob. II, Ltd.*, 116 B.R. at 506 (Bankr. S.D. Tex. 1989) (noting that the feasibility standard "contemplates whether the debtor can realistically carry out its plan").

[201]   *In re T-H New Orleans Ltd P'ship*, 116 F.3d at 801 ("[T]he [bankruptcy] court need not require a guarantee of success . . . , [o]nly a reasonable assurance of commercial viability is required.") (citations omitted); *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed.").

[202]   *Kane*, 843 F.2d at 649; *In re Flintkote Co.*, 486 B.R. 99, 139 (Bankr. D. Del. 2012); *In re W.R. Grace & Co.*, 475 B.R. 34, 115 (D. Del. 2012); *see also Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) ("The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.") (quotation and citations omitted); *accord In re Capmark Fin. Grp. Inc.*, No. 09-13684 (CSS), 2011 WL 6013718, at *32 (Bankr. D. Del. Aug. 24, 2011) (same).

[203]   *See, e.g.*, *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (quoting approvingly that "[t]he Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility") (internal quotation and citations omitted); *In re Sea Garden Motel & Apartments*, 195 B.R. 294, 305 (D. N.J. 1996); *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011), *on reconsideration*, 464 B.R. 208 (Bankr. D. Del. 2011).

including cash sufficient to pay all known Administrative Claims pursuant to section 1129(a)(9) and fund the Unsecured Claims Recovery Pool pursuant to the Committee Settlement.  Further, the Debtors have sufficient funds to establish the Wind-Down Professional Fee Escrow Account contemplated under the Committee Settlement.   Moreover, pursuant to the Stalking Horse Agreement, the Stalking Horse Bidder agreed to the payment of certain cure costs for the bulk of the contracts that generated administrative claims.

136.    Accordingly, the Wind-Down Debtors or the Plan Administrator will have sufficient funds to satisfy all requirements and obligations under the Plan.  Accordingly, the Debtors submit that the Plan fully complies with and satisfies all of the requirements of section 1129(a)(11) of the Bankruptcy Code.[204]  No party has asserted otherwise.

### L.    All Statutory Fees Have Been or Will Be Paid (Section 1129(a)(12)).

137.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."[205]  Section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses.[206]

138.    The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article II.E of the Plan provides that all such fees payable shall be paid by each of the Wind-Down Debtors

---

[204]    *See* Rose Decl. ¶¶ 43–45.

[205]    11 U.S.C. § 1129(a)(12).

[206]    11 U.S.C. § 507(a)(2).

(or the Disbursing Agent on behalf of each of the Wind-Down Debtors) for each quarter until these Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.[207]

**M.      Sections 1129(a)(13) through 1129(a)(16) Do Not Apply to the Plan.**

139.      Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits established at any level continue post-confirmation in accordance with section 1114 of the Bankruptcy Code.[208]  The Debtors do not have any remaining obligations to pay retiree benefits (as defined in section 1114 of the Bankruptcy Code).[209]  Therefore, section 1129(a)(13) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases or the Plan.

140.      Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.[210]  Since the Debtors are not subject to any domestic support obligations, the requirements of section 1129(a)(14) of the Bankruptcy Code do not apply.  Section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" as defined in the Bankruptcy Code.[211]  Because none of the Debtors are an "individual," the requirements of section 1129(a)(15) of the Bankruptcy Code do not apply.  Finally, none of the Debtors are a nonprofit corporation or trust, and, therefore, section 1129(a)(16) of the Bankruptcy Code, which relates only to nonprofit corporations or trusts, is not applicable in these Chapter 11 Cases.[212]

---

[207]   *See* Plan Art. II.E.

[208]   *See* 11 U.S.C. § 1129(a)(13).

[209]   *See* Rose Decl. ¶ 47.

[210]   *See* 11 U.S.C. § 1129(a)(14).

[211]   *See* 11 U.S.C. § 1129(a)(15).

[212]   *See* 11 U.S.C. § 1129(a)(16).

**N.     The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code.**

141.     Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.[213]   To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[214]

**1.     The Plan Does Not Unfairly Discriminate with Respect to the Rejecting Classes (Section 1129(b)(1)).**

142.     Although the Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists, courts typically examine the facts and circumstances of the particular case to make the determination.[215]   In general, courts have held that a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if (a) it provides less favorable treatment to a dissenting class of creditors than to another class of creditors with similar

---

[213]   *See* 11 U.S.C. § 1129(b).

[214]   *See* 11 U.S.C. § 1129(b)(1); *see In re Idearc, Inc.*, 423 B.R. 138, 169 (Bank. N.D. Tex. 2009) ("[T]o confirm a plan that has not been accepted by all impaired classes (thereby failing section 1129(a)(8)), the plan proponent must show that the plan 'does not discriminate unfairly' and is 'fair and equitable' with respect to the non-accepting impaired classes.") (citation omitted).

[215]   *In re 203 N. LaSalle St. Ltd. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established."), *rev'd on other grounds*, *203 N. LaSalle St. P'ship*, 526 U.S. 434; *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances"); *In re Aztec Co.*, 107 B.R. 585, 589 (Bankr. M.D. Tenn. 1989) ("Courts interpreting language elsewhere in the Code, similar in words and function to § 1129(b)(1), have recognized the need to consider the facts and circumstances of each case to give meaning to the proscription against unfair discrimination.").

legal rights, taking into account whether the different treatment is material and the relative risks associated with each class's treatment, and (b) there is not sufficient justification for doing so.[216] A threshold inquiry to assessing whether a proposed chapter 11 plan unfairly discriminates against a dissenting class is whether the dissenting class is equally situated to a class allegedly receiving more favorable treatment.[217]

143.    Here, the Plan's treatment of the Rejecting Classes is proper because all similarly situated Holders of Claims and Interests at each applicable Debtor will receive substantially similar treatment, and the Plan's classification scheme rests on a legally acceptable rationale, including in relation to their priority within the Debtors' capital structure, their differing legal nature, and their respective rights against the Debtors.  Claims in each of the Rejecting Classes are not similarly situated to those of any other classes, given their distinctly different legal character from all other Claims and Interests.[218]

144.    Accordingly, the Plan does not discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code with respect to the rejecting Classes.

---

[216]   *See In re Nuverra*, 590 B.R. 75, 93 (D. Del. 2018) (holding that a plan's unequal treatment of substantially similar claims did not constitute unfair discrimination where such unequal treatment was justified); *In re Aleris Int'l*, No. 09-10478 (BLS), 2010 WL 3492664, at *31 (Bankr. D. Del. May 13, 2010) ("[S]ection 1129(b) of the Bankruptcy Code ensures that a plan does not unfairly discriminate against a dissenting class with respect to the value the dissenting class will receive under a plan when compared to the value given to all other similarly situated classes.") (citing *In re Armstrong World Indus.*, 348 B.R. at 121); *In re Coram Healthcare Corp.*, 315 B.R. 321, 349 (D. Del. 2004) (citing cases and noting that separate classification and treatment of claims is acceptable if the separate classification is justified because such claims are essential to a reorganized debtor's ongoing business); *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 661 (Bankr. D. Del. 2003) (permitting different treatment of two classes of similarly situated creditors upon a determination that the debtors showed a legitimate basis for such discrimination), *aff'd sub nom. In re Lernout & Hauspie Speech Prod. N.V.*, 308 B.R. 672 (D. Del. 2004); *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 656–57 (9th Cir. 1997) (same); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) (stating that interests of objecting class were not similar or comparable to those of any other class and thus there was no unfair discrimination).

[217]   *See In re Aleris Int'l, Inc.*, 2010 WL 3492664, at *31 (citing *In re Armstrong World Indus.*, 348 B.R. at 121).

[218]   *See* Rose Decl. ¶ 49.

## 2.      The Plan Is Fair and Equitable (Section 1129(b)(2)(B)(ii)).

145.     A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.[219]  The absolute priority rule provides that a junior stakeholder may not receive or retain property "on account of" its junior interests unless all senior classes either (a) are paid in full or (b) vote in favor of the plan.[220]

146.     Here, the Plan does not violate absolute priority rule with respect to the Rejecting Classes because no Holder of a Claim or Interest junior to Holders in such Classes will receive recovery.[221]  With respect to Class 4, while it is true that Class 5 (Intercompany Claims) and Class 6 (Intercompany Interests) may be reinstated, such reinstatement is merely a technical preservation of Claims and Interests necessary to preserve the Debtors' corporate structure, does not have any economic substance, and does not enable any junior creditor or interest holder to retain or recover any value under the Plan.[222]

---

[219]  *203 N. LaSalle St. P'ship*, 526 U.S. at 441–42  ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii).  That latter condition is the core of what is known as the 'absolute priority rule.'").

[220]  11 U.S.C. § 1129(b)(2); *see also DISH Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*, 634 F.3d 79, 88 (2d Cir. 2011) (stating that the absolute priority rule "provides that a reorganization plan may not give 'property' to the holders of any junior claims or interests 'on account of' those claims or interests, unless all classes of senior claims either receive the full value of their claims or give their consent") (citations omitted); *In re Armstrong World Indus., Inc.*, 432 F.3d 507, 512 (3d Cir. 2005) ("Under the statute, a plan is fair and equitable with respect to an impaired, dissenting class of unsecured claims if (1) it pays the class's claims in full, or if (2) it does not allow holders of any junior claims or interests to receive or retain any property under the plan 'on account of' such claims or interests.") (citations omitted).

[221]  *See* Rose Decl. ¶¶ 50, 51.

[222]  *See In re Ion Media Networks, Inc.*, 419 B.R. 585, 600–01 (Bankr. S.D.N.Y. 2009) (overruling an objection that reinstatement of an intercompany interest violates the absolute priority rule because the "retention of

147.     Accordingly, the Plan is "fair and equitable" with respect to all Rejecting Classes and satisfies section 1129(b) of the Bankruptcy Code.

### O.     The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Section 1129(c)–(e)).

148.     The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code. Section 1129(c), prohibiting confirmation of multiple plans, is not implicated because there is only one proposed chapter 11 plan.[223]

149.     Section 1129(d) of the Bankruptcy Code provides that "on request of a party in interest that is a governmental unit, the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933."[224]  The principal purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.[225]  The Debtors filed the Plan to accomplish their objective of winding down their estates and maximizing value for all of their stakeholders.[226]  Moreover, no governmental unit or any other party has asserted otherwise.  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

---

intercompany equity interests for holding company purposes constitutes a device utilized to allow the Debtors to maintain their organizational structure and avoid the unnecessary cost of having to reconstitute that structure").

[223]     *See* 11 U.S.C. § 1129(c).

[224]     11 U.S.C. § 1129(d).

[225]     *See* Rose Decl. ¶ 54.

[226]     *See id.*

150.    Lastly, section 1129(e) of the Bankruptcy Code is inapplicable because none of the Debtors' Chapter 11 Cases is a "small business case."[227]    Thus, the Plan satisfies the Bankruptcy Code's mandatory confirmation requirements.

## III.    Good Cause Exists to Waive the Stay of the Confirmation Order.

151.    Bankruptcy Rule 3020(e) provides that "[u]nless the court orders otherwise, a confirmation order is stayed for 14 days its entry."[228]    Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale, or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.[229]    Each rule also permits modification of the imposed stay upon court order.

152.    The Debtors submit that good cause exists for waiving and eliminating any stay of the proposed Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the proposed Confirmation Order will be effective immediately upon its entry.    As noted above, these Chapter 11 Cases and the Plan have been negotiated in good faith and with a high degree of transparency and public dissemination of information.    The Debtors have undertaken great efforts to efficiently close the Sale Transactions and march toward their exit from chapter 11 as soon as practicable.    Additionally, each day the Debtors remain in chapter 11 they incur significant

---

[227]    *See* 11 U.S.C. § 1129(e).  A "small business debtor" cannot be a member "of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $3,024,725[] (excluding debt owed to 1 or more affiliates or insiders)."  11 U.S.C. § 101(51D)(B).

[228]    Fed. R. Bankr. P. 3020(e).

[229]    Fed. R. Bankr. P. 6004(h), 6006(d).

administrative and professional costs, which will be significantly reduced if the Debtors emerge expeditiously.[230]

153.    For these reasons, the Debtors, their advisors, and other key constituents are working to expedite the Debtors' entry into and consummation of the documents and transactions related to the Plan so that the Effective Date of the Plan may occur as soon as possible after the Confirmation Date.  Based on the foregoing, the Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry.[231]

## **CONCLUSION**

154.    For all of the reasons set forth herein, in the Rose Declaration, and the Voting Report, and as will be further shown at the Combined Hearing, the Debtors respectfully request that the Bankruptcy Court approve the Disclosure Statement and confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the proposed Confirmation Order, overruling the Objections to the Plan to the extent not resolved in the Confirmation Order or otherwise consensually resolved in advance of the Combined Hearing, and granting such other and further relief as is just and proper.

---

[230]    *See* Rose Decl. ¶¶ 83, 84.

[231]    *See id.* ¶ 85.

Houston, Texas
Dated: January 14, 2025

/s/ *John F. Higgins*

| | |
|---|---|
| **PORTER HEDGES LLP** | **KIRKLAND & ELLIS LLP** |
| John F. Higgins (TX Bar No. 09597500) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| M. Shane Johnson (TX Bar No. 24083263) | Joshua A. Sussberg, P.C. (admitted *pro hac vice*) |
| Megan Young-John (TX Bar No. 24088700) | Elizabeth H. Jones (admitted *pro hac vice*) |

**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
James A. Keefe (TX Bar No. 24122842)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone:      (713) 226-6000
Facsimile:      (713) 226-6248
Email:            jhiggins@porterhedges.com
                     sjohnson@porterhedges.com
                     myoung-john@porterhedges.com
                     jkeefe@porterhedges.com


*Co-Counsel to the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Elizabeth H. Jones (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:            joshua.sussberg@kirkland.com
                     elizabeth.jones@kirkland.com

-and-

Alexandra F. Schwarzman, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:            alexandra.schwarzman@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

**<u>Certificate of Service</u>**

I certify that on January 14, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ John F. Higgins*
John F. Higgins