**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

```
------------------------------------------------------- x
                                                        :
In re:                                                  :   Chapter 11
                                                        :
DOCUDATA SOLUTIONS, L.C., et al.,                       :   Case No. 25-90023 (CML)
                                                        :
             Debtors.[1]                                :   (Jointly Administered)
                                                        :
------------------------------------------------------- x
```

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF**
**(I) FINAL APPROVAL OF THE DISCLOSURE STATEMENT AND**
**(II) CONFIRMATION OF THE JOINT PLAN OF REORGANIZATION OF**
**DOCUDATA SOLUTIONS, L.C. AND ITS DEBTOR AFFILIATES**
**<u>UNDER CHAPTER 11 OF THE BANKRUPTCY CODE</u>**

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/DocuDataSolutions.  The Debtors' mailing address for the purposes of these cases is 2701 E. Grauwyler Road, Irving, TX 75061 USA.

**TABLE OF CONTENTS**

*Page*

PRELIMINARY STATEMENT ............................................................................1

I.      Background ............................................................................................3

        A.      The Restructuring Term Sheet and Plan Support Agreement.................3

        B.      The Two Key Settlements.....................................................................4

        C.      The Solicitation Process and Voting Results. ........................................6

        D.      Non-Voting Classes ..............................................................................9

        E.      Service of Combined Notice and Publication.......................................10

        F.      Service of Cure Notice.........................................................................11

        G.      The Plan Supplement and the Proposed Confirmation Order...............11

II.     Overview of the Plan ...........................................................................12

III.    Limited Objections Received.................................................................15

ARGUMENT .................................................................................................16

I.      Approval of the Disclosure Statement is Warranted..............................17

        A.      Creditors Received Sufficient Notice of the Hearing and Objection
                Deadline for Approval of the Disclosure Statement. ...........................17

        B.      The Disclosure Statement Satisfies the Requirements of the Bankruptcy
                Code and Should Be Approved............................................................19

        C.      The Debtors' Solicitation of Votes Complied With the Bankruptcy Code,
                the Bankruptcy Rules, and the Solicitation Procedures Order..............21

                1.      The Ballots Used to Solicit Holders of Claims Entitled to Vote on
                        the Plan Complied with the Bankruptcy Rules. ...........................21

                2.      The Voting Record Date Complied with the Bankruptcy Rules and
                        the Solicitation Procedures Order. .............................................22

                3.      The Debtors' Solicitation Period Complied with Bankruptcy Rule
                        3018 and the Solicitation Procedures Order. ...............................22

                4.      The Debtors' Vote Tabulation Was Appropriate and Complied
                        with the Solicitation Procedures Order.......................................23

**Page**

5.      Waiver of Certain Solicitation Package Mailings Is Reasonable and Appropriate and Complied with the Solicitation Procedures Order. .........23

6.      Solicitation of the Plan Complied with the Bankruptcy Code and Was in Good Faith. ...................................................................................24

II.     The Plan Meets the Requirements For Confirmation Under Section 1129 of the Bankruptcy Code. ............................................................................................25

A.      The Plan Complies with All Applicable Provisions of the Bankruptcy Code – 11 U.S.C. § 1129(a)(1). ..............................................................25

1.      The Classification of Claims and Interests in the Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code. ..................................................................................................26

2.      The Plan Satisfies the Requirements of Section 1123(a)..........................28

3.      The Plan Complies With the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code..............................................................32

4.      The Assumption or Rejection of Executory Contracts and Unexpired Leases Under the Plan Are Appropriate Pursuant to Section 365 and Section 1123(b)(2) of the Bankruptcy Code. ..................34

5.      The Plan Complies With Section 1123(d) of the Bankruptcy Code..........36

6.      The Plan's Release, Exculpation, and Injunction Provisions Comply With the Bankruptcy Code..........................................................37

a.      The Debtor Release Complies With the Bankruptcy Code and Is Appropriate..........................................................37

b.      The Consensual Third-Party Release Complies With the Bankruptcy Code and Is Appropriate. ...........................................42

c.      The Exculpation Provision Complies With the Bankruptcy Code and is Appropriate. ..............................................50

d.      The Injunction Provision and Gatekeeping Provision Comply With the Bankruptcy Code and is Appropriate...............51

B.      The Debtors Have Complied With the Applicable Provisions of the Bankruptcy Code – 11 U.S.C. § 1129(a)(2)............................................53

C.      The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law – 11 U.S.C. § 1129(a)(3). ........................................54

**Page**

D.    The Plan Provides That Payments Made by the Debtors for Services or Costs and Expenses Are Subject to Approval – 11 U.S.C. § 1129(a)(4) .............. 56

E.    The Debtors Have Disclosed All Necessary Information Regarding the Reorganized Debtors' Directors and Officers and Insiders – 11 U.S.C. § 1129(a)(5) ................................................................................ 56

F.    The Plan Does Not Contain Any Rate Changes Subject to the Jurisdiction of Any Governmental Regulatory Commission – 11 U.S.C. § 1129(a)(6) ........... 58

G.    The Plan is in the Best Interests of Creditors – 11 U.S.C. § 1129(a)(7) .............. 58

H.    Acceptance of Impaired Voting Class –11 U.S.C. § 1129(a)(8). ......................... 60

I.    The Plan Provides for Payment in Full of All Allowed Priority Claims – 11 U.S.C. § 1129(a)(9) ....................................................................... 61

J.    At Least One Impaired Class Has Accepted the Plan – 11 U.S.C. § 1129(a)(10) ....................................................................... 62

K.    The Plan is Feasible – 11 U.S.C. § 1129(a)(11). ................................................. 62

L.    All Statutory Fees Have Been or Will Be Paid – 11 U.S.C. § 1129(a)(12). ........... 64

M.    The Debtors Do Not Have Any Retiree Benefit Obligations – 11 U.S.C. § 1129(a)(13). .......................................................................... 65

N.    Sections 1129(a)(14)-(a)(16) of the Bankruptcy Code Are Inapplicable. ............. 65

O.    Section 1129(b): The Plan Satisfies the "Cramdown" Requirements .................. 65

     1.    The Plan Does Not Discriminate Unfairly ................................................ 66

     2.    The Plan Is Fair and Equitable ................................................................. 68

P.    The Plan Is Not an Attempt to Avoid Tax Obligations – 11 U.S.C. § 1129(d). ....................................................................... 69

Q.    The Waiver of Stay of Effectiveness Is Appropriate. .......... **Error! Bookmark not defined.**

III.    The U.S. Trustee Objection Should Be Overruled ........................................................ 70

A.    Purdue Does Not Support the U.S. Trustee's Objection ....................................... 70

B.    The U.S. Trustee's Reliance on State Contract Law is Without Support ............. 73

**Page**

    C.    The Exculpation Provision, Injunction Provision and Gatekeeping
         Provision Are Each Consistent with Fifth Circuit Law and Plans
         Confirmed in this District ........................................................................76

CONCLUSION.............................................................................................................79

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.)*,
203 F.3d 914 (5th Cir. 2000) ................................................................45

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999)................................................................59, 69

*Bank of New York Trust Co. v. Official Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*,
584 F.3d 229 (5th Cir. 2009) ................................................................51

*Brite v. Sun Country Dev. (In re Sun Country Dev.)*,
764 F.2d 406 (5th Cir. 1985) ................................................................54

*Cadle Co. v. Mims (In re Moore)*,
608 F.3d 253 (5th Cir. 2010) ................................................................38

*Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*,
116 F.3d 790 (5th Cir. 1997) ................................................................54, 62, 63

*Floyd v. Hefner*,
No. H-03-5693, 2006 WL 2844245 (S.D. Tex. Sept. 29, 2006)................................................................19

*FOM Puerto Rico S.E. v. Dr. Barnes Eyecenter Inc.*,
255 Fed. App'x 909 (5th Cir. 2007) ................................................................45

*Harrington v. Purdue Pharma L.P.*,
603 U.S. 204 (2024)................................................................42

*Hernandez v. Larry Miller Roofing, Inc.*,
628 Fed. App'x 281 (5th Cir. 2016) ................................................................45

*Highland Capital Mgmt. Fund Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*,
132 F.4th 353 (5th Cir. 2025) ................................................................77, 78

*In re 11,111, Inc.*,
117 B.R. 471 (Bankr. D. Minn. 1990) ................................................................67

*In re 203 N. LaSalle St. Ltd. P'ship.*,
   190 B.R. 567 (Bankr. N.D. Ill. 1995), *rev'd on other grounds sub nom. Bank
   of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434
   (1999) ..................................................................................................................66

*In re Ambanc La Mesa Ltd. P'ship*,
   115 F.3d 650 (9th Cir. 1997) ...........................................................................67

*In re Apex Oil Co.*,
   118 B.R. 683 (Bankr. E.D. Mo. 1990)..............................................................57

*In re Applegate Prop., Ltd.*,
   133 B.R. 827 (Bankr. W.D. Tex. 1991) .............................................................19

*In re Aztec Co.*,
   107 B.R. 585 (Bankr. M.D. Tenn. 1989) ...........................................................67

*In re Beyond.com Corp.*,
   289 B.R. 138 (Bankr. N.D. Cal. 2003) ..............................................................57

*In re Bigler LP*,
   442 B.R. 537 (Bankr. S.D. Tex. 2010) ..............................................................38

*In re Bowles*,
   48 B.R. 502 (Bankr. E.D. Va. 1985)..................................................................66

*In re Briscoe Enters.*,
   994 F.2d at 1167 ....................................................................25, 26, 62, 63

*In re Buttonwood Partners, Ltd.*,
   111 B.R. 57 (Bankr. S.D.N.Y. 1990) .................................................................67

*In re Camp Arrowhead, Ltd.*,
   451 B.R. 678 (Bankr. W.D. Tex. 2011)....................................................42, 51, 77

*In re CJ Holding Co.*,
   597 B.R. 597 (S.D. Tex. 2019) .................................................................42, 70, 77

*In re Cutera, Inc.*,
   No. 25-90088 (ARP) (Bankr. S.D. Tex. Apr. 16, 2025)....................................72, 77

*In re Davis Offshore, L.P.*,
   644 F.3d 259 (5th Cir. 2011) ...........................................................................24

*In re Diamond Sports Grp., LLC*,
   No. 23-90116 (CML) (Bankr. S.D.Tex. Nov. 18, 2024) ....................................73

*In re Drexel Burnham Lambert Grp. Inc.*,
  138 B.R. 723 (Bankr. S.D.N.Y. 1992) ...............................................................53, 59

*In re Eagle Bus Mfg., Inc.*,
  134 B.R. 584 (Bankr. S.D. Tex. 1991), *aff'd sub nom NLRB v. Greyhound
  Lines (In re Eagle Bus Mfg.)*, 158 B.R. 421 (S.D. Tex. 1993) .........................26, 35

*In re Energy & Expl. Partners, Inc.*,
  No. 15-44931 (RFN) (Bankr. N.D. Tex. Apr. 21, 2016) .........................................43

*In re Food City, Inc.*,
  110 B.R. 808 (Bankr. W.D. Tex. 1990) ..................................................................54

*In re Freymiller Trucking, Inc.*,
  190 B.R. 913 (Bankr. W.D. Okla. 1996) ................................................................66

*In re Gen. Homes Corp.*,
  134 B.R. 853 (Bankr. S.D. Tex. 1991) ...................................................................38

*In re GOL Linhas Aéreas Inteligentes S.A.*,
  Case No. 24-10118 (MG), 2025 WL 1466055 (Bankr. S.D.N.Y. May 22,
  2025), *appeal docketed,* No. 25-04610 (S.D.N.Y. June 3, 2025) ...........................74

*In re Granite Broad. Corp.*,
  369 B.R. 120 (Bankr. S.D.N.Y. 2007) ...................................................................69

*In re Greate Bay Hotel & Casino, Inc.*,
  251 B.R. 213 (Bankr. D.N.J. 2000) .......................................................................63

*In re Heritage Org., L.L.C.*,
  375 B.R. 230 (Bankr. N.D. Tex. 2007) ...................................................................38

*In re Hunt*,
  146 B.R. 178 (Bankr. N.D. Tex. 1992) ...................................................................18

*In re Idearc, Inc.*,
  423 B.R. 138 (Bankr. N.D. Tex. 2009) ..............................................................26, 35

*In re Independence Contract Drilling, Inc.*,
  No. 24-90612 (ARP) (Bankr. S.D. Tex. Jan. 9, 2025) ..................................71, 72, 77

*In re Indianapolis Downs, LLC*,
  486 B.R. 286 (Bankr. D. Del. 2013) .......................................................................73

*In re Intrum AB et al.*,
  No. 24-90575 (CML) (Bankr. S.D. Tex. Dec. 31, 2024) .........................................73

*In re Invitae Corp. et al.*,
No. 24-11362 (MBK) (Bankr. D.N.J. July 23, 2024) ...........................................................73

*In re J.D. Mfg., Inc.*,
2008 WL 4533690 (Bankr. S.D. Tex. Oct. 2, 2008)...........................................................19

*In re Johns-Manville Corp.*,
68 B.R. 618 (Bankr. S.D.N.Y. 1986) ..................................................................................67

*In re Lakeside Glob. II Ltd.*,
116 B.R. 499 (Bankr. S.D. Tex. 1989) ..........................................................................16, 62

*In re Landing Assocs.*,
157 B.R. 791 (Bankr. W.D. Tex. 1993)..........................................................................57, 62

*In re Landmark at Plaza Park, Ltd.*,
7 B.R. 653 (Bankr. D.N.J. 1980) ........................................................................................63

*In re LaVie Care Ctrs., LLC*,
No. 24-55507, 2024 WL 4988600 (Bankr. N.D. Ga. Dec. 5, 2024).....................................75

*In re Lone Star Utils. LLC*,
2014 WL 4629129 (Bankr. N.D. Tex. Sept. 15, 2014).........................................................16

*In re Mallinckrodt PLC*,
639 B.R. 837 (Bankr. D. Del. 2022), *abrogated in part on other grounds by*
*Purdue*, 603 U.S. 204........................................................................................................75

*In re Mayer Pollock Steel Corp.*,
174 B.R. 414 (Bankr. E.D. Pa. 1994) ..................................................................................63

*In re McCommas LFG Processing Partners, LP*,
2007 Bankr. LEXIS 4053 (Bankr. N.D. Tex. 2007)............................................................56

*In re Metrocraft Publ'g Servs., Inc.*,
39 B.R. 567 (Bankr. N.D. Ga. 1984) ...................................................................................20

*In re Mirant Corp.*,
2007 WL 1258932 (Bankr. N.D. Tex. Apr. 27, 2007)..........................................................26

*In re Mirant Corp.*,
348 B.R. 725 (Bankr. N.D. Tex. 2006)............................................................................38, 40

*In re Phx. Petroleum*,
278 B.R. 385 (Bankr. E.D. Pa. 2001) ..................................................................................20

*In re Pilgrim's Pride Corp*,
2010 WL 200000 (Bankr. N.D. Tex. Jan. 14, 2010)............................................................52

*In re Placid Oil Co.*,
753 F.3d 151 (5th Cir. 2014) .......................................................................17

*In re Prussia Assocs.*,
322 B.R. 572 (Bankr. E.D. Pa. 2005) ..........................................................63

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000) ........................................................................50

*In re Rivera Echevarria*,
129 B.R. 11 (Bankr. D.P.R. 1991) ...............................................................67

*In re Robertshaw US Holding Corp.*,
662 B.R. 300 (Bankr. S.D. Tex. 2024) ................................................ *passim*

*In re Robertshaw US Holding Corp.*,
No. 24-90052 (CML) (Bankr. S.D. Tex. Aug. 16, 2024) ............................73

*In re Rusty Jones, Inc.*,
110 B.R. 362 (Bankr. N.D. Ill. 1990) ..........................................................57

*In re Sherwood Square Assoc.*,
107 B.R. 872 (Bankr. D. Md. 1989) .............................................................57

*In re Spirit Airlines, Inc.*,
668 B.R. 689 (Bankr. S.D.N.Y. 2025) ...................................................73, 75

*In re Star Ambulance Serv. LLC*,
540 B.R. 251 (Bankr. S.D. Tex. 2015) ...................................................16, 59

*In re Stratford Assocs. Ltd. P'ship*,
145 B.R. 689 (Bankr. D. Kan. 1992) ............................................................57

*In re Temple Zion*,
125 B.R. 910 (Bankr. E.D. Pa. 1991) ..........................................................63

*In re Tex. Extrusion Corp.*,
844 F.2d 1142 (5th Cir. 1988) .....................................................................20

*In re Tex. Tamale Co., Inc.*,
219 B.R. 732 (Bankr. S.D. Tex. 1998) ........................................................18

*In re The Container Store Group, Inc.*,
No. 24-90627 (ARP) (Bankr. S.D. Tex. Jan. 24, 2025) .........................72, 78

*In re Toy & Sports Warehouse, Inc.*,
37 B.R. 141 (Bankr. S.D.N.Y. 1984) .....................................................57, 63

*In re Transcon. Energy Corp.*,
764 F.2d 1296 (9th Cir. 1985) ...............................................................41

*In re U.S. Brass Corp.*,
194 B.R. 420 (Bankr. E.D. Tex. 1996) ..........................................19, 20

*In re Vroom, Inc.*,
No. 24-90571 (CML) (Bankr. S.D. Tex. Jan. 8, 2025) ...........................73

*In re Wesco Aircraft Holdings, Inc.*, et al.,
No. 23-90611 (MI) (Bankr. S.D. Tex. Jan. 6, 2025) ..............................73

*In re Wool Growers Cent. Storage Co.*,
371 B.R. 768 (Bankr. N.D. Tex. 2007) ...........................................43, 45

*In re Zenith Elecs. Corp.*,
241 B.R. 92 (Bankr. D. Del. 1999) ........................................................54

*Kellogg v. United States (In re West Tex. Mktg. Corp.)*,
54 F.3d 1194 (5th Cir. 1995) ...............................................................74

*Lubrizol Enters., Inc. v. Richmond Metal Finishers (In re Richmond Metal Finishers, Inc.)*,
756 F.2d 1043 (4th Cir. 1985), *cert. denied*, 475 U.S. 1057 (1986) ........................................35

*Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*,
150 F.3d 503 (5th Cir. 1998) .............................................19, 20, 54, 56

*Matter of Foster Mortg. Corp.*,
68 F.3d 914 (5th Cir. 1995) ................................................................41

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
139 S. Ct. 1652 (2019) .........................................................................35

*Mullane v. Cent. Hanover Bank & Trust Co.*,
339 U.S. 306 (1950) ............................................................................17

*NexPoint Advisors, L.P., et al. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*,
48 F.4th 419 (5th Cir. 2022) ..................................................52, 76, 77

*NLRB v. Bildisco & Bildisco (In re Bildisco)*,
465 U.S. 513 (1984) .......................................................................35, 55

*Norwest Bank Worthington v. Ahlers*,
485 U.S. 197 (1988) ............................................................................40

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop., Inc.)*,
119 F.3d 349 (5th Cir. 1997) ................................................................38

*Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*,
995 F.2d 1274 (5th Cir. 1991) ..............................................................26

*Republic Supply Co. v. Shoaf*,
815 F.2d 1046 (5th Cir. 1987) ..............................................................45

*Richmond Leasing Co. v. Capital Bank, N.A.*,
762 F.2d 1303 (5th Cir. 1985) ..............................................................35

*Sequa Corp. v. Christopher (In re Christopher)*,
28 F.3d 512 (5th Cir. 1994) ..................................................................18

*Toibb v. Radloff*,
501 U.S. 157 (1991)..............................................................................55

*Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.*,
549 U.S. 443 (2007)........................................................................73, 74

*United States v. Whiting Pools, Inc.*,
462 U.S. 198 (1983)..............................................................................55

### STATUTES

11 U.S.C.
    § 101....................................................................................................57
    § 365............................................................................................ *passim*
    § 506....................................................................................................12
    § 507....................................................................................................28
    § 510............................................................................................40, 68
    § 524....................................................................................................72
    § 1122..........................................................................................26, 27, 28
    § 1123.......................................................................................... *passim*
    § 1124..........................................................................................13, 33
    § 1125.......................................................................................... *passim*
    § 1129.......................................................................................... *passim*

28 U.S.C. § 157......................................................................................51

Securities Act § 5 ..................................................................................70

# RULES

Fed. R. Bankr. P.

2002............................................................................................................17, 18, 19
3017............................................................................................................17, 19, 22
3018............................................................................................................22, 23
3020............................................................................................................70
6004............................................................................................................70
6006............................................................................................................70

# OTHER AUTHORITIES

H.R. Rep. No. 95-595 (1977) ...............................................................................25, 53

S. Rep. No. 95-989 (1978) ...................................................................................25, 53

7 Collier on Bankruptcy (Richard Levin & Henry J. Sommer eds., 16th ed.) ............53, 58, 69

DocuData Solutions, L.C. and each of the other debtors and debtors-in-possession in the above-captioned cases (collectively, the "***Debtors***") hereby submit this memorandum of law in support of (i) final approval of the *Disclosure Statement for Joint Plan of Reorganization of DocuData Solutions, L.C. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, dated May 7, 2025 [Docket No. 591] (as may be amended, modified or supplemented from time to time, the "***Disclosure Statement***") and (ii) confirmation of the *Joint Plan of Reorganization of DocuData Solutions, L.C. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, dated May 7, 2025 [Docket No. 592] (as may be amended, modified or supplemented from time to time, the "***Plan***"), pursuant to Section 1129 of title 11 of the United States Code (the "***Bankruptcy Code***").[2]

## PRELIMINARY STATEMENT

1.      The Plan, which implements a comprehensive restructuring of the Debtors' prepetition funded debt obligations on a substantially consensual basis, is the result of the Debtors' extensive negotiations with an overwhelming majority of their key stakeholders, including, among others, (i) the Consenting Creditors and the Consenting ETI Parties (the "***Consenting Stakeholders***") and (ii) the Official Committee of Unsecured Creditors (the "***Committee***"). Approval of the Disclosure Statement and confirmation of the Plan will allow the Debtors to emerge from these chapter 11 cases (the "***Chapter 11 Cases***") as reorganized entities better positioned to succeed in the highly competitive information and payment technology industry in which the Debtors operate.  Specifically, the Plan will (i) leave the Debtors' businesses substantially intact and de-levered, (ii) provide ongoing access to additional capital through the

---

[2]      Capitalized terms used, but not otherwise defined herein, have the meanings ascribed to such terms in the Plan or the Disclosure Statement, as applicable.

Exit Financing Facilities and the Exit Securitization Programs, and (iii) result in the consummation of the XBP Transaction which will enhance the Debtors' business capabilities.

2.　　The Plan is supported by a majority of the Holders of Claims entitled to vote on the Plan, which consist of the Holders of April 2026 Notes Claims in Class 3; Holders of Convenience Claims in Class 4; Holders of July 2026 Notes Claims in Class 5; and Holders of General Unsecured Claims in Class 6 (collectively, the "***Voting Classes***," and each, a "***Voting Class***"). Indeed, as set forth in the *Declaration of Jeriad R. Paul of Omni Agent Solutions, Inc. Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Joint Plan of DocuData Solutions L.C. and its Debtor Affiliates Under the Bankruptcy Code* (the "***Vote Certification***") filed contemporaneously herewith, the Holders of Claims in each of the foregoing Classes have voted in favor of the Plan as follows: (i) 100% both in number and amount of the April 2026 Notes Claims in Class 3 that voted; (ii) 91.67% in number of Holders of Convenience Claims in Class 4 that voted and 92.91% in amount of the Convenience Claims in Class 4 that voted; (iii) 100% both in number and amount of the July 2026 Notes Claims in Class 5 that voted; and (iv) 88.89% in number of Holders General Unsecured Claims in Class 6 that voted and 99.99% in amount of the General Unsecured Claims in Class 6 that voted.

3.　　The Debtors received four objections to the Plan.[3] Three of those objections address issues particular to the objectors' asserted claims. The Debtors expect to resolve those objections prior to the Confirmation Hearing. The fourth objection was filed by the Office of the United States Trustee for the Southern District of Texas (the "***U.S. Trustee***"). The Debtors do not

---

[3]　The Debtors also received three objections—one from AmeriHealth Caritas Health Plan [Docket No. 778], one from DMT Solutions Global Corporation d/b/a BlueCrest [Docket No. 780], and one from Exela Technologies, Inc. and Rule 14, LLC [Docket No. 787]—which relate to cure amounts in connection with the potential assumption of certain Executory Contracts. These objections are not addressed in this memorandum of law because they are not objections to the Plan.

expect to resolve the U.S. Trustee's objection, which—in keeping with a post-*Purdue* shift in policy by the Office of the United States Trustee nationwide—primarily takes issue with the opt-out mechanism employed by the Debtors with respect to the Plan's Third-Party Release (as defined below). As explained in greater detail below, the U.S. Trustee's objection is meritless because (i) the opt-out mechanism employed by the Plan is consistent with longstanding practice in this district for more than a decade, and (ii) it is premised on a misplaced reliance on the Supreme Court's decision in *Purdue* which did *not* change the law in the Fifth Circuit. As the Court is well-aware, the Fifth Circuit has long prohibited non-consensual releases, and the U.S. Trustee offers no valid legal or factual basis, much less a persuasive one, for this Court to break with a longstanding practice under which hundreds of complex chapter 11 cases employing such opt-out mechanism have been confirmed.[4] Indeed, this Court has uniformly rejected substantively identical objections raised by the U.S. Trustee's office on this issue in several complex chapter 11 cases post-*Purdue*, and the U.S. Trustee cannot offer a factual or legal basis that the Court should reach a different result in this case—because there isn't one. Apart from the objection of the U.S. Trustee, the Debtors expect to have no unresolved objections at the time of the Confirmation Hearing.

## I.    BACKGROUND

### A.    The Restructuring Term Sheet and Plan Support Agreement

4.    Prior to the Petition Date, on March 3, 2025, the Debtors and the Prepetition Ad Hoc Group reached a deal in principle regarding the broad terms of a Chapter 11 plan of reorganization. The terms of the deal were memorialized in a non-binding restructuring term sheet annexed as **Exhibit D** to the DIP Credit Agreement (the "***Restructuring Term Sheet***"). Pursuant

---

[4]    *In re Robertshaw US Holding Corp.*, 662 B.R. 300, 323 (Bankr. S.D. Tex. 2024) ("***Hundreds of chapter 11 cases*** have been confirmed in this District with consensual third-party releases with an opt-out.") (emphasis added).

to the terms of the DIP Credit Agreement, the Debtors were required, as a condition to further funding under the DIP Facility, to execute a restructuring support agreement with the Prepetition Ad Hoc Group and other parties that was predicated on the terms contained in the Restructuring Term Sheet within 10 Business Days of the Petition Date (subject to further extensions in accordance with the terms of the DIP Credit Agreement) (as extended from time to time, the "***RSA Milestone***").   The original RSA Milestone was extended several times by agreement of the requisite parties, and after weeks of hard-fought negotiations, the Debtors entered into the initial plan support agreement with the Consenting Stakeholders.  *See* [Docket No. 334].  Thereafter, the Debtors amended the plan support agreement, *see* [Docket No. 374], and ultimately, on April 24, 2025, the Debtors, and the Consenting Stakeholders entered into the further amended and restated plan support agreement [Docket No. 396] (the "***Plan Support Agreement***"), which incorporated the terms of the Sub-Group DIP Lenders Settlement and the Committee Settlement (each as defined below).  The term sheet annexed to the Plan Support Agreement contained the material terms of the Plan and provided a roadmap for the Debtors' restructuring process.[5]

### B.   The Two Key Settlements

5.   While neither the Committee nor the Sub-Group DIP Lenders are party to the Plan Support Agreement, following hard-fought, good-faith negotiations, pursuant to the terms of the Committee Settlement and the Sub-Group DIP Lenders Settlement, which are each incorporated into the Plan, the Committee and Sub-Group DIP Lenders, respectively, each agreed to support the Plan and the transactions thereunder.

---

[5]   Pursuant to the terms of the consensual Final DIP Order, the entry into the Plan Support Agreement satisfied the RSA Milestone.

### (i) The Committee Settlement

6.       On April 21, 2025, the Debtors reached a global and comprehensive settlement with the Committee,[6] the terms of which are set forth in the *Notice of Settlement Term Sheet with Official Committee of Unsecured Creditors* [Docket No. 368] (the "***Committee Settlement***").  The key components of the Committee Settlement include, without limitation (a) the inclusion in the Plan of the July 2026 Noteholder Equity Distribution, subject to the terms of the Committee Settlement, (b) the payment of Allowed Convenience Claims in Cash in an amount equal to no less than 70% of such Allowed Convenience Claims, and (c) the establishment of the Unsecured Cash Pool.  In consideration for the Committee Settlement, and as more fully described in the Plan, the Committee has agreed to support the Plan and recommend to its constituents that they vote to accept the Plan and support the relief and treatment (including such releases as agreed and granted by the Debtors and other supporting parties) provided for in the Plan and the other Definitive Documents.

### (ii) The Sub-Group DIP Lenders Settlement

7.       As more fully described in the Disclosure Statement, after entry of the Interim DIP Order[7] on March 4, 2025, the Debtors encountered several disputes with the Sub-Group DIP Lenders.  Ultimately, on April 23, 2025, shortly following the commencement of the continued hearing to consider entry of a final order approving the DIP Motion,[8] the Sub-Group DIP Lenders

---

[6]     On March 19, 2025, the U.S. Trustee appointed the Committee [Docket No. 139], which was subsequently reconstituted on March 24, 2025.  The Committee is composed of (1) U.S. Bank Trust Company, N.A., (2) Alpine Global Management, LLC, (3) Phoenix Investment Adviser LLC, (4) Rocket Software, Inc., (5) Konica Minolta Business Solutions, USA, (6) AFLAC, and (7) Opex.

[7]     The "***Interim DIP Order***" is the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 58].

[8]     The "***DIP Motion***" is the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief*

and the Consenting Stakeholders agreed on the terms of a global settlement resolving all disputes among the parties (the "***Sub-Group DIP Lenders Settlement***").

8.      The terms of the Sub-Group DIP Lenders Settlement were incorporated into the Bankruptcy Court's *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (the "***Final DIP Order***") [Docket No. 397] entered on April 24, 2025.[9]

9.      The Sub-Group DIP Lenders Settlement is a crucial component of the Plan, as it enabled the Debtors to obtain much-needed funding under the DIP Facility and paved the way for a consensual confirmation process.

### C.      The Solicitation Process and Voting Results.

10.     On May 8, 2025, the Court entered an order granting the Solicitation Procedures Motion [Docket No. 601] (the "***Solicitation Procedures Order***") which, among other things, (a) conditionally approved the Disclosure Statement; (b) scheduled a combined hearing (the "***Combined Hearing***") for June 18, 2025, to consider (i) final approval of the Disclosure Statement and (ii) confirmation of the Plan; (c) established June 11, 2025 at 4:00 p.m. (Prevailing Central Time), as the deadline for (i) filing objections to the proposed final approval of the Disclosure Statement and confirmation of the Plan (the "***Objection Deadline***") and (ii) voting on the Plan (the "***Voting Deadline***"); (d) approved the form of notice of the Combined Hearing, the

---

[Docket No. 5].  Through the DIP Motion, the Debtors requested authority to, among other things, obtain postpetition financing comprising a superpriority priming term loan facility in an aggregate principal amount of not less than $185 million under that certain *Superpriority Priming Debtor-in-Possession Financing Agreement*, dated March 4, 2025 (the "***DIP Credit Agreement***").

[9]      Final DIP Order ¶ 59.

Voting Deadline, and the Objection Deadline (the "**Combined Notice**"), [10] (e) approved the Solicitation Procedures (as defined in the Solicitation Procedures Motion) with respect to the Plan, including the forms of Ballots and Voting Instructions, (f) approved the form and manner of the non-voting status notice (the "**Non-Voting Status Notice**"),[11] (g) approved the form of the release opt-out form for third-party Holders of Claims and Interests in the Non-Voting Classes (as defined in the Solicitation Procedures Motion) (the "**Release Opt-Out Form**"),[12] (h) approved the timing and manner of delivery and publication (as applicable) of the Combined Notice, the Non-Voting Status Notice, and the Release Opt-Out Form, (i) approved the Assumption Procedures (as defined in the Solicitation Procedures Motion) and the form and manner of the Cure Notice (as defined in the Solicitation Procedures Motion); and (j) granted related relief.

11.     In accordance with the Solicitation Procedures Order, on or around May 13, 2025, and as more fully described in the Solicitation Procedures Motion,[13] the Debtors commenced the solicitation of votes on the Plan from Holders of April 2026 Notes Claims in Class 3; Holders Convenience Claims in Class 4; Holders July 2026 Notes Claims in Class 5; and Holders General Unsecured Claims in Class 6.   Specifically, the Debtors, through their claims, noticing, and solicitation agent, Omni Agent Solutions, Inc. (the "**Notice and Claims Agent**"), transmitted

---

[10]   The form of Combined Notice is attached as **Exhibit 1** to the Solicitation Procedures Order.

[11]   The form of Non-Voting Status Notice is attached as **Exhibit 5** to the Solicitation Procedures Order.

[12]   The Release Opt-Out Form, among other things, provided an opportunity for each Non-Voting Holder (as defined below) to "opt out" of the Plan's Third-Party Releases (as defined below), a form of which is annexed as **Exhibit 6** to the Solicitation Procedures Order.

[13]   *See Emergency Motion of Debtors for Entry of Order (I) Conditionally Approving the Disclosure Statement; (II) Scheduling Combined Hearing to Consider (A) Final Approval of the Disclosure Statement and (B) Confirmation of Plan; (III) Establishing an Objection Deadline to Object to Disclosure Statement and Plan; (IV) Approving the Form and Manner of Notice of Combined Hearing and Objection Deadline; (V) Approving the Solicitation Procedures and Forms of Ballots, (VI) Approving Procedures for Assumption of Contracts and Leases and Form and Manner of Cure Notice; and (VII) Granting Related Relief* [Docket No. 439] (the "**Solicitation Procedures Motion**").   The facts and the legal arguments set forth in the Solicitation Procedures Motion are incorporated herein by reference in their entirety.

copies of a solicitation package (the "***Solicitation Package***")[14] to the Holders of Claims in the Voting Classes or their Nominees via electronic mail. The Solicitation Package contained the Disclosure Statement, including, among other things, the Plan and other exhibits thereto and the applicable Ballots.[15]

12. The Disclosure Statement and Plan, among other case-related pleadings and information, were also made publicly available free of charge on the Notice and Claims Agent's website, https://omniagentsolutions.com/DocuDataSolutions.

13. The Solicitation Package advised Holders in each of the Voting Classes, among other things, that (a) the record date with respect to all Holders of Claims entitled to vote on the Plan was May 8, 2025 (the "***Voting Record Date***"), and (b) the deadline for submitting a Ballot containing a vote to accept or reject the Plan was June 11, 2025 at 4:00 p.m. (Prevailing Central Time). The instructions set forth on the Ballots further advised recipients that the Ballots must be returned to the Notice and Claims Agent by the Voting Deadline and specified the applicable methods by which Ballots may be transmitted to the Notice and Claims Agent. Each Ballot also contained detailed instructions regarding how to complete it and how to make any applicable elections (e.g., opting out of the Third-Party Release) contained therein. The Voting Record Date and the Voting Deadline were clearly identified in the Solicitation Package materials.

14. The materials in the Solicitation Package also established and communicated how the Notice and Claims Agent would tabulate the votes and elections contained in the Ballots. Those tabulation rules provided, among other things, that the following Ballots would not be counted in determining the acceptance or rejection of the Plan: (i) any Ballot that is illegible or

---

[14]   *See Affidavit of Service*, dated May 23, 2025 [Docket No. 715] (the "***Solicitation Affidavit***").

[15]   The form of Ballots are annexed as **Exhibits 2-A**, **2-B**, **3-A**, **3-B**, and **4** to the Solicitation Procedures Order (as defined below) (the "***Ballots***").

contains insufficient information to permit the identification of the Holder, (ii) any Ballot cast by a Person that does not hold a Claim in the Voting Class specified on the Ballot, (iii) any unsigned Ballot, (iv) any Ballot that does not contain an original signature, and (v) any Ballot not marked to accept or reject the Plan, or marked both to accept and reject the Plan.

15.     The Debtors, through their Notice and Claims Agent, completed the solicitation and tabulation of votes following the Voting Deadline.  As noted above and in the Vote Certification, the Debtors received votes in favor of the Plan from Holders of April 2026 Notes Claims (Class 3); Holders of July 2026 Notes Claims (Class 5); and Holders of General Unsecured Claims (Class 6).

### D.     Non-Voting Classes

16.     The Plan provides that (a) Holders of Claims in Class 1 (Other Secured Claims) and Class 2 (Prepetition Term Loan Claims) are Unimpaired and, thus, presumed to have accepted the Plan,[16] (b) Holders of Claims and Interests, as applicable, in Class 7 (Subordinated Claims), Class 10 (Existing BPA Equity Interests), and Class 11 (Other Existing Equity Interests) are Impaired and not receiving any recovery and, thus, Holders of Claims and Interests in such Classes are deemed to reject the Plan,[17] and (c) Holders of Claims in Class 8 (Intercompany Claims) and Interests in Class 9 (Intercompany Interests) may either be Impaired or Unimpaired, and, therefore, such parties are conclusively presumed to have accepted the Plan or conclusively deemed to have rejected the Plan (Classes 1, 2, 7, 8, 9, 10, and 11, collectively, the "***Non-Voting Classes***").  In lieu

---

[16]     Pursuant to Section 1126(f) of the Bankruptcy Code, each holder of a claim or interest in an unimpaired class is "conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class . . . is not required."  11 U.S.C. § 1126(f).

[17]     Pursuant to Section 1126(g) of the Bankruptcy Code, each holder of a claim or equity interest "is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests."  11 U.S.C. § 1126(g).

of a Solicitation Package and in accordance with the Solicitation Procedures Order, certain of the Non-Voting Classes (Classes 1, 2, 7, 10, and 11) received the Non-Voting Status Notice. Notwithstanding their non-voting status, Holders of Claims or Interests, as applicable, in such Non-Voting Classes also received a Release Opt-Out Form solely for the purpose of opting out of the Third-Party Release.  Because the Intercompany Claims in Class 8 and Intercompany Interests in Class 9 are all held by the Debtors or affiliates of the Debtors, the Debtors, through the Solicitation Procedures Order, obtained a waiver of any requirement to serve the Holders of Claims and Interests in Classes 8 and 9 with Solicitation Packages or any other type of notice, including a Non-Voting Status Notice.  The Non-Voting Status Notice and the Release Opt-Out Form were served on non-Affiliate Non-Voting Holders by the Notice and Claims Agent on or before May 13, 2025.[18]

### E.    Service of Combined Notice and Publication

17.    Following the entry of the Solicitation Procedures Order, on May 8, 2025, the Debtors caused the Notice and Claims Agent to serve the Combined Notice on the Debtors' creditor matrix in accordance with the terms of the Solicitation Procedures Order.[19]  In addition, the Debtors caused a form of the Combined Notice to be published in the national edition of *The New York Times* on May 12, 2025 (the "***Publication Notice***"), in accordance with the terms of the Solicitation Procedures Order.[20]  Lastly, the Combined Notice was filed on the docket of the Chapter 11 Cases [Docket No. 699].

---

[18]    *See* Solicitation Affidavit.

[19]    *See* Solicitation Affidavit.

[20]    *See Proof of Publication*  [Docket No. 677] (the "***Affidavit of Publication***").

### F.      Service of Cure Notice

18.      Following the entry of the Solicitation Procedures Order, on May 8, 2025, the Debtors caused the Notice and Claims Agent to serve the Cure Notice on the Debtors' Contract Parties to the Executory Contracts and Unexpired Leases listed on Exhibit A attached to the Cure Notice in accordance with the terms of the Solicitation Procedures Order.  The Cure Notice was filed on the docket of the Chapter 11 Cases on May 20, 2025 [Docket No. 702], and a supplemental Cure Notice was filed on the docket on June 12, 2025 [Docket No. 789].

### G.      The Plan Supplement and the Proposed Confirmation Order

19.      On June 4, 2025, the Debtors filed with the Court the *Notice of Filing of Plan Supplement to the Joint Plan of Reorganization of DocuData Solutions, L.C. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 738], which included, among other things, the XBP Transaction Documents, Directors and Officers of the Reorganized Debtors, Rejected Executory Contract/Unexpired Lease List, Schedule of Retained Causes of Action, and Restructuring Steps Exhibit.  Thereafter, on June 9, 2025, the Debtors filed with the Court the *Notice of Filing of First Amended Plan Supplement to the Joint Plan of Reorganization of DocuData Solutions, L.C. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 758], which included, among other things, certain Exit Facilities Documents, and on June 11, 2025, the Debtors filed with the Court the *Notice of Filing of Second Amended Plan Supplement to the Joint Plan of Reorganization of DocuData Solutions, L.C. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 782] (as amended, supplemented or modified, the "***Plan Supplement***"), which included the Exit Securitization Program Documents. The Debtors also filed contemporaneously herewith a proposed form of *Order (I) Approving Debtors' Disclosure Statement and (II) Confirming the Joint Plan of Reorganization of DocuData Solutions, L.C. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (as amended

11

or modified, the "***Confirmation Order***").  The Debtors expect to satisfy all conditions precedent to the Effective Date shortly after the Court's entry of the Confirmation Order and expect for the Plan to become effective shortly thereafter.

## II.  OVERVIEW OF THE PLAN

20.    As noted above, the restructuring contemplated in the Plan will allow the Debtors to emerge from the Chapter 11 Cases with a capital structure better aligned with the Debtors' long-term growth and business strategy while saving more than 11,000 jobs globally.  Specifically, the Plan will implement comprehensive consensual restructuring transactions, including by providing for the equitization of all Allowed July 2026 Notes Claims and Allowed April 2026 Notes Claims through the XBP Transaction, that will reduce the Debtors' funded debt obligations from approximately $1.383 billion to approximately $367 million upon emergence.

21.    The following table summarizes the proposed treatment afforded to the different Classes of Claims and Interests under the Plan and designates which Classes of Claims and Interests are Impaired by the Plan and which Classes of Claims and Interests are entitled to vote on the Plan:[21]

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan |
|---|---|---|---|---|
| 1 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim, at the option of the applicable Debtor shall, on the Effective Date, (i) be paid in full in Cash, (ii) receive the collateral securing its Allowed Other Secured Claim including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, (iii) reinstatement of its Allowed Other Secured Claim, or (iv) such other | Unimpaired | Not Entitled to Vote<br><br>(Presumed to Accept) |

---

[21]    The table is qualified in its entirety by reference to the full text of the Plan.

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan |
|---|---|---|---|---|
| | | treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | | |
| 2 | Prepetition Term Loan Claims | Except to the extent that a Holder of an Allowed Prepetition Term Loan Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Prepetition Term Loan Claim, each Holder of an Allowed Prepetition Term Loan Claim on the Effective Date shall be paid in full in Cash. | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | April 2026 Notes Claims | Except to the extent that a Holder of an April 2026 Notes Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed April 2026 Notes Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in accordance with the Definitive Documents and in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed April 2026 Notes Claim, either: (i) if such Holder is a Non-ETI Holder, its Noteholder Pro Rata Share of the Non-ETI Equity Distribution; or (ii) if such Holder is ETI or an ETI Holder, its ETI Pro Rata Share of the ETI Equity Distribution. | Impaired | Entitled to Vote |
| 4 | Convenience Claims | Except to the extent that a Holder of an Allowed Convenience Claim agrees to a less favorable treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, Cash in an amount equal to no less than 70% of such Allowed Convenience Claim amount pursuant to the Committee Settlement; *provided*, that to the extent that a Holder of an Allowed Convenience Claim against a Debtor holds any joint and several liability Claims, guaranty Claims, or other similar Claims against any other Debtors arising from or relating to the same obligations or liability as such Convenience Claim, such Holder shall only be entitled to a distribution on one Convenience Claim against the Debtors in full and final satisfaction of all such Claims. | Impaired | Entitled to Vote |
| 5 | July 2026 Notes Claims | Except to the extent that a Holder of a July 2026 Notes Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed July 2026 | Impaired | Entitled to Vote |

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan |
|---|---|---|---|---|
| | | Notes Claim shall receive, in full and final satisfaction, settlement, release, and discharge and in exchange for such Allowed July 2026 Notes Claim, and as a carve out of the collateral (or value of such collateral) securing the April 2026 Notes Claims, its Pro Rata share of the July 2026 Noteholder Equity Distribution. | | |
| 6 | General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date, as a carve out of collateral (or the value of such collateral) securing the April 2026 Notes Claims, its Pro Rata share of the Unsecured Cash Pool, with such amount being paid out over the following schedule: (i) 1/3 paid within nine (9) months of the Effective Date; (ii) 1/3 paid within eighteen (18) months of the Effective Date; and (iii) 1/3 paid within twenty-seven (27) months of the Effective Date.  Holders of Allowed General Unsecured Claims shall be entitled to interest (which interest shall be treated for all purposes as an incremental distribution on account of such Allowed General Unsecured Claim) on unpaid portions of such Holder's Pro Rata share of the Unsecured Cash Pool, accruing at 4% per annum, paid in-kind, commencing on the Effective Date, and such payment obligations shall be secured by collateral reasonably acceptable to the Debtors, the Required Consenting Creditors, and the Committee (the "*GUC Payment Obligations Collateral*"). | Impaired | Entitled to Vote |
| 7 | Subordinated Claims | On the Effective Date, each Subordinated Claim shall be cancelled, released and extinguished, and each Holder of a Subordinated Claim shall not receive or retain any distribution, property, or other value on account of its Subordinated Claim. | Impaired | Not Entitled to Vote  (Deemed to Reject) |
| 8 | Intercompany Claims | On or as soon as reasonably practicable after the Effective Date, all Intercompany Claims will be adjusted, Reinstated, or discharged, as determined by the Debtors or the Reorganized Debtors with the reasonable consent of the Required Consenting Creditors and the Consenting ETI Parties, as applicable, or as provided in the Restructuring Steps Exhibit. | Impaired / Unimpaired | Not Entitled to Vote  (Presumed to Accept or Deemed to Reject) |

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan |
|---|---|---|---|---|
| 9 | Intercompany Interests | On or as soon as reasonably practicable after the Effective Date, all Intercompany Interests will be adjusted, Reinstated, or discharged as determined by the Debtors or the Reorganized Debtors with the reasonable consent of the Required Consenting Creditors and the Consenting ETI Parties, as applicable, or as provided in the Restructuring Steps Exhibit; *provided,* that Subordinated Claims will be cancelled, released, or extinguished pursuant to Article III.B.7 of the Plan. | Impaired / Unimpaired | Not Entitled to Vote<br><br>(Presumed to Accept or Deemed to Reject) |
| 10 | Existing BPA Equity Interests | Holders of Existing BPA Equity Interests are not entitled to receive a recovery or distribution on account of such Existing BPA Equity Interests.  On the Effective Date, Existing BPA Equity Interests shall, subject to the Restructuring Steps Exhibit, be canceled, released, discharged, and extinguished, and shall be of no further force or effect. | Impaired | Not Entitled to Vote<br><br>(Deemed to Reject) |
| 11 | Other Existing Equity Interests | Holders of Other Existing Equity Interests are not entitled to receive a recovery or distribution on account of such Other Existing Equity Interests.  On the Effective Date, Other Existing Equity Interests shall be either (i) treated in accordance with the Restructuring Steps Exhibit or (ii) canceled, released, discharged, and extinguished, and shall be of no further force or effect. | Impaired | Not Entitled to Vote<br><br>(Deemed to Reject) |

## III.    LIMITED OBJECTIONS RECEIVED

22.    As noted above, the Debtors have received only four formal, yet limited, objections to confirmation of the Plan.  The first objection was filed by Canon U.S.A., Inc. and Canon Financial Services, Inc. (together, "***Canon***") [Docket No. 769] (the "***Canon Objection***") and takes issue with certain provisions of the Plan that allegedly affect the rights or interests of Canon with respect to the Canon Agreements (as defined in the Canon Objection).  The Canon Objection also objects to the Plan to the extent that the Plan provisions release or discharge Non-Debtor Affiliates with respect to any obligations owed to Canon or that result in the cancelation of the Canon Non-Debtor Agreements or that otherwise affect Canon's rights under the Canon Non-Debtor

Agreements.  Second, the U.S. Trustee's objection [Docket No. 772] (the "**U.S. Trustee Objection**") relates primarily to the opt out mechanism utilized by the Debtors to obtain consent to the Third-Party Release.  Third, two objections were filed – one from the Illinois Department of Revenue ("**IDOR**") [Docket No. 777] (the "**IDOR Objection**") and one from the Tennessee Department of Devenue ("**TDR**") [Docket No. 779] (the "**TDR Objection**," and together with the IDOR Objection, the "**Tax Objections**," and together with the Canon Objection and the U.S. Trustee Objection, the "**Objections**") – which object to the treatment of Priority Tax Claims in the Plan, including, among other things, with respect to the amounts listed on Appendix A to the Plan. Additionally, in advance of confirmation, the Debtors received informal comments from various parties with respect to the Plan.  With respect to the latter, the Debtors have resolved such comments and reflected such resolution in the proposed Confirmation Order as well as in the Plan. As to the Objections, the Debtors have resolved all formal Objections with the exception of the U.S. Trustee Objection, the merits of which is addressed in Section III of this memorandum.

## ARGUMENT

23.    This memorandum is divided into three parts.  First, the Debtors provide the Court with information to support their request for final approval of the Disclosure Statement and a finding that the Debtors complied with the Solicitation Procedures Order.  Second, to support their request that the Court confirm the Plan and approve the Restructuring Transactions provided for therein, the Debtors demonstrate that the Plan satisfies Section 1129 of the Bankruptcy Code.[22]

---

[22]    *In re Lakeside Glob. II, Ltd.*, 116 B.R. 499, 505 (Bankr. S.D. Tex. 1989) ("In order to confirm a reorganization plan, the bankruptcy court must be satisfied that the plan complies with all of the requirements of § 1129(a) of the Bankruptcy Code.") (internal citations omitted); *In re Star Ambulance Serv., LLC*, 540 B.R. 251, 259 (Bankr. S.D. Tex. 2015) ("As the proponent of the Plan, the Debtor must establish by a preponderance of the evidence that each of the confirmation requirements set forth in Bankruptcy Code [Section] 1129 has been met.") (internal citation omitted); *In re Lone Star Utils., LLC*, No. 13–34302–SGJ–11, 2014 WL 4629129, at *2 (Bankr. N.D. Tex. Sept. 15, 2014) ("The Debtor has the burden of proving the elements of Bankruptcy Code section[] 1129(a) by a preponderance of the evidence.").

Finally, in Section III, the Debtors address the arguments raised in the Objections.  In support of

their request for confirmation of the Plan, the Debtors have filed contemporaneously herewith the

*Declaration of Steve Spitzer in Support of (I) Approval of the Disclosure Statement and*

*(II) Confirmation of the Joint Plan of Reorganization of DocuData Solutions, L.C. and Its Debtor*

*Affiliates Under Chapter 11 of the Bankruptcy Code* (the "**Spitzer Declaration**").  The Debtors

also rely upon the First Day Declaration,[23] the *Declaration of Alan Carr in Support of*

*Confirmation of the Joint Plan of Reorganization of DocuData Solutions, L.C. and Its Debtor*

*Affiliates Under Chapter 11 of the Bankruptcy Code* (the "**Carr Declaration**") filed

contemporaneously herewith, the Solicitation Affidavit, and the Vote Certification.

## I.    APPROVAL OF THE DISCLOSURE STATEMENT IS WARRANTED.

### A.    Creditors Received Sufficient Notice of the Hearing and Objection Deadline for Approval of the Disclosure Statement.

24.     Under Bankruptcy Rule 3017(a), a hearing on the adequacy of a disclosure

statement generally requires twenty-eight (28) days' notice.[24]  Similarly, Bankruptcy Rule 2002(b)

provides that parties in interest should receive twenty-eight (28) days' notice of the objection

deadline and the hearing to consider approval of the disclosure statement.[25]  Courts in the Fifth

Circuit and elsewhere have adopted the general rule that due process requires "notice be

'reasonably calculated, under all the circumstances, to inform interested parties of the pendency

of a proceeding.'"[26]  When evaluating the notice and the sufficiency thereof, courts will consider

---

[23]   *Declaration of Randall S. Eisenberg in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 6] (the "**First Day Declaration**").

[24]   Fed. R. Bankr. P. 3017(a) ("[T]he court must hold a hearing on a disclosure statement filed under Rule 3016(b) and any objection or modification to it . . . on at least 28 days' notice . . . to the debtor; creditors; equity security holders; and other parties in interest.").

[25]   Fed. R. Bankr. P. 2002(b).

[26]   *In re Placid Oil Co.*, 753 F.3d 151, 154 (5th Cir. 2014) (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).

"[f]irst, whether the notice apprised the claimant of the pendency of the action, and second, whether it was sufficiently timely to permit the claimant to act."[27]  Whether a particular method of notice is reasonably calculated to inform interested parties is determined on a case-by-case basis.[28]

25.     As noted above, on May 8, 2025, the Court entered the Solicitation Procedures Order which, among other things, scheduled the Combined Hearing, approved the deadline to object to confirmation of the Plan and/or final approval of the Disclosure Statement, and approved the form of Combined Notice and manner of service thereof.[29]  The Combined Notice informed recipients of (a) the date and time of the Combined Hearing, (b) the Objection Deadline and the procedures for filing objections to final approval of the Disclosure Statement and/or the confirmation of the Plan, (c) the name and telephone number of a person from whom copies of the Plan and Disclosure Statement could be obtained at the Debtors' expense, (d) the manner in which the Disclosure Statement and the Plan could be obtained or viewed electronically, and (e) the proposed treatment of Claims and Interests of each Class under the Plan.[30]  On May 13, 2025, the Combined Notice was served upon the Debtors' full creditor matrix and the Debtors' master service list.  Accordingly, the Debtors submit that all parties in interest had notice at least 35 days prior to the Combined Hearing and at least 29 days prior to the Objection Deadline, in compliance with both Bankruptcy Rule 3017(a) and Bankruptcy Rule 2002(b).[31]

---

[27]     *In re Tex. Tamale Co., Inc.*, 219 B.R. 732, 739-40 (Bankr. S.D. Tex. 1998) (applying two-part test); *Sequa Corp. v. Christopher (In re Christopher)*, 28 F.3d 512, 518 (5th Cir. 1994) (same).

[28]     *In re Hunt*, 146 B.R. 178, 182 (Bankr. N.D. Tex. 1992) ("Whether a particular method of notice is reasonably calculated to reach interested parties depends upon the particular circumstances of each case.").

[29]     *See* Solicitation Procedures Order.

[30]     *Id.*, Ex. 1.

[31]     *See* Solicitation Affidavit.

26.     Further, the Debtors caused the Publication Notice, which is substantially similar to the Combined Notice, to be published in the national edition of *The New York Times* on May 12, 2025, which publication, among other things, disclosed the date of the Combined Hearing and the Objection Deadline.[32]  Both the Combined Notice and the Publication Notice also included instructions regarding how parties in interest could obtain copies of the Plan and the Disclosure Statement free of charge through the Notice and Claims Agent's website, https://omniagentsolutions.com/DocuDataSolutions.

27.     For the reasons set forth above, the Debtors submit that they have satisfied Bankruptcy Rules 2002(b) and 3017(a).

**B.     The Disclosure Statement Satisfies the Requirements of the Bankruptcy Code and Should Be Approved.**

28.     The Disclosure Statement complies with Section 1125(a) of the Bankruptcy Code, which requires that a disclosure statement provide material information, or "adequate information," that allows parties entitled to vote on a proposed plan to make an informed decision about whether to vote to accept or reject the plan.[33]  "Adequate information" is a flexible standard based on the facts and circumstances of each case.[34]  Courts within the Fifth Circuit and elsewhere

---

[32]  Affidavit of Publication.

[33]  11 U.S.C. § 1125(a)(1); *see, e.g., In re J.D. Mfg., Inc.*, 2008 WL 4533690, at *2 (Bankr. S.D. Tex. Oct. 2, 2008) ("Adequacy of information is a determination that is relative both to the entity (e.g. assets/business being reorganized or liquidated) and to the sophistication of the creditors to whom the disclosure statement is addressed.") (internal quotations omitted); *In re U.S. Brass Corp.*, 194 B.R. 420, 423 (Bankr. E.D. Tex. 1996) ("The purpose of the disclosure statement is . . . to provide enough information to interested persons so they may make an informed choice.") (internal citation omitted); *In re Applegate Prop., Ltd.*, 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991) ("A court's legitimate concern under Section 1125 is assuring that hypothetical reasonable investors receive such information as will enable them to evaluate for *themselves* what impact the information might have on their claims and on the outcome of the case.") (emphasis in original) (internal citation omitted).

[34]  *See, e.g.*, 11 U.S.C. § 1125(a)(1) ("'[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records"); *Mabey v. S.W. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 518 (5th Cir. 1998) ("The legislative history of § 1125 indicates that, in determining what constitutes 'adequate information' with respect to a particular disclosure statement . . . the kind and form of information are left essentially to the judicial discretion of the court and that the information required will necessarily be governed by the circumstances of each case.") (internal citations omitted); *Floyd v. Hefner*, No. H-03-5693, 2006 WL

acknowledge that determining what constitutes "adequate information" for the purpose of satisfying Section 1125 of the Bankruptcy Code resides within the broad discretion of the court.[35]

29.     Courts may consider various factors when evaluating the adequacy of the disclosures in a proposed disclosure statement, including: (a) the events that led to the filing of a bankruptcy petition, (b) the relationship of the debtor with its affiliates, (c) a description of the available assets and their value, (d) the anticipated future of the company, (e) claims asserted against the debtor, (f) the estimated return to creditors under a chapter 7 liquidation, (g) the chapter 11 plan or a summary thereof, (h) financial information relevant to a creditor's decision to accept or reject the chapter 11 plan, (i) information relevant to the risks posed to creditors under the plan, (j) the actual or projected realizable value from recovery of preferential or otherwise avoidable transfers, and (k) the source of information stated in the disclosure statement.[36]

30.     The Disclosure Statement is extensive and comprehensive.  It contains descriptions of, among other things: (a) the Plan, (b) an overview of the Debtors' businesses, (c) key events leading to the commencement of the Chapter 11 Cases, (d) events that occurred during the Chapter 11 Cases, (e) financial information and financial projections relevant to creditors' determinations of whether to accept or reject the Plan, (f) a liquidation analysis setting forth the estimated return that Holders of Claims and Interests would receive in a hypothetical chapter 7 liquidation, (g) a

---

2844245, at *30 (S.D. Tex. Sept. 29, 2006) (noting that what constitutes "adequate information" is a flexible standard); *In re Applegate Prop.*, 133 B.R. at 829 ("The issue of adequate information is usually decided on a case by case basis and is left largely to the discretion of the bankruptcy court.") (internal citations omitted).

[35]     *See, e.g., In re Cajun Elec. Power Coop., Inc.*, 150 F.3d at 518 (holding that courts are vested with wide discretion to determine whether disclosure statement contains "adequate information" within meaning of Section 1125(a) of the Bankruptcy Code); *In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988) ("The determination of what is adequate information is subjective and made on a case by case basis.  This determination is largely within the discretion of the bankruptcy court.").

[36]     *In re Metrocraft Publ'g Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984).  Disclosure regarding all topics is not necessary in every case.  *See, e.g., In re U.S. Brass Corp.*, 194 B.R. at 425; *In re Phx. Petroleum*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001).

valuation analysis, (h) risk factors affecting the Plan, and (i) federal tax law consequences of the Plan.[37]  In addition, the Disclosure Statement and the Plan were subject to review and comment by the signatories to the Plan Support Agreement, the Committee, and the Sub-Group DIP Lenders.[38]

31.     Accordingly, the Debtors submit that the Disclosure Statement contains adequate information within the meaning of Section 1125(a) of the Bankruptcy Code, in satisfaction of Sections 1125(b) and 1126(b)(2) of the Bankruptcy Code, and should therefore be approved. Moreover, no party has objected to the adequacy of the Disclosure Statement.[39]

**C.     The Debtors' Solicitation of Votes Complied With the Bankruptcy Code, the Bankruptcy Rules, and the Solicitation Procedures Order.**

32.     After the entry of the Solicitation Procedures Order, the Debtors solicited votes from the Holders of Claims in the Voting Classes.  For the reasons set forth herein, the Debtors satisfied the requirements of the Bankruptcy Code and the Bankruptcy Rules in connection with the solicitation, and the Debtors complied with the procedures approved by the Solicitation Procedures Order.

**1.     The Ballots Used to Solicit Holders of Claims Entitled to Vote on the Plan Complied with the Bankruptcy Rules.**

33.     Bankruptcy Rule 3017(d) requires the Debtors to transmit a form of ballot, which substantially conforms to Form 314, only to "creditors and equity security holders who are entitled to vote on the plan."[40]  As set forth in the Solicitation Affidavit, the Ballots were transmitted to all

---

[37]     Spitzer Declaration, ¶ 13.

[38]     Spitzer Declaration, ¶ 58.

[39]     In passing, the U.S. Trustee Objection notes that the Disclosure Statement should not be approved, however, the U.S. Trustee does not raise specific objections with respect to the Disclosure Statement or explain why the Disclosure Statement should not be approved.  *See* U.S. Trustee Objection ¶ 17.

[40]     Fed. R. Bankr. P. 3017(d).

Holders of Claims in the Voting Classes.[41]  The forms of Ballots complied with the Bankruptcy Rules and are consistent with Official Form No. 314.  Moreover, the forms of Ballots were approved by the Bankruptcy Court in the Solicitation Procedures Order.[42]  Further, there have been no objections to the sufficiency of the Ballots.  Based on the foregoing, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 3017(d).

> **2.     The Voting Record Date Complied with the Bankruptcy Rules and the Solicitation Procedures Order.**

34.     For a postpetition solicitation, the holders of record of the applicable claims against and interests in a debtor entitled to receive ballots and related solicitation materials are to be determined "on the date the order approving the disclosure statement is entered or on another date the court sets . . . after notice and a hearing."[43]  With respect to all Claims in the Voting Classes, the Solicitation Procedures Order, the Disclosure Statement, and the Ballots clearly identify May 8, 2025 as the Voting Record Date.  No party in interest has objected to the Voting Record Date. Accordingly, the Debtors submit that the Voting Record Date complies with the Bankruptcy Rules, as previously approved by the Bankruptcy Court in the Solicitation Procedures Order.[44]

> **3.     The Debtors' Solicitation Period Complied with Bankruptcy Rule 3018 and the Solicitation Procedures Order.**

35.     The Debtors' solicitation period for all Holders of Claims in the Voting Classes complied with Bankruptcy Rule 3018.  First, as set forth above, the Plan and Disclosure Statement were transmitted to all Holders of Claims in the Voting Classes in accordance with Bankruptcy

---

[41]    Solicitation Affidavit.

[42]    Solicitation Procedures Order, ¶13.

[43]    Fed. R. Bankr. P. 3018(a)

[44]    Solicitation Procedures Order, ¶2.

Rule 3018(b).[45]  Second, the solicitation period—which lasted from May 13, 2025 through June 11, 2025 (approximately 29 days)—complied with the deadlines set forth in the Solicitation Procedures Order and was adequate under the particular facts and circumstances of the Chapter 11 Cases and applicable bankruptcy law.  Accordingly, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 3018.

> ### 4.  The Debtors' Vote Tabulation Was Appropriate and Complied with the Solicitation Procedures Order.

36.     The Debtors further submit that the tabulation of votes was completed in a manner consistent with the Solicitation Procedures approved in the Solicitation Procedures Order and in accordance with applicable bankruptcy law.  As described in the Solicitation Procedures Motion and the Vote Certification, the Notice and Claims Agent used standard and customary procedures in tabulating votes from Holders of Claims in the Voting Classes.  Specifically, the Notice and Claims Agent reviewed and tabulated all valid Ballots received through June 11, 2025, each in accordance with the Court-approved Solicitation Procedures and the Disclosure Statement.[46]

> ### 5.  Waiver of Certain Solicitation Package Mailings Is Reasonable and Appropriate and Complied with the Solicitation Procedures Order.

37.     As further described in the Solicitation Procedures Motion, certain Holders of Claims and Interests were not provided a Solicitation Package because such Holders were either Unimpaired under, and conclusively presumed to accept, the Plan pursuant to Section 1126(f) of the Bankruptcy Code and/or are receiving nothing under the Plan and deemed to reject the Plan. In the Solicitation Procedures Order, the Court approved the Debtors' Solicitation Procedures, which provided that the Debtors would not mail a copy of the Solicitation Package or any other

---

[45]     Solicitation Affidavit, ¶ 2.

[46]     *See* Vote Certification.

materials to Holders of Claims and Interests presumed to accept and/or deemed to reject the Plan.[47] As set forth above, the Court-approved Combined Notice was sent to the Debtors' full creditor matrix and provided instructions for obtaining copies of the Disclosure Statement and Plan, which are available at no cost on the Notice and Claims Agent's website.  In addition, the Court-approved Non-Voting Status Notice and Release Opt-Out Form were sent to all non-Affiliate Holders of Claims and Interests in Non-Voting Classes in accordance with the Solicitation Procedures Order.[48]

**6. Solicitation of the Plan Complied with the Bankruptcy Code and Was in Good Faith.**

38.    Section 1125(e) of the Bankruptcy Code provides that "[a] person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title . . . is not liable on account of such solicitation . . . for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan."[49]  Section 1125(e) of the Bankruptcy Code is understood to "provide[] a safe harbor for the disclosure and solicitation process of a bankruptcy."[50]

39.    As set forth in the First Day Declaration, the Spitzer Declaration, and the Disclosure Statement, the parties to the Plan Support Agreement engaged in arm's-length, good-faith negotiations,[51] and all parties, including the Debtors, the Released Parties, and the Exculpated Parties took appropriate actions in connection with the solicitation of votes on the Plan in compliance with Section 1125 of the Bankruptcy Code.  Therefore, the Debtors respectfully

---

[47]    Solicitation Procedures Order, ¶ 5.

[48]    *Id.*

[49]    11 U.S.C. § 1125(e).

[50]    *In re Davis Offshore, L.P.*, 644 F.3d 259, 266 (5th Cir. 2011) (internal citations and quotations omitted).

[51]    First Day Declaration ¶ 76; Spitzer Declaration ¶ 64.

request that the Court grant these parties the protections provided under Section 1125(e) of the Bankruptcy Code.

## II.     THE PLAN MEETS THE REQUIREMENTS FOR CONFIRMATION UNDER SECTION 1129 OF THE BANKRUPTCY CODE.

40.     To confirm a plan, a court must find that both the plan and the debtor are in compliance with each of the requirements of Section 1129 of the Bankruptcy Code.  Further, the proponent of a plan must demonstrate compliance with Section 1129 by a preponderance of the evidence.[52]  For the reasons set forth below, the Plan and the Debtors meet the requirements of Section 1129 of the Bankruptcy Code.[53]

### A.     The Plan Complies with All Applicable Provisions of the Bankruptcy Code – 11 U.S.C. § 1129(a)(1).

41.     Section 1129(a)(1) of the Bankruptcy Code provides that a court may confirm a plan of reorganization only if "[t]he plan complies with the applicable provisions of [the Bankruptcy Code]."[54]  As set forth herein, the Plan complies with the requirements of the Bankruptcy Code in terms of both (a) the classification of Claims and Interests and (b) the content of the Plan.

---

[52]  *In re Briscoe Enters.*, Ltd., II, 994 F.2d 1160, 1165 (5th Cir. 1993) (recognizing that "preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown.") (citation omitted).

[53]  In the event all requirements of Section 1129(a) are met other than every impaired class having accepted the Plan, the Court may confirm the Plan if the "cramdown" requirements under Section 1129(b) of the Bankruptcy Code are satisfied.  11 U.S.C. § 1129(b)(1).  Here, an Impaired Class—Class 3 (Prepetition Term Loan Claims)—have voted to accept the Plan.

[54]  11 U.S.C. § 1129(a)(1).  The legislative history of Section 1129(a)(1) explains that this provision encompasses the requirements of Sections 1122 and 1123 governing classification of claims and contents of the plan, respectively.  *See* H.R. REP. No. 95-595, at 412 (1977); S. REP. No. 95-989, at 126 (1978).

1.    **The Classification of Claims and Interests in the Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.**

42.    Section 1122(a) of the Bankruptcy Code states: "[e]xcept as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[55]   The plan proponent has broad discretion in classifying claims under Section 1122 and, as implied by the statute, a plan may place substantially similar claims in different classes when a reasonable nondiscriminatory basis exists for such classification.[56]   In evaluating whether a plan complies with Section 1122, courts look to the kind, species, or character of each category of claims.  If a plan classifies substantially similar claims in different classes, there must exist a reasonable, non-discriminatory basis for such treatment, such as a business or economic justification for the separate classification or a legal distinction between the claims.[57]   Here, the Plan classifies substantially similar Claims and Interests in the same Class, satisfying Section 1122(a) of the Bankruptcy Code.

43.    Article III of the Plan classifies eight Classes of Claims against the Debtors and three Classes of Interests in the Debtors, which are described in the Plan and Disclosure Statement. Pursuant to Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including DIP

---

[55]    11 U.S.C. § 1122(a).

[56]    *In re Idearc, Inc.*, 423 B.R. 138, 160 (Bankr. N.D. Tex. 2009); *see also In re Eagle Bus Mfg., Inc.*, 134 B.R. 584, 596 (Bankr. S.D. Tex. 1991), *aff'd sub nom NLRB v. Greyhound Lines (In re Eagle Bus Mfg.)*, 158 B.R. 421 (S.D. Tex. 1993); *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1278-79 (5th Cir. 1991) ("A fair reading of both subsections [of Section 1122] suggests that ordinarily 'substantially similar claims,' those which share common priority and rights against the debtor's estate, should be placed in the same class").

[57]    *In re Briscoe Enters.*, 994 F.2d at 1167 (Claims may be classified separately for good business reasons and a plan proponent cannot "classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan."); *In re Mirant Corp.*, No. 03–46590DML11, 2007 WL 1258932 at *7 (Bankr. N.D. Tex. Apr. 27, 2007) ("Section 1122 of the Bankruptcy Code does not require that all substantially similar claims be placed in the same class.  Decisions interpreting section 1122(a) generally uphold separate classification of different groups of unsecured claims when a reasonable basis exists for that classification.") (citations omitted).

26

Claims and Postpetition Securitization Programs Claims), Priority Tax Claims, Non-Priority Tax Claims, Cure Claims and Other Priority Claims are not classified and are separately treated. The Classes under the Plan are designated as follows: Other Secured Claims (Class 1), Prepetition Term Loan Claims (Class 2), April 2026 Notes Claims (Class 3), Convenience Claims (Class 4), July 2026 Notes Claims (Class 5), General Unsecured Claims (Class 6), Subordinated Claims (Class 7), Intercompany Claims (Class 8), Intercompany Interests (Class 9), Existing BPA Equity Interests (Class 10), and Other Existing Equity Interests (Class 11).

44. The classification scheme set forth in the Plan complies with Section 1122(a) of the Bankruptcy Code because each Class contains only Claims or Interests that are substantially similar to each other. Furthermore, the classification scheme created by the Plan is based on the similar nature of the Claims or Interests contained in each Class and not upon an impermissible classification factor. Similar Claims have not been placed into different Classes in order to affect the outcome of the vote on the Plan. Rather, Other Secured Claims, Prepetition Term Loan Claims, April 2026 Notes Claims, Convenience Claims, July 2026 Notes Claims, General Unsecured Claims, Subordinated Claims, and Intercompany Claims, respectively, have been classified separately because of the nature of such Claims and/or their unique proposed treatment under the Plan, as negotiated in connection with the Plan Support Agreement and the Committee Settlement.[58] Intercompany Interests, Existing BPA Equity Interests, and Other Existing Equity Interests have been classified separately due to their distinct nature and their separate proposed treatment under the Plan.[59] Because each Class consists of only similar Claims or Interests, the

---

[58]   Spitzer Declaration, ¶ 88.

[59]   *Id.*

Court should approve the classification scheme of the Plan as consistent with Section 1122(a) of the Bankruptcy Code.

### 2.    The Plan Satisfies the Requirements of Section 1123(a).

45.    The Plan complies with all subsections of Section 1123(a) of the Bankruptcy Code, which sets forth seven requirements that every chapter 11 plan must satisfy.[60]

46.    <u>Designation of Classes of Claims and Interests – 11 U.S.C. § 1123(a)(1)</u>.  Section 1123(a)(1) of the Bankruptcy Code requires a plan to designate classes of interests and claims, other than the types of claims specified in Section 507(a)(2) (administrative expense claims), Section 507(a)(3) (claims arising in the "gap" period in an involuntary case),[61] and Section 507(a)(8) (priority tax claims).[62]  As described above, Article III of the Plan designates Classes of Claims and Interests in compliance with Section 1123(a)(1).

47.    <u>Specification of Unimpaired Classes – 11 U.S.C. § 1123(a)(2)</u>.  Section 1123(a)(2) of the Bankruptcy Code requires that a plan "specify any class of claims or interests that is not impaired under the plan."[63]  Article III of the Plan provides that Claims and Interests in Classes 1 and 2 are Unimpaired under, and conclusively presumed to accept, the Plan.  Furthermore, Claims and Interests in Classes 8 and 9 may be Unimpaired under, and may be conclusively presumed to accept, the Plan.[64]

48.    <u>Specification of Treatment of Impaired Classes – 11 U.S.C. § 1123(a)(3)</u>.  Section 1123(a)(3) of the Bankruptcy Code requires that a plan "specify the treatment of any class of claims

---

[60]    11 U.S.C. § 1123(a).  Section 1123(a)(8) does not apply in the Chapter 11 Cases because the Debtors are not individuals.

[61]    The Debtors commenced a voluntary chapter 11 case; therefore, there are no "gap" period claims of the kind specified in Section 507(a)(3) of the Bankruptcy Code.

[62]    11 U.S.C. § 1123(a)(1).

[63]    11 U.S.C. § 1123(a)(2).

[64]    The Plan provides that Claims and Interests in Classes 8 and 9 may be either Impaired or Unimpaired.

or interests that is impaired under the plan."[65]  As provided in Article III of the Plan, Claims and

Interests in Classes 3, 4, 5, 6, 7, 10 and 11 are designated as Impaired under the Plan.  In accordance

with Section 1123(a)(3), Article III of the Plan specifies the treatment afforded to the Impaired

Classes of Claims (Class 3 April 2026 Notes Claims, Class 4 Convenience Claims, Class 5 July

2026 Notes Claims, Class 6 General Unsecured Claims, and Class 7 Subordinated Claims) and the

Impaired Classes of Equity Interests (Class 10 Existing BPA Equity Interests and Class 11 Other

Existing Equity Interests).  Furthermore, Claims and Interests in Classes 8 and 9 may be Impaired

under, and may be conclusively deemed to reject, the Plan.[66]

49.     Same Treatment of Claims or Interests Within Each Class – 11 U.S.C. § 1123(a)(4).

Section 1123(a)(4) of the Bankruptcy Code requires that the treatment of each claim or interest in

each particular class be the same as the treatment of all other claims or interests in such class unless

the holder of a particular claim or interest agrees to less favorable treatment.[67]  The Plan complies

with Section 1123(a)(4) by ensuring that the treatment of each Claim or Interest in each particular

Class is the same as the treatment of all other Claims or Interests in such Class unless the Holder

of a particular Claim or Interest has agreed to less favorable treatment with respect to such Claim

or Interest.

50.     Adequate Means for Implementation of Plan – 11 U.S.C. § 1123(a)(5).  Section

1123(a)(5) of the Bankruptcy Code requires that a plan "provide adequate means for the plan's

implementation," and gives several examples of what may constitute "adequate means."[68]  In

---

[65]   11 U.S.C. § 1123(a)(3).

[66]   *See* Footnote 61.

[67]   11 U.S.C. § 1123(a)(4).

[68]   11 U.S.C. § 1123(a)(5).  Section 1123(a)(5) requires a plan to provide for "adequate means" for the plan's
implementation, "such as—

(A) retention by the debtor of all or any part of the property of the estate;

accordance with Section 1123(a)(5) of the Bankruptcy Code, the Plan, including Article IV thereof, provides adequate means for its implementation, including, among other things: (a) the continued corporate existence of the Debtors and the vesting of assets in the Reorganized Debtors under Articles IV.E and IV.F of the Plan, respectively; (b) the adoption of the New Organizational Documents and the appointment of the new board of directors or managers, as provided in Articles IV.M and IV.Q of the Plan, respectively; (c) the issuance of Plan Securities for distribution in accordance with the terms of the Plan, as detailed in Article IV.K; (d) the entry by the Reorganized Debtors into the Exit Facilities Documents, as detailed in Article IV.I of the Plan; (e) the cancellation Existing BPA Equity Interests, Other Existing Equity Interests and certain Intercompany Interests, and any other notes, bonds, indentures, credit agreements, certificates, securities, purchase rights, options, warrants, calls, puts, awards, commitments, obligations, registration rights, preemptive rights, rights of first refusal, rights of first offer, co-sale rights, investor rights, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any existing indebtedness or obligations of or ownership interest in the Debtors or giving rise to any rights,

---

(B) transfer of all or any part of the property of the estate to one or more entities, whether organized before or after confirmation of such plan;

(C) merger or consolidation of the debtor with one or more persons;

(D) sale of all or any part of property of the estate . . . among those having an interest in such property of the estate;

(E) satisfaction or modification of any lien;

(F) cancellation or modification of any indenture or similar instrument;

(G) curing or waiving of any default;

(H) extension of a maturity date or a change in an interest rate or other term of outstanding securities;

(I) amendment of the debtor's charter; or

(J) issuance of securities of the debtor, or of any entity referred to in subparagraph (B) or (C) of this paragraph, for cash, for property, for existing securities, or in exchange for claims or interests, or for any other appropriate purpose."

commitments, or obligations relating to Claims against or Interests in the Debtors, in each case, to the extent provided in the Plan, as detailed in Article IV.G of the Plan; (f) the release and discharge of all Liens, except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan (including, for the avoidance of doubt, the Exit Facilities Documents and the Exit Securitization Programs Documents), on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of an Other Secured Claim, satisfaction in full of the portion of the Other Secured Claim that is Allowed as of the Effective Date,[69] as detailed in Article IV.G of the Plan; (g) the preservation of certain causes of action by the Reorganized Debtors pursuant to Article IV.R of the Plan; (h) the various discharges, releases, injunctions, indemnifications, and exculpations provided in Article IX of the Plan; and (i) the assumption or rejection of executory contracts and unexpired leases to which any Debtor is a party, as detailed in Article V of the Plan.[70]  Accordingly, the Plan provides adequate means for its implementation in a manner consistent with Section 1123(a)(5) of the Bankruptcy Code.

51.     Prohibition on the Issuance of Nonvoting Equity Securities – 11 U.S.C. § 1123(a)(6).  Under Section 1123(a)(6) of the Bankruptcy Code, a plan must "provide for the inclusion in the charter of the debtor, if the debtor is a corporation, . . . of a provision prohibiting the issuance of nonvoting equity securities . . . ."[71]  Article IV.M of the Plan provides that the New Organizational Documents of the Debtors shall be deemed to be modified to prohibit the issuance of non-voting equity securities to the extent prohibited by Section 1123(a)(6) of the Bankruptcy

---

[69]     The treatment of Other Secured Claims is detailed in Article III.B.1 of the Plan.

[70]      Spitzer Declaration, ¶ 24.

[71]     11 U.S.C. § 1123(a)(6).

Code.[72]  As a result, the Plan complies with Section 1123(a)(6) of the Bankruptcy Code to the extent applicable.

52.    <u>Selection of Directors and Officers — 11 U.S.C. § 1123(a)(7)</u>.  Section 1123(a)(7) of the Bankruptcy Code provides that a plan shall "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director or trustee under the plan and any successor to such officer, director or trustee."[73]

53.    In accordance with Section 1123(a)(7) of the Bankruptcy Code, the provisions of the Plan and the Reorganized Debtors' formation documents, bylaws and similar constituent documents, the manner of selection of officers and directors or managers, as appliable, of the Reorganized Debtors is consistent with the interests of creditors and equity security holders and with public policy.  The Debtors disclosed in the Plan Supplement the known proposed members of Reorganized Parent's board of managers and their affiliations as well as the parties entitled to appoint the remaining board members.[74]  Accordingly, the Plan satisfies the requirements of Section 1123(a)(7) of the Bankruptcy Code.

### 3.    The Plan Complies With the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.

54.    Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.[75]  Among other things, Section 1123(b) of the Bankruptcy Code provides that a plan may: (a) impair or leave unimpaired any class of claims or interests, (b) provide for the assumption or rejection of executory contracts and unexpired leases,

---

[72]   Spitzer Declaration, ¶ 24.

[73]   11 U.S.C. § 1123(a)(7).

[74]   Plan Supplement, Ex. C; Spitzer Declaration, ¶ 30.

[75]   11 U.S.C. § 1123(b).

(c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates, and (d) include any other appropriate provision not inconsistent with the applicable provisions of chapter 11.[76]

55.   The Plan is consistent with Section 1123(b) of the Bankruptcy Code.  Specifically, under Article III of the Plan, Classes 1 and 2 are Unimpaired because the Plan leaves unaltered the legal, equitable, and contractual rights of, or otherwise provides treatment in accordance with Section 1124(2) to, the Holders of Claims and Interests within such Classes.[77]  On the other hand, Classes 3, 4, 5, 6, 7, 10 and 11 are Impaired because the Plan modifies the rights of the Holders of Claims or Interests within such Classes as contemplated by Section 1123(b)(1) of the Bankruptcy Code.[78]  Classes 8 and 9 may be either Impaired or Unimpaired because the Plan may modify the rights of the Holders of Claims or Interests within such Classes as contemplated by Section 1123(b)(1) of the Bankruptcy Code.[79]  As permitted by Section 1123(b)(2) of the Bankruptcy Code, for the reasons set forth below, Article V of the Plan provides for the assumption, subject to certain exceptions set forth in Article V of the Plan, of all of the Debtors' executory contracts and unexpired leases pursuant to Section 365 of the Bankruptcy Code.[80]  Finally, for the reasons set forth below, the release, exculpation, and injunction provisions contained in Article IX of the Plan are consistent with Section 1123(b) of the Bankruptcy Code.

---

[76]   11 U.S.C. § 1123(b)(1)–(3), (6).

[77]   Plan, Art. III.

[78]   *Id.*

[79]   *Id.*

[80]   Plan, Art. V.

4.    **The Assumption or Rejection of Executory Contracts and Unexpired Leases Under the Plan Is Appropriate Pursuant to Section 365 and Section 1123(b)(2) of the Bankruptcy Code.**

56.    As set forth in Section 1123(b)(2) of the Bankruptcy Code, a plan may provide for the assumption, rejection or assignment of any executory contract or unexpired lease not previously rejected.[81]  Pursuant to Article V of the Plan, and except as otherwise provided therein, each Executory Contract and Unexpired Lease shall be deemed assumed and amended, as of the Effective Date, unless such contract or lease: (a) was assumed or rejected by the Debtors by prior order of the Bankruptcy Court, (b) is the subject of a motion to reject filed by the Debtors pending on the Effective Date, (c) is identified as a rejected Executory Contract and Unexpired Lease by the Debtors, subject to the consent of the Required Consenting Creditors, on the Rejected Executory Contract/Unexpired Lease List, filed with the Plan Supplement, which Plan Supplement may be amended by the Debtors, subject to the consent of the Required Consenting Creditors, to add or remove Executory Contracts and Unexpired Leases by filing with the Bankruptcy Court an amended Plan Supplement and serving it on the affected non-Debtor contract parties prior to the Effective Date, (d) is a Related Parties Contract that is not included on the Assumed Related Parties Contracts List, subject to the consent of the Required Consenting Creditors, or (e) is rejected or terminated pursuant to the terms of the Plan.

57.    The Plan provides that entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejections described in Article V of the Plan pursuant to Sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.[82]  In addition, under the Plan, the Debtors reserve the right at any time prior to the Effective Date, except as otherwise

---

[81]    11 U.S.C. § 1123(b)(2).

[82]    Plan, Art. V.C.

specifically provided in the Plan, to seek to reject any Executory Contract or Unexpired Lease and to file a motion requesting authorization for the rejection of any such contract or lease. [83]

58.     All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after service of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.[84]

59.     Section 365(a) provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease."[85]  Courts routinely approve motions to assume, assume and assign, or reject executory contracts or unexpired leases upon a showing that the debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment.[86]  Indeed, courts recognize that to impose more exacting scrutiny than the business judgment standard would slow a debtor's reorganization, thereby increasing its cost and undermining the "Bankruptcy Code's provision for private control" of the estate's administration.[87]

60.     The assumption or rejection by the Debtors of their Executory Contracts and Unexpired Leases in accordance with and subject to the terms and conditions of the Plan is both

---

[83]  *Id.*

[84]  Plan, Art. V.D.

[85]  11 U.S.C. § 365(a).

[86]  *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019) (recognizing business judgment standard); *NLRB v. Bildisco & Bildisco (In re Bildisco)*, 465 U.S. 513, 523 (1984) (same); *In re Eagle Bus Mfg.*, 134 B.R. at 597 (confirming plan in which decisions regarding assumption or rejection of executory contracts and unexpired leases were based on sound business judgment and in best interests of the estate); *see also In re Idearc, Inc.*, 423 B.R. at 162 (citing *Lubrizol Enters., Inc. v. Richmond Metal Finishers (In re Richmond Metal Finishers, Inc.)*, 756 F.2d 1043, 1047 (4th Cir. 1985), *cert. denied*, *Lubrizol Enters., Inc. v. Canfield*, 475 U.S. 1057 (1986) (for the proposition that courts will approve a debtor's assumption or rejection of an executory contract or unexpired lease unless evidence is presented that the debtor's decision to assume or reject "was so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice")).

[87]  *Richmond Leasing Co. v. Cap. Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

beneficial and necessary to the Debtors' and Reorganized Debtors' business operations upon and subsequent to emergence from chapter 11.[88]  The assumption or rejection of each of the Executory Contracts and Unexpired Leases proposed to be assumed or rejected pursuant to Section 365 of the Bankruptcy Code and the Plan is a sound exercise of the Debtors' business judgment and is in the best interest of the Debtors, their Estates and their creditors.[89]  Based upon, among other things, the Reorganized Debtors' anticipated financial wherewithal after the Effective Date, each Reorganized Debtor that is assuming an Executory Contract or Unexpired Lease pursuant to the Plan will be fully capable of performing under the terms and conditions of the respective contract or lease to be assumed or assumed and assigned on and after the Effective Date.[90]

61.     Finally, the assumption by the Debtors of all the D&O Insurance Policies pursuant to Article V.G of the Plan, is of fundamental importance to the Debtors' reorganization process, a sound exercise of the Debtors' business judgment, and in the best interest of the Debtors and their Estates.[91]

### 5.     The Plan Complies With Section 1123(d) of the Bankruptcy Code.

62.     Section 365(b)(1) and  Section 1123(b)(2) of the Bankruptcy Code provide that a debtor may not assume an executory contract or unexpired lease unless, among other things, it cures any defaults at the time of assumption.[92]  Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law."[93]

---

[88]   Spitzer Declaration, ¶ 33.

[89]   *Id.*

[90]   *Id.*

[91]   Spitzer Declaration, ¶ 34.

[92]   11 U.S.C. § 365(b)(1); 11 U.S.C. § 1123(b)(2).

[93]   11 U.S.C. § 1123(d).

63.     The Plan complies with Section 1123(d) of the Bankruptcy Code.  Article V.B of the Plan provides for the satisfaction of any monetary amounts by which each Executory Contract and Unexpired Lease to be assumed is in default by payment of the applicable Cure Claim on the Effective Date in accordance with Section 365(b)(1) of the Bankruptcy Code.

### 6.     The Plan's Release, Exculpation, and Injunction Provisions Comply With the Bankruptcy Code.

64.     The Plan includes certain releases of the Debtors and third-parties, an exculpation provision, and an injunction provision.[94]  These provisions comply with the Bankruptcy Code and applicable law because, among other things, they are fair and equitable, are given for valuable consideration, are the product of extensive good faith, arm's-length negotiations by sophisticated entities that were represented by able counsel and financial advisors, were a material inducement for parties to enter into the Plan Support Agreement, and are in the best interests of the Debtors and the Chapter 11 Cases.[95]  In addition, the Third-Party Release contained in the Plan is consensual and consistent with Fifth Circuit precedent.  None of the release, exculpation, or injunction provisions are inconsistent with the Bankruptcy Code and, thus, the requirements of Section 1123(b) of the Bankruptcy Code are satisfied.

### a.     The Debtor Release Complies With the Bankruptcy Code and Is Appropriate.

65.     Article IX.B of the Plan provides for the Debtors to release the Released Parties, as contemplated by Section 1123(b)(3)(A) of the Bankruptcy Code.  Section 1123(b)(3)(A) provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[96]  Accordingly, pursuant to Section 1123(b)(3)(A), the

---

[94]    Plan, Art. IX.

[95]    Spitzer Declaration, ¶ 38.

[96]    11 U.S.C. § 1123(b)(3)(A).

Debtors may release estate causes of action as consideration for concessions made by its various stakeholders pursuant to the Plan.[97]  In considering the appropriateness of such releases, courts in the Fifth Circuit generally consider whether the release is (a) "fair and equitable" and (b) "in the best interests of the estate."[98]

### (i)   The Debtor Release is Fair and Equitable

66.     While courts sometimes conflate the two prongs of the foregoing analysis, the "fair and equitable" prong is generally interpreted, consistent with that term's usage in Section 1129(b) of the Bankruptcy Code, to require compliance with the Bankruptcy Code's absolute priority rule.[99]  Courts generally determine whether a release is "in the best interest of the estate" by reference to the following factors:

(a)   the probability of success of litigation;

(b)   the complexity and likely duration of the litigation, any attendant expense, inconvenience, or delay, and possible problems collecting a judgment;

(c)   the interest of creditors with proper deference to their reasonable views; and

(d)   the extent to which the settlement is truly the product of arm's-length negotiations.[100]

Ultimately, courts afford a debtor some discretion in determining for itself the appropriateness of granting plan releases of estate causes of action.[101]

---

[97]  *See*, *e.g.*, *In re Bigler LP*, 442 B.R. 537, 547 (Bankr. S.D. Tex. 2010) (plan release provision "constitutes an acceptable settlement under § 1123(b)(3) because the Debtors and the Estate are releasing claims that are property of the Estate in consideration for funding of the Plan"); *see also In re Heritage Org., L.L.C.,* 375 B.R. 230, 259 (Bankr. N.D. Tex. 2007); *In re Mirant Corp.*, 348 B.R. 725, 737-39 (Bankr. S.D. Tex. 2006); *In re Gen. Homes Corp.*, 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991).

[98]  *In re Mirant Corp.*, 348 B.R. at 738; *see also In re Heritage Org.*, 375 B.R. at 259.

[99]  *In re Mirant Corp.*, 348 B.R. at 738.

[100]  *Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010) (citation omitted); *In re Mirant Corp.*, 348 B.R. at 739-40 (citing *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 355-56 (5th Cir. 1997)).

[101]  *In re Gen. Homes*, 134 B.R. at 861 ("[t]he court concludes that such a release is within the discretion of the Debtor").

67.     Article IX.B of the Plan provides for releases by the Debtors, the Reorganized Debtors, and their Estates of any and all Causes of Action, including any derivative claims, that the Debtors could assert against the Released Parties[102] (the "***Debtor Release***").   The Debtor Release easily meets the controlling standard.   The Plan, including the Debtor Release, complies with the Bankruptcy Code's absolute priority rule because (a) Classes 1 and 2 are Unimpaired, (b) Classes 3, 4, 5, and 6 have voted to accept the Plan, (c) the Holders of Claims and Interests in Classes 8 and 9 are Affiliates of the Debtors, and (d) with respect to Holders of Claims and Interests in Classes 7, 10, and 11 respectively, no Holder of a Claim or Interest junior to the Claims and

---

[102]   "***Released Parties***" means, collectively, each of, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each Non-Debtor Affiliate; (d) each of the Debtors' and Non-Debtor Affiliates' current and former directors and officers; (e) XBP; (f) each Consenting Stakeholder; (g) the Committee and each of its members in such capacity; (h) Blue Torch; (i) the April 2026 Notes Indenture Trustee; (j) the July 2026 Notes Indenture Trustee; (k) the April 2026 Notes Collateral Agent; (l) the DIP Agent; (m) each DIP Lender; (n) the DIP Backstop Commitment Parties; (o) the Exit Financing Facility Agents; (p) each lender under the Exit Facilities; (q) the Securitization Programs Parties; (r) each Holder of a Claim in a Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective ballot; (s) each Holder of a Claim or Interest in a Non-Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective Release Opt-Out Form; and (t) each Related Party of each Entity in clauses (a) through (s); *provided*, that any Holder of a Claim or Interest that timely objects to the Third-Party Release, either through (i) a formal objection Filed on the docket of the Chapter 11 Cases or (ii) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before the Confirmation Hearing, shall not be a "Released Party."

"***Related Parties***" means, with respect to an Entity, each of, and in each case in its capacity as such, such Entity's current and former Affiliates, and such Entity's and such Affiliates' current and former members, directors, managers, officers, proxyholders, control persons, investment committee members, special committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds (including any beneficial holders for the account of whom such funds are managed), predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, Representatives, investment managers, and other professionals and advisors, each in their capacity as such, and any such Person's or Entity's respective heirs, executors, estates, and nominees.

Interests in Classes 7, 10, and 11 will receive or retain any property under the Plan on account of such Claims or Interests.[103]  Therefore, the release is "fair and equitable" to all Classes.[104]

### (ii)    The Debtor Release is in the Debtors' Best Interests

68.    In addition to being fair and equitable, the Debtor Release is in the best interest of the Estates.[105]  To begin, based on their review, the Debtors are not aware of any claims being released that might reasonably be expected to yield value for their Estates that outweighs the benefits provided under the Plan and the Restructuring Transactions.  As discussed in Article IV.K of the Disclosure Statement, in connection with the commencement of the Chapter 11 Cases, the Board empowered and authorized its independent director, Alan Carr (the "***Disinterested Director***") to investigate potential claims that the Debtors might hold against their directors, officers, employees, lenders, stockholders, or advisors, review any proposed releases including, most notably, the releases proposed to be given under the Plan, and make a recommendation to the Board in connection therewith.  The Disinterested Director has been assisted and advised throughout the investigation (the "***Investigation***") by Latham & Watkins LLP ("***Latham***") and APS.  The Investigation focused on numerous types of potential claims, including, without limitation, the following: (i) potential fraudulent conveyances; (ii) preferences; (iii) negligence, corporate mismanagement, or waste; and (iv) breaches of fiduciary duty.[106]

---

[103]    Claims in Class 7 (510(b) Claims) are subordinated under Section 510(b) of the Bankruptcy Code "to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock."  *See* 11 U.S.C. § 510(b).

[104]    *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988) ("[T]he absolute priority rule provides that a *dissenting class* of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan.") (internal citation omitted) (emphasis added); *see also In re Mirant Corp.*, 348 B.R. at 738 ("Because 'fair and equitable' translates to the absolute priority rule, in order for a settlement to meet that test it must be consistent with the requirement that *dissenting classes* of creditors must be fully satisfied before any junior creditor receives anything on account of its claim") (emphasis added).

[105]    Carr Declaration, ¶ 35.

[106]    *Id.*

69.     As set forth in the Spitzer Declaration, as part of the Investigation, and at the request of the Disinterested Director, Latham and APS conducted a thorough investigation into the transactions and conduct leading up to the bankruptcy filing.[107]   The Disinterested Director determined, based in part on his own review of the factual record as well as the findings and recommendations of his advisors, that any potential claims (i) were either not cognizable due to the absence of certain key legal predicates, or (ii) even if proven to exist – and even without time, cost or risk adjusting – did not have a value that would warrant their pursuit on behalf of the Debtors' estates.[108]   Ultimately, based upon his investigation, the Disinterested Director determined that the Debtor Release contemplated by the Plan was fair, reasonable, and appropriate and should be granted.[109]

70.     Further supporting the conclusion that the Debtor Release is in the best interest of the Estates is the fact that each Released Party has played an integral role in the Chapter 11 Cases, made substantial concessions that underpin the consensual resolution of the Chapter 11 Cases that will allow the Debtors to expeditiously exit bankruptcy with a de-leveraged capital structure, and/or may be unwilling to support the Plan without the Debtor Release.[110]   In addition, the Plan, including the Debtor Release, was negotiated by sophisticated entities that were represented by able counsel and financial advisors.[111]   Accordingly, the Debtor Release is fair, equitable, and in

---

[107]   *Id.*

[108]   *Id.* ¶ 31.

[109]   *Id.* ¶ 35.

[110]   Spitzer Declaration, ¶ 44; *see also Matter of Foster Mortg. Corp.*, 68 F.3d 914, 917 (5th Cir. 1995) ("While the desires of the creditors are not binding, a court 'should carefully consider the wishes of the majority of the creditors.'") (quoting *In re Transcon. Energy Corp.*, 764 F.2d 1296 (9th Cir. 1985)).

[111]   Spitzer Declaration, ¶ 44.

the best interests of the Estates, is justified under the controlling Fifth Circuit standard, and should be approved.

> **b.  The Consensual Third-Party Release Complies With the Bankruptcy Code and Is Appropriate.**

71.     The third-party release provision contained in Article IX.C of the Plan provides that each Releasing Party,[112] including each Holder of a Claim or Equity Interest in a Class who does not affirmatively elect to opt out of the third-party release contained in the Plan, is deemed to release the claims it holds against the Debtors, the Reorganized Debtors, and the other Released Parties (the "***Third-Party Release***").  While the Supreme Court has held that the Bankruptcy Code prohibits non-consensual third-party releases, the Supreme Court did not call into question the permissibility of consensual third-party releases,[113] and the Fifth Circuit has long allowed consensual third-party releases.[114]  Indeed, as noted by a bankruptcy court in this Circuit, "most

---

[112]   "***Releasing Parties***" means, collectively, each of, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each Non-Debtor Affiliate; (d) each of the Debtors', and Non-Debtor Affiliates' current and former directors and officers; (e) XBP;  (f) each Consenting Stakeholder;  (g) the Committee and each of its members in such capacity; (h) Blue Torch; (i) the April 2026 Notes Indenture Trustee; (j) the July 2026 Notes Indenture Trustee; (k) the April 2026 Notes Collateral Agent; (l) the DIP Agent; (m) each DIP Lender; (n) the DIP Backstop Commitment Parties; (o) the Exit Financing Facility Agents; (p) each lender under the Exit Facilities; (q) the Securitization Programs Parties; (r) each Holder of a Claim in a Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective ballot; (s) each Holder of a Claim or Interest in a Non-Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective Release Opt-Out Form; and (t) each Related Party of each Entity in clauses (a) through (s), solely to the extent such Related Party (I) would be obligated to grant a release under principles of agency if it were so directed by the Entity in the foregoing clauses (a) through (s) to whom they are related or (II) may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clause (a) through (s); *provided*, that, any Holder of a Claim or Interest that timely objects to the Third-Party Release, either through (i) a formal objection Filed on the docket of the Chapter 11 Cases or (ii) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before the Confirmation Hearing, shall not be a "Releasing Party."

[113]   *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 226-27 (2024).

[114]   *See, e.g.*, *In re Robertshaw US Holding Corp.*, 662 B.R. at 322 (Bankr. S.D. Tex. 2024) (noting the permissibility of consensual third-party releases); *In re CJ Holding Co.*, 597 B.R. 597, 608 (S.D. Tex. 2019) ("The Fifth Circuit does not preclude bankruptcy courts from approving a 'consensual non-debtor release.'  Bankruptcy courts within the Fifth Circuit commonly exercise jurisdiction to approve nonparty releases based on agreed plans."); *See also In re Camp Arrowhead, Ltd.*, 451 B.R. 678, 701-02 (Bankr. W.D. Tex.  2011) ("the Fifth Circuit does allow permanent injunctions *so long as there is consent*") (emphasis in original).

courts allow consensual non-debtor releases to be included in a plan."[115]  Here, the solicitation process gave, and the Plan expressly allows for, the ability of affected parties in interest to object to (formally or informally) or opt out of the Third-Party Release.  Accordingly, the Third-Party Release is justified under Fifth Circuit precedent as consensual.

72.     The Fifth Circuit, like other circuits, has not directly defined what constitutes a "consensual" third-party release.  Nonetheless, bankruptcy courts in the Fifth Circuit largely analyze whether third-party releases are consensual by focusing on the facts and circumstances of the specific *process—i.e.*, whether "notice has gone out, parties have actually gotten it, they've had the opportunity to look it over [and] the disclosure is adequate so that they can actually understand what they're being asked to do and the options that they're being given."[116]

73.     The notice furnished by the Debtors to parties in interest, the review opportunity afforded to such parties, and the general disclosure in the Chapter 11 Cases meets the established requirements for the Third-Party Release to be considered consensual.  Indeed, the Debtors clearly and conspicuously included the full text of the Third-Party Release language in the Ballots, the Release Opt-Out Form, and the Non-Voting Status Notice, which were sent to all potential Releasing Parties.[117]  Additionally, the Debtors made this information available free of charge on the case website maintained in the Chapter 11 Cases by the Notice and Claims Agent.[118]  In each of the foregoing, the Debtors explicitly provided the potential Releasing Parties with clear directions for how to opt out of the Third-Party Release.  And notably, the Debtors know the

---

[115]  *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775 (Bankr. N.D. Tex. 2007).

[116]  Conf. Hr'g Tr. 47:7-11, *In re Energy & Expl. Partners, Inc.*, No. 15-44931 (RFN) (Bankr. N.D. Tex. Apr. 21, 2016) [Docket No. 730]; *see also In re Robertshaw US Holding Corp.*, 662 B.R. at 323-24 (noting procedures for providing notice and opportunity to opt out of third party releases).

[117]  *See* Solicitation Affidavit.

[118]  *See* Copies of the Plan and Disclosure Statement.

process worked because, as reflected in the Vote Certification, certain parties did, in fact, timely elect to opt out of the Third-Party Release by submitting Ballots or Release Opt-Out Forms, as applicable, to the Notice and Claims Agent.[119]

74.    Furthermore, the Debtors included language in the Ballots that made clear that, even if a creditor opted out of the Third-Party Release, such creditor would still receive the consideration and treatment for its Claim provided under the Plan.[120]  Importantly, under the Plan, the Releasing Party granting the Third-Party Release could opt out of the Third-Party Release without the need to object to or vote against confirmation of the Plan.  Said differently, a party could opt out of the Third-Party Release without impacting its recovery under the Plan and regardless of whether that party voted to accept or reject the Plan.  This procedure was laid out in detail in the Solicitation Procedures Motion and the notices approved by the Court and provided to the Releasing Parties.

75.    Further, the Release Opt-Out Form is only one way by which a party can effectively opt out of the Third-Party Release.  As set forth in the Plan, any party can also file an objection on the docket maintained in the Chapter 11 Cases or send an email to the Debtors' counsel stating that they do not wish to grant the Third-Party Release and, upon doing so, such party will not be held to be a Releasing Party.[121]  These procedures for opting out of the Third-Party Release are consistent with what this Court determined "has long been settled in this District" for constituting consent.[122]

---

[119]   *See* Vote Certification.

[120]    *See* bold, conspicuous language preceding the opt out election in each Ballot providing: "Please be advised that your decision to opt out does not affect the amount of distribution you will receive under the Plan. Specifically, your recovery under the Plan will be the same if you opt out; however, in the event you opt out of the Releases, you will not be granted a release from the Releasing Parties under the Plan."

[121]   Plan Art. I.A.200.

[122]   *In re Robertshaw US Holding Corp.*, 662 B.R. at 323.

76.     Suffice it to say, the process, approved by the Court and utilized by the Debtors in connection with the Third-Party Release, meets the applicable consent standard under which "[h]undreds of chapter 11 cases have been confirmed in this District. . . ."[123]  This standard looks to whether there has been adequate notice of the Third-Party Release and the consequences of electing not to opt out and whether the Thirds-Party Release is narrowly tailored to the circumstances of the Chapter 11 Cases.[124]

77.     The Fifth Circuit has also shed light on the issue of consent through a series of decisions addressing the *res judicata* effect of a confirmed chapter 11 plan that contains a third-party release provision.[125]  For example, in *Republic Supply*, the Fifth Circuit found that the Bankruptcy Code does not preclude a third-party release provision where "it has been accepted and confirmed as an integral part of a plan of reorganization,"[126] and ultimately held that such provision was binding and enforceable.[127]  The Fifth Circuit addressed the same issue on three occasions thereafter, analyzing the specificity of the third-party release to determine its *res judicata* effect.[128]  *Republic Supply* and its Fifth Circuit progeny ultimately stand for the proposition that "[c]onsensual nondebtor releases that are specific in language, integral to the plan, a condition of the settlement, and given for consideration do not violate" the Bankruptcy Code.[129]

---

[123]  *Id.*

[124]  *Id.* at 323-24.

[125]  *Hernandez v. Larry Miller Roofing, Inc.*, 628 Fed. App'x 281, 286-88 (5th Cir. 2016); *FOMPuerto Rico S.E. v. Dr. Barnes Eyecenter Inc.*, 255 Fed. App'x 909, 911-12 (5th Cir. 2007); *Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.)*, 203 F.3d 914, 919 (5th Cir. 2000); *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987).

[126]  *Republic Supply*, 815 F.2d at 1050.

[127]  *Id.* at 1053.

[128]  *See generally Hernandez*, 628 Fed. App'x. 281 (comparing the specificity of the third-party release provisions at issue in *Republic Supply*, *Applewood*, and *Dr. Barnes Eyecenter*).

[129]  *In re Wool Growers*, 371 B.R. at 776 (citing *Republic Supply*, 815 F.2d at 1050; *FOMPuerto Rico*, 255 Fed. App'x at 911-12).

78.     The Third-Party Release meets the *Republic Supply* standard.  First, the Third-Party Release is consensual.  As set forth above, parties in interest were provided fair and extensive notice of the Chapter 11 Cases, the Plan (including the Third-Party Release), and the deadline to object to confirmation of the Plan and related releases.  Further, all Holders of Claims in the Voting Class were provided with an opportunity to opt out of the Third-Party Release on their Ballots, and all non-Affiliate Holders of Claims and Interests in Non-Voting Classes were provided with an opportunity to opt out of the Third-Party Release on the Release Opt-Out Form (or object to the Third-Party Release).  Any Holders of Claims in the Voting Class or Non-Voting Classes that timely submitted a valid Release Opt-Out Form or otherwise objected to granting the Third-Party Release (formally or informally) will not be deemed to grant the Third-Party Release.[130]

79.     In sum, all potential Releasing Parties were given ample opportunity and means to opt out of the Third-Party Release, all parties in interest were given ample notice of the Third-Party Release, and all potential Releasing Parties were given ample opportunity to demonstrate their consent to the Third-Party Release by taking the simple and easy-to-follow steps necessary to elect to opt out of the Third-Party Release, thus demonstrating their consent or non-consent.[131]

80.     Second, the language in the Plan and the solicitation materials is sufficiently specific so as to put the Releasing Parties on notice of the Third-Party Release.  The Third-Party Release describes in detail the nature and type of Claims being released, including Claims with respect to:

> **(1) the management, ownership, or operation of the Debtors, the Non-Debtor Affiliates, or the Consenting ETI Parties, (2) the purchase, sale, or rescission of any Security of the Debtors, the Non-Debtor Affiliates, or the Consenting ETI Parties, (3) the subject matter of, or the transactions, events, circumstances, acts or omissions giving rise to, any Claim or Interest that is**

---

[130]   Plan, Art. A.200.

[131]   *See* Vote Certification.

46

**treated in the Restructuring Transactions, including the negotiation, formulation, or preparation of the Restructuring Transactions, (4) the business or contractual arrangements between any Debtor, Non-Debtor Affiliate, or Consenting ETI Party and any other Entity (including Consenting Stakeholders), (5) the Debtors', Non-Debtor Affiliates', and Consenting ETI Parties' in- or out-of-court restructuring efforts, (6) intercompany transactions, (7) the formulation, preparation, dissemination, negotiation, Filing, or consummation of this Plan, the XBP Transaction Documents, the Disclosure Statement, the Plan Support Agreement, the Definitive Documents, the Prepetition Term Loan Documents, the April 2026 Notes Documents, the July 2026 Notes Documents, the DIP Documents, the Exit Facilities Documents, the Prepetition Securitization Programs Documents, the Postpetition Securitization Programs Documents, the Exit Securitization Programs Documents (and any financing permitted thereunder), the New Organizational Documents, the Chapter 11 Cases, the BTC Transaction, the Committee Settlement, the Sub-Group DIP Lenders Settlement, or any Restructuring Transaction, (8) any contract, instrument, release, or other agreement or document created or entered into in connection with this Plan, the XBP Transaction Documents, the Disclosure Statement, the Plan Support Agreement, the Definitive Documents, the Prepetition Term Loan Documents, the April 2026 Notes Documents, the July 2026 Notes Documents, the DIP Documents, the Exit Facilities Documents, the Prepetition Securitization Programs Documents, the Postpetition Securitization Programs Documents, the Exit Securitization Programs Documents (and any financing permitted thereunder), the Chapter 11 Cases, the pursuit of Confirmation of this Plan, the administration and implementation of this Plan, the BTC Transaction, the Committee Settlement, the Sub-Group DIP Lenders Settlement, or the Restructuring Transactions, including the issuance or distribution of Securities pursuant to this Plan and the XBP Transaction Documents, (9) the distribution, including any disbursements made by a Distribution Agent, of property under this Plan, the XBP Transaction Documents, or any other related agreement, or (10) any other act or omission, transaction, agreement, event, or other occurrence relating to any of the foregoing and taking place on or before the Effective Date [132]**

Each of the Ballots and the Release Opt-Out Form contained the same clear disclosure, as Appendix A thereto, providing the nature and types of Claims being released, thus providing sufficient specificity to the Releasing Parties of the nature and types of Claims being released. The clear language of the Plan and the language sent to the Releasing Parties in the Ballots and Release

---

[132] Plan, Article X.C.

47

Opt-Out Form transparently placed the Releasing Parties on notice of the types of Claims being released.  And notably, this language is consistent with other third-party releases that have been approved by this Court.

81.     Third, the Third-Party Release is integral to the Plan and a condition to the global settlements embodied therein.  As described above and in the Spitzer Declaration, the provisions of the Plan and Plan Support Agreement, including the Third-Party Release, were integral to the global settlements embodied in the Plan, and the parties to the Plan Support Agreement may be unwilling to support the Plan without the Third-Party Release.[133]  Indeed, the plan term sheet attached to the Plan Support Agreement required that the parties would incorporate release provisions into the Plan.[134]

82.     Fourth, the Third-Party Release is to be provided in exchange for significant consideration.  All parties in interest benefit from the Restructuring Transactions contemplated by the Plan Support Agreement and the Plan—including the distributions under the Plan and the reduction of debt—which will allow the Debtors to emerge as reorganized entities better positioned for long-term growth to the benefit of the Debtors' employees, vendors, and commercial counterparties.  That accomplishment is a direct result of the contributions of and, in some cases, material concessions made by, the Released Parties.  Such contributions include, among other things, (a) compromising Claims and accepting impaired recoveries, (b) participating in raising new money debt (and providing backstop commitments with respect to those investments), (c) permitting the use of encumbered assets and cash collateral during the Chapter 11 Cases, (d) negotiating and supporting the Plan, and (e) in the case of the Debtors' directors, officers, and

---

[133]   Spitzer Declaration, ¶ 48.

[134]   Disclosure Statement, Ex. B.

48

employees, their immense efforts on behalf of the Debtors both prior to and throughout the Chapter 11 Cases. [135]   Furthermore, Holders of Claims and Interests who do not opt out of the Third-Party Release will be considered Released Parties, receiving a release from Releasing Parties under the Plan.

83.      The Consenting Stakeholders engaged with the Debtors in extensive good faith negotiations and spent many months working with the Debtors to develop and implement a value-maximizing restructuring, culminating with the upcoming hearing on confirmation of the Plan.[136] Furthermore, the Plan Support Agreement provided the Debtors with the requisite commitments for funding of their final draw of the DIP Facility.[137]   In short, the contributions and efforts of the Released Parties in formulating the Plan have allowed the Debtors to achieve a value-maximizing outcome and strongly support approval of the Third-Party Release.

84.      Finally, as noted above, "[h]undreds of chapter 11 cases have been confirmed in this District" with third-party releases using the procedures employed here.[138]   Specifically, the Plan provides (i) Holders of Claims in the Voting Classes with the opportunity to opt-out of the Third-Party Release, regardless of whether they voted to accept or reject the Plan, by indicating their election to opt-out on their Ballot, and (ii) Holders of Claims and Interests in Non-Voting Classes with the opportunity to opt-out of the Third-Party Release by indicating their election to opt-out on the Release Opt-Out Form.   Thus, the Third-Party Release is a permissible, consensual release because the Holders of Claims and Interests who elect not to opt-out of the Third-Party Release have manifested their consent through their *choice* not to exercise their right to opt-out of

---

[135]   Spitzer Declaration, ¶ 32.

[136]   *Id.*

[137]   *Id.*

[138]   *In re Robertshaw US Holding Corp.*, 662 B.R. at 323.

49

such releases through any of the various methods clearly set forth in their Ballots, the Release Opt-Out Form, and the Plan (and it bears emphasis that doing so was as easy as checking a box on a form, or even simply sending an email to the Debtors).

> **c.      The Exculpation Provision Complies With the Bankruptcy Code and is Appropriate.**

85.      Article IX.D of the Plan provides that each Exculpated Party—*i.e.*, the Debtors; the Disinterested Director; and the Committee and each member of the Committee—shall be exculpated from any Claims or Causes of Action for any act taken or omitted to be taken between the Petition Date and the Effective Date relating to the Chapter 11 Cases, except for acts or omissions that are found to have been the product of willful misconduct, actual fraud (but not, for the avoidance of doubt, fraudulent transfers), or gross negligence (the "***Exculpation Provision***"). Unlike the Third-Party Release, the Exculpation Provision does not affect the liability of Exculpated Parties *per se*, but rather sets a standard of care of willful misconduct, actual fraud, or gross negligence in hypothetical future litigation against an Exculpated Party for acts arising out of the Debtors' restructuring.[139]  A bankruptcy court may approve an exculpation provision in a chapter 11 plan because a bankruptcy court cannot confirm a chapter 11 plan unless it finds that the plan has been proposed in good faith.[140]  Accordingly, an exculpation provision represents a legal conclusion resulting from certain findings a bankruptcy court must reach in confirming a plan.[141]  Once the court makes its good faith finding, it is appropriate to set the standard of care of the fiduciaries involved in the formulation of that chapter 11 plan.[142]  Exculpation provisions

---

[139]   *See*, *e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000).

[140]   11 U.S.C. § 1129(a)(3).

[141]   28 U.S.C. § 157(b)(2)(L).

[142]   *In re PWS Holding Corp.*, 228 F.3d at 246 (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity" for actions within the scope of their duties).

appropriately prevent future collateral attacks against debtors.  Accordingly, the Exculpation

Provision in the Plan is appropriate because it provides protection to the Exculpated Parties, who

served as fiduciaries during the restructuring process.

86.     The Exculpation Provision is an integral component of the global settlement

embodied in the Plan and is the product of good faith, arm's-length negotiations.[143]   The

Exculpation Provision is narrowly tailored to a limited group of parties that served as fiduciaries

in the Chapter 11 Cases, excludes acts of willful misconduct, actual fraud, and gross negligence,

and relates only to acts or omissions in connection with or arising out of the administration of the

Chapter 11 Cases.[144]  Accordingly, the Debtors respectfully submit that the Exculpation Provision

should be approved.

> ### d.     The Injunction Provision and Gatekeeping Provision Comply With the Bankruptcy Code and is Appropriate.

87.     The injunction provision set forth in Article IX.E of the Plan (the "***Injunction***

***Provision***") implements the Plan's discharge, release, and exculpation provisions, in part, by

permanently enjoining all Persons from commencing or maintaining any action against the Debtors

or the Reorganized Debtors, as applicable, on account of or in connection with or with respect to

any Claims or Interests discharged, released, exculpated, or settled under the Plan.  Thus, the

Injunction Provision is a key provision of the Plan.  Accordingly, to the extent the Court finds that

the Plan's exculpation and release provisions are appropriate, the Injunction Provision should be

approved.[145]

---

[143]   Spitzer Declaration, ¶ 32.

[144]   Spitzer Declaration, ¶ 53; Plan, Art. IX.D.

[145]   *See, e.g.*, *In re Camp Arrowhead*, 451 B.R. at 701-02 ("[T]he Fifth Circuit does allow permanent injunctions *so long as there is consent*.  Without an objection, this court was entitled to rely on . . . silence to infer consent at the confirmation hearing.") (citing *Bank of N.Y. Tr. Co. v. Off. Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*,

88.     In addition, the Plan provides for a "gatekeeping" provision to implement the Plan's exculpation and release provisions.  Specifically, Article IX.E of the Plan provides that, for any Person or Entity to commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of Claims or Causes of Action subject to the Debtor Release, the Third-Party Release, or Exculpation, the Court must (a) first determine, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind and (b) specifically authorize a Person or Entity to bring such Claim or Cause of Action, as applicable, against any of the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties; *provided*, that, the foregoing shall only apply to Claims or Causes of Action brought against a Released Party if the Person or Entity bringing such Claim or Cause of Action is a Releasing Party (the "***Gatekeeping Provision***"). The Gatekeeping Provision is consistent with the one authorized in *In re Highland Capital* and ones contained in recent plans confirmed in this District.[146]  In addition, the Gatekeeping Provision is limited to parties that have performed valuable services in connection with the Debtors' restructuring, including negotiating and supporting the Plan Support Agreement, the Plan, the DIP Facility, and the Exit Facilities, among other aspects of the Restructuring Transactions.[147]  The value-maximizing outcome set forth in the Plan is a direct result of the efforts of the Debtors, the

---

584 F.3d 229, 253 (5th Cir. 2009); *In re Pilgrim's Pride Corp*, No. 08–45664–DML–11, 2010 WL 200000, *5 (Bankr. N.D. Tex. Jan. 14, 2010)).

[146]     *NexPoint Advisors, L.P., et al. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 48 F.4th 419, 437-38 (5th Cir. 2022) ("***Highland I***").  As discussed in more detail below, the U.S. Trustee's reliance on Highland II (defined below) to challenge the scope of the Gatekeeping Provision fails because the Gatekeeping Provisions only applies to parties other than the Debtors and the Exculpated Parties to the extent such parties are deemed to have consensually agreed to be bound by the Third-Party Release.  Highland II only addressed the scope of the Gatekeeping Provision with respect to non-consensual exculpation and injunction provisions.

[147]     Spitzer Declaration, ¶ 55.

Reorganized Debtors, and the Released Parties.  Accordingly, the Gatekeeping Provision is appropriate and should be approved.

### B. The Debtors Have Complied With the Applicable Provisions of the Bankruptcy Code – 11 U.S.C. § 1129(a)(2).

89.     Section 1129(a)(2) of the Bankruptcy Code requires that the proponent of a plan comply "with the applicable provisions of this title."[148]  Whereas Section 1129(a)(1) of the Bankruptcy Code focuses on the form and content of a plan itself, Section 1129(a)(2) is concerned with the applicable activities of a plan proponent under the Bankruptcy Code.[149]  In determining whether a plan proponent has complied with this section, courts focus on whether the proponent has adhered to the disclosure and solicitation requirements of Sections 1125 and 1126 of the Bankruptcy Code.[150]

90.     As set forth above and as evidenced by the Vote Certification and the Solicitation Affidavit, the Debtors have complied with all solicitation and disclosure requirements set forth in the Bankruptcy Code, the Bankruptcy Rules, and the Solicitation Procedures Order governing notice, disclosure, and solicitation in connection with the Plan.  In addition, the Debtors and their professionals acted in good faith in all respects in connection with the solicitation of votes on the Plan and the tabulation of such votes.[151]  Accordingly, the requirements of Section 1129(a)(2) of the Bankruptcy Code have been satisfied.[152]

---

[148]   11 U.S.C. § 1129(a)(2).

[149]   7 COLLIER ON BANKRUPTCY ¶ 1129.02[2] (Richard Levin & Henry J. Sommer eds., 16th ed.).

[150]   The legislative history to Section 1129(a)(2) reflects that this provision is intended to encompass the disclosure and solicitation requirements under Sections 1125 and 1126.  H.R. REP. NO. 95-595, at 412 (1977); S. REP. NO. 95-989, at 126 (1978) ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure.").

[151]   Spitzer Declaration, ¶ 58.

[152]   *In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 769 (Bankr. S.D.N.Y. 1992) (holding Section 1129(a)(2) satisfied where debtors complied with all provisions of Bankruptcy Code and Bankruptcy Rules governing notice, disclosure and solicitation relating to Plan).

### C.   The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law – 11 U.S.C. § 1129(a)(3).

91.   Section 1129(a)(3) of the Bankruptcy Code provides that a court shall confirm a plan of reorganization only if the plan has been "proposed in good faith and not by any means forbidden by law."[153]   Section 1129(a)(3) does not define good faith, but it is generally held that a plan is proposed in good faith if there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.[154]   "The requirement of good faith must be viewed in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give the debtors a reasonable opportunity to make a fresh start."[155]   The plan proponent must also show that the plan has not been proposed by any means forbidden by law and that the plan has a reasonable likelihood of success.[156]

92.   The objectives and purposes of the Bankruptcy Code, and chapter 11 reorganization in particular, have been described by the United States Supreme Court as follows: "to revive the debtors' businesses and thereby preserve jobs and protect investors" and to "maximiz[e] the value

---

[153]   11 U.S.C. § 1129(a)(3).

[154]   *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 802 (5th Cir. 1997).

[155]   *In re Cajun Elec. Power Coop.*, 150 F.3d at 519 (quoting *In re T-H New Orleans*, 116 F.3d at 802); *see also Brite v. Sun Country Dev. (In re Sun Country Dev., Inc.)*, 764 F.2d 406, 408 (5th Cir. 1985); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 107 (Bankr. D. Del. 1999) ("The good faith standard requires that the plan be 'proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code'" (citations omitted)).

[156]   *In re T-H New Orleans*, 116 F.3d at 802 (finding that a court may only confirm a plan for reorganization if the plan has been proposed in good faith and not by any means forbidden by law and that where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of Section 1129(a)(3) is satisfied); *see also In re Food City, Inc.*, 110 B.R. 808, 810 (Bankr. W.D. Tex. 1990) (explaining that the term "law" as used in this section, includes state law, and applies not to the substantive provision of a plan itself but rather to the means employed in proposing a plan.).

of the bankruptcy estate;"[157] "to permit the successful rehabilitation of debtors;"[158] and "to provide jobs, to satisfy creditors' claims, and to produce a return for [debtors'] owners."[159] These opinions recognize the primary legislative goal of rehabilitating viable businesses.[160]

93.     The Plan accomplishes this goal in the Chapter 11 Cases by providing the means by which the Reorganized Debtors may continue to operate as viable entities.  The Debtors filed the Chapter 11 Cases to preserve the going concern value of their businesses and to maximize the value of their Estates.[161]  The Plan is the culmination of the Debtors' efforts and the product of extensive and arms' length negotiations between and among the Debtors, the Consenting Stakeholders, the Committee, and the Sub-Group DIP Lenders, and it provides a mechanism for preserving the going-concern value of the Debtors through emergence from chapter 11.   In addition, the Plan provides for the continued employment of the Debtors' employees.

94.     As will be further demonstrated at the Combined Hearing, the Debtors have satisfied the good faith requirement of Section 1129(a)(3) of the Bankruptcy Code.  The Debtors proposed the Plan with the legitimate and honest purpose of reorganizing a company burdened by an unsustainable debt load.  The terms of the Plan were negotiated in good faith with the Consenting Stakeholders, the Committee, and the Sub-Group DIP Lenders, and their respective advisors, and achieve an outcome that is fundamentally fair to all stakeholders.[162]  Indeed, the broad-based support behind the Plan speaks to the good faith of the parties involved and the fairness of the Plan.

---

[157]   *Toibb v. Radloff*, 501 U.S. 157, 163 (1991).

[158]   *In re Bildisco*, 465 U.S. at 527.

[159]   *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203 (1983).

[160]   *In re Bildisco*, 465 U.S. at 528.

[161]   First Day Declaration, ¶ 14.

[162]   Spitzer Declaration, ¶ 61.

**D.     The Plan Provides That Payments Made by the Debtors for Services or Costs and Expenses Are Subject to Approval – 11 U.S.C. § 1129(a)(4).**

95.     Section 1129(a)(4) of the Bankruptcy Code provides that a court shall confirm a plan only if "[a]ny payment made or to be made by the proponent, [or] by the debtor, . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."[163]   In other words, the debtor must disclose to the court all professional fees and expenses, and such professional fees and expenses must be subject to court approval.[164]

96.     In accordance with Section 1129(a)(4) of the Bankruptcy Code, no payment for services or costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incidental to the Chapter 11 Cases, including Claims for professional fees, has been or will be made by any Debtor other than payments that have been authorized by order of the Bankruptcy Court.   Article II.A of the Plan provides for the payment of various Administrative Claims, including professional Fee Claims, which are subject to Court approval and the standards of the Bankruptcy Code.   Accordingly, the provisions in the Plan comply with Section 1129(a)(4) of the Bankruptcy Code.

**E.     The Debtors Have Disclosed All Necessary Information Regarding the Reorganized Debtors' Directors and Officers and Insiders – 11 U.S.C. § 1129(a)(5).**

97.     Section 1129(a)(5)(A)(i) of the Bankruptcy Code requires that the proponent of a plan disclose the identity and affiliations of the proposed officers and directors of the reorganized

---

[163]   11 U.S.C. § 1129(a)(4).

[164]   *In re Cajun Elec. Power Coop.*, 150 F.3d at 514-15 (concluding that Section 1129(a)(4) is designed to assure payments for professional services are subject to the bankruptcy court's approval and determination of reasonableness); *see also In re McCommas LFG Processing Partners, LP*, 2007 Bankr. LEXIS 4053, at *45 (Bankr. N.D. Tex. Nov. 29, 2007).

debtor.[165]  Section 1129(a)(5)(B) of the Bankruptcy Code requires a plan proponent to disclose the identity of an "insider" (as defined by Section 101(31) of the Bankruptcy Code) to be employed or retained by the reorganized debtor and the nature of any compensation for such insider.[166]  In addition, the Bankruptcy Code provides that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[167]  Section 1129(a)(5)(A)(ii) directs the Court to ensure that the post-confirmation governance of the Reorganized Debtors is in "good hands," which courts have interpreted to mean: (a) that management has experience in the reorganized debtor's business and industry,[168] (b) that management has experience in financial and management matters,[169] (c) that the debtor and creditors believe control of the entity by the proposed individuals will be beneficial,[170] and (d) that the post-confirmation governance does not "perpetuate[] incompetence, lack of discretion, inexperience, or affiliations with groups inimical to the best interests of the debtor."[171]  The "public policy requirement would enable [the court] to disapprove plans in which demonstrated incompetence or malevolence is a hallmark of the proposed management."[172]

---

[165]  11 U.S.C. § 1129(a)(5)(A)(i).

[166]  11 U.S.C. § 1129(a)(5)(B).

[167]  11 U.S.C. § 1129(a)(5)(A)(ii).

[168]  *In re Rusty Jones, Inc.*, 110 B.R. 362, 372, 375 (Bankr. N.D. Ill. 1990) (stating that Section 1129(a)(5) was not satisfied where management had no experience in the debtor's line of business); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149-50 (Bankr. S.D.N.Y. 1984) (continuation of debtors' president and founder, who had many years of experience in the debtors' businesses, satisfied Section 1129(a)(5)).

[169]  *In re Stratford Assocs. Ltd. P'ship*, 145 B.R. 689, 696 (Bankr. D. Kan. 1992); *In re Sherwood Square Assoc.*, 107 B.R. 872, 878 (Bankr. D. Md. 1989).

[170]  *In re Landing Assocs.*, 157 B.R. 791, 817 (Bankr. W.D. Tex. 1993) ("In order to lodge a valid objection under § 1129(a)(5), a creditor must show that a debtor's management is unfit or that the continuance of this management post-confirmation will prejudice the creditors") (citation omitted); *see also In re Apex Oil Co.*, 118 B.R. 683, 704-05 (Bankr. E.D. Mo. 1990).

[171]  *In re Beyond.com Corp.*, 289 B.R. 138, 145 (Bankr. N.D. Cal. 2003).

[172]  7 COLLIER ON BANKRUPTCY ¶ 1129.02[5][b].

98.     The Debtors disclosed in the Plan Supplement the identity of the known managers of Reorganized Parent who will serve as of the Effective Date.  In addition, the Debtors disclosed the identity of the officers of Reorganized Parent who will be employed as of the Effective Date in paragraph 53 herein.

99.     The Reorganized Debtors' appointment or continuance of officers, directors, and managers is "consistent with the interests of creditors and equity security holders and with public policy."[173]  The proposed managers and officers of the Reorganized Debtors have significant knowledge and business and industry experience and will give the Reorganized Debtors continuity in running their businesses.  The Debtors submit that the requirements of Section 1129(a)(5)(A)(ii) of the Bankruptcy Code are satisfied.

### F.     The Plan Does Not Contain Any Rate Changes Subject to the Jurisdiction of Any Governmental Regulatory Commission – 11 U.S.C. § 1129(a)(6).

100.     Section 1129(a)(6) of the Bankruptcy Code requires that any regulatory commission having jurisdiction over the rates charged by a reorganized debtor in the operation of its business approve any rate change provided for in the plan.[174]  The Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission and no rate changes under the Plan will require governmental regulatory approval.   As a result, the requirements of Section 1129(a)(6) of the Bankruptcy Code have been satisfied.

### G.     The Plan is in the Best Interests of Creditors – 11 U.S.C. § 1129(a)(7).

101.     Section 1129(a)(7) of the Bankruptcy Code requires that a plan be in the best interests of creditors and equity holders.  This "best interests" test focuses on individual dissenting

---

[173]   11 U.S.C. § 1129(a)(5)(A)(ii).

[174]   11 U.S.C. § 1129(a)(6).

creditors, rather than classes of claims.[175]  The best interests test requires that each holder of a claim or equity interest either accept the plan or receive or retain under the plan property having a present value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code.[176]

102.    As Section 1129(a)(7) of the Bankruptcy Code makes clear, the liquidation analysis applies only to non-accepting holders of impaired claims or interests.[177]  If a class of claims or interests unanimously approves the plan, the best interests test is deemed satisfied for all members of that class.[178]  Under the Plan, Claims in Classes 3, 4, 5 and 6 are Impaired and allowed to vote on the Plan.  The Plan was accepted by Classes 3, 4, 5, and 6.  As such, although the best interests test is applicable only to each rejecting Holder of Claims in Classes 3, 4, 5 and 6, the Liquidation Analysis establishes (as described therein) that the best interests test is satisfied as to each Impaired Class.

103.    Based on the liquidation analysis performed by AP Services, LLC ("***APS***"), an affiliate of AlixPartners LLP, and the financial advisor to the Debtors, and annexed to the Disclosure Statement as **<u>Exhibit D</u>** (the "***Liquidation Analysis***"), including the methodology used and estimations and assumptions made therein, it is clear that the best interests test is satisfied as to Classes 3, 4, 5, and 6.  A chapter 7 liquidation of the Debtors' Estates would result in a substantial loss of value otherwise available to Holders of Claims in Classes 3, 4, 5, and 6 when compared to the proposed distributions under the Plan.[179]  In fact, a liquidation under chapter 7 as

---

[175] *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999).

[176] 11 U.S.C. § 1129(a)(7).

[177] 11 U.S.C. § 1129(a)(7).

[178] *In re Drexel Burnham Lambert*, 138 B.R. at 761; *see also In re Star Ambulance Serv., LLC*, 540 B.R. at 264.

[179] Disclosure Statement, Ex. D; Spitzer Declaration, ¶ 70.

set forth in the Liquidation Analysis would materially and adversely affect the ultimate proceeds available for distribution to all Holders of Allowed Claims and Interests in the Chapter 11 Cases. The Plan provides Holders of Claims in Classes 3, 4, 5 and 6 with a recovery greater than what would be available in a liquidation under chapter 7 and, thus, the Plan satisfies the best interests test.

**H.      Acceptance of Impaired Voting Class –11 U.S.C. § 1129(a)(8).**

104.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests either accept a plan or not be impaired by a plan.[180]  A class of claims or interests that is not impaired under a plan is "conclusively presumed" to have accepted the plan and need not be further examined under Section 1129(a)(8) of the Bankruptcy Code.[181]  A class of claims accepts a plan if the holders of at least two-thirds in dollar amount and more than one-half in the number of claims in the class vote to accept the plan, counting only those claims whose holders actually vote to accept or reject the plan.[182]  As further discussed below, if any class of claims or interests rejects a plan, such plan must satisfy the "cramdown" requirements of Section 1129(b) of the Bankruptcy Code with respect to such claims or interests.

105.    As set forth in Article III of the Plan, Classes 1 and 2 are Unimpaired under the Plan and are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code.  The Holders of Claims in the Voting Classes entitled to vote to accept or reject the Plan—Class 3 (April 2026 Notes Claims), Class 4 (Convenience Class), Class 5 (July 2026 Notes Claims) and Class 6 (General Unsecured Claims)—have voted overwhelmingly to accept

---

[180]   11 U.S.C. § 1129(a)(8).

[181]   11 U.S.C. § 1126(f).

[182]   11 U.S.C. § 1126(c).

the Plan pursuant to Section 1126(c) of the Bankruptcy Code.[183]   Meanwhile, Classes 7, 10 and 11 are Impaired and deemed to reject the Plan, and Classes 8 and 9 are either Unimpaired and presumed to accept the Plan or Impaired and deemed to reject the Plan.   Thus, the Plan does not satisfy Section 1129(a)(8) of the Bankruptcy Code with respect to Classes 7, 10 and 11, nor with respect to Classes 8 and 9 to the extent they are Impaired.   Notwithstanding, the Plan is confirmable because, as discussed below, the Plan satisfies Section 1129(b) of the Bankruptcy Code with respect to such Classes.

**I.      The Plan Provides for Payment in Full of All Allowed Priority Claims – 11 U.S.C. § 1129(a)(9).**

106.      The Plan satisfies the requirements of Section 1129(a)(9) of the Bankruptcy Code, which requires that persons holding priority claims under the Bankruptcy Code receive specified cash payments.[184]  The treatment of Administrative Claims (other than DIP Claims) (Article II.A), DIP Claims (Article II.B), Postpetition Securitization Programs Claims (Article II.D), Priority Tax Claims (Article II.E), Other Priority Claims (Article II.F), and Statutory Fees (Article II.G) under the Plan is, in each case, consistent with Section 1129(a)(9) of the Bankruptcy Code.

---

[183]  *See* Vote Certification.

[184]  11 U.S.C. § 1129(a)(9).  Under Section 1129(a)(9), unless otherwise agreed, a plan must provide that:

the holder of a claim entitled to priority under Section 507(a)(2) or 507(a)(3) will receive cash for the allowed amount of the claims on the effective date of the plan;

the holder of a claim entitled to priority under Section 507(a)(1), (4), (5), (6), or (7) will receive either deferred cash payments for the allowed amount or cash for the allowed amount for the claim on the effective date of the plan;

the holder of a tax claim entitled to priority under Section 507(a)(8) will receive regular installment payments in cash (i) of the total value, as of the effective date of the plan, equal to the allowed amount of such claim; (ii) over a period ending not later than 5 years after the date of the order of relief under Section 301, 302, or 303; and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under Section 1122(b)); and

the holder of a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under Section 507(a)(8), but for the secured status of that claim, will receive cash payments on account of that claim in the same manner and over the same period, as prescribed in subparagraph (C).

**J.      At Least One Impaired Class Has Accepted the Plan – 11 U.S.C. § 1129(a)(10).**

107.    In general, Section 1129(a)(10) requires that, to the extent there is a class of impaired claims under a plan that at least one impaired class of claims must accept the plan, excluding the votes of any insiders.[185]  As shown in the Vote Certification, Classes 3, 4, 5, and 6 voted to accept the Plan.[186]  As such, at least one impaired Class of Claims has voted in sufficient number and amount to accept the Plan, without regard to the votes of insiders.[187]  Accordingly, the Plan satisfies Section 1129(a)(10) of the Bankruptcy Code.

**K.      The Plan is Feasible – 11 U.S.C. § 1129(a)(11).**

108.    Pursuant to Section 1129(a)(11) of the Bankruptcy Code, a plan of reorganization may be confirmed only if "[c]onfirmation of the plan is not likely to be followed by liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."[188]  As described below, the Plan is feasible under Section 1129(a)(11) of the Bankruptcy Code.

109.    To establish that a plan is feasible, "the [bankruptcy] court need not require a guarantee of success . . . [o]nly a reasonable assurance of commercial viability is required."[189]  Indeed, "[a]ll the bankruptcy court must find is that the plan offer[s] 'a reasonable probability of success.'"[190]  While the debtor bears the burden of proving plan feasibility, the applicable standard is by a preponderance of the evidence, which means presenting proof that a given fact is "more

---

[185]   11 U.S.C. § 1129(a)(10).

[186]   *See* Vote Certification.

[187]   *See* Vote Certification.

[188]   11 U.S.C. § 1129(a)(11).

[189]   *In re Briscoe Enters.*, 994 F.2d at 1165-66 (quoting *In re Lakeside Glob. II*, 116 B.R. at 507).

[190]   *In re T-H New Orleans*, 116 F.3d at 801 (quoting *In re Landing Assocs.*, 157 B.R. at 820).

likely than not."[191]  The courts have fashioned a series of factors that may be considered in the determination of whether a debtor's plan is feasible.  These factors, while varying from case to case, traditionally include: (a) the adequacy of the debtor's capital structure, (b) the earning power of its business, (c) economic conditions, (d) the abilities of the debtor's management, (e) the probability of the continuation of the same management, and (f) other related matters affecting successful performance under the provisions of the plan.[192]  As demonstrated below, consideration of these factors supports a finding that the Plan is feasible.

110.   Here, the Spitzer Declaration and the Financial Projections attached to the Disclosure Statement as **Exhibit C** demonstrate that the Plan is feasible.  These Financial Projections demonstrate that the Debtors will have sufficient earnings to meet their obligations under the Plan.[193]  Although the Debtors' businesses operate in a competitive industry and market, and although it is impossible to predict with certainty the precise future profitability of the Debtors' businesses or industries and markets in which the Debtors operate, confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors, the Reorganized Debtors, or any successors to the Reorganized Debtors under the Plan.[194]  The proposed Plan, negotiated in good faith between the Debtors and their major creditor constituencies, has more than a reasonable likelihood of success because the transactions

---

[191]   *In re Briscoe Enters.*, 994 F.2d at 1164; *see also In re T-H New Orleans*, 116 F.3d at 801.  Further, a number of courts have held that this standard constitutes a "relatively low threshold of proof."  *In re Mayer Pollock Steel Corp.*, 174 B.R. 414, 423 (Bankr. E.D. Pa. 1994) (stating that the debtors "have established that they meet the requisite low threshold of support for the Plan as a viable undertaking.").

[192]   *See, e.g.*, *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 226-27 (Bankr. D.N.J. 2000) (citing *In re Temple Zion*, 125 B.R. 910, 915 (Bankr. E.D. Pa. 1991)); *In re Toy & Sports Warehouse*, 37 B.R. at 151 (citing *In re Landmark at Plaza Park, Ltd.*, 7 B.R. 653, 659 (Bankr. D.N.J. 1980)); *see also In re T-H New Orleans*, 116 F.3d at 801 (discussing the factors that the bankruptcy court examined in its decision that the debtor's plan was feasible).

[193]   Disclosure Statement, Ex. C; *see also* Spitzer Declaration, ¶ 80.

[194]   Spitzer Declaration, ¶ 81.

contemplated under the Plan will enable the Debtors to continue their current operations while generating positive free cash flow and will eliminate meaningful amounts of prepetition debt.[195]

111.    In formulating the Plan, the Debtors and their financial advisors sought to ensure that the Plan would provide sufficient free cash flow to allow the Debtors to continue to operate their businesses successfully after emergence and to satisfy all of their obligations under the Plan. By substantially reducing the Debtors' prepetition debt and negotiating the Exit Facilities, the Reorganized Debtors will be better positioned to service ongoing debt obligations and generate cash flow to reinvest in their businesses.  Indeed, the Plan ensures that the Debtors' capital structure is aligned with their businesses and long-term growth strategy.  Accordingly, the Plan provides for a workable reorganization, with more than a reasonable likelihood of success, and, therefore, satisfies Section 1129(a)(11) of the Bankruptcy Code.

### L.    All Statutory Fees Have Been or Will Be Paid – 11 U.S.C. § 1129(a)(12).

112.    Section 1129(a)(12) of the Bankruptcy Code provides that a court may confirm a plan of reorganization only if "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan."[196]  Article II provides for the payment by each of the Debtors of all fees payable pursuant to Section 1930(a) of the Judicial Code for each quarter (including any fraction thereof) until the earliest to occur of (a) the final decree closing such Debtors' Chapter 11 Case, (b) an order dismissing such Debtor's Chapter 11 Case or (c) an order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code. Thus, the Plan meets the requirements of Section 1129(a)(12) of the Bankruptcy Code.

---

[195]   *Id.* ¶ 80.

[196]   11 U.S.C. § 1129(a)(12).

**M.     The Debtors Do Not Have Any Retiree Benefit Obligations – 11 U.S.C. § 1129(a)(13).**

113.     Section 1129(a)(13) of the Bankruptcy Code requires that a plan of reorganization provide for the continued payment of certain retiree benefits "for the duration of the period that the debtor has obligated itself to provide such benefits."[197]  The Debtors do not have obligations to pay retiree benefits and, therefore, Section 1129(a)(13) of the Bankruptcy Code, to the extent applicable to the Debtors, is satisfied.

**N.     Sections 1129(a)(14)-(a)(16) of the Bankruptcy Code Are Inapplicable.**

114.     Based on the facts of the Chapter 11 Cases, Sections 1129(a)(14) through (16) of the Bankruptcy Code are not applicable to the Chapter 11 Cases.

**O.     Section 1129(b):  The Plan Satisfies the "Cramdown" Requirements**

115.     Section 1129(b) of the Bankruptcy Code provides a mechanism for confirmation of a plan in circumstances where the plan is not accepted by all impaired classes of claims and Interests.  This mechanism is known colloquially as "cram down."  Section 1129(b) provides in pertinent part:

> [I]f all of the applicable requirements of [Section 1129(a) of the Bankruptcy Code] other than [the requirement contained in Section 1129(a)(8) that a plan must be accepted by all impaired classes] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.[198]

---

[197]   11 U.S.C. § 1129(a)(13).

[198]   11 U.S.C. § 1129(b)(1).

116.     Thus, under Section 1129(b) of the Bankruptcy Code, the Court may "cram down" a plan over rejection by impaired classes of claims or Interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such classes.[199]

117.     Claims in Class 7 (Subordinated Claims) and Interests in Classes 10 (Existing BPA Equity Interests) and 11 (Other Existing Equity Interests) are Impaired under the Plan, and the Holders of such Claims and Interests have been deemed to reject the Plan.  Additionally, Claims and Interests in Classes 8 and 9 may be Impaired, and the Holders of such Claims and Interests may be deemed to reject the Plan.  The Debtors, however, respectfully submit that the Plan may nonetheless be confirmed over the deemed rejection by such Classes pursuant to Section 1129(b) of the Bankruptcy Code, because the Plan does not discriminate unfairly and is fair and equitable with respect to all non-accepting Impaired Classes.  Moreover, all Voting Classes–Classes 3, 4, 5, and 6–voted in favor of the Plan, meaning the unfair discrimination and fair and equitable analysis is inapplicable to such Classes (though the Plan nonetheless would satisfy those requirements as to the Voting Classes if they were applicable).

### 1.     The Plan Does Not Discriminate Unfairly

118.     The Plan does not discriminate unfairly with respect to Impaired Classes that were deemed to have rejected the Plan.  The Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists.[200]  Rather, courts typically examine the facts and circumstances of the particular case to determine whether unfair discrimination exists.[201]  At a

---

[199]   *Id.*

[200]   *In re 203 N. LaSalle St. Ltd. P'ship.*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established"), *rev'd on other grounds sub nom. 203 N. LaSalle St. P'ship*, 526 U.S. 434.

[201]   *In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) (explaining that "whether or not a particular plan does [unfairly] discriminate is to be determined on a case-by-case basis"); *In re Freymiller Trucking, Inc.*, 190 B.R.

minimum, however, the unfair discrimination standard prevents creditors and interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so.[202]  In other words, Section 1129(b)(1) of the Bankruptcy Code does not prohibit discrimination between classes; it prohibits only discrimination that is unfair.[203]  Accordingly, between two classes of claims or two classes of interests, there is no unfair discrimination if (a) the claims or interests in each such class are dissimilar from those in the other class,[204] or (b) taking into account the particular facts and circumstances of the case, there is a reasonable basis for disparate treatment of otherwise similar claims or interests.[205]

119.    Here, the Plan's treatment of the Impaired Classes that have been deemed to reject the Plan is proper because (a) all similarly situated Claims and Interests will receive substantially similar treatment, (b) there is a reasonable basis for those Claims and Interests being classified separately from other Claims and Interests that remain Unimpaired, and (c) the Plan's classification scheme rests on a legally acceptable rationale.

120.    Claims and Interests in deemed rejecting Classes are not similarly situated to the Claims and Interests in any other Classes, given their distinctly different legal character from all other Claims and Interests.  The Plan does not discriminate unfairly against Class 7 (Subordinated Claims), Class 10 (Existing BPA Equity Interests), or Class 11 (Other Existing Equity Interests)

---

913, 916 (Bankr. W.D. Okla. 1996) (finding that determination of unfair discrimination requires court to "consider all aspects of the case and the totality of all the circumstances").

[202]   *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 654-55 (9th Cir. 1997); *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986).

[203]   *In re 11,111, Inc.*, 117 B.R. 471, 478 (Bankr. D. Minn. 1990).

[204]   *See, e.g.*, *Johns-Manville Corp.*, 68 B.R. at 636.

[205]   *See, e.g., In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990); *In re Rivera Echevarria*, 129 B.R. 11, 13 (Bankr. D.P.R. 1991).

because there is no other Class of Claims or Interests similarly situated to the Claims or Interests in Classes 7, 10, or 11, respectively.[206]

121.     Similarly, Claims in Class 8 (Intercompany Claims) and Interests in Class 9 (Intercompany Interests) are entirely unique from Claims or Interests in any other Class and, therefore, are appropriately placed in their own Classes.   The Debtors separately classified (a) Intercompany Claims from other Claims and (b) Intercompany Interests from other Interests to preserve the option to (x) reinstate or (y) set off, settle, distribute, contribute, merge, cancel, or release such Claims and Interests, respectively.   Such treatment allows the Debtors greater flexibility to determine whether it is more efficient to maintain their organizational structure and certain entity relationships when they are implementing the Restructuring Transactions rather than prior thereto.   Significantly, the optionality does not affect any stakeholders' recovery under the Plan and is intended only for administrative convenience and efficiency in the restructuring process.

122.     Further, Class 7 (Subordinated Claims) consists solely of Claims that may be subordinated pursuant to Sections 509(c), 510(b), or 510(c) of the Bankruptcy Code.

123.     Accordingly, because the Plan does not discriminate unfairly with respect to Classes that have been or may be deemed to reject the Plan, the Debtors respectfully submit that the Plan satisfies the requirements of Section 1129(b) of the Bankruptcy Code.

### 2.     The Plan Is Fair and Equitable

124.     Sections 1129(b)(2)(B)(ii) and (b)(2)(C)(ii) of the Bankruptcy Code provide that a plan is fair and equitable with respect to a class of impaired unsecured claims or interests if, under the plan, no holder of any junior claim or interest will receive or retain property under the plan on

---

[206]   Spitzer Declaration, ¶ 85.

account of such junior claim or interest.[207]  Generally, this requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired rejecting class not receive any distribution under a plan on account of its junior claim or interest.[208]  Additionally, in order for a plan to be "fair and equitable," no creditor may be paid more than what it is owed (*i.e.*, no class of creditors may receive more than 100% of its claims).[209]

125.     With respect to the Classes that are deemed to reject the Plan (*i.e.*, Classes 7, 10 and 11, and potentially Classes 8 and 9), no Claim or Interest in a Class junior to such Classes will receive a recovery under the Plan on account of such Claim or Interest.[210]  Accordingly, the Plan is "fair and equitable" and, therefore, consistent with the requirements of Section 1129(b) of the Bankruptcy Code.

### P.     The Plan Is Not an Attempt to Avoid Tax Obligations – 11 U.S.C. § 1129(d).

126.     Section 1129(d) of the Bankruptcy Code provides that a court may not confirm a plan if the principal purpose of the plan is to avoid taxes or the application of Section 5 of the Securities Act.[211]  The Plan meets these requirements because the principal purpose of the Plan is not avoidance of taxes or avoidance of the requirements of Section 5 of the Securities Act, and there has been no filing by any governmental agency asserting such a purpose.

---

[207]  11 U.S.C. § 1129(b)(2)(B)(ii), (C)(ii).

[208]  *203 N. LaSalle P'ship*, 526 U.S. at 459.

[209]  7 COLLIER ON BANKRUPTCY ¶ 1129.03[4][a]; *see also In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) ("There is no dispute that a class of creditors cannot receive more than full consideration for its claims, and that excess value must be allocated to junior classes of debt or equity, as the case may be.").

[210]  Plan, Art. III.; Spitzer Declaration, ¶ 89.

[211]  11 U.S.C. § 1129(d)

III.    THE U.S. TRUSTEE OBJECTION SHOULD BE OVERRULED

A.    Purdue Does Not Support the U.S. Trustee's Objection

127.    The U.S. Trustee contends that the Third-Party Release constitutes an impermissible non-consensual release based on the U.S. Trustee's categorial assertion that the opt-out mechanism employed under the Plan, and, by extension, countless other plans confirmed in complex chapter 11 cases in this district, "does not constitute consent to a non-debtor release in a chapter 11 plan."[212]  Instead, the U.S. Trustee argues that the Court must apply state contract law principles to determine whether the Third-Party Release is consensual,[213] and the U.S. Trustee claims that under his preferred state contract law analysis the opt-out mechanism employed by the Plan is "insufficient for this Court to make a finding of consent . . . ."[214]  Not so.  Third-party releases are permitted under Fifth Circuit precedent when the release is consensual.[215]  Indeed, bankruptcy courts within the Fifth Circuit "commonly exercise jurisdiction to approve [consensual third-party] releases…"[216]  Here, as discussed in detail above, the Third-Party Release and the opt-out process is fully consensual.[217]  Accordingly, the Third-Party Release is permissible under Fifth Circuit precedent.  The U.S. Trustee's claim that *Purdue* somehow warrants revisiting the long-established practice in this district is foreclosed by the Supreme Court's express statements to the contrary.

---

[212]   U.S. Trustee Objection, ¶ 21.

[213]   *Id.*

[214]   *Id.* ¶ 29.

[215]   *In re CJ Holding Co.*, 597 B.R. at 608-09 ("The Fifth Circuit does not preclude bankruptcy courts from approving a 'consensual non-debtor release.'") (citation omitted).

[216]   *Id.*

[217]   *See* ¶¶ 71–84, *supra.*

128.     In *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024), the Supreme Court held that the Bankruptcy Code does not allow for the inclusion of non-consensual, third-party releases in chapter 11 plans outside the context of Section 524(g) of the Bankruptcy Code. However, as clearly noted in its opinion, the Supreme Court limited its holding to the issue before it:

> As important as the question we decide today are ones we do not. Nothing in what we have said should be construed to call into question consensual third-party releases offered in connection with a bankruptcy reorganization plan; those sorts of releases pose different questions and may rest on different legal grounds than the nonconsensual release at issue here.  Nor do we have occasion today to express a view on what qualifies as a consensual release or pass upon a plan that provides for the full satisfaction of claims against a third-party nondebtor.[218]

129.     As this Court is well-aware, the Fifth Circuit has long-prohibited nonconsensual, third-party releases in chapter 11 plans.  Accordingly, "*Purdue* did not change the law in this Circuit."[219]  Indeed, the U.S. Trustee admits as much.[220]  Despite paying lip service to the reality that *Purdue* did not change the law in the Fifth Circuit, the U.S. Trustee makes the puzzling assertion that *Purdue* somehow mandates revisiting whether "imposing non-debtor releases based on a failure to opt out is permissible."[221]  The Supreme Court expressly stated the opposite: *Purdue*

---

[218]   *Harrington v. Purdue Pharma, L.P.*, 603 U.S. 204, 224-25 (2024).

[219]   *In re Robertshaw US Holding Corp.*, 662 B.R. 300 at 323 (Bankr. S.D. Tex. 2024); *id.*324 ("Hundreds of chapter 11 cases have been confirmed in this District with consensual third-party releases with an opt-out.  And, again, *Purdue* did not change the law in this Circuit."); Conf. Hr'g Tr. 32:3-4, *In re Indep. Contract Drilling, Inc.*, No. 24-90612 (ARP) (Bankr. S.D. Tex. Jan. 9, 2025) [Docket No. 127] ("Case law in the Fifth Circuit allows the use of injunctions in consensual third party releases.").

[220]   U.S. Trustee Objection, ¶ 18 (recognizing it "has long been the conclusion held by the Fifth Circuit" that nonconsensual third-party releases are not authorized by the Bankruptcy Code).

[221]   U.S. Trustee Objection, ¶21.

neither calls into question consensual third-party releases nor offers a view as to what qualifies as a consensual release.  As this Court observed, "[t]hese words must be read literally."[222]

130.    Evidently unphased, the U.S. Trustee invites the Court to expand *Purdue*, in contravention of the Supreme Court's own statements, to upend the existing practice in the Southern District of Texas of providing consent to a third-party release through an opt-out (as opposed to an opt-in).  In truth, the U.S. Trustee Objection has *nothing* to do with what *Purdue* requires.  It is based on the U.S. Trustee's desire to see *Purdue* expanded to compel a result that is inconsistent with longstanding Fifth Circuit practice.  As this Court recognized in *Robertshaw*, the "[U.S.] Trustee wants to use the *Purdue* holding as an opportunity to advance its long-held position that consensual third-party releases in a plan should require an opt-in feature, rather than an opt-out."  *Robertshaw*, .662 B.R at 323.  No such expansion is warranted.  Indeed the Supreme Court expressly stated that its decision neither called into question the validity of consensual releases nor expressed any view on what constitutes a consensual release which, ironically, are precisely the issues the U.S. Trustee seeks to have this Court revisit based on *Purdue*.  As this Court observed in *Robertshaw*, "what constitutes consent, including opt-out features and deemed consent for not opting out, has **long been settled in this District**."[223]  Accordingly, the U.S. Trustee Objection should be overruled.

131.    Further, the U.S. Trustee's arguments have been presented, and unequivocally rejected, numerous times in this District and in others.[224]  For example, in *In re Robertshaw*, this

---

[222]   *In re Robertshaw US Holding Corp.*, 662 B.R. at 323.

[223]   *Id.* (emphasis added).

[224]   *See, e.g.*, Conf. Hr'g Tr. 92:18-19, *In re Cutera, Inc.*, No. 25-90088 (ARP) (Bankr. S.D. Tex. Apr. 16, 2025) [Docket No. 251] ("I think that . . . the release provision was appropriate."); Conf. Hr'g Tr. 43:4-7, *In re The Container Store Group, Inc.*, No. 24-90627 (ARP) (Bankr. S.D. Tex. Jan. 24, 2025) [Docket No. 201] (I think that, based on the facts in this case and the process that was run, that the releases are -- because of the opportunity for all the parties to have opted out, are consensual."); Conf. Hr'g Tr. 31:25-32:13, *In re Independence Contract Drilling, Inc.*, No. 24-90612 (ARP) (Bankr. S.D. Tex. Jan. 9, 2025) [Docket No. 127] ("*Purdue* does not address

Court upheld an opt-out process similar in all material respects to what was used in this case over the U.S. Trustee's objection. The Third-Party Release and opt-out procedures in the Chapter 11 Cases are almost identical to the provisions and procedures approved in *Robertshaw*, *Independence Contract Drilling*, *The Container Store*, and *Cutera*, and the U.S. Trustee does not present any new arguments as to why the result should be any different here. That failure is not surprising given the factual similarities between those cases and the Chapter 11 Cases.

### B. The U.S. Trustee's Reliance on State Contract Law is Without Support

132. The U.S. Trustee's position that state contract law should apply here, instead of federal bankruptcy law, is unsupported. The U.S. Trustee argues that "state law governs" in "determining the validity of most claims" in bankruptcy[225] and thus should apply in determining consent to the third party releases contained in the Plan. This generalized assertion fails to take into account that the bankruptcy court does not determine the validity of any claims or evaluate

---

the use of injunctions in consensual third party releases, as the one before the Court today. Case law in the Fifth Circuit allows the use of injunctions in consensual third party releases… Therefore, for all of these reasons, the Court overrules the objections and will confirm the Plan."); Conf. Hr'g Tr. 20:20-23, *In re Vroom, Inc.*, No. 24-90571 (CML) (Bankr. S.D. Tex. Jan. 8, 2025) [Docket No. 128] ("I'm comfortable that [the third-party release] runs afoul of no law and that these should be approved and that they[]… don't run afoul of *Purdue*."); Conf. Hr'g Tr. 32:18-35:9, *In re Intrum AB*, No. 24-90575 (CML) (Bankr. S.D. Tex. Dec. 31, 2024) [Docket No. 275] (approving third party releases for which consent was confirmed through opt outs); Conf. Hr'g Tr. 66:3-6, *In re Diamond Sports Grp., LLC*, No. 23-90116 (CML) (Bankr. S.D.Tex. Nov. 14, 2024) [Docket No. 2680] ("When I look at everything, I'm going to approve the Plan under the law. I think it complies with every provision under the law. I think the opt-outs worked."); Corrected Findings of Fact, Conclusions of Law, and Order, *In re Wesco Aircraft Holdings, Inc.*, No. 23-90611 (MI) (Bankr. S.D. Tex. June. 6, 2025) [Docket No. 2550]; Memorandum Decision on Plan Confirmation at 28; *In re Robertshaw US Holding Corp.*, No. 24-90052 (CML) (Bankr. S.D. Tex. Aug. 16, 2024) [Docket No. 959] ("[T]he consensual third-party releases in the Plan are appropriate, afforded affected parties constitutional due process, and a meaningful opportunity to opt out. There is nothing improper with an opt-out feature for consensual third-party releases in a chapter 11 plan. . . . And, again, Purdue did not change the law in this Circuit."); Conf. Hr'g Tr. 14:10-13, *In re Invitae Corp.*, No. 24-11362 (MBK) (Bankr. D.N.J. July 23, 2024) [Docket No. 869] (overruling the Office of the U.S. Trustee's objections, predicated on *Purdue*, with respect to plan releases, *the opt out mechanism*, and gatekeeper provisions); *see also In re Spirit Airlines, Inc.*, (Bankr. S.D.N.Y. 2025) (approving consensual third-party release with opt-out mechanism); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 305 (Bankr. D. Del. 2013) (confirming a plan that provided that creditors were deemed to have consented to the plan's third party release provisions where: (a) the creditor voted to reject or accept the plan and failed to "opt-out", (b) the creditor failed to return his/her ballot, or (c) the creditor's claims were unimpaired, and therefore, were not entitled to vote).

225 *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450 (2007); *see* U.S. Trustee Objection, ¶23.

their substance in considering third-party releases.  Nor does this approach—which rests on the idea that the claims themselves were "created and defined by state law" before the "petition in bankruptcy [was] filed,"[226]—apply to the third-party releases here, which will be created and defined exclusively as part of the Plan formed under federal bankruptcy law.[227]

133.    More fundamentally, as the court in *In re GOL Linhas Aéreas Inteligentes S.A.* recently held, "[t]he right which creditors are giving up by consensually releasing claims against third parties . . . is a *personal constitutional* right which is protected by *federal* Constitutional law, and which is therefore subject to waiver."[228]  Accordingly, when bankruptcy courts approve the opt-out structure for third-party releases, they "are not creating substantive rights or doing equity in impermissible ways, as the UST puts it—they are following longstanding constitutional doctrines."[229]  The *GOL* court also noted that if the U.S. Trustee's position were adopted, bankruptcy courts would potentially "need to engage in untold numbers of individualized choice-of-law analyses" to determine which state law to apply.[230]  "This would in no way facilitate the uniform development of bankruptcy law in the United States, and would be extremely difficult, costly, and time-consuming to determine and apply."[231]

134.    Further, the U.S. Trustee argues that third-party releases in plans should be viewed as a collection of "separate [settlement] agreements," each of which is governed by state contract

---

[226]   *Travelers*, 549 U.S. at 451 (citations omitted).

[227]   *See Kellogg v. United States (In re West Tex. Mktg. Corp.)*, 54 F.3d 1194, 1196 (5th Cir. 1995) ("[T]he validity of any interest that may have accrued prior to the filing of the petition is resolved generally by state law.  But, once the petition is filed, federal law controls." (citation omitted)).

[228]   *In re GOL Linhas Aéreas Inteligentes S.A.,* Case No. 24-10118 (MG), 2025 WL 1466055, at *20 (Bankr. S.D.N.Y. May 22, 2025), *appeal docketed,* No. 25-04610 (S.D.N.Y. June 3, 2025).

[229]   *Id.*

[230]   *Id.* at *21

[231]   *Id.* (internal citation omitted).

law.[232]  But treating each third-party release as a "separate bilateral contract entirely unrelated to the Plan" is "divorced from . . . reality[.]"[233]  The Plan's Third-Party Releases are not free-floating settlement agreements, they are an "integral" part of—and an "essential means of implementing"—the Plan under the Bankruptcy Code.[234]  The creditors providing third-party releases here are doing so only by virtue of the Plan, which is a creature of the Chapter 11 Cases that the creditors are involved in.  "[T]he plan . . . serves as the mechanism to have the release take effect."[235]  Determining whether a creditor has provided consent to a particular term contained in the Plan "is a matter of federal bankruptcy law, with an already existing and well-developed body of case law on consent in the context of a collective bankruptcy proceeding."[236]

135.    Lastly, the U.S. Trustee argues that if state contract law doesn't apply, federal contract law should, and the result would be the same as if state contract law applied.  This assertion, regardless of whether it is true or not, is of no consequence.  As explained above, federal bankruptcy law governs the confirmation of chapter 11 plans and the appropriateness of third party releases.  When approving chapter 11 plans and third party releases, bankruptcy courts ensure that the plans and releases comport with the Bankruptcy Code and federal bankruptcy law not federal contract law.

---

[232]   U.S. Trustee Objection, ¶ 24.

[233]   *In re Spirit Airlines, Inc.*, 668 B.R. 689, 718 (Bankr. S.D.N.Y. 2025); *see In re LaVie Care Ctrs., LLC*, No. 24-55507, 2024 WL 4988600, slip op. at *14 (Bankr. N.D. Ga. Dec. 5, 2024) ("[T]he basis for the enforcement of consensual releases has not as far as this Court has been able to determine been described anywhere as a 'contract' for them, or an 'agreement' to them.").

[234]   *Spitzer Declaration* ¶ 46.

[235]   *In re Mallinckrodt PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022) (citation omitted), *abrogated in part on other grounds by Purdue*, 603 U.S. 204.

[236]   *Spirit Airlines*, 668 B.R. at 716.

C.     **The Exculpation Provision, Injunction Provision and Gatekeeping Provision Are Each Consistent with Fifth Circuit Law and Plans Confirmed in this District**

136.    The U.S. Trustee also objects to the Plan's Exculpation Provision, noting that the Bankruptcy Court "may not approve the provision[] at Art. IX.D."[237]   The inclusion of the Disinterested Director as an Exculpated Party is appropriate under the circumstances of the Chapter 11 Cases.  As discussed in Paragraphs 68 through 71 *supra*, the Disinterested Director acted as a fiduciary in the Chapter 11 Cases and contributed significant time and effort to the Debtors by, among other things, overseeing the Investigation.  Moreover, the inclusion of the Disinterested Director within the Exculpated Parties is supported by Fifth Circuit case law. Specifically, in *Highland I*, the Fifth Circuit noted that the exculpation provision as drafted by the *Highland I* debtor was inappropriate and revised the provision by "strik[ing] all exculpated parties from the Plan except [the debtor], the Committee and its members, and the **Independent Directors**."[238]   Accordingly, the Debtors submit that the Disinterested Director is appropriately included in the Plan as an Exculpated Party and such inclusion is in accordance with Fifth Circuit law, and therefore, the Court should overrule the U.S. Trustee's objection to the Exculpation Provision on such basis.

137.    The U.S. Trustee further objects to the Injunction Provision and Gatekeeping Provision set forth at Article IX.E of the Plan and discussed at Paragraphs 88 through 89 *supra*. However, contrary to the U.S. Trustee's assertions,[239] both of these provisions are consistent with applicable law and practice in the Fifth Circuit and this District.  The Injunction Provision is merely the means by which the Third-Party Release and Debtor Release (among others) are enforced.  The

---

[237]   U.S. Trustee Objection ¶ 56.

[238]   *Highland I*, 48 F.4th at 438. (emphasis added).

[239]   U.S. Trustee Objection ¶¶ 61-67.

U.S. Trustee's assertion that, even if the Third-Party Release is allowed, an injunction enforcing it is not is an assertion that borders on nonsensical.[240]  Without an enforcement mechanism, the Plan's release and discharge provisions are essentially a nullity.  This argument from the U.S. Trustee is simply a back door through which it attempts to, once again, attack the Third-Party Release itself.  As this Court has noted, "[c]ase law in the Fifth Circuit allows the use of injunctions in consensual third party releases."[241]  Also, as set forth above in paragraph 88 of this memorandum, the Injunction Provision is a key part of the Plan that is integral to its function.

138.    In addition, the U.S. Trustee's efforts to apply the holding of *Highland II*[242] to the Injunction Provision and the Gatekeeping Provision are unpersuasive.[243]  In *Highland I*, the Fifth Circuit approved the injunction and gatekeeping provisions related to claims that were being properly exculpated under the plan.[244]  Later, in *Highland II*, the Fifth Circuit clarified that the scope of such provisions may be no broader than the underlying claims being exculpated.[245]  Here, the Injunction Provision and Gatekeeping Provision also apply to the Third-Party Release; however, such application is consistent with *Highland I* and *Highland II*.  The claims released by the Third-Party Release are subject to the same injunction that applies to the claims subject to the

---

[240]   U.S. Trustee Objection ¶ 61.

[241]   Conf. Hr'g Tr. 32:3-4, *In re Independence Contract Drilling, Inc*., No. 24-90612 (ARP) (Bankr. S.D. Tex. Jan. 9, 2025) [Docket No. 127]; *see also In re CJ Holding Co.*, 597 B.R. at 608 (collecting cases); *In re Camp Arrowhead, Ltd.*, 451 B.R. 678, 701-02 (Bankr. W.D. Tex. 2011) ("[T]he Fifth Circuit does allow permanent injunctions so long as there is consent.").

[242]   *Highland Capital Mgmt. Fund Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 132 F.4th 353 (5th Cir. 2025) ("***Highland II***")

[243]   Conf. Hr'g Tr. 94:24 – 95:2, *In Cutera, Inc.*, No. 25-90088 (ARP) (Bankr. S.D. Tex. Apr. 16, 2025) ("I don't think *Highland II . . .*addresses whether you can have an injunction and a gatekeeping function in support of a consensual release." (cleaned up).

[244]   *Highland I* 48 F.4th at 439.  ("We otherwise affirm the inclusion of the injunction and the gatekeeper provisions in the Plan.")

[245]   *Highland II*, 123 F.4th at 359.  ("Even before *Purdue Pharma*, this court had held the same: that any provision that ***non-consensually releases*** non-debtors from liability for debts and/or conduct, and any injunction that acts to shield non-debtors from such liability, must be struck from a bankruptcy confirmation plan.") (emphasis added).

Exculpation Provision.  And, critically, the Gatekeeping Provision has been narrowed to "only apply to Claims or Causes of Action brought against a Released Party if such Person or Entity Bringing such Claim or Cause of Action is a Releasing Party."[246]  Each of the Exculpation Provision, Injunction Provision and Gatekeeping Provision are linked and only apply to claims that this Court has the power to enjoin.[247]  As a result, the Injunction Provision and Gatekeeping Provision are each consistent with others contained in recent plans confirmed in this Court and have been further narrowed to confirm with *Highland II*.

139.    Accordingly, *Highland II* is simply not relevant to the facts of the Chapter 11 Cases. In that case, the Fifth Circuit emphasized that their analysis applied to *nonconsensual* releases.  As discussed in detail above, the Third-Party Release under the Plan is consensual, and *Highland II* does not provide a basis to claim that injunction provisions or "gatekeeping" provisions cannot apply to consensual third-party releases.  As the bankruptcy court noted in *The Container Store*, "[w]hile *Highland I* and *II* involve exculpation provisions, which are inherently non-consensual, this case involves a consensual release.  Therefore, the *Highland II* holding that the injunction be narrowed to include the same parties as the exculpation clause, should not have an impact on this case, where the Third-Party Release is consensual."[248]  As noted previously, the Injunction Provision and Gatekeeping Provision are narrowly tailored to apply to claims or causes of action against Exculpated Parties and to claims or causes of action against Released Parties but only to the extent that the person or entity bringing such claim is a Releasing Party.

---

[246]   Plan Art. IX.E.

[247]   *Highland II*, 132 F.4th at 360-61 (stating that the Fifth Circuit linked its "treatment of the Exculpation Provision and the Injunction Provision and its Gatekeeper Clause.")

[248]   Order at 16, *In re The Container Store Group, Inc.*, No. 24-90627, (Bankr. S.D. Tex. Apr. 7, 2025) [Docket No. 280].

140.    The value-maximizing outcome set forth in the Plan is a direct result of the efforts of the Debtors and the Released Parties.  Accordingly, the Exculpation Provision, the Injunction Provision, and the Gatekeeping Provision are appropriate and should be approved, and the U.S. Trustee Objection should be overruled.

## **CONCLUSION**

141.    For all of the reasons set forth herein and in the Spitzer Declaration, the Carr Declaration, and the Vote Certification, and as will be further shown at the Combined Hearing, the Debtors respectfully request that the Court approve the Disclosure Statement on a final basis and confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the proposed Confirmation Order, and granting such other and further relief as is just and proper.

Dated:  June 18, 2025    Respectfully submitted,
   Houston, Texas

*/s/ Timothy A. ("Tad") Davidson II*

**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Ashley L. Harper (Texas Bar No. 24065272)
Philip M. Guffy (Texas Bar No. 24113705)
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone:  (713) 220-4200
Email:  taddavidson@hunton.com
   ashleyharper@hunton.com
   pguffy@hunton.com

- and –


**LATHAM & WATKINS LLP**
Ray C. Schrock (NY Bar No. 4860631)
Alexander W. Welch (NY Bar No. 5624861)
Hugh Murtagh (NY Bar No. 5002498)
Adam S. Ravin (NY Bar No. 4079190)
Jonathan J. Weichselbaum (NY Bar No. 5676143)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email:   ray.schrock@lw.com
   alex.welch@lw.com
   hugh.murtagh@lw.com
   adam.ravin@lw.com
   jon.weichselbaum@lw.com

*Co-Counsel for the Debtors and Debtors in Possession*


## CERTIFICATE OF SERVICE

   I certify that on June 18, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

        */s/ Timothy A. ("Tad") Davidson II*
        Timothy A. ("Tad") Davidson II